OPENING BRIEF

EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SYNGENTA SEEDS, INC.,         )
)
)
                       Plaintiffs,   )    C.A. No.: 04-908-SLR
)
       v.                   )
)
MONSANTO COMPANY and     )    **JURY TRIAL DEMANDED**
MONSANTO TECHNOLOGY LLC,  )
)
                   Defendants.  )

## AMENDED COMPLAINT

Plaintiff Syngenta Seeds, Inc. ("Syngenta"), by and through its undersigned attorneys,

demands a trial by jury and alleges on knowledge as to itself and its own acts and on information

and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.     This case arises from defendants Monsanto Company and Monsanto Technology

LLC's (together "Monsanto") improper and illegal monopolization and attempted

monopolization in the supply chain for biotechnology corn seed used by farmers throughout the

United States. Since the 1990s, Monsanto has maintained and increased its monopoly power in

multiple markets through a series of coercive tactics and exclusive dealing arrangements

designed to keep out all competitors. Monsanto's illegal and improper efforts have increased

dramatically since May 2004, when Syngenta's affiliate publicly announced its acquisition of

key technology and other assets that will facilitate Syngenta's entry into these markets in

competition with Monsanto for next year's growing season. Immediately following that

announcement, Monsanto launched a scorched-earth campaign to cut off Syngenta's access to

the market and destroy key assets that would facilitate Syngenta's entry. This attempt to thwart Syngenta's entry unlawfully maintains and attempts to create monopolies in multiple markets in violation of Section 2 of the Sherman Act.

2.    Monsanto's domination and control of the corn seed supply chain begins with Monsanto's monopolies in the markets for biotechnology "traits." Through the use of biotechnology, it is possible to introduce new genetic characteristics, or traits, into seeds in order to add desirable characteristics to crops. For example, biotechnology seed traits permit farmers to grow corn or soybeans tolerant to a leading non-selective herbicide, glyphosate. This "glyphosate-tolerant" trait allows growers to spray glyphosate herbicide over the entire crop, and kill all weeds, without risking any damage to the corn or soybean crop. Other biotechnology seed traits permit farmers to plant corn that is resistant to certain pervasive insects that are harmful to the crops, such as corn rootworm and the European corn borer.

3.    Monsanto is a monopolist in the markets for every biotechnological corn trait available in the United States market. Monsanto controls 100% of the market for the glyphosate-tolerant corn trait, 100% of the market for the corn rootworm-resistant corn trait, and at least 84% of the market for the European corn borer-resistant trait. Monsanto also controls 100% of the market for the glyphosate-tolerant soybean trait.

4.    Monsanto has maintained its monopoly power through a series of exclusionary and unlawful practices. Monsanto has denied seed companies access to these traits unless the seed companies agree to enter restrictive licenses designed to prevent competition. These licenses impede the seed companies' ability to deal in the competitive traits of any other company, including Syngenta. The licenses impose massive financial penalties on seed companies unless a very high percentage of seeds they sell contain Monsanto traits, effectively

making it impossible for Syngenta and other potential competitors to enter the trait markets in a truly competitive fashion.

5.    Monsanto also has unlawfully maintained and enhanced its monopoly power through its "bundling" agreements. As a result of these agreements, any seed company that sells a meaningful amount of seeds containing a single trait provided by any company other than Monsanto faces significant penalties from Monsanto across all traits licensed by Monsanto. For example, many seed companies grow and sell glyphosate-resistant corn seeds, rootworm-resistant corn seeds, European corn borer-resistant corn seeds and glyphosate-resistant soybean seeds. If a seed company does not sell a minimum percentage of seeds containing Monsanto traits for *each and every* one of those product lines, it will lose discounts or seed service fees for *all* Monsanto traits. Monsanto thus has used its monopoly power in several markets to create a virtually impenetrable barrier to entry for any competitor seeking to enter any one of those trait markets.

6.    In addition to unlawfully maintaining its monopolies in the markets for corn traits, Monsanto has unlawfully attempted to monopolize the market for "foundation" corn seed. In order for a trait – such as the glyphosate-tolerant corn trait – to be included in seeds planted by corn growers, the trait must first be introduced into a foundation seed or "inbred" seed line. Foundation seed lines may contain one or more biotechnology traits as well as other desirable seed characteristics. Two foundation seed lines are then crossed to create "hybrid" seeds, which are the finished seeds planted by growers to produce the corn crop. Because traits cannot be introduced into the hybrid seeds planted by growers unless they are first introduced into inbred or foundation seeds, access to foundation seed is critical for successful production and marketing

of corn traits. Similarly, because of the importance of traits to corn growers and seed companies, access to traits is critical for successful marketing of foundation seed.

7.     Today Monsanto controls 45% of the foundation corn seed produced in the United States and 70% of the foundation corn seed sold or licensed to independent seed companies. Monsanto has attempted to monopolize the foundation corn seed market by, among other things, limiting or denying foundation seed companies' access to traits necessary for the foundation seed companies to compete in the sale of foundation seed.

8.     Although Monsanto has engaged in unlawful conduct over many years, its conduct has increased drastically since May 2004. On May 12, 2004, Syngenta's affiliate announced that it has acquired intellectual property rights to "GA21," a glyphosate-resistant corn trait. Syngenta's affiliate also announced its intent to acquire the corn and soybean seed businesses of Garst Seeds and the Golden Harvest Group. As a result of these acquisitions, Syngenta poses a substantial competitive threat to Monsanto's monopoly positions. Absent Monsanto's unlawful and anticompetitive conduct, Syngenta would be able to provide the market with a substantial alternative source of corn seed containing the glyphosate-tolerant trait and other key traits.

9.     Since learning of Syngenta's imminent entry into the glyphosate-tolerant trait market, Monsanto has launched a wide-ranging attack designed to delay and obstruct Syngenta's entry. Monsanto's new unlawful tactics include:

- filing two baseless patent infringement lawsuits;

- misrepresenting Syngenta's ability to commercialize GA21 to discourage seed companies from dealing with Syngenta;

- misrepresenting its rights and intimidating seed companies to cease all GA21 production and destroy GA21 inbred inventories;

4

- accelerating the withdrawal of GA21 seeds from the market and engaging in other tactics to remove GA21 seeds from distribution channels; and

- pressuring foundation seed companies, seed companies, and brokers to deal exclusively with Monsanto and not do business with Syngenta, particularly with respect to inbreds containing the GA21 trait.

10.     By its conduct, Monsanto seeks to maintain its monopoly in key corn traits. If permitted to enter and compete on a level playing field, Syngenta would be the first alternative source for glyphosate-tolerant corn trait, and the first competitive source for the European corn borer-resistant corn trait stacked with a glyphosate tolerant trait. Syngenta also would develop its foundation corn seed business to challenge Monsanto's market power in that market.

11.     The antitrust laws flatly prohibit Monsanto's anticompetitive conduct and the resulting antitrust injury to plaintiff, seed companies, farmers and consumers. Syngenta brings this action in order to remove the artificial and unlawful barriers erected by Monsanto, permit Syngenta to compete fully and fairly in the trait and foundation seed markets, and to obtain compensation for the injuries caused by Monsanto's illegal acts.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction under 28 U.S.C. § 1337 (commerce and antitrust regulation) and 28 U.S.C. § 1331 (federal question), as this action arises under Section 2 of the Sherman Act (15 U.S.C. § 2) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

13.     This Court has personal jurisdiction under Section 12 of the Clayton Act (15 U.S.C. § 22). Monsanto Company and Monsanto Technology LLC are both inhabitants of and may be found in this district. Both companies are organized and existing under the laws of the State of Delaware.

14.    Venue is proper because Monsanto Company and Monsanto Technology LLC reside within this judicial district as provided in 28 U.S.C. § 1391(b) and (c) and as provided in Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22).

### THE PARTIES

15.    Plaintiff Syngenta Seeds, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 7500 Olson Memorial Highway, Golden Valley, Minnesota 55427.  Syngenta Seeds, Inc. is a producer of commercial seeds, including field crop seeds, vegetable seeds and flower seeds.

16.    Defendant Monsanto Company is a Delaware corporation with its principal place of business at 800 North Lindbergh Boulevard, St. Louis, Missouri 63167.

17.    Defendant Monsanto Technology (an affiliate of Monsanto Company) is a Delaware limited liability company with its principal place of business at 800 North Lindbergh Boulevard, St. Louis, Missouri 63167.

18.    Defendants Monsanto Company and Monsanto Technology (together, "Monsanto") are engaged in interstate commerce and in activities substantially affecting interstate commerce.  Monsanto is a leading supplier of agricultural products, including biotechnology traits and seeds, with sales to customers located throughout the United States. Both defendants are companies organized under Delaware law and both maintain registered agents in Delaware.

### FACTUAL BACKGROUND

### A.    CORN SEEDS AND TRAITS

19.    Corn is the leading cash crop in the United States, with an annual value of over $24 billion.  In 2003, approximately 79 million acres of corn were grown in the United States.

6

20. Like most crops, corn production can be impaired by weeds. To control weeds, growers apply herbicides – chemical compounds that destroy or inhibit the growth of undesirable plants.

21. "Selective herbicides" are tolerated by the crop but kill or suppress one or more undesirable weeds that infest the crop. "Non-selective herbicides" are active on all vegetation and do not distinguish between the commercial crop (such as corn) and other vegetation (such as weeds).

## 1. Biotechnology Crop Traits

22. Biotechnology has made it possible to introduce new genetic characteristics into plant seeds. The genetic make-up (or "genome") of a seed can be altered by transferring a transgenic "event" into the seed genome. An event contains, among other things, a specific gene that expresses a desirable characteristic in the seed.

23. The insertion of a desirable transgenic event into a seed alters the seed's genome, conferring a desirable characteristic, or "trait," on the crops grown from the seed.

24. Since 1996, there have been a number of commercially available biotechnology corn traits for corn seeds. One of the most common of these traits is for glyphosate tolerance. Glyphosate-tolerant corn is impervious to the effect of glyphosate, the leading non-selective herbicide used by growers. As a result of this biotechnology, growers that plant glyphosate-tolerant corn may apply glyphosate over an entire field, killing the weeds while allowing the corn crop to survive.

25. There are two different transgenic events that can be inserted into corn seed to create glyphosate tolerance: NK603 and GA21.

26. Biotechnology is also used to make corn resistant to the European corn borer ("ECB") and the corn rootworm ("CRW"). The ECB-resistant corn trait and the CRW-resistant

7

corn trait are both created by the insertion of the gene for Bacillus thuringensis (Bt) into the corn seed genome.

27.    Crop protection traits, including herbicide tolerance and insect resistance, are useful to growers because they reduce production costs and increase yield. U.S. farmers are increasingly planting genetically modified varieties of seed. It is estimated that 46% of the corn planted in the U.S. in 2004 was transgenic corn (up from 40% in 2003) and that 86% of all commercial soybeans planted were transgenic.

### 2.    The Corn Seed Chain of Distribution

28.    There typically are four levels in the corn seed chain of distribution: foundation seed companies, hybrid seed companies, dealers and retailers, and end-use growers.

29.    Inbred or foundation seed lines are developed by foundation seed companies and hybrid seed companies to exhibit desirable agronomic characteristics such as high yield, resistance to disease, high oil content or other attributes. Developers of inbred or foundation seed lines also can introduce biotechnology traits, such as glyphosate tolerance or ECB resistance, into inbred or foundation seed lines. It may take several years to develop each inbred or foundation seed line.

30.    Foundation seed companies license or sell foundation seed to hybrid seed companies (the "Seed Companies") for the production of finished, hybrid seed. Hybrid seed (or finished seed) is the seed used to grow all commercially grown corn in the United States today. Hybrid seed is created when a Seed Company crosses two unrelated foundation seed lines.

31.    Seed Companies typically sell or license hybrid seed through dealers and retailers or directly to growers (farmers). Growers plant the hybrid seed and grow the crops for cash.

8

## B.    MONSANTO

### 1.  Monsanto's Acquisitions of Trait and Foundation Seed Assets

32.    Since the mid 1990s, Monsanto has engaged in a series of transactions to acquire traits, technology, intellectual property, hybrid seed, and foundation seed assets.

33.    In 1996, Monsanto acquired a minority interest in DeKalb Genetics Corporation ("DeKalb"), which had a leading foundation and hybrid corn seed business.  In addition, DeKalb licensed to Monsanto (i) the intellectual property rights to the GA21 (glyphosate-tolerant) event that DeKalb was developing in collaboration with Rhone-Poulenc and (ii) the intellectual property rights for ECB-resistant corn traits and for an alternative herbicide (glufosinate) resistant corn.

34.    In 1997, Monsanto began marketing an ECB-resistant corn under the YieldGard tradename.

35.    In February 1997, Monsanto acquired Asgrow, another leading soybean and corn seed company.  Following the acquisition, Monsanto terminated an existing collaboration between Asgrow and AgrEvo to commercialize a herbicide-tolerant soybean trait (glufosinate tolerance) competitive with Monsanto's Roundup Ready® soybean trait.

36.    Next, in September 1997, Monsanto acquired Holden's, the leading foundation corn seed supplier.

37.    Finally, in 1998, Monsanto announced that it would acquire the remaining shares of DeKalb.

38.    With its acquisitions of DeKalb, Holden's and Asgrow, Monsanto bought control of over approximately 45% of foundation corn seed production and 70% of the foundation corn seed sold or licensed to independent Seed Companies.

39.    By 1998, Monsanto had introduced a Roundup Ready® (glyphosate-tolerant) corn trait using the GA21 event DeKalb had developed with Rhone-Poulenc.

40.    In 1997 Rhone-Poulenc (now Bayer CropScience), owner of patents covering the GA21 event, sued DeKalb (its licensee) and Monsanto (the sublicensee), alleging that DeKalb had misappropriated Rhone-Poulenc technology by hiding successful field tests of GA21. It charged Monsanto with patent infringement, among other things.

41.    DeKalb was found to have no rights to GA21 in February 2000 in *Rhone-Poulenc Agro, S.A. v. Monsanto Co. and DeKalb Genetics Corp.*, No. 1:97CV1138, 2000 U.S. Dist. LEXIS 21330 (M.D.N.C., Feb. 8, 2000), *aff'd in relevant part*, 272 F.3d 1335 (Fed. Cir. 2001). The Federal Circuit later determined that Monsanto had no defense to Rhone-Poulenc's infringement action and lacked any rights to GA21, *see Rhone-Poulenc Agro, S.A., v. DeKalb Genetics Corp.*, 284 F.3d 1323 (Fed. Cir. 2002), which Monsanto purportedly had sublicensed to Seed Companies.

42.    Realizing that its licensed rights were lost through the Rhone-Poulenc litigation, in 2000, Monsanto required Seed Companies to which it had sublicensed GA21 to switch to NK603 and sign new, NK603 contracts.

43.    In 2003, Monsanto began marketing a CRW corn trait, called YieldGard Rootworm,® and in 2004 a combination product or "stack" of ECB-resistant corn trait and the CRW-resistant corn trait, called YieldGard Plus.® Today, Monsanto also produces a stacked ECB-resistant and glyphosate-tolerant corn trait.

## 2.  Monsanto's Licensing Practices

44.    Monsanto has generated revenues from its traits by licensing them to foundation seed companies, hybrid seed companies and end-use growers. It also has generated revenue by

selling foundation and hybrid seeds containing those traits through its Asgrow, Holden's and DeKalb subsidiaries.

45.    Over the past seven years, Monsanto's revenues from its licenses have been derived from "Grower Fees" paid by farmers and collected by the Seed Company as agent for Monsanto. More recently, Monsanto collects royalties directly from Seed Companies. A typical Roundup Ready® corn seed grower fee ranged up to $18 per bag of seed.

46.    Monsanto's typical license with Seed Companies (the "GA21 License") for its GA21 glyphosate-tolerant corn trait includes the following terms:

- Seed Companies may not sell GA21 corn seed except to corn growers – or through retailers to growers – that are directly licensed by Monsanto;

- Seed Companies may not sell "corn inbreds or parent lines required for the development of" GA21 corn hybrids to any other party;

- Seed Companies may not sell GA21 corn seed to any other Monsanto licensee except with Monsanto's express written consent or through Monsanto's wholly-owned subsidiary Corn States Hybrid Service, Inc.;

- Seed Companies may not sell GA21 corn seed without the express written consent of Monsanto; and

- Seed Companies must withdraw all GA21 corn seeds from the market after five years, i.e., 2005.

47.    In addition, the GA21 License typically provides substantial financial incentives for the Seed Companies to favor Monsanto's trait:

- If Seed Companies require growers that purchase Roundup Ready® seeds to sign Monsanto's grower license, Monsanto will pay the Seed Company 10% of the Grower Fee (the "Seed Services Fee");

- If the Seed Company meets certain sales targets ( i.e., if Roundup Ready® corn seeds exceed a set percentage of the Seed Company's total corn seed sales), it can make 50% more per bag; and

- If Monsanto's Roundup Ready® corn seeds constitute, for example, 85% of the Seed Company's herbicide-tolerant corn seed sales, on or before milestone dates, milestone payments are significantly reduced or waived altogether.

48.    Substantially similar Monsanto agreements, with varied target market shares, control the use by Seed Companies and farmers of (i) Monsanto's NK603 glyphosate-tolerant corn trait, (ii) its ECB-resistant corn trait, (iii) its CRW-resistant corn trait (iv) its glyphosate-tolerant soybean trait, and (v) products containing combinations or "stacks" of the corn traits in (i), (ii) and (iii).

49.    As Monsanto added new traits to its portfolio, it leveraged its more established traits to promote its newer traits by bundling additional financial incentives across all of its products. At least as early as 1998, Monsanto bundled additional payments of fees and additional waivers of milestone payments across its glyphosate-tolerant soybeans, glyphosate-tolerant corn and ECB-resistant corn. At least by 2003, Monsanto had expanded the range of products covered by its bundled incentives to cover CRW-resistant corn as well.

50.    To carry out its bundling plan, Monsanto has entered an "Amended and Restated Licensee Incentive Agreement" (the "Incentive Agreement") with Seed Companies. Under the Incentive Agreement, Seed Companies meeting certain targets are paid an additional 5% to 10% of the fee and receive reduced or waived milestone payments that may be due under the individual trait licenses.

51.    However, to qualify for any of these payments or waivers, the Seed Company must ensure every year that its sales of each trait are at least 70% Monsanto brand products. If the Seed Company does not maintain Monsanto's target in any product, it loses the incentives across the entire line of products and must repay previous waived fees. Thus, for example, a Seed Company may be faced with substantial financial penalties for one Monsanto product (such as glyphosate-tolerant corn) if it fails to sell enough of another Monsanto product (such as ECB-

resistant corn). The Seed Company may also lose the Incentive Agreement and thus lose the upside opportunities on all traits.

52.    On information and belief, Monsanto's trait licenses, including its GA21 License and its Incentive Agreements generally run through 2007 and may not be voluntarily terminated. A majority of independent Seed Companies in the United States has signed Monsanto trait licenses and Incentive Agreements.

### 3.  Monsanto's Strategy and Dominance

53.    In recent years, Monsanto has shifted its business strategy from a focus on Roundup® herbicide to a focus on its traits and seed businesses. Hugh Grant, Chairman, President and Chief Executive Officer of Monsanto, declared, in Monsanto's 2003 Annual Report, that:

> " . . . 2003 has been especially important for Monsanto shareowners because this was the year we saw our business make the transition from a company led by Roundup herbicide to a company based on seeds and traits. This evolution of our business was carefully planned; we've been working toward it for some time."

54.    Monsanto's acquisitions of trait and seed assets have made it the dominant provider of biotechnology traits in the U.S., the leading supplier of foundation seeds, and a leading supplier of hybrid seeds and other crop protection products. Monsanto estimates that its traits accounted for more than 90% of the biotechnology acres planted worldwide in 2003. More than 300 Seed Companies in the U.S. license at least one biotechnology trait from Monsanto.

55.    On information and belief, Monsanto controls the entire commercially practicable trait licensing businesses. Its shares of those businesses are:

| Trait | Share |
|-------|-------|
| Glyphosate-Tolerant Corn | 100% |
| European Corn Borer-Resistant Corn | at least 84% |
| Corn Rootworm-Resistant Corn | 100% |
| Glyphosate-Tolerant Soybeans | 100% |

56.    Monsanto controls approximately 45% of foundation corn seed production via its Holden's, DeKalb and Asgrow acquisitions. Holden's is the leading commercial provider of foundation corn seeds. Monsanto controls approximately 70% of the foundation corn seed sold or licensed to independent seed companies.

57.    Monsanto is active in the hybrid corn seed market through its wholly-owned subsidiaries, DeKalb and Asgrow. It brokers corn seed and licenses foundation seed through its wholly-owned subsidiary, Corn States Hybrid Service LLC.

58.    Monsanto is the leading producer of glyphosate-based herbicides, accounting for at least 70% of all glyphosate sold in the United States.

## C.    SYNGENTA

59.    Syngenta develops and produces a wide range of agricultural products, including biotechnology traits, seeds and other crop protection products (such as herbicides, insecticides and fungicides). Syngenta is also a provider of seed traits in the United States.

60.    Syngenta markets an ECB-resistant corn trait, Bt11, by license to other Seed Companies and through its own NK® brand corn seeds. Its Bt11 trait is marketed under a license from Monsanto that carries a significant royalty and restrictions on sublicensing.

61.    Syngenta also sells glyphosate-tolerant soybean seeds. Its glyphosate-tolerant soybean trait also is licensed from Monsanto with restrictions on the right to sublicense.

62.    To date, Syngenta has been able to gain a modest share only in the ECB-resistant corn trait market.

63.    In crop protection chemicals (herbicides, insecticides and fungicides), Syngenta sells a glyphosate herbicide under the Touchdown® trademark.

64.    On February 5, 2004, Syngenta's affiliate acquired the intellectual property rights to the GA21 glyphosate-tolerant corn trait from Bayer CropScience. Syngenta now has the right to introduce and market its own GA21 product and to license others. As part of the acquisition, Syngenta's affiliate also acquired the GA21 license from Bayer CropScience under which Monsanto and its sublicensees operate to produce GA21 corn seeds through 2004.

65.    On May 12, 2004, Syngenta's affiliate announced its intention to acquire Advanta BV, including Advanta's Garst Seeds subsidiary and its U.S. corn and soybean seed businesses. At the same time, Syngenta's affiliate publicly announced its acquisition of the GA21 rights from Bayer CropScience.

66.    Syngenta announced an agreement to acquire the Golden Harvest group of seed companies on June 25, 2004. Golden Harvest is a producer of hybrid corn and soybean seeds.

67.    The acquisitions of Golden Harvest and Advanta were completed on August 2, 2004, and September 1, 2004, respectively.

68.    The combination of the Advanta, Golden Harvest and GA21 acquisitions will permit Syngenta to expand its corn product offering and provide Seed Companies and growers a full range of biotechnology input traits for corn in competition with Monsanto. Syngenta will commercialize GA21 in NK®, Golden Harvest®, and Garst® brand seeds, and through licenses to

15

other Seed Companies.  It plans to introduce the GA21 corn trait to the market for the 2005

growing season as a complement to its ECB-resistant trait, both in competition with Monsanto.

Syngenta plans to offer a CRW-resistant trait in 2007.

69.     Syngenta also plans to expand its distribution of ECB-resistant corn trait in

foundation and hybrid seeds via the NK,® Golden Harvest®, and Garst® seed brands.

**D.    MONSANTO'S UNLAWFUL CONDUCT AND PRACTICES TO EXCLUDE
SYNGENTA FROM THE TRAITS AND FOUNDATION SEED MARKETS**

70.     As soon as it learned of Syngenta's impending entry, Monsanto launched a wide-

ranging attack to disrupt and delay Syngenta's entry and preserve its own monopolies in

glyphosate-tolerant and ECB-resistant corn traits, and to preclude Syngenta from competing

effectively for sales of foundation seeds.

**1.   Monsanto's Efforts to Prevent Syngenta's Entry and Maintain Its
Glyphosate-Tolerant Corn Trait Monopoly**

71.     Monsanto's attacks to prevent Syngenta from entering with GA21 have included

filing two baseless patent infringement lawsuits, misrepresenting Syngenta's as well as its own

patent position, wrongfully ordering Seed Companies to stop producing GA21 seeds and to

destroy their GA21 inventories, attempting to enforce exclusive dealing contracts with

customers, improperly bundling incentive programs to defeat or delay new entry, and impeding

Syngenta's trait access to the market by hampering its access to foundation seeds.  All of this

conduct is intended to preserve Monsanto's highly profitable dominance of many aspects of the

relevant businesses and to entrench itself against challengers.

**a.     Monsanto's Baseless Patent Infringement Cases**

72.     The same day that Syngenta announced its entry, Monsanto filed a baseless patent

infringement lawsuit against Syngenta.  *See Monsanto Company et al. v. Syngenta Seeds, Inc. et

al.*, C.A. No. 04-305 (D. Del. filed May 12, 2004).  The lawsuit claims that Syngenta has

infringed Patent No. 4,940,835 (the "Shah patent"), which allegedly covers a technique used in producing glyphosate-tolerant plants.

73.    Monsanto knew or should have known that the Shah patent is invalid or unenforceable against Syngenta with respect to the GA21 event in corn.  In fact, Monsanto or its affiliates have twice told federal courts that the technique described in its patent (and all other available techniques) would not work in corn as of the time the Shah patent was filed. *See Plant Genetic Systems, N.V. v. DeKalb Genetics Corp.*, 175 F. Supp. 2d 246 (D. Conn. 2001), *aff'd* 315 F.3d 1335 (Fed. Cir. 2003); *Monsanto Co. v. Aventis CropScience, N.V.*, No. 4:00CV01915ERW, 2002 U.S. Dist. LEXIS 27417 (E.D. Mo. Dec. 13, 2002); *Monsanto Co. v. Bayer Bioscience NV*, 363 F.3d 1235, 1245 (Fed. Cir. 2004).  For this reason, the patent claims were not "enabled" and were invalid or unenforceable as to corn.

74.    Monsanto's attempt to switch its position and claim that Monsanto's patent was enabled for corn and that Syngenta's introduction of GA21 corn would infringe its patent is baseless in so much as no reasonable litigant could expect to prevail.

75.    On July 27, Monsanto, through its wholly-owned subsidiary, DeKalb Genetics Corporation, filed a second baseless patent infringement lawsuit in an effort to block Syngenta's entry. *See DeKalb Genetics Corporation v. Syngenta Seeds, Inc. et al.*, C.A. No. 04C50323 (N.D. Ill. filed July 27, 2004).  Monsanto's second lawsuit alleges that Syngenta has infringed Patent Nos. 5,538,880 and 6,013,863 (collectively, the "Lundquist patents"), two process patents that claim a particular process for producing transgenic corn. As in the Delaware lawsuit on the Shah patent, Monsanto asserts that Syngenta has infringed the Lundquist patents by making and using glyphosate-tolerant corn.

76.     Syngenta has not infringed the Lundquist patents.  In particular, it has not practiced and is not practicing any process covered by them.  Monsanto and its subsidiary knew or should have known that Syngenta has not practiced the process covered by the Lundquist patents and therefore could not have infringed those patents.  Monsanto's claim of infringement is baseless in so much as no reasonable litigant could expect to prevail.

77.     On July 28, 2004, Monsanto announced, among other things, that the Illinois lawsuit was filed by "Monsanto via DeKalb" to enjoin Syngenta from developing, using and selling herbicide tolerant corn seed such as corn seed based on GA21.

78.     Monsanto's intention in filing its two patent infringement cases was to maintain its monopolies in glyphosate-tolerant and ECB-resistant corn traits and further its attempt to monopolize the market for foundation corn seeds.

### b.    Monsanto has Misrepresented Its Patent Position and Disparaged Syngenta's Ability to Commercialize GA21

79.     In a press release that accompanied Monsanto's Delaware lawsuit and in various communications to the industry, Monsanto has misrepresented its own patent position and disparaged Syngenta's patent position.  Monsanto has told Seed Companies that Syngenta could not "lawfully" commercialize GA21 in the United States and has claimed that Monsanto sought to enjoin any "unauthorized" sales of GA21 corn.

80.     Monsanto also has disparaged its (former) glyphosate corn trait, GA21, in favor of NK603.

81.     Monsanto's misrepresentations, known to be false, are intended to undermine Seed Company and grower confidence in Syngenta's entry and block Syngenta's ability to commercialize GA21.  These misrepresentations are designed to deter Syngenta's customers from licensing Syngenta's products and thereby competing with Monsanto's monopoly.

### c.   *Monsanto's Attempts to Destroy GA21 Inbreds and Accelerate the Withdrawal of GA21 from the Market*

(i)   Monsanto's Original Plan

82.   Because Monsanto lost its rights to GA21 via the DeKalb license as a result of the Rhone-Poulenc litigation, Monsanto decided in 2000 to require Seed Companies to switch to the NK603 glyphosate-tolerant trait.

83.   By letter to the Seed Companies on February 28, 2000, Monsanto announced its original plan to withdraw GA21 from the market. Invoking Section 3.12 of the GA21 License, Monsanto notified its customers that no GA21 corn hybrid "may be produced, sold or used" after February 28, 2005 (five years from the date of the letter, consistent with the terms of the GA21 License).

84.   Thereafter, according to Monsanto's letter, Seed Companies could continue to offer a glyphosate-tolerant corn seed based on the NK603 technology if the Seed Companies signed a new NK603 license. Monsanto agreed to waive large payments due under the existing GA21 licenses only if the Seed Companies signed the NK603 license promptly.

85.   Monsanto reconfirmed the 2005 cutoff for production, sale and use of GA21 by letter dated July 19, 2001.

86.   In 2003, Monsanto extended the withdrawal date until June 28, 2005 in order to permit the seed companies to make a more orderly transition from GA21 to NK603.

(ii)   Monsanto and its Licensees Are Granted New GA21 Rights

87.   On March 26, 2002, the Federal Circuit held that Monsanto did not have a bona fide purchaser defense to Rhone-Poulenc's infringement case and therefore did not have rights to the technology.

19

88.    Thereafter, Monsanto reached a settlement with Rhone-Poulenc's successor, Aventis (now Bayer CropScience), whereby Aventis granted to Monsanto *and Monsanto's sublicensees* the right to make, produce, use and sell GA21 corn seeds through the 2004 growing season, and, thereafter, to sell any carry-over inventory of GA21 corn seed produced in 2004, *i.e.*, into 2005 and beyond.

(iii)    Monsanto Accelerated the End of GA21 Production and Told Seed Companies to Destroy Existing Inventories

89.    When Monsanto learned that Syngenta had acquired the GA21 patent rights and was about to enter the market as a competing source of glyphosate-tolerant corn traits, Monsanto changed its plan and wrongfully accelerated the withdrawal of GA21 corn seeds by ordering Seed Companies to stop production and destroy all GA21 foundation seeds.

90.    On information and belief, Monsanto learned that Syngenta acquired the rights to GA21 at least as early as March 11, 2004. By that time, a Syngenta affiliate had submitted a GA21 planting request to an Argentinean agricultural committee that included a Monsanto representative.

91.    On March 17, 2004, Monsanto notified its GA21 licensees that, despite its earlier notices and the rights conferred on the Seed Companies by the Aventis GA21 License,

"the final production year for event GA21 was 2003. No production of Roundup Ready Corn (Event GA21) is allowed in 2004 or thereafter. All production of Roundup Ready Corn in 2004 must be Event NK603. Accordingly, all inbred seed stock of GA21 must be destroyed." (emphasis in original).

92.    Monsanto's letter also reminded the Seed Companies about the June 28, 2005 cutoff for commercial activity in GA21, and then went on to demand:

"Accordingly, after June 28, 2005, all commercial hybrids containing GA21 must be destroyed." (emphasis in original).