93.    On information and belief, this was the first time Monsanto had ever suggested to Seed Companies that they would be required to destroy any GA21 inventory.

94.    Monsanto repeated its demand the day after Syngenta announced its acquisition of the GA21 rights:

> In our March 17, 2004 letter we gave notice to all GA21 licensees that the last year of commercial production of GA21 Roundup Ready corn was 2003, and that no production would be allowed in 2004. Additionally, the March 17 letter included notification requiring your company to destroy all GA21 inbred seed stock.

95.    Monsanto's acceleration of the end of GA21 production and its demand that Seed Companies destroy GA21 inbreds and hybrids are wrongful acts intended to deny Syngenta access to a critical asset required for swift entry and to maintain Monsanto's monopoly in glyphosate-tolerant corn traits. Monsanto has no legal right to demand that the Seed Companies destroy any inventory.

96.    On information and belief, some Seed Companies have destroyed their GA21 inbreds on Monsanto's instruction.

### d.    *Monsanto's Exclusive Dealing Seed Licenses and Related Pressure Not To Do Business with Syngenta*

97.    On May 13, 2004, the day after Monsanto filed its patent infringement lawsuit, it notified Seed Companies that it sought to prevent any unauthorized sales of GA21 corn seeds. Monsanto pressured Seed Companies not to deal with Syngenta and implicitly threatened to sue the Seed Companies if they cooperated with Syngenta's entry.

98.    Monsanto's GA21 License forces Seed Companies to deal exclusively in Monsanto's GA21 and not in any other company's GA21 trait, effectively foreclosing competition in glyphosate-tolerant corn traits. Monsanto has enforced the GA21 License to prevent Seed Companies from licensing GA21 rights from Syngenta and from selling GA21

21

foundation seeds or hybrid seeds except to growers or other licensees directly licensed or approved by Monsanto.

99.    Through these restrictions, Monsanto controls the outlets for corn seed and thus controls the Seed Companies' marketing. Seed companies are wed to Monsanto, regardless of any alternative GA21 trait available in the market. If the Seed Companies were to license GA21 from Syngenta, Monsanto would block them from bringing GA21 seeds to market, including through lawsuits, as Monsanto has made clear in its recent letters.

100.    Monsanto's threats to enforce the GA21 Licenses were made even though it had lost the rights to the underlying technology as a result of the Rhone-Poulenc litigation.

101.    On May 13, 2004, Monsanto warned the Seed Companies that:

> "Separately and independent of any patent claims Monsanto has against Syngenta . . . your Monsanto GA21 license agreement requires your company to withdraw all corn containing the GA21 event."

102.    Monsanto also claimed that its GA21 Licenses prohibit the Seed Companies from selling GA21 seed to anyone who is not licensed or approved in advance by Monsanto:

> " . . . seed containing GA21 currently in your inventory can only be sold to growers licensed by Monsanto to plant the corn as a commercial crop or be sold to another GA21 licensee via Corn States Hybrid Services brokerage department. GA21 cannot be sold to companies not licensed by Monsanto. Remember, all commercial activity needs to be completed by June 28, 2005."

103.    Monsanto claimed that:

> "no agreement with or intellectual property license from Syngenta or any other third party can change your obligation to discontinue commercial activity with GA21 or to withdraw and cease activity with it in the appointed timeframe."

104.    Monsanto then instructed the Seed Companies that if they even talked with Syngenta about GA21, they were required to tell Monsanto. Citing a provision of its NK603

corn license that requires Seed Companies to report any infringement of Monsanto's purported patent rights:

> "If Syngenta or any other third party contacts you or your company to access from you or to offer to you any GA21 corn material, we look forward to hearing from you."

105. On June 2, 2004, Monsanto reiterated its demand that Seed Companies deal only with approved or licensed customers. By letter, Monsanto reminded licensees of their "obligations under Section 3.02" of the GA21 License agreement to sell only to growers directly licensed by Monsanto (or to retailers required to do the same) and "to obtain prior written consent from Monsanto involving any proposed transactions between yourself and another Monsanto licensee."

106. On information and belief, Monsanto's purpose in sending this letter was to make sure the Seed Companies did not directly or indirectly sell any inventory to Syngenta.

107. On information and belief, in May and June 2004, Monsanto communicated with seed brokers regarding Syngenta's entry and has required them to agree in writing not to deal in GA21 hybrid seeds, or their brokerage agreements would be terminated and they would risk losing access to hybrids containing Monsanto germplasm and traits.

108. On information and belief, Monsanto made statements to foundation seed companies to intimidate the foundation seed companies from selling inbreds containing the GA21 trait.

109. Monsanto's intimidation of Seed Companies and foundation seed companies and attempted enforcement of the GA21 License to exclude Syngenta is wrongful conduct designed to maintain Monsanto's glyphosate-tolerant corn trait monopoly.

110.    The GA21 Licenses, even if valid, constitute illegal exclusive dealing arrangements.

### e.    *Monsanto's Bundled Incentives*

111.    In addition to entering into exclusive dealing agreements with its customers, Monsanto has pressured Seed Companies not to sell seeds containing a single trait provided by any company other than Monsanto through its "bundling" agreements – namely, Monsanto's GA21 License, its other trait licenses and the Incentive Agreement. As a result of these agreements, Seed Companies are economically coerced into only selling seeds containing traits provided by Monsanto. If any Seed Company sells a meaningful amount of seeds containing a single trait provided by any company other than Monsanto, it will face significant penalties from Monsanto across all traits licensed by Monsanto.

112.    For example, under the Incentive Agreement, for a Seed Company to qualify for certain financial incentives it must sign all applicable trait licenses and must be sure that, every year, its sales of each and every trait are at least 70% Monsanto brand products. If the Seed Company does not maintain Monsanto's target, it will lose the incentives across Monsanto's entire line of products. And if the Seed Company allows Monsanto's share to fall below a specified share on any product, all incremental Seed Service fees, plus interest, become due and owing to Monsanto.

113.    The effect of Monsanto's bundled incentive programs is to create insurmountable economic barriers through bundling fees and incentives across all product lines, which, in turn, defeat or deter new entrants and foreclose a substantial portion of competition for the licensing of traits to Seed Companies.

### f.    Monsanto Has Attempted to Foreclose Syngenta's Trait Access to the Foundation Corn Seed Market

114.    As discussed below, *see* Section 3 ("Monsanto's Attempted Monopolization of the Foundation Corn Seed Market"), Monsanto has engaged in conduct to deny Syngenta access to the foundation corn seed market.  Such conduct also has the effect of excluding Syngenta from competing effectively in the market for glyphosate-tolerant corn traits.  By foreclosing Syngenta access to foundation seeds, Monsanto undermines Syngenta's ability to gain effective distribution for its corn traits.

## 2.  Monsanto's Maintenance of its European Corn Borer Trait Monopoly

115.    Currently, Monsanto's share of the ECB-resistant trait market is at least 84%.  Its ECB-resistance event is called MON810.  Monsanto licenses the MON810 event for sale under the YieldGard® trademark and in a stack with its glyphosate-tolerant event, NK603.

116.    Syngenta's share of the ECB trait market is approximately 12-13%.  Its ECB event is called Bt11.  Syngenta is required to pay a royalty to Monsanto in connection with Bt11 and has restrictions on its ability to sublicense.

117.    Dow AgroSciences/Pioneer also market an ECB event, under the name Herculex®, representing approximately 2-3% of the ECB market.  On information and belief, Dow/Pioneer's rights also are subject to a Monsanto license that carries a royalty.

118.    Between Monsanto's sales of YieldGard® and its licensing to Syngenta and Dow AgroSciences/Pioneer, Monsanto collects revenues for all ECB-resistant corn seed sold in the United States.

119.    Because combinations of traits or "stacks," such as Monsanto's ECB/NK603 stack, represent significant value to growers, there is a strong trend toward ECB/glyphosate-

tolerant stacks and away from ECB-only offerings. A substantial portion of ECB-resistant traits are stacked with NK603.

120.    For the 2005 planting season, through its proprietary GA21 trait, Syngenta plans to offer stacked GA21/Bt11 products that will confer glyphosate tolerance and ECB resistance in its own seed and through licensing to other Seed Companies.

121.    Monsanto's licensing restrictions will impede Syngenta's ability to offer stacked GA21/Bt11 products, which will put Syngenta at a disadvantage in the marketplace by forcing Syngenta to offer only a disfavored, unstacked Bt11 product.

122.    Monsanto's license restrictions will prevent Syngenta from developing stacks of Bt11 and Seed Company or foundation seed company sourced GA21 or NK603. Monsanto's GA21 and NK603 licenses prevent Seed Companies and foundation seed companies from stacking GA21 or NK603 with Bt11.

123.    Monsanto's restriction has no reasonable business or scientific justification. In fact, on information and belief, Monsanto has selectively waived the restriction to permit certain Seed Companies to produce a comparable stack.

124.    As a result of Monsanto's maintenance of its glyphosate-tolerant corn trait monopoly and its unlawful contractual restrictions, Syngenta and others are unable to compete effectively in the licensing of ECB traits. Through these devices, Monsanto unlawfully maintains its monopoly in ECB traits and eliminates competition that would redound to the benefit of consumers.

**3.  Monsanto's Attempted Monopolization of the Foundation Corn Seed Market**

125.    Through its affiliates, Monsanto controls approximately 45% of foundation corn seed production and approximately 70% of foundation corn seed sold or licensed to independent seed companies. The second largest foundation seed producer, Pioneer, controls approximately

35% of the foundation corn seed production through its hybrid seed business, and has key commercial arrangements with Monsanto. Pioneer has not made its foundation seeds available for commercial sale or licensing to hybrid seed companies.

126.    Monsanto has attempted to exclude competition from the foundation seed market and attempted to monopolize that market by (i) preventing Syngenta entry and expansion in key corn traits, (ii) barring foundation seed companies from stacking Monsanto's glyphosate-tolerant corn traits with Bt11, (iii) denying Syngenta access to foundation seeds (iv) pressuring foundation seed companies or hybrid seed companies not to deal with Syngenta or provide GA21 foundation seeds to Syngenta, (v) entering into commercial arrangements with seed companies and growers that bundle discounts and incentives across product lines to provide economic barriers to entry and (vi) attempting to acquire Advanta/Garst solely to block Syngenta's entry.

127.    Developers of inbred seed lines rely on the availability of biotechnology traits to compete effectively for sales of foundation seeds to Seed Companies. Blocking Syngenta's entry/expansion in GA21 and Bt11, and the resulting absence of significant competition in trait licensing, means that Monsanto is able to set the terms on which companies may compete with its owned foundation seed operations.

128.    Monsanto restricts foundation seed companies from stacking its glyphosate-tolerant corn trait with competing herbicide tolerant traits. As a result, foundation seed producers lack the ability to offer a range of traited corn seed choices in competition with Monsanto. This diminished competitiveness further increases Monsanto's market power.

129.    In May 2004, Monsanto effectively terminated Syngenta's license and supply agreement with Holden's for the supply of foundation corn seeds, having failed to negotiate a

renewal in good faith. On information and belief, the Holden's agreement was terminated for the purpose of preventing Syngenta from expanding its own foundation seed business.

130.   On information and belief, in connection with Monsanto's acquisition of DeKalb, Monsanto undertook to provide Seed Companies access to Holden's foundation seeds on a non-discriminatory basis for the purpose of converting Holden's lines with third-party corn traits. Monsanto's non-discrimination undertaking will expire in December 2005. Holden's newly offered foundation seed contracts reflect that Monsanto will not honor its non-discrimination obligations after that date.

131.   As discussed above, *see* paragraphs 82 to 110, Monsanto has enforced its GA21 License and instructed seed companies not to deal with Syngenta and not to provide Syngenta with GA21 foundation seeds.

132.   As discussed above, *see* paragraphs 111 to 113, Monsanto has entered into exclusionary bundled incentive programs. These incentive programs have the effect of foreclosing access to customers to Syngenta and other foundation seed providers from key segments of the market.

133.   In April 2004, after learning of Syngenta's acquisition of GA21, Monsanto renewed an early effort to acquire Advanta for the purpose of blocking Syngenta. Advanta originally was offered for sale in mid-2003. In April 2004, Monsanto obtained exclusive negotiation rights with Advanta and eventually made an increased offer. On information and belief, Monsanto knew of Syngenta's interest in Advanta and its acquisition of GA21 intellectual property rights from Bayer CropScience when it made its revised offer and hoped to block Syngenta's acquisition and access to GA21 inventory at Garst. Monsanto's unlawful

interference increased the cost of Syngenta's entry through an increased purchase price and other expenses.

134.    Monsanto's conduct to maintain its monopolies in glyphosate-tolerant corn traits and ECB-resistant corn traits will further its ability to control prices and exclude competitors from the market for foundation seeds.

135.    Monsanto's conduct creates the dangerous probability that it will achieve a monopoly position in the foundation corn seed market.

136.    On information and belief Monsanto has engaged in other unlawful conduct in order to prevent Syngenta's entry and maintain its monopolies in glyphosate-tolerant corn and ECB-resistant corn, and to attempt to gain a monopoly in the market for foundation corn seed.

## RELEVANT MARKET AND MONSANTO'S MONOPOLY POWER

### A.    *Glyphosate-Tolerant Corn Traits*

137.    The licensing of glyphosate-tolerant corn traits is a line of commerce or relevant product market within the meaning of the antitrust laws. A related relevant market or submarket is the licensing of glyphosate-tolerant corn traits stacked with another key corn trait, such as ECB-resistance.

138.    Glyphosate-tolerant corn traits provide a unique product to developers of inbred or foundation corn seed lines. There are no substitutes for glyphosate-tolerant corn traits for these customers. Stacked corn traits provide a performance bundle of traits to developers of inbred or foundation corn seed lines. There are no substitutes for stacked corn traits for these customers.

139.    No reasonable substitutes for glyphosate-tolerant corn traits or stacked corn traits are available to developers of inbred or foundation seed lines. A significant, non-transitory increase of the fees associated with the licensing of Monsanto's glyphosate-tolerant corn trait or

stacked corn traits would not result in foundation seed companies or other customers purchasing other traits.

140.    The derived demand for the package of non-glyphosate-tolerant corn and selective herbicides does not provide adequate discipline for the package of glyphosate-tolerant corn or stacked corn traits and glyphosate and other pesticides. Monsanto has charged monopoly rents in the price of glyphosate-tolerant corn traits and stacked corn traits. Syngenta's entry would substantially reduce the monopoly price of both.

141.    The United States is a relevant geographic market within the meaning of the antitrust laws. Before genetically modified corn can be commercialized in the United States, it must receive regulatory approval from U.S. governmental agencies. The U.S. Department of Agriculture regulates the use of biotechnology traits in crops planted in the United States. The U.S. Environmental Protection Agency regulates the use of both plant incorporated protectants and chemical herbicides in the United States. Other factors, such as the U.S. distribution system and other demand characteristics, support a U.S. geographic market.

142.    Monsanto is the only supplier of glyphosate-tolerant corn traits and stacked glyphosate-tolerant corn traits in the United States. Monsanto possesses monopoly power in both, where its market share is 100%. Monsanto has the power to control prices and exclude competition in the relevant markets.

143.    Substantial barriers to entry and expansion exist in the licensing of glyphosate-tolerant corn traits and stacked corn traits. The considerable time and expense to develop a competing corn trait and obtain the necessary regulatory approvals are strong barriers to entry. Importantly, Monsanto's anti-stacking provision and bundling of incentives provides additional barriers to entry for any competitor.

30

144.    Monsanto's market domination and the existence of entry barriers are evidenced by its high licensing fees.

**B.    *European Corn Borer-Resistant Corn Traits***

145.    The licensing of ECB-resistant corn traits is a line of commerce or relevant market within the meaning of the antitrust laws.

146.    ECB-resistant corn traits differ from other non-transgenic insect-resistant corn traits that provide protection against other crop pests.  ECB-resistant corn traits offer superior performance at lower total cost versus traditional chemical insecticides.

147.    No reasonable non-transgenic insect-resistant corn trait substitutes are available to developers of inbred or foundation corn lines and to purchasers that seek the crop yield to cost value that ECB-resistant corn traits provide.  A significant, non-transitory increase by Monsanto of the fees associated with the licensing of its ECB-resistant corn trait would not result in customers licensing other insect-resistant corn traits.

148.    The derived demand of using non-ECB-resistant corn traits plus traditional insecticides does not provide sufficient discipline over the price of ECB-resistant corn traits.

149.    Monsanto has charged monopoly rents in the price of ECB-resistant corn traits. Syngenta's expansion would substantially reduce the monopoly price of that trait.

150.    The United States is a relevant geographic market within the meaning of the antitrust laws.  Before genetically modified corn can be commercialized in the United States, it must receive regulatory approval from U.S. governmental agencies.  The U.S. Department of Agriculture regulates the use of biotechnology traits in crops planted in the United States.  The U.S. Environmental Protection Agency regulates the use of both plant incorporated protectants and chemical insecticides in the United States.  Other factors, such as the U.S. distribution system and other demand characteristics, support a U.S. geographic market.

151.    Monsanto is the dominant supplier of ECB-resistant corn traits in the United States. Monsanto possesses monopoly power in the market for licensing of ECB-resistant corn traits, where its market share is at least 84%. Monsanto has the power to control prices and exclude competition in the relevant market.

152.    Substantial barriers to entry and expansion exist in the licensing of ECB-resistant corn traits. The considerable time and expense to develop a competing corn trait and obtain the necessary regulatory approvals are strong barriers to entry. Importantly, Monsanto's bundling of incentives provides an additional barrier to entry for any competitor.

153.    Monsanto's market domination and the existence of entry barriers are evidenced by its high licensing fees.

### C.    *Foundation Corn Seeds*

154.    The license/sale of foundation corn seed is a line of commerce or relevant product market within the meaning of the antitrust laws.

155.    No reasonable substitute for foundation corn seed is available to hybrid seed companies, who need access to foundation seed in order to produce finished seeds. A significant, non-transitory increase in the prices of foundation corn seed would not result in customers purchasing other products.

156.    Substantial barriers to entry and expansion exist in the foundation corn seed market. The considerable time and expense to develop foundation seed lines are strong barriers to entry. It takes several years to develop each foundation seed line.

157.    The United States is a relevant geographic market within the meaning of the antitrust laws, because foundation seed producers outside the United States are not a reasonable alternative source for hybrid seed producers. There are no significant imports of foundation seeds into the United States and there is substantial regulation of imports.

32

158.    Monsanto is the leading producer of corn foundation seeds in the United States. It possesses market power in the corn foundation seed market; Monsanto's share of all corn foundation seed produced is approximately 45% and its share of all corn foundation seed commercially sold or licensed is about 70%.

159.    There is a dangerous probability that Monsanto will gain monopoly power in the market for corn foundation seeds.

160.    Monsanto's market domination and the existence of entry barriers are evidenced by the increasing prices of foundation corn seed and the exclusionary practices employed.

161.    The most likely source of effective competition to Monsanto's monopoly or market power in the relevant markets is through Syngenta's entry as a second competitor for licensing the relevant traits and producing corn foundation seeds. Such entry would threaten to take significant revenues away from Monsanto.

## EFFECTS OF DEFENDANTS' UNLAWFUL SCHEME

### 1.    Effects on the Glyphosate-Tolerant Corn Trait Markets

162.    Monsanto's unlawful conduct has caused and will cause substantial harm to competition in the market for the licensing of glyphosate-tolerant corn traits and stacked corn traits. Absent Monsanto's exclusionary conduct and practices, Syngenta would enter the markets for the licensing of glyphosate-tolerant corn traits for the 2005-growing season in vigorous competition with Monsanto. Syngenta's entry would introduce much-needed competition to these markets. Syngenta expects that its availability as an alternative source will increase market efficiency, provide greater access to traits, increase choice and lower costs for Seed Companies, foundation seed companies and growers. If Monsanto is permitted to maintain its sham litigation and continue its campaign of unlawful tactics and licensing practices, Syngenta's entry into the

glyphosate-tolerant corn trait and stacked traits markets could be delayed until the 2008 growing season.

163.    Monsanto's wrongful acts to exclude Syngenta from glyphosate-tolerant corn trait licensing have caused injury to Syngenta's business in the form of increased expenses and delay, and adverse effects on customers as well as lost revenues. Monsanto's exclusionary conduct will adversely affect Syngenta's ability to gain market acceptance for and confidence in its entry, thereby depriving Syngenta of potential profits.

164.    By delaying Syngenta's entry, Monsanto has harmed competition and caused injury at all levels of distribution: foundation seed producers, hybrid seed producers, dealers and retailers, and end-use growers. Monsanto's wrongful acts have forced Seed Companies, foundation seed producers and growers to pay higher fees than would prevail in a competitive environment.

## 2.    Effects on the ECB-Resistant Corn Trait Market

165.    Monsanto's wrongful acts have also injured and will injure competition in the market for the licensing of ECB-resistant corn traits. Monsanto's control of ECB-resistant corn traits licensing leaves Seed Companies and end-use growers with effectively only one source from which to license ECB-resistant corn traits. If Monsanto is permitted to maintain its sham litigation and continue its campaign of unlawful tactics and licensing practices, Syngenta's ability to expand its licensing of ECB-resistant traits and to offer a real alternative to Monsanto will be substantially hampered.

166.    Delay of Syngenta's expansion has harmed and will continue to harm competition and cause injury at all levels of distribution: foundation seed producers, hybrid seed producers, retailers and dealers, and end-use growers. Seed Companies, foundation seed producers and

34

growers are deprived of a competitive alternative to Monsanto, and pay higher fees than would prevail in a competitive environment.

167.    Monsanto's wrongful acts have caused injury to Syngenta's business in the form of increased expenses and delay, as well as lost revenues. If permitted to persist, Monsanto's exclusionary conduct will deprive Syngenta of potential profits.

### 3.    Effects on the Foundation Corn Seed Market

168.    Monsanto's wrongful acts have also injured and will injure competition in the market for foundation corn seeds. By foreclosing competition in corn trait licensing, Monsanto reduces competition and enhances its market power in the foundation corn seed market by excluding competition from non-Monsanto-trait bearing foundation corn seeds, aiding Monsanto's attempt to monopolize the foundation seed market. Absent Monsanto's conduct, traits not controlled by Monsanto could be licensed to foundation seed companies (and used in Syngenta's foundation seed business) to compete with Monsanto's foundation seed operations. As a result of Monsanto's unlawful action, Seed Companies and growers are deprived of a competitive alternative to Monsanto, and pay higher fees than would prevail in a competitive environment.

169.    Monsanto's wrongful acts to foreclose competition in the foundation corn seed market caused injury to Syngenta's business in the form of lost revenues. Monsanto's exclusionary conduct will adversely affect Syngenta's ability to distribute corn traits, thereby depriving Syngenta of lost profits.

170.    Monsanto's concerted campaign is a thinly veiled attempt to impede, hamper and delay Syngenta's entry into key corn trait markets in an attempt to cling to its monopoly positions, allowing it to charge supracompetitive prices for as long as possible at the expense of

Seed Companies, growers and, ultimately, the public. If permitted to persist in its exclusionary practices and other illegal conduct, Monsanto will only further entrench itself against Syngenta, causing substantial injury to the market and ultimately to Seed Companies and growers.

171.    Because of all the foregoing, Syngenta has suffered antitrust injury with respect to all of the relevant markets.

## CLAIMS FOR RELIEF

### COUNT ONE

### Willful Maintenance of a Monopoly of the Glyphosate-Tolerant Corn Trait Market In Violation of Sherman Act, Section 2

172.    Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1 to 171 herein.

173.    The licensing of glyphosate-tolerant corn traits is a relevant line of commerce within the meaning of the antitrust laws. A related relevant market or submarket is the licensing of stacked corn traits.

174.    The relevant geographic market is the United States.

175.    Monsanto possesses monopoly power in the relevant markets, maintaining a market share of 100%. Substantial barriers to entry and expansion exist in the relevant markets.

176.    Monsanto has the power to control market prices and exclude competition.

177.    Monsanto has engaged in conduct and a pattern of conduct with anticompetitive effects to unlawfully maintain and enhance its monopoly in the relevant markets and to keep prices high, stifle competition and eliminate consumer choice though exclusionary behavior designed to keep Syngenta from entering the relevant markets and competing successfully. It has done so with the intent to monopolize the relevant markets.

36

178.   There is no legitimate business justification for defendants' conduct.

179.   Syngenta has suffered and will likely suffer additional antitrust injury.
Defendants' wrongful conduct is material, and will impede, hamper and delay Syngenta's ability
to enter quickly the relevant markets and cause Syngenta to lose business and suffer damages in
an amount to be proven at trial.

180.   Defendants' wrongful acts are likely to cause injury to the relevant markets and
cause Seed Companies, growers and consumers to continue to pay higher prices than they would
otherwise pay in a competitive environment.

### COUNT TWO

#### Willful Maintenance of a Monopoly of the
#### ECB-Resistant Corn Trait Market
#### In Violation of Sherman Act, Section 2

181.   Plaintiff realleges and incorporates herein by reference the allegations set forth in
paragraphs 1 to 180 herein.

182.   The licensing of European corn borer-resistant corn traits is a relevant line of
commerce within the meaning of the antitrust laws.

183.   The relevant geographic market is the United States.

184.   Monsanto possesses monopoly power in the relevant market, maintaining a
market share of at least 84%. Substantial barriers to entry and expansion exist in the relevant
market.

185.   Monsanto has the power to control market prices and exclude competition.

186.   Monsanto has engaged in conduct and a pattern of conduct with anticompetitive
effects to unlawfully maintain and enhance its monopoly in the relevant market and to keep
prices high, stifle competition and eliminate consumer choice though exclusionary behavior

37

designed to keep Syngenta from entering the relevant market. It has done so with the intent to monopolize the relevant market.

187.    There is no legitimate business justification for defendants' conduct.

188.    Syngenta has suffered and will likely suffer additional antitrust injury. Defendants' wrongful conduct is material, and will impede, hamper and delay Syngenta's ability to enter quickly the relevant market and cause Syngenta to lose business and suffer damages in an amount to be proven at trial.

189.    Defendants' wrongful acts are likely to cause injury to the relevant market and cause Seed Companies, growers and consumers to continue to pay higher prices than they would otherwise pay in a competitive environment.

### COUNT THREE

### Attempted Monopolization of the Foundation Corn Seed Market In Violation of Sherman Act, Section 2

190.    Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1 to 189 herein.

191.    The market for foundation corn seed is a relevant line of commerce within the meaning of the antitrust laws.

192.    The relevant geographic market is the United States.

193.    Monsanto possesses market power in the relevant market, maintaining a market share of at least 45% or higher under alternative measures. Substantial barriers to entry and expansion exist in the relevant market.

194.    There is a dangerous probability that Monsanto will acquire monopoly power in the relevant market.

38

195.    Monsanto has engaged in a pattern of conduct with anti-competitive effects to unlawfully attempt to monopolize the relevant market and to keep prices high, stifle competition and eliminate consumer choice though exclusionary behavior designed to keep Syngenta and others from expanding in the relevant market. It has done so with the specific intent to monopolize the relevant market.

196.    There is no legitimate business justification for defendants' conduct.

197.    Syngenta has suffered and will likely suffer additional antitrust injury. Defendants' wrongful conduct is material, and will impede, hamper and delay Syngenta's and others' ability to expand in the relevant market and cause Syngenta to lose business and suffer damages in an amount to be proven at trial.

198.    Defendants' wrongful acts are likely to cause injury to the relevant market and cause Seed Companies, growers and consumers to continue to pay higher prices than they would otherwise pay in a competitive environment.

### DEMAND FOR TRIAL BY JURY

199.    Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

### PRAYER FOR RELIEF

WHEREFORE, PLAINTIFF PRAYS THIS COURT:

A.    Find that Monsanto is wrongfully maintaining its monopoly over the licensing of glyphosate-tolerant corn traits and stacked corn traits in violation of Section 2 of the Sherman Act and award plaintiff treble damages in an amount to be proven at trial, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a);

B.    Find that Monsanto is wrongfully maintaining its monopoly over the licensing of ECB-resistant corn traits in violation of Section 2 of the Sherman Act and

award plaintiff treble damages in an amount to be proven at trial, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a);

C. Find that Monsanto is wrongfully attempting to monopolize the market for foundation corn seed in violation of Section 2 of the Sherman Act and award plaintiff treble damages in an amount to be proven at trial, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a);

D. Grant injunctive relief prohibiting defendants and all persons, firms and corporations acting on their behalf and under their direction or control from continuing violations of Section 2 of the Sherman Act, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26;

E.   Award plaintiff such other relief as is necessary or appropriate to restore and

maintain competitive conditions in the markets affected by defendants'

unlawful conduct; and

F.   Award plaintiff attorneys' fees and costs of this action.

Respectfully submitted,

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6600

*Attorneys for Plaintiff*

Of Counsel:

SHEARMAN & STERLING LLP
Steven C. Sunshine
Heather Lamberg Kafele
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 508-8000
Facsimile: (202) 508-8100

Richard F. Schwed
Thomas A. McGrath III
599 Lexington Avenue
New York, NY 10022-6069
Telephone: (212) 848-4000
Facsimile: (212) 848-7179

Dated: September 14, 2004

NYDOCS04/410554

## CERTIFICATE OF SERVICE

I, John W. Shaw, hereby certify that on September 14, 2004, copies of the

foregoing document were caused to be served upon the following:

### BY HAND DELIVERY

Richard L. Horwitz, Esquire
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801

_____
John W. Shaw (#3362)