# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE**

| | |
|---|---|
| AMERICAN SEED CO. INC., and JERRY ELLEFSON, | ) ) ) |
| Plaintiffs, On Behalf ~~Itself~~ of Themselves and Others Similarly Situated, | ) ) ) ) |
| | ) C.A. N~~O~~o. ~~————————~~ 05-535-SLR |
| v. | ) ) |
| MONSANTO COMPANY, | ) - ) |
| Monsanto Controlled Subsidiaries: | ) ) ~~CLASS ACTION~~ |
| AMERICAN SEEDS INC., ——— CORN STATES HYBRID, SERVICE INC. ASGROW SEED CO., INC., HOLDEN FOUNDATION SEEDS, INC., DEKALB SEEDS, CALGENE, L.L.C., CHANNEL BIO CO., NC+ HYBRIDS, SEMINIS INC., | ) ) ) ) ~~JURY TRIAL DEMANDED~~ ) ) ) ) ) ) |
| ~~Defendants~~ ~~)~~ Defendants. | ) ) |

| | |
|---|---|
| DARRELL SOUHRADA, and DAVE JOHNSON, | ) ) |
| Plaintiffs, On Behalf of Themselves and Iowa Citizens Similarly Situated, | ) C.A. No. 05-535-SLR ) ) ) ) |
| v. | ) ) ) |
| MONSANTO COMPANY, | ) ) |
| Defendant. | ) ) |

10012378.WPD



KENT DUXBURY

Text Moved Here: 2

End Of Moved Text

    Plaintiff, On Behalf of Himself
    and Minnesota Citizens
    Similarly Situated,

              v.

MONSANTO COMPANY,

    Defendant.

C.A. No. 05-535-SLR

## FIRST AMENDED COMPLAINT

On behalf of ~~itself~~themselves and other similarly-situated direct purchasers of biotechnological corn seed from the Monsanto Company (including its named controlled seed companies), American Seed Co. Inc., and Jerry Ellefson alleges as follows:

### SUMMARY OF CLAIMS

1.    With the use of biotechnology, it is possible to introduce new genetic characteristics, or traits, into seeds in order to add desirable characteristics to corn crops. For example, biotechnological seed traits permit farmers to grow corn tolerant to a leading herbicide, glyphosate. This "glyphosate-tolerant" trait allows growers to spray glyphosate herbicide over the entire crop, and kill all weeds, without risking any damage to the corn. Other biotechnological seed traits permit farmers to plant corn that is resistant to certain pervasive insects that are harmful to the crops, such as root worm and the European Corn Borer.

2.    Monsanto Company sells separate varieties of corn seed that (1) are tolerant of glyphosate herbicide; (2) are resistant to the European Corn Borer; (3) are resistant to root worm; and (4) combine or "stack" two or more of these traits.  These seed varieties are sold in four relevant product markets in the United States.

3.    Monsanto Company – including the named seed companies it controls and operates as subsidiaries or divisions (collectively "Monsanto") – has unlawfully maintained its monopolies in these four relevant product markets using exclusive dealing agreements to deny Monsanto's actual and potential competitors (a) access to foundation seed companies and others needed for the creation or manufacture of competitive corn seed with the competitors' biotechnological traits; and (b) the distribution these Monsanto competitors require to market their biotechnological corn seed. These agreements impose massive financial penalties on seed companies unless a very high percentage of seeds they sell contain Monsanto traits, effectively impeding potential competitors from entering the relevant product markets.

4.    Monsanto also has unlawfully maintained and enhanced its monopoly power through "bundling" agreements.  As a result of these agreements, any seed company that sells a meaningful amount of seeds containing a single trait provided by any company other than Monsanto faces significant penalties from Monsanto across all traits licensed by Monsanto.  For example, some seed companies grow and sell glyphosate-resistant corn seeds, root- worm-resistant corn seeds, or European borer-resistant corn seeds with traits provided by Monsanto.  If such a seed company does not sell a minimum percentage of seeds containing Monsanto traits for *each and every* one of those

product lines, it will lose discounts or seed service fees for *all* Monsanto traits. Thus, Monsanto has used its monopoly power in several markets to create a high barrier to entry for any corn seed competitor seeking to enter any one of those trait markets. Monsanto controls 100% of the market for the glyphosate-tolerant corn trait, at least 84% of the market for the European Corn Borer-resistant trait, and 100% of the market for the root worm-resistant corn trait.

5.    This claim is prosecuted by four Classes of direct purchasers of corn seed sold by Monsanto (including its named controlled seed companies) that is tolerant of the glyphosate herbicide, resistant to the European Corn Borer, resistant to root worm, or combines or "stacks" two or more of these traits in the seed.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction under 28 U.S.C. § 1337 (commerce and antitrust regulation) and 28 U.S.C. § 1331 (federal question), as this action arises under Section 2 of the Sherman Act (15 U.S.C. § 2) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

7.    Venue is proper because Monsanto resides within this judicial district as provided in 28 U.S.C. § 1391(b) and (c) and as provided in Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22).

## PARTIES

8.    Plaintiff American Seed Co. Inc. is a family-owned and operated corporation, which has operated for fourteen (14) years in Spring Grove, Pennsylvania. Until the end of 2004 it was an actual or potential purchaser of corn seed with biotechnological corn traits directly from Monsanto,

including its named controlled seed companies.  The latter included Defendants Corn States Hybrid Service, Inc. and Holden Foundation Seeds, Inc.

9.    Plaintiff Jerry Ellefson is a farmer who lives in Flandreau, South Dakota.  Until the end of 2004, he was an actual or potential purchaser of corn seed with biotechnological traits directly from Monsanto.

10.    Defendant Monsanto Company is a Delaware corporation with its principal place of business in St. Louis, Missouri.

11.    Defendant American Seeds Inc. is a Monsanto-controlled subsidiary which sells Monsanto corn seed with biotechnological traits directly to members of the four Classes defined herein by itself or through its subsidiaries.

12.    Corn States Hybrid Service, Inc. is a Monsanto-controlled subsidiary which sells Monsanto corn seed with biotechnological traits directly to members of the four Classes defined herein.

13.    Asgrow Seed Co., Inc. is a Monsanto-controlled subsidiary which sells Monsanto corn seed with biotechnological traits directly to members of the four Classes defined herein.

14.    Holden Foundation Seeds, Inc. is a Monsanto-controlled subsidiary which sells Monsanto corn seed with biotechnological traits directly to members of the four Classes defined herein.

15.    DeKalb Seeds is a Monsanto-controlled subsidiary which sells Monsanto corn seed with biotechnological traits directly to members of the four Classes defined herein.

16.    Calgene, L.L.C. is a Monsanto-controlled subsidiary which sells Monsanto corn seed with biotechnological traits directly to members of the four Classes defined herein.

17.     NC+ Hybrids is a Monsanto controlled subsidiary which sells Monsanto corn seed with biotechnological traits directly to members of the four Classes defined herein.

18.     Channel Bio Co. is a Monsanto-controlled subsidiary which sells Monsanto corn seed with biotechnological traits directly to members of the four Classes defined herein.

19.     Seminis Inc. is a Monsanto-controlled subsidiary which sells, or will sell before trial, Monsanto corn seed with biotechnological traits directly to members of the four Classes defined herein.

## RELEVANT MARKETS

20.     Corn is the leading cash crop in the United States, with an annual value of over $24 billion. To control weeds, growers apply herbicides. "Selective herbicides" are tolerated by the crop but kill or suppress one or more undesirable weeds that infest the crop. "Non-selective herbicides" are active on all vegetation and do not distinguish between the commercial crop (such as corn) and other vegetation (such as weeds).

21.     Biotechnology has made it possible to introduce new genetic characteristics into plant seeds. The genetic make-up (or "genome") of a seed can be altered by transferring a transgenic "event" into the seed genome. An event contains, among other things, a specific gene that expresses a desirable characteristic in the seed. The insertion of a desirable transgenic event into a seed alters the seed's genome, conferring a desirable characteristic, or "trait," on the crops grown from the seed.

22.     Since 1996, there have been a number of commercially available corn traits for corn seeds. One of the most common of these traits is for glyphosate tolerance offered by Monsanto. Glyphosate-tolerant corn is impervious to the effect of glyphosate, the leading non-selective herbicide used by growers. As a result of this biotechnology, growers that plant glyphosate-tolerant

corn may apply glyphosate over an entire field, killing the weeds while allowing the corn crop to survive.

23.      Biotechnology is also used to make corn resistant to the European Corn Borer and the root worm.

24.      Crop protection traits, including herbicide tolerance and insect resistance, are useful to growers because they reduce production costs and increase yield.  U.S. farmers are increasingly planting genetically modified varieties of seed.  It is estimated that 46% of the corn planted in the U.S. in 2004 was transgenic corn (up from 40% in 2003).

## Relevant Market for Corn Seed Tolerant
## of Glyphosate

25.      The sale of corn seed tolerant of the glyphosate is a relevant product market.

26.      The pricing and derived demand for the package of non-glyphosate-tolerant corn and selective herbicides does not provide adequate price discipline for glyphosate-tolerant corn seed. Monsanto has charged monopoly prices for corn seed tolerant of glyphosate.

27.      The United States is the relevant geographic market.  Before genetically modified corn seed can be commercialized in the United States, it must receive regulatory approval from U.S. governmental agencies. The U.S. Department of Agriculture regulates the use of biotechnology traits in crops planted in the United States.  The U.S. Environmental Protection Agency regulates the use of both plant incorporated protectants and chemical herbicides in the United States.  Other factors, such as the U.S. distribution system and other demand characteristics, support a U.S. geographic market.

28.    Monsanto is the only supplier of glyphosate-tolerant corn seeds in the United States and Monsanto possesses monopoly power in the relevant product market, that is, the power to control prices or exclude competition.

29.    Substantial barriers to entry and expansion exist in the creation of glyphosate-tolerant corn seeds. The considerable time and expense to develop a competing corn seed with a particular trait and obtain the necessary regulatory approvals are strong barriers to entry. Importantly, Monsanto's exclusive dealing and bundling of incentives provides additional barriers to entry for any competitor.

30.    Monsanto's market domination and the existence of entry barriers are evidenced by its above-competitive prices for the glyphosate-tolerant corn seed.

## Relevant Market for Corn Seed Resistant to the European Corn Borer

31.    The sale of corn seed resistant to the European Corn Borer is a relevant product market.

32.    Borer-resistant corn traits differ from other non-transgenic insect-resistant corn traits that provide protection against other crop pests. Borer-resistant corn traits offer superior performance at lower total cost versus traditional chemical insecticides.

33.    No reasonable, non-transgenic insect-resistant corn trait substitutes are available to purchasers that seek the crop yield-to-cost value that borer-resistant corn traits provide.

34.    The pricing derived demand of using non-borer-resistant corn traits plus traditional insecticides does not provide sufficient discipline over the price of borer-resistant corn seed.

35.    The United States is the relevant geographic market. Before genetically modified corn seed can be commercialized in the United States, it must receive regulatory approval from U.S. governmental agencies. The U.S. Department of Agriculture regulates the use of biotechnology traits in crops planted in the United State. The U.S. Environmental Protection Agency regulates the use of both plant incorporated protectants and chemical insecticides in the United States. Other factors, such as the U.S. distribution system and other demand characteristics, support a U.S. geographic market.

36.    Monsanto is the dominant supplier of borer-resistant corn traits in the United States. Monsanto possesses monopoly power in the market for the sale of borer-resistant corn seed, where its market share is at least 80%, that is, it has the power to control prices or exclude competition in the relevant market.

37.    Substantial barriers to entry and expansion exist in the licensing of borer-resistant corn seed. The considerable time and expense to develop a competing corn seed and obtain the necessary regulatory approvals are strong barriers to entry. Importantly, Monsanto's exclusive dealing and bundling of incentives provided an additional barrier to entry for any competitor.

38.    Monsanto's market domination and the existence of entry barriers are evidenced by its above-competitive prices for borer-resistant corn seed.

### Relevant Market for Corn Seed Resistant to Root Worm

39.    The sale of root-worm-resistant corn seed is a relevant product market.

40.    Root worm resistant corn seed differs from other non-transgenic, insect resistant corn seed providing protection against other crop pests. Root worm-resistant corn seed offers superior performance at lower total cost versus traditional chemical insecticides.

41.    No reasonable non-transgenic insect-resistant corn seed substitutes are available to developers of inbred or foundation corn lines and to purchasers that seek the crop yield-to-cost value that root worm resistant corn seed provides.

42.    The pricing and derived demand of using corn seed without root worm resistant traits plus traditional insecticides does not provide sufficient discipline over the price of *root worm* resistant seeds.

43.    The United States is a relevant geographic market. Before genetically modified corn seed can be commercialized in the United States, it must receive regulatory approval from U.S. governmental agencies. The U.S. Department of Agriculture regulates the use of biotechnology traits in crops planted in the United State. The U.S. Environmental Protection Agency regulates the use of both plant incorporated protectants and chemical insecticides in the United States. Other factors, such as the U.S. distribution system and other demand characteristics, support a U.S. geographic market.

44.    Monsanto is the only, dominant supplier of root worm resistant corn traits in the United States. It possesses monopoly power in the market, that is, it has the power to control prices or exclude competition in the relevant market.

45.    Substantial barriers to entry and expansion exist in the sale of root worm resistant corn seeds. The considerable time and expense to develop a competing corn seed and obtain the

necessary regulatory approvals are strong barriers to entry.  Importantly, Monsanto's exclusive dealing and bundling of incentives provided an additional barrier to entry for any competitor.

46.    Monsanto's market domination and the existence of entry barriers are evidenced by its above-competitive prices.

## Relevant Market for Corn Seed With Stacked Traits

47.    The sale of corn seed with two or more of the Monsanto glyphosate tolerant, borer-resistant, or root-worm-resistant traits constitutes a relevant product market, and possibly relevant product sub-markets.

48.    Such stacked corn differs substantially in use and price from other non-transgenic herbicide and insect-resistant corn seed for the reasons set out above.

49.    The United States is the relevant geographic area for the market and sub-markets. Before genetically modified corn seed can be commercialized in the United States, it must receive regulatory approval from U.S. governmental agencies. The U.S. Department of Agriculture regulates the use of biotechnology traits in crops planted in the United State.  The U.S. Environmental Protection Agency regulates the use of both plant incorporated protectants and chemical insecticides in the United States.  Other factors, such as the U.S. distribution system and other demand characteristics, support a U.S. geographic market.

50.     Monsanto is the dominant supplier of stacked corn traits in the United States.  It has monopoly power in the market for its sale, that is, the power to control prices or exclude competition in the relevant market or sub-markets.

51.     Substantial barriers to entry and expansion exist in the sale of corn seed with stacked traits.  The considerable time and expense to develop a competing stacked corn seed and obtain the necessary regulatory approvals are strong barriers to entry.  Importantly, Monsanto's exclusive dealing and bundling of incentives provided an additional barrier to entry for any competitor.

52.     Monsanto's market domination and the existence of entry barriers are evidenced by its above-competitive prices.

## CLASS ACTION ALLEGATIONS

### Class of Direct Purchasers of Monsanto Seed Corn
### Tolerant of Glyphosate

53.     Plaintiffs American Seed Co. Inc. isand Jerry Ellefson a-re representatives of a class of  persons ("Class of Direct Purchasers of Monsanto Corn Seed Tolerant of Glyphosate" or "Glyphosate-Tolerant Corn Seed Class") directly purchasing seed corn from Monsanto Company (including its named controlled seed companies) which is tolerant of glyphosate herbicide between July 26, 2001 and the present excluding citizens of the States of Iowa and Minnesota, persons affiliated with Monsanto, or governmental entities. The Class  includes primarily farmers, and retailers of this seed to these farmers.

### Rule  23(a) Prerequisites

54.     Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

(a)    **Numerosity.**   The number of persons in the Class is, upon information and belief, in the thousands, and the members of the Class are therefore so numerous that joinder of all members of the Class is impracticable.   Joinder is also impracticable because of the geographic diversity of the members of the Class, the need to expedite judicial relief, and the Class ~~Representative's~~Representatives' lack of knowledge of the identity and addresses of all members of the Class.

(b)    **Common Questions.**   There are numerous questions of law and fact arising from the pattern of Monsanto's anti-competitive conduct which are common to the members of the Class.   These include, but are not limited to, common issues as to:

●    the existence of a relevant market for seed corn which is tolerant of glyphosate herbicide, and Monsanto's monopoly power in such market;

●    whether Monsanto has unlawfully maintained a monopoly in this relevant market;

●    whether Monsanto's maintenance of its monopoly over the relevant market harmed competition;

●    whether such monopoly maintenance caused antitrust injury to members of the  Class due to Monsanto's above-competitive pricing of the corn seed to members of the Class; and

●    the nature and extent of the injunctive and actual damage relief available to the members of the Class.

5~~4~~5.    **Adequacy of Representation**. The claims of the Class Representatives are typical of the claims of the members of the Class and fairly encompass the claims of the members of the

Class. The Class Representatives and the members of the Class are similarly or identically harmed by the same systematic and pervasive conduct including pervasive above competitive pricing of the corn seed by Monsanto.

55~~5~~6. The Class Representatives and ~~its~~their counsel will fairly and adequately protect the interests of the members of the Class. There are no material conflicts between the claims of the Class Representatives and the members of the Class making class certification inappropriate. Counsel for the Class will vigorously assert the ~~Representative's~~Representatives' claims and those of the members of the Class.

## Rule 23(b)(3) Prerequisites

56~~6~~7. In addition, the prosecution of the claims of the Class as a class action pursuant to Fed. R. Civ. P. 23(b)(3) is appropriate because:

(a)     The questions of law or fact common to the members of the Class predominate over any questions affecting only its individual members; and

(b)     A class action is superior to other methods for the fair and efficient resolution of the controversy.

## Rule 23(b)(2) Prerequisites

57~~7~~8. In the alternative, the prosecution of the claims of the Class as a class action pursuant to Fed. R. Civ. P. 23(b)(2) is appropriate because Monsanto has acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

## Class of Direct Purchasers of Monsanto Corn Seed Resistant to the European Corn Borer

5~~8~~9. Plaintiffs American Seed Co. Inc. ~~is~~and Jerry Ellefson are representatives of a class of persons ("Class of Direct Purchasers of Corn Seed Resistant to European Corn Borer" or "Borer-Resistant Corn Seed Class") directly purchasing corn seed resistant to European Corn Borer from the Monsanto Company (including its controlled seed companies) between July 26, 2001 and the present excluding citizens of the States of Iowa and Minnesota, persons affiliated with Monsanto, or governmental entities. The Class includes primarily farmers and retailers of this seed to these farmers.

### Rule 23(a) Prerequisites

~~59~~60. Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

(a) **Numerosity.** The number of persons in the Class is, upon information and belief, in the thousands, and the members of the Class are therefore so numerous that joinder of all members of the Class is impracticable. Joinder is also impracticable because of the geographic diversity of the members of the Class, the need to expedite judicial relief, and the Class ~~Representative's~~Representatives' lack of knowledge of the identity and addresses of all members of the Class.

(b) **Common Questions.** There are numerous questions of law and fact arising from the pattern of Monsanto's anti-competitive conduct which are common to the members of the Class. These include, but are not limited to, common issues as to:

- the existence of a relevant market for corn seed resistant to the European Corn Borer and Monsanto's monopoly power in such market;

- whether Monsanto has unlawfully maintained a monopoly in this relevant market;

- whether Monsanto's maintenance of its monopoly over the relevant market harmed competition;

- whether such monopoly maintenance caused antitrust injury to members of the Class due to Monsanto's above-competitive pricing to members of the Class; and

- the nature and extent of the injunctive and actual damage relief available to the members of the Class.

6~~0~~1.    **Adequacy of Representation**. The claims of the Class Representatives are typical of the claims of the members of the Class and fairly encompass the claims of the members of the Class.  The Class Representatives and the members of the Class are similarly or identically harmed by the same systematic and pervasive conduct.

6~~1~~2.    The Class Representatives and ~~its~~their counsel will fairly and adequately protect the interests of the members of the Class.  There are no material conflicts between the claims of the Class Representatives and the members of the Class making class certification inappropriate. Counsel for the Class will vigorously assert the ~~Representative's~~Representatives' claims and those of the members of the Class.

### Rule 23(b)(3) Prerequisites

6~~2~~3.    In addition, the prosecution of the claims of the Class as a class action pursuant to Fed. R. Civ. P. 23(b)(3) is appropriate because:

(a)    The questions of law or fact common to the members of the Class predominate over any questions affecting only its individual members; and

(b)    A class action is superior to other methods for the fair and efficient resolution of the controversy.

### Rule 23(b)(2) Prerequisites

6~~3~~4.    In the alternative, the prosecution of the claims of the Class as a class action pursuant to Fed. R. Civ. P. 23(b)(2) is appropriate because Monsanto has acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

### Class of Direct Purchasers of Monsanto
### Corn Seed Resistant to Root Worm

6~~4~~5.    Plaintiff~~s~~ American Seed Co. Inc. ~~is~~and Jerry Ellefson are representative~~s~~ of a class of persons ("Class of Direct Purchasers of Corn Seed Resistant to Root Worm" or "Root-Worm-Resistant Corn Seed Class") directly purchasing corn seed resistant to root worm from the Monsanto Company (including its controlled seed companies) between July 26, 2001 and the present excluding citizens of the States of Iowa and Minnesota, persons affiliated with Monsanto, or governmental entities. The Class includes primarily farmers, and retailers of this seed to these farmers.

### Rule 23(a) Prerequisites

6~~5~~6.     Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

(a)     **Numerosity.**  The number of persons in the Class is, upon information and belief, in the thousands, and the members of the Class are therefore so numerous that joinder of all members of the Class is impracticable.  Joinder is also impracticable because of the geographic diversity of the members of the Class, the need to expedite judicial relief, and the Class ~~Representative's~~Representatives' lack of knowledge of the identity and addresses of all members of the Class.

(b)     **Common Questions.** There are numerous questions of law and fact arising from the pattern of Monsanto's anti-competitive conduct which are common to the members of the Class.  These include, but are not limited to, common issues as to:

- the existence of a relevant market for corn seed resistant to root worm and Monsanto's monopoly power in such market;

- whether Monsanto has unlawfully maintained a monopoly in this relevant market;

- whether Monsanto's maintenance of its monopoly over the relevant market harmed competition;

- whether such monopoly maintenance caused antitrust injury to members of the  Class due to Monsanto's above-competitive pricing to members of the Class; and

- the nature and extent of the injunctive and actual damage relief available to the members of the Class.

66~~7~~. **Adequacy of Representation**. The claims of the Class Representatives are typical of the claims of the members of the Class and fairly encompass the claims of the members of the Class.  The Class Representatives and the members of the Class are similarly or identically harmed by the same systematic and pervasive conduct.

67~~8~~.    The Class Representatives and ~~its~~their counsel will fairly and adequately protect the interests of the members of the Class.  There are no material conflicts between the claims of the Class Representatives and the members of the Class making class certification inappropriate. Counsel for the Class will vigorously assert the ~~Representative's~~Representatives' claims and those of the members of the Class.

### Rule 23(b)(3) Prerequisites

68~~9~~.    In addition, the prosecution of the claims of the Class as a class action pursuant to Fed. R. Civ. P. 23(b)(3) is appropriate because:

(a)    The questions of law or fact common to the members of the Class predominate over any questions affecting only its individual members; and

(b)    A class action is superior to other methods for the fair and efficient resolution of the controversy.

### Rule 23(b)(2) Prerequisites

~~69~~70.    In the alternative, the prosecution of the claims of the Class as a class action pursuant to Fed. R. Civ. P. 23(b)(2) is appropriate because Monsanto has acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

### Class of Direct Purchasers of Monsanto Corn Seed

**With Stacked Traits**

7~~0~~1.    Plaintiff~~s~~ American Seed Co. Inc. ~~is~~and Jerry Ellefson a~~re~~ representative~~s~~ of a class of persons ("Class of Direct Purchasers of Monsanto Corn Seed with Stacked Traits" or "Stacked-Trait Corn Seed Class") directly purchasing seed corn from Monsanto Company (including its controlled seed companies) between July 26, 2001 and the present excluding citizens of the States of Iowa and Minnesota, persons affiliated with Monsanto, or governmental entities. The Class includes primarily farmers, and retailers of seed to these farmers.

### Rule 23(a) Prerequisites

7~~1~~2.    Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

(a)    **Numerosity.** The number of persons in the Class is, upon information and belief, in the thousands, and the members of the Class are therefore so numerous that joinder of all members of the Class is impracticable.   Joinder is also impracticable because of the geographic diversity of the members of the Class, the need to expedite judicial relief, and the Class ~~Representative's~~Representatives' lack of knowledge of the identity and addresses of all members of the Class.

(b)    **Common Questions.** There are numerous questions of law and fact arising from the pattern of Monsanto's anti-competitive conduct which are common to the members of the Class.   These include, but are not limited to, common issues as to:

●    the existence of a relevant market and sub-markets for seed corn with stacked traits, and Monsanto's monopoly power in such market(s);

- whether Monsanto has unlawfully maintained a monopoly in the relevant market(s);

- whether Monsanto's maintenance of its monopoly over the relevant market(s) harmed competition;

- whether such monopoly maintenance caused antitrust injury to members of the Class due to Monsanto's above-competitive pricing of the corn seed to members of the Class; and

- the nature and extent of the injunctive and actual damage relief available to the members of the Class.

7~~2~~3.    **Adequacy of Representation**.  The claims of the Class Representatives are typical of the claims of the members of the Class and fairly encompass the claims of the members of the Class.  The Class Representatives and the members of the Class are similarly or identically harmed by the same systematic and pervasive conduct including pervasive above competitive pricing of the corn seed by Monsanto.

7~~3~~4.    The Class Representatives and ~~its~~their counsel will fairly and adequately protect the interests of the members of the Class.  There are no material conflicts between the claims of the Class Representatives and the members of the Class making class certification inappropriate. Counsel for the Class will vigorously assert the ~~Representative's~~Representatives' claims and those of the members of the Class.

### Rule 23(b)(3) Prerequisites

7~~4~~5.    In addition, the prosecution of the claims of the Class as a class action pursuant to Fed. R. Civ. P. 23(b)(3) is appropriate because:

(a)    The questions of law or fact common to the members of the Class predominate over any questions affecting only its individual members; and

(b)    A class action is superior to other methods for the fair and efficient resolution of the controversy.

### Rule 23(b)(2) Prerequisites

75~~6~~. In the alternative, the prosecution of the claims of the Class as a class action pursuant to Fed. R. Civ. P. 23(b)(2) is appropriate because Monsanto has acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

### MONOPOLY MAINTENANCE

76~~7~~. In 1997, Monsanto began marketing a corn seed resistant to European Corn Borer under the YieldGard trade name.

77~~8~~. By 1998, Monsanto had introduced a Roundup Ready ® (glyphosate-tolerant) corn seed using the "GA21 event" Defendant DeKalb had developed with Rhone-Poulenc.

78~~9~~. In 2003, Monsanto began marketing a corn seed resistant to root worm, called YieldGard Root worm®, and in 2004 a combination product or "stack" of the European Corn Borer trait and the root worm resistant trait, called YieldGard Plus ®. Today, Monsanto also produces a stacked borer-resistant and glyphosate-tolerant seed corn.

~~79~~80. Monsanto has sold glyphosate-tolerant, borer-resistant, and root-worm resistant seeds through its named controlled subsidiaries, that is, Defendants American Seeds Inc., Corn States Hybrid Service Inc., Asgrow Seeds Co. Inc., Holden Foundation Seeds, Inc., DeKalb Seeds, Calgene L.L.C., NC+ Hybrids, Channel Bio Co., and Seminis Inc.

**Exclusive Dealing Contracts**

8̶0̶1.    The Monsanto GA 21 License for the glyphosate-resistant trait typically provides substantial financial incentives for the seed companies selling to the Glyphosate- Tolerant Corn Seed Class to favor Monsanto's trait.  If Monsanto's Roundup Ready® corn seeds constitute, for example, 85% of the seed company's herbicide-tolerant corn seed sales, on or before progress or milestone dates, milestone payments to Monsanto are significantly reduced or waived altogether.

8̶1̶2.    Substantially similar Monsanto agreements, with varied target market share, control the use by seed companies selling to the Classes (i) Monsanto's NK603 glyphosate-tolerant corn trait, (ii) its European Corn Borer resistant corn trait, (iii) its root worm-resistant corn trait, and (iv) products containing combinations or "stacks" of these corn traits.

8̶2̶3.    Actual or potential trait competitors such as Syngenta Seeds, Inc. ("Syngenta") develop and produce a wide range of agricultural products, including biotechnology seeds and other crop protection products (such as herbicides, insecticides and fungicides).  Syngenta is also a provider of seed traits in the United States.

8̶3̶4.    Syngenta markets a corn trait resistant to the European Corn-Borer trait, Bt11, by license to other seed companies and through its own NK® brand corn seeds. To date, Syngenta has been able to gain only a small market  share only in the borer-resistant corn trait market.

8̶4̶5.    On February 5, 2004, Syngenta's affiliate acquired the intellectual property rights to the GA21 glyphosate-tolerant corn trait from Bayer CropScience. Syngenta now has the right to introduce and market its own GA21 product and to license others.  As part of the acquisition,

Syngenta's affiliate also acquired the GA21 license from Bayer CropScience under which Monsanto and its sublicensees operate to produce GA21 corn seeds through 2004.

8<s>5</s><u>6</u>.    On May 12, 2004, Syngenta's affiliate announced its intention to acquire Advanta BV, including Advanta's Garst Seeds subsidiary and its U.S. corn and soybean seed businesses. At the same time, Syngenta's affiliate publicly announced its acquisition of the GA21 rights from Bayer CropScience.

8<s>6</s><u>7</u>.    Syngenta announced an agreement to acquire the Golden Harvest group of seed companies on June 25, 2004. Golden Harvest is a producer of hybrid corn and soybean seeds.

8<s>7</s><u>8</u>.    The combination of the Advanta, Golden Harvest and GA21 acquisitions will permit Syngenta to expand its corn product offering and provide seed companies and growers a full range of biotechnology input traits for corn in competition with Monsanto.    <s>Syngenta</s><u>Syngetna</u> will commercialize GA21 in NK®, Golden Harvest®, and Garst® brand seeds, and through licenses to other seed companies. It plans to introduce the GA 21 corn trait to the market for the 2005 growing season as a complement to its corn borer resistant trait, both in competition with Monsanto. Syngenta plans to offer a root worm-resistant trait in 2007.

8<s>8</s><u>9</u>.    Syngenta also wishes to expand its distribution of borer-resistant corn trait in foundation and hybrid seeds via the NK®, Golden Harvest®, and Garst® seed brands.

<s>89</s><u>90</u>.    On May 13, 2004, Monsanto notified seed companies selling to the Classes that it sought to prevent any unauthorized sales of GA21 corn seeds. Monsanto pressured seed companies not to deal with Syngenta and implicitly threatened to sue the seed companies if they cooperated with Syngenta's entry.

## **Product Bundling to Deny Competitors**

## Distribution of Corn Seed with Traits

9θ1.    As Monsanto added new corn seed traits to its portfolio, it leveraged its more established traits to promote its newer traits by bundling additional financial incentives across all of its products to cause seed companies to use only its traits to create biotechnological corn seed. At least as early as 1998, Monsanto bundled additional payments of fees and additional waivers of progress or milestone payments across its glyphosate-tolerant soybeans, glyphosate-tolerant corn and borer-resistant corn. At least by 2003, Monsanto had expanded the range of products covered by its bundled incentives to cover root worm-resistant corn as well.

9±2.    To carry out its bundling plan, Monsanto has entered an "Amended and Restated Licensee Incentive Agreement" (the "Incentive Agreement") with seed companies. Under the Incentive Agreement, seed companies meeting certain targets are paid an additional 5% to 10% of the fee and receive reduced or waived milestone payments that may be due under the individual trait licenses.

9²3.    However, to qualify for any of these payments or waivers, the seed company must ensure every year that its sales of each trait are at least 70% Monsanto brand products. If the seed company does not maintain Monsanto's target in any product, it loses the incentives across the entire line of products and must repay previous waived fees.

9³4.    Thus, for example, a seed company may be faced with substantial financial penalties for one Monsanto product (such as glyphosate-tolerant corn seed) if it fails to sell enough of another Monsanto product (such as borer-resistant corn seed). The seed company may also lose the Incentive Agreement and thus lose the upside opportunities on all traits.

945.    On information and belief, Monsanto's trait licenses, including its GA21 License and its Incentive Agreements are long term and generally run through 2007 and may not be voluntarily terminated.  A majority of independent seed companies in the United States has signed Monsanto trait licenses and Incentive Agreements.

956.    The effect of Monsanto's bundled incentive programs is to create barriers to entry and expansion for its competitors seeking to sell corn seed with traits through  bundling fees and incentives across all product lines, which, in turn, defeat or deter new entrants and foreclose a substantial portion of competition for the sale of trait corn seed.

## INJURY TO COMPETITION

### Relevant Market for Corn Seed Tolerant of Glyphosate

967.    Monsanto's unlawful conduct has caused and will cause substantial  harm to competition in the market for the sale of glyphosate-tolerant corn seed in the United States.  As a consequence of Monsanto's exclusionary conduct, members of the Glyphosate-Tolerant Corn Seed Class have paid above-competitive prices directly to Monsanto (including its named controlled seed companies) for corn seed with the glyphosate-tolerant trait. This pricing does not include any licensing payments to Monsanto associated with the purchase or subsequent sale of the corn seed.

### Relevant Market for Corn Seed Resistant to European Corn Borer

978.    Monsanto's unlawful conduct has caused and will cause substantial  harm to competition in the market for the sale of corn seed resistant to the European Corn Borer.  As a

consequence of Monsanto's exclusionary conduct, members of the Borer-Resistant Corn Seed Class have paid above competitive prices directly to Monsanto (including its named controlled seed companies) for corn seed with the borer trait. This pricing excludes any licensing payments to Monsanto associated with the purchase or subsequent sale of the corn seed.

### Relevant Market for Corn Seed Resistant to Root Worm

98<u>9</u>.    Monsanto's unlawful conduct has caused and will cause substantial  harm to competition in the market for the sale of corn seed resistant to root worm.  As a consequence of Monsanto's exclusionary conduct and practices directed at its competitors, members of the Root-Worm Corn Seed Class have paid above-competitive prices directly to Monsanto (including its controlled seed companies) for corn seed resistant to root worm.  This pricing  does not include any licensing payments to Monsanto associated with the purchase or subsequent sale of the corn seed.

### Relevant Market for Corn Seed with Stacked Traits

99<u>100</u>. Monsanto's unlawful conduct has caused and will cause substantial  harm to competition in the market for the sale of corn seed with stacked traits.  As a consequence of Monsanto's exclusionary conduct and practices directed at its competitors, members of the Stacked-Trait Corn Seed Class have paid above-competitive prices directly to Monsanto (including its named controlled seed companies).  This pricing excludes any licensing payments to Monsanto associated with the purchase or subsequent sale of the corn seed.

### CLAIMS FOR RELIEF

### COUNT ONE

### Maintenance of a Monopoly in the Relevant Market<br>for Corn Seed Tolerant of Glyphosate

100<s>1</s>1.    Plaintiff<s>s</s> incorporate<s>s</s> herein the foregoing allegations.

10<s>1</s>2.    The sale of corn seed tolerant of glyphosate herbicide is a relevant product market.

10<s>2</s>3.    The relevant geographic market is the United States.

10<s>3</s>4.    Monsanto possesses monopoly power in the relevant market, maintaining a market share of 100%.  Substantial barriers to entry and expansion exist in the relevant market.

10<s>4</s>5.    Monsanto has the power to control market prices and exclude competition in the relevant market.

10<s>5</s>6.    Monsanto has engaged in conduct and a pattern of conduct with anti-competitive effects to unlawfully maintain and enhance its monopoly in the relevant market and to keep the relevant corn seed prices high, stifle competition, and eliminate consumer choice through exclusionary behavior.

10<s>6</s>7.    There is no legitimate business justification for Defendants' conduct.

10<s>7</s>8.    The Glyphosate-Tolerant Corn Seed Class has suffered and will suffer antitrust injury in the form of above-competitive corn seed prices paid directly to Monsanto (including its named controlled seed companies) for corn seed with the glyphosate-tolerant trait. The corn seed pricing at issue does not include any licensing payments to Monsanto associated with the purchase or subsequent sale of the corn seed.


**COUNT TWO**

**Maintenance of Monopoly in a Relevant Market for Corn Seed
Resistant to the European Corn Borer**

10<s>8</s>9.    Plaintiff<s>s</s> incorporate<s>s</s> herein the foregoing allegations.

~~109~~110.    The sale of corn seed resistant to the European Corn Borer is a relevant product market.

11~~0~~1.    The relevant geographic market is the United States.

11~~1~~2.    Monsanto possesses monopoly power in the relevant market, maintaining a market share of at least 80%. Substantial barriers to entry and expansion exist in the relevant market.

11~~2~~3.    Monsanto has the power to control market prices and exclude competition.

11~~3~~4.    Monsanto has engaged in conduct and a pattern of conduct with anti-competitive effects to unlawfully maintain and enhance its monopoly in the relevant market and to keep prices high, stifle competition and eliminate consumer choice through exclusionary behavior.

11~~4~~5.    There is no legitimate business justification for Defendants' conduct.

11~~5~~6.    The Borer-Resistant Corn Seed Class  has suffered and will  suffer anti-trust injury in the form of above-competitive prices paid directly to Monsanto (including its named controlled seed companies) for corn seed with the borer-resistant trait.  The corn seed pricing at issue does not include any licensing payments to Monsanto associated with the purchase or subsequent sale of the corn seed.

### COUNT THREE
### Maintenance of a Monopoly in the Relevant Market
### for Corn Seed Resistant to Root Worm

116.    ~~Plaintiff incorporates herein the foregoing allegations.~~

~~117.    The sale of corn seed resistant to root worm is a relevant product market.~~

~~118.    The relevant geographic market is the United States.~~

~~119.    Monsanto possesses monopoly power in the relevant market, maintaining a market share of 100%.  Substantial barriers to entry and expansion exist in the relevant market.~~

~~120.    Monsanto has the power to control market prices and exclude competition.~~

~~121.    Monsanto has engaged in conduct and a pattern of conduct with anti-competitive effects to unlawfully maintain and enhance its monopoly in the relevant market and to keep prices high, stifle competition, and eliminate consumer choice through exclusionary behavior.~~

~~122.    There is no legitimate business justification for Defendants' conduct.~~

~~Text Was Moved From Here: 1~~

## ~~COUNT FOUR~~

### ~~Maintenance of a Monopoly in the Relevant Market~~

~~for Stacked Corn Seed~~        ~~124.    Plaintiff incorporates~~<u>7.</u>        <u>Plaintiffs incorporate</u>herein the foregoing allegations.

12<u>5</u><u>18</u>. The sale of corn seed ~~with stacked corn traits~~<u>resistant to root worm</u> is a relevant product market~~, or consists of relevant product sub-markets according to the traits stacked.~~

~~126.~~<u>.</u>

<u>119</u>.    The relevant geographic market is the United States.

12<u>7</u><u>0</u>.    Monsanto possesses monopoly power in the relevant market ~~and any sub-markets~~, maintaining a market share~~(s)~~ of 100%.  Substantial barriers to entry and expansion exist in the relevant market~~(s)~~.

12<u>8</u><u>1</u>.    Monsanto has the power to control market prices and exclude competition.

129~~2~~. Monsanto has engaged in conduct and a pattern of conduct with anti-competitive effects to unlawfully maintain and enhance its monopoly in the relevant market~~(s)~~ and to keep prices high, stifle competition, and eliminate consumer choice through exclusionary behavior.

~~130~~123.    There is no legitimate business justification for Defendants' conduct.

13~~1~~24. The ~~Stacked-Trait~~Root-Worm-Resistant Corn Seed Class has suffered and will suffer antitrust injury in the form of above-competitive prices paid directly to Monsanto   (including its named controlled seed companies) for corn seed with ~~stacked~~the root worm traits.  The corn seed pricing at issue does not include any licensing payments to Monsanto associated with the purchase or subsequent sale of the corn seed.

=

### COUNT FOUR
### Maintenance of a Monopoly in the Relevant Market
### for Stacked Corn Seed

125.    Plaintiffs incorporate herein the foregoing allegations.

126.    The sale of corn seed with stacked corn traits is a relevant product market, or consists of relevant product sub-markets according to the traits stacked.

127.    The relevant geographic market is the United States.

128.    Monsanto possesses monopoly power in the relevant market and any sub-markets, maintaining a market share(s) of 100%. Substantial barriers to entry and expansion exist in the relevant market(s).

129.    Monsanto has the power to control market prices and exclude competition.

130.    Monsanto has engaged in conduct and a pattern of conduct with anti-competitive effects to unlawfully maintain and enhance its monopoly in the relevant market(s) and to keep prices high, stifle competition, and eliminate consumer choice through exclusionary behavior.

131.    There is no legitimate business justification for Defendants' conduct.


Text Moved Here: 1

~~123~~132.    The ~~Root-Worm-Resistant~~Stacked-TraitCorn Seed Class has suffered and will suffer antitrust injury in the form of above-competitive prices paid directly to Monsanto ~~(including its named controlled seed companies)~~ for corn seed with ~~the root worm~~ stacked trait~~s~~. The corn seed pricing at issue does not include any licensing payments to Monsanto associated with the purchase or subsequent sale of the corn seed.

End Of Moved Text

## DEMAND FOR TRIAL BY JURY

Pursuant to Fed. R. Civ. P. 3(b), Plaintiff~~s~~ demand~~s~~ a trial by jury.



## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFF~~S~~ PRAY~~S~~ THIS COURT:

A.    Find that Defendants have unlawfully monopolized the sale of biotechnological corn seed in the relevant markets in violation of Section 2 of the Sherman Act and award plaintiff Classes treble damages in amounts to be proven at trial, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a);

B.    Grant injunctive relief prohibiting Defendants and all persons, firms and corporations acting on their behalf and under their direction or control from continuing violations of Section 2 of the Sherman Act, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26;

C.    Award plaintiff Classes such other relief as is necessary or appropriate to restore and maintain competitive conditions in the markets affected by Defendants' unlawful conduct; and

D.    Award plaintiffs attorneys' fees and costs of this action.

SMITH, KATZENSTEIN & FURLOW LLP


Joelle E. Polesky (ID No. 3694)
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899 (Courier 19801)
Telephone: 302-652-8400
Facsimile: 302-652-8405
E-mail: jpolesky@skfdelaware.com
Attorneys for Plaintiffs

~~July 26, 2005~~
~~SMITH, KATZENSTEIN & FURLOW LLP~~


~~Joelle E. Polesky (ID No. 3694)~~

~~800 Delaware Avenue, 7th Floor~~

~~P.O. Box 410~~

~~Wilmington, DE 19899 (Courier 19801)~~

~~Telephone: 302-652-8400~~

~~Facsimile: 302-652-8405~~

~~Attorneys for American Seed~~

Text Was Moved From Here: 2

~~Of~~ Dated: March 22, 2006

10012378.WPD                    -34-

<u>Of</u> Counsel:

KELLOGG, HUBER, HANSEN,
TODD, EVANS & FIGEL P.L.L.C.
Steven ~~V~~F. Benz~~, D.C. Bar No. 428026~~
Michael S. Zuckman~~, D.C. Bar No. 472546~~
1615 M St., N.W.~~-~~
, Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
~~Telecopy~~Facsimile: (202) 326-7999

BERRY & LEFTWICH
R. Stephen Berry~~, D.C. Bar No. 234815~~
J. Daniel Leftwich~~, D.C. Bar No. 428134~~
Gregory Baruch~~, D.C. Bar No. 420137~~
1717 Pennsylvania Ave. NW

10012378.WPD

-35-

Suite 450
Washington, DC  20006
Telephone:  (202) 296-3020
TelecopyFacsimile:    (202) 296-3038

10012378.WPD