FILED UNDER SEAL - CONTAINS RESTRICTED CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN SEED CO. INC. | ) | REDACTED |
| | ) | |
| Plaintiff, On Behalf Of Itself | ) | |
| and Others Similarly Situated, | ) | |
| | ) | C.A. NO. 05-535 |
| v. | ) | |
| | ) | |
| MONSANTO COMPANY, et al. | ) | |
| | ) | |

| | | |
|---|---|---|
| DARRELL SOUHRADA and | ) | |
| DAVE JOHNSON, | ) | |
| | ) | |
| Plaintiffs, On Behalf of Themselves | ) | |
| and Iowa Citizens Similarly | ) | |
| Situated, | ) | C.A. NO. 05-535 |
| | ) | |
| v. | ) | |
| | ) | |
| MONSANTO COMPANY | ) | |
| | ) | |
| Defendant | ) | |

| | | |
|---|---|---|
| KENT DUXBURY | ) | |
| | ) | |
| Plaintiff, On Behalf of Himself | ) | |
| and Minnesota Citizens | ) | |
| Similarly Situated, | ) | C.A. NO. 05-535 |
| | ) | |
| v. | ) | |
| | ) | |
| MONSANTO COMPANY | ) | |
| | ) | |
| Defendant | ) | |

## DECLARATION OF MORTON I. KAMIEN
## REGARDING CLASS CERTIFICATION

Morton I. Kamien declares and states as follows:

I am the Joseph and Carole Levy Professor of Entrepreneurship at Northwestern University's Kellogg School of Management. I received my B.A. from City College of New York in 1960 and my Ph.D. from Purdue University in 1964. I began teaching at the Graduate School of Industrial Administration at Carnegie-Mellon University in 1963 and left in 1970 to become a professor of managerial economics at the Kellogg School of Management at Northwestern University, where I have been ever since.

I have taught a variety of subjects, including microeconomics, macroeconomics, international economics, the economics of industrial organization, calculus of variations and optimal control theory, and statistics. My research interests have been largely in the economics of industrial organization, the field of economics that includes the study of antitrust issues. I have published over seventy-five papers in economics journals and books, and have coauthored two books. I am listed in all the editions of *Who's Who in Economics*, am a fellow of the Econometric Society, and have received an honorary degree from Purdue University.

I have also consulted and testified in a number of antitrust cases. My billing rate for the provision of expert services is $700 per hour plus expenses. My compensation is unaffected by the outcome of this matter. A copy of my *curriculum vitae* is attached as Exhibit A.

## Summary of Conclusions

Plaintiffs, through their counsel, have asked me to determine whether the conduct constituting the antitrust violations alleged in the Complaints, if proven, can be shown to

using common formulaic proof. The damages to the class are then determined by subtracting the amount that would have been paid under the "but for" prices from the amount actually paid.

Common impact on all members of each of the Iowa and Minnesota classes can be demonstrated by showing that, as a result of Monsanto's monopoly power (derived from or maintained by the anticompetitive conduct alleged in the Complaints), class members were charged higher prices for biotechnology corn seed than they would have had to pay if Monsanto had not engaged in anticompetitive conduct. Insofar as Iowa and Minnesota class members purchased directly from Monsanto or from a Monsanto-controlled subsidiary, the analysis is identical to that used for the national classes above. Insofar as Iowa and Minnesota class members purchased the relevant Monsanto biotechnology corn seed through independent distributors, all that needs to be proved to show common impact is that it is likely that at least some amount of the monopoly overcharge incorporated in the price charged by Monsanto to its independent distributors was passed on to customers. As discussed below, it is my opinion that it is overwhelmingly likely that this was the case.

The calculation of damages for each class is also susceptible of common proof. Here, too, Plaintiffs need to establish the amounts by which purchasers were overcharged due to monopoly pricing during the damage period. This involves determining what the price of the biotechnology corn seed at issue would have been in the absence of the anticompetitive conduct. Using benchmarks set forth in Dr. Lesser's report, it is possible to calculate these "but for" prices for biotechnology corn seed using common formulaic proof. The damages to the class are then determined by subtracting the amount that would have been paid under

the "but for" prices from the amount actually paid. Here, too, insofar as Iowa and Minnesota class members purchased Monsanto biotechnology corn seed directly from Monsanto or from a Monsanto-controlled subsidiary, the analysis is identical to that for the national classes. Insofar as they purchased through an independent distributor, as discussed below, it is my conclusion that, at a minimum, the full amount of the overcharge was passed on.

**The Proposed Classes**

I am informed that there are three groups of classes seeking certification in this case under Federal Rule of Civil Procedure 23.

National Direct Purchaser Classes. Plaintiff American Seed Company and proposed intervenor Jerry Ellefson seek certification of four classes (in all cases excluding citizens of Iowa and Minnesota), consisting of all persons who, since July 26, 2001, have directly purchased from defendants the following:

Direct Purchaser Glyphosate Class: corn seed that is tolerant of glyphosate herbicide.

Direct Purchaser Corn Borer Class: corn seed resistant to European corn borer.

Direct Purchaser Root Worm Class: corn seed resistant to root worm.

Direct Purchaser Stacked Trait Class: corn seed with stacked traits.

Iowa Classes. Plaintiffs Darrell Souhrada and Dave Johnson seek certification of four classes of Iowa citizens who have purchased the following from Defendants or their independent distributors between July 29, 2001 and the present:

Iowa Glyphosate Class: corn seed that is tolerant of glyphosate herbicide.

Iowa Corn Borer Class: corn seed resistant to European corn borer.

Iowa Root Worm Class: corn seed resistant to root worm.

5

Iowa Stacked Trait Class: corn seed with stacked traits.

<u>Minnesota Classes</u>.  Plaintiff Kent Duxbury seeks certification of four classes of Minnesota citizens who have purchased the following from Defendants or their independent distributors between July 29, 2001 and the present:

Minnesota Glyphosate Class: corn seed that is tolerant of glyphosate herbicide.

Minnesota Corn Borer Class: corn seed resistant to European corn borer.

Minnesota Root Worm Class: corn seed resistant to root worm.

Minnesota Stacked Trait Class: corn seed with stacked traits.

It is my understanding that both the Iowa and Minnesota Classes are limited to growers.

## Monsanto's Alleged Antitrust Violations

Since 1997, Monsanto has sold YieldGard, a corn seed resistant to European corn borer. In 1998, Monsanto introduced Roundup Ready corn seed that is tolerant to glyphosate herbicide. In 2003, Monsanto began selling its YieldGard Root Worm, a root worm-resistant corn seed. In 2004, Monsanto introduced YieldGard Plus, which stacks the European corn borer-resistant trait and the root worm-resistant trait. Monsanto also produces corn seed that stacks the borer-resistant and glyphosate-tolerant traits.

Monsanto has engaged in two categories of conduct that Plaintiffs allege violate the antitrust laws:  exclusive dealing contracts and product bundling.

In the first category are Monsanto's licenses providing substantial financial incentives for seed companies in return for selling a high proportion of biotechnology corn seeds with Monsanto traits as opposed to biotechnology corn seed that provide the same relevant trait

6

provided by Monsanto's trait competitors. For example, Monsanto's GA21 licenses for the glyphosate-resistant trait reduce or waive milestone payments if the seed company's sales of Roundup Ready corn seeds constitute 85% of its total sales of herbicide-tolerant corn seed. Am. Seed Am. Compl. ¶¶ 81-82. In other words, if the seed company's sales of competing herbicide-tolerant corn seed with non-Monsanto traits exceed 15% of the seed company's total sales of herbicide-tolerant corn seed, the seed company is penalized by Monsanto and in effect pays a higher amount to Monsanto for Monsanto traits solely because it has obtained traits from a Monsanto competitor. This provides a significant disincentive for such seed companies to use competing traits and produce biotechnology corn seed in competition with Monsanto. Am. Seed Am. Compl. ¶¶ 81-82, 84. Monsanto has also allegedly pressured seed companies not to deal with Syngenta (Monsanto's leading biotechnology corn seed competitor) as to the licensing of competing traits and has allegedly suggested that it may sue seed companies that cooperate with Syngenta. Am. Seed Am. Compl. ¶ 90.

The second category of alleged illegal conduct includes Monsanto's bundling of financial incentives across different types of Monsanto corn traits, to discourage seed companies from producing biotechnology corn seed with competing traits. Am. Seed Am. Compl. ¶¶ 91-96. Under Monsanto's Amended and Restated Licensee Incentive Agreement, seed companies are given price reductions and their milestone payments are reduced or waived under individual trait licenses, provided that 70% of their biotechnology corn seed sales contains Monsanto traits. At least for certain times during the damage period, if the seed company did not maintain this target, it lost the incentives across the entire line of Monsanto traits and was required to pay amounts that had previously been waived. Am.

7

Seed Am. Compl. ¶¶ 92-94. These requirements similarly provide significant disincentives for seed companies to produce biotechnology corn seed competitive with Monsanto's. *Id.* ¶96.

**Proof of Common Injury and Damages**

Plaintiffs allege that each class member was injured to at least some degree as a result of Monsanto's alleged anticompetitive conduct. Plaintiffs' counsel have asked me to determine whether, if the conduct alleged were proven at trial, it will be possible to show injury to every member of each of the three groups of class member (National Direct Purchaser, Iowa, and Minnesota) on a common basis. In my opinion, it will be possible to do so.

Here, the common impact or injury alleged with respect to each class member in each proposed class is that the class member paid more for biotechnology corn seed than the class member would have paid in a competitively unrestrained market. If Monsanto's conduct is proven to have restrained trait competition -- by excluding Syngenta and other trait competitors and discouraging competition for Monsanto biotechnology corn seed by corn seed with non-Monsanto traits -- it is economically reasonable to conclude that this had the effect of raising or maintaining prices for all purchasers in the biotechnology corn seed market above what they would have been otherwise. In the biotechnology corn seed markets at issue (as elsewhere), the dimensions of competition are price and quality. In that setting, it is standard economic theory that, absent artificial impediments, competition will drive the price down to the level at which the supplier realizes a reasonable or normal rate of return, taking into account the distinctive quality dimension of his product.

8

Therefore, even without further analysis, it would be reasonable as a matter of economic theory to conclude that all members of a particular class were injured at least to some extent if, as alleged, competition was impeded in the relevant product market.

In addition, however, further substantiation of common impact is available. It is also necessary in this litigation to measure class members' damages, and this damage analysis can provide common proof that class members were injured. It is my conclusion that this can be done in a common formulaic way using data largely available from Monsanto. One approach commonly employed by economists to assess the magnitude of damages is to determine "benchmarks" or "yardsticks" that can be used to develop a methodology for assessing what prices would have been in the absence of the anticompetitive conduct. In this case, damages equal the difference between what the class members paid for biotechnology corn seed in the alleged anticompetitive period and what they would have paid in the absence of the anticompetitive practices.

Dr. Lesser has identified two possible benchmark products that he believes would be reasonable in estimating damages to class members. As set forth in his Declaration, there are several proposed benchmarks for determining what the competitive prices would have been that appear to be feasible and for which data are likely to be available:

REDACTED

REDACTED

These benchmarks would be used to determine Monsanto's gross margins in the benchmark markets and compare them to its gross margins with respect to the sales of biotechnology corn seed to the classes at issue here. If, as alleged, Monsanto has monopolized the relevant markets, it is reasonable to expect that its gross margins were elevated, as inflated gross margins have long been recognized as a result of monopoly power. The achievement and maintenance of a monopoly position enables a monopolistic firm to realize extraordinary profits by charging higher than competitive prices (by which I mean the prices that the firm would have obtained if it had not been for its exclusionary conduct). These higher prices resulting from a firm's monopoly power are reflected in the item's gross margin, defined as the price per unit of the item, P, minus its cost per unit, C, divided by price per unit of the item, P; or by the formula, "gross margin (GM) = (P-C)/P." (The gross margin a firm realizes was recognized by the distinguished economist Abba Lerner to be a measure of its monopoly power. The higher the gross margin, the greater the firm's monopoly power. This Lerner Index of monopoly power is widely cited in microeconomics texts. A. P. Lerner, "The Concept of Monopoly and the Measurement of Monopoly Power," *The Review of Economic Studies*, Vol. 1, No. 3 (Jan. 1934): 157-175 at 169.

For example, if the gross margin obtained by Monsanto is 80% and its production cost is $1 per unit, then its price to the direct purchaser will be $5; if the gross margin is 50%, then the price will be $2; and so forth. Dr. Lesser's proposed benchmarks allow us to determine what Monsanto's gross margins are in similar markets apparently untainted by

10

anticompetitive conduct. We can therefore determine the margins Monsanto would have obtained in the markets at issue here, and the prices it would have charged, had it not engaged in monopolistic conduct. Thus, by determining a benchmark gross margin based on the benchmark markets identified by Dr. Lesser it becomes a relatively simple matter to derive a damage formula that would determine what prices class members would have paid if Monsanto had had the same competitive gross margin in its sales to the class members.

A simpler way of putting it is as follows.

*Overcharge = actual price paid minus estimated "but for" price*

This requires us first to determine the actual price class members paid, REDACTED

REDACTED                                                    We

then determine the gross margin Monsanto would have realized in the competitive benchmark market and the corresponding competitive price from the equation:

*Unit price =    unit cost ÷ (1 - gross margin)*

We then assume that Monsanto would have charged that competitive price if it had not excluded competition. Thus, each product's competitive gross margin can be used to estimate competitive prices for each product at issue. It is then possible, using a common damage formula, to calculate the overcharge for each customer.

REDACTED

REDACTED

If there were real regional cost differences that would apply to all biotechnology corn seed competitors in a but for competitive market, then the benchmark regional gross margins can be adjusted accordingly. Class members' damages would still be computed by a common formula by comparing Monsanto's actual regional gross margins with the benchmark competitive regional gross margins.

REDACTED

## Proof of Injury and Damages for the Iowa and Minnesota Classes

An additional issue for members of the Iowa and Minnesota classes is that some of them do not purchase directly from Defendants but through an authorized distributor. This, however, does not change my conclusion that both injury and damages can be shown on a

12

common basis.

Independent distributors must recover their costs of business plus a competitive return on their investment or they will go out of business. When Monsanto charges a higher than competitive price for biotechnology corn seed, the distributor must charge class members a price that incorporates this price, and any other costs associated with reselling, and a competitive rate of return. As a result, above-competitive prices to resellers result in above-competitive prices to class members, and the existence of injury can be shown by common proof.

For example, if Monsanto sells biotechnology corn seed to distributors at $5, and its gross margin is 80%, then its cost of production is $1 per unit. In other words, Monsanto is making $4 per unit over its cost of production. For purposes of this example, let us assume that half of the $4 is determined to be a monopoly overcharge compared to a competitive benchmark, so that in a more competitive market Monsanto would be charging the distributor $3 rather than $5. That means that the distributor's current price charged to its customers includes Monsanto's price of $5 ($2 of which is a monopoly overcharge), in addition to its costs associated with reselling, and a competitive rate of return. This $2 monopoly overcharge is passed through to customers even if the distributor does not mark up Monsanto's price at all above his competitive rate of return and selling costs. The only way for the distributor's customer not to incur this $2 in monopoly overcharge would be to sell the seed at $3, and forego his or her competitive rate of return and selling costs. In other words, he or she would have to sell below cost and take a loss.

It is my understanding that the market among distributors of Monsanto biotechnology

13

corn seed is a competitive one – that is, that no independent distributor has monopoly power. As a result, no independent distributor is able to extract monopoly profits because of market power in the resale of Monsanto biotechnology corn seed. At the same time, there is no reason to believe that competition among distributors would be *less* intense in a market in which Monsanto had not excluded competition in the sale of competing biotechnology corn seed products. There is therefore no reasonable basis for concluding that such distributors would be making a higher margin on resale in a more competitive producer market than they are in the current, constrained market. This means that the full amount of Monsanto's monopoly overcharge is being passed on to purchasers.

In perfectly competitive markets, input costs are passed through to end users on a dollar-to-dollar basis. In less competitive distributor markets, an increase in input costs can result in a *more* than dollar-to-dollar increase in the price to end users. As noted above, I am not aware of any basis for concluding that any independent distributor has market power in reselling Monsanto biotechnology corn seed. Once again, this means that the full amount of the overcharge was passed on.

There are other, alternative ways to measure the pass-on of overcharges using common proof. If (for example) the distributor market were regarded as oligopolistic, then the distributors' markups would be higher than they would be in a competitive market. And this would mean that they could eliminate Monsanto's monopoly overcharge and still realize a positive profit. An analysis of this situation can be done through empirical estimation of the demand function for biotechnology corn seed and the Cournot oligopoly model to determine the equilibrium markup in the biotechnology corn seed distribution market. The

14

FROM :                           FAX NO. :8472564903              Apr. 14 2006 02:38PM P2

equilibrium markup is the one to which all the distributors independently and voluntarily find it their best interest to adhere. Knowing the equilibrium markup will make it possible to isolate the damages inflicted by Monsanto's monopolistic price overcharge on farmers. Of course, the same analysis could also be performed if the distributor markups are competitive.


REDACTED


I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on April 14, 2006.

Morton I. Kamien

15

**EXHIBIT A**

Curriculum Vita

April 2006

MORTON I. KAMIEN

Addresses

Home:     1500 Sheridan Road
          Wilmette, Illinois 60091
          847/251-4225

Office:   Kellogg School of Management
          Northwestern University
          Evanston, Illinois 60208
          847/491-5167

Personal

Born:   August 15, 1938, Warsaw, Poland

Education

B.A., City College of New York, 1960
Ph.D., Purdue University, 1964

Academic Experience

1963-67   Assistant Professor of Economics, Graduate School of Industrial Administration, Carnegie-Mellon University, Pittsburgh, Pennsylvania 15213.

1967-70   Associate Professor of Economics, Carnegie-Mellon University.

1970-78   Professor of Managerial Economics, Graduate School of Management, Northwestern University, Evanston, Illinois 60208.

1978-88   Harold L. Stuart Professor of Managerial Economics, Kellogg Graduate School of Management, Northwestern University.

1988-     Joseph and Carole Levy Professor of Entrepreneurship. Kellogg Graduate School of Management, Northwestern University

Research Interests

Economic theory, industrial organization, optimization techniques, entrepreneurship.

Administrative Experience

1971-75   Chair, Department of Managerial Economics and Decision Sciences, Northwestern University.

1

1976-78     Associate Dean for Academic Affairs, Kellogg Graduate School of Management, Northwestern University

1982-84     Associate Dean for Academic Affairs, Kellogg Graduate School of Management, Northwestern University.

1986-88     Associate Dean for Academic Affairs, Kellogg Graduate School of Management, Northwestern University.

1997-99     Chair, Department of Managerial Economics and Decision Sciences, Northwestern University.

1988- Director, Heizer Entpreneurship Research Center

Honors

Listed in *Who's Who in Economics:  A Biographical Dictionary of Major Economists 1700 to 1994 (first edition to current edition).*

Fellow of the Econometric Society

Doctor of Economics (honorary), Purdue University. 2001

Books

Dynamic Optimization, 2nd Edition, Elsevier North-Holland (1991), with N. L. Schwartz.

Market Structure and Innovation, Cambridge University Press (1982), with N. L. Schwartz.  (Spanish edition, 1988.)

Papers

"A Comment on Alternative Derivations of the Two Input Production Function with Constant Elasticity of Substitution," Zeitschrift für Nationalokonimie (April 1964), pp. 124-126.

"A Note on Complementarity and Substitution," International Economic Review (May 1964), pp. 221-227.

"Asymmetry Between Bribes and Charges," Water Resources Research (1966), pp. 147-57, with N. L. Schwartz and F. T. Dolbear

"On Interest Rate Guidelines for Federal Decision Making," Congressional Record (September 25, 1967), S 13543-5 in The Planning-Programming-Budgeting System:  Progress and Potentials.  Hearings Subcommittee on Economy in Government, J.E.C., Nineteenth Congress, September 20, 1967.

"Behavioral Rules and the Theory of the Firm," in Phillips and Williamson (eds.), Prices:  Issues in Theory, Practice and Policy, University of Pennsylvania Press, 1967, with R. M. Cyert.  Reprinted in C. K. Rowley (ed.), Readings in Industrial Economics, New York:  Crane, Russak and Co., 1972.

"Optimal 'Induced' Technical Change," Econometrica (January 1968), pp. 1-17, with N. L. Schwartz.

2

"The Paradox of Voting: Probability Calculations," <u>Behavioral Science</u> (July 1968), pp. 306-316, with Mark Garmen.

"Externalities in the Allocation of Air and Water Resources," <u>Economics of Air and Water Pollution</u>, Virginia Polytechnic Institute, April 1969, pp. 15-29, with O. Davis.

"A Naive View of the Indicator Problem," in Karl Brunner (ed.), <u>Targets and Indicators of Monetary Policy</u>, Chandler, 1969, with N. L. Schwartz.

"Induced Factor Augmenting Technical Progress from a Microeconomic Viewpoint," <u>Econometrica</u> (October 1969), pp. 668-684, with N. L. Schwartz.

"Externalities, Information and Alternative Collective Action," <u>The Analysis and Evaluation of Public Expenditures:  The PPB System</u>, JEC Compendium, Vol. 1, 1969, with O. Davis, reprinted in R. H. Havemann and J. Margolis (eds.), <u>Public Expenditures and Policy Analysis</u>, Markham, 1970, in Dorfman and Dorfman (eds.), <u>Economics of the Environment</u>, Norton, 1972, J. E. Reynolds, et al. (eds.), in <u>Readings in Natural Resource Economics</u>, MSS Information Corp., 1974; also Bobbs-Merrill, Reprint Series in Economics.

"Market Structure, Elasticity of Demand and the Incentive to Invent," <u>Journal of Law and Economics</u> (April 1970), pp. 241-52, with N. L. Schwartz.

"Revelation of Preference for a Public Good with Imperfect Exclusion," <u>Public Choice</u> (Fall 1970), pp. 19-30, with N. L. Schwartz.

"Expenditure Patterns for Risky R&D Projects," <u>Journal of Applied Probability</u> (March 1971), pp. 60-73, with N. L. Schwartz.

"Optimal Maintenance and Sale Age for a Machine Subject to Failure," <u>Management Science</u> (April 1971), pp. 495-504, with N. L. Schwartz.

"Limit Pricing and Uncertain Entry," <u>Econometrica</u> (May 1971), pp. 441-54, with N. L. Schwartz.

"Sufficient Conditions in Optimal Control Theory," <u>Journal of Economic Theory</u> (June 1971), pp. 207-14, with N. L. Schwartz.

"Theory of the Firm with Induced Technical Change," <u>Metroeconomica</u> (Sept.-Dec. 1971), pp. 233-56, with N. L. Schwartz.

"Timing of Innovations Under Rivalry," <u>Econometrica</u> (January 1972), pp. 43-60, with N. L. Schwartz.

"A Direct Approach to Choice Under Uncertainty," <u>Management Science</u> (April 1972), pp. 470-77, with N. L. Schwartz.

"Some Economic Consequences of Anticipating Technical Advance," <u>Western Economic Journal</u> (June 1972), pp. 123-38, with N. L. Schwartz.

"Exclusion Costs and the Provision of Public Goods," <u>Public Choice</u> (Spring 1972), pp. 43-55, with N. L. Schwartz.

"Uncertain Entry and Excess Capacity," <u>American Economics Review</u> (December 1972), pp. 918-27, with N. L. Schwartz.

"Public Goods, Externalities and Exclusion:  A Consolidation with Extensions," Journal of Public Economics (July 1973), pp. 217-30, with N. L. Schwartz and D. J. Roberts.

"Payment Plans and the Efficient Delivery of Health Care Services," Journal of Risk and Insurance (September 1973), pp. 427-36, with N. L. Schwartz.

"Risky R&D with Rivalry," Annals of Economic and Social Measurement (January 1972), pp. 267-77, with N. L. Schwartz.

"Patent Life and the Timing of Innovations," American Economic Review (March 1974), pp. 183-87, with N. L. Schwartz.

"Product Durability Under Monopoly and Competition," Econometrica (March 1974), pp. 289-301, with N. L. Schwartz.

"Cournot Oligopoly with Uncertain Entry," Review of Economic Studies (January 1975), pp. 125-31, with N. L. Schwartz.

"Market Structure and Innovative Activity:  A Survey," Journal of Economic Literature (March 1975), pp. 1-37, with N. L. Schwartz.

"On the Degree of Rivalry for Maximum Innovative Activity," Quarterly Journal of Economics (May 1976), pp. 245-60, with N. L. Schwartz.

"Optimal Control with Integral State Equations," Review of Economic Studies (October 1976), pp. 459-73, with E. Muller.

"Technology: More for Less?", in S. Weintraub (ed.), Modern Economic Thought, University of Pennsylvania Press, 1976, pp. 501-15, with N. L. Schwartz.

"A Note on Resource Usage and Market Structure," Journal of Economic Theory (August 1977), pp. 394-97, with N. L. Schwartz.

"Disaggregated Intertemporal Models with an Exhaustible Resource and Technical Advance," Journal of Environmental Economics and Management (1977), pp. 271-88, with N. L. Schwartz.

"Optimal Capital Accumulation and Durable Goods Production," Zeitschrift für Nationalökonomie (1977), pp. 25-43, with N. L. Schwartz.

"Self-Financing of an R&D Project," American Economic Review (June 1978), pp. 252-61, with N. L. Schwartz.

"Potential Rivalry, Monopoly Profits and the Pace of Inventive Activity," Review of Economic Studies (1978), pp. 547-57, with N. L. Schwartz.

"An Intergenerational Cake Eating Game," Economics Letters (1979), pp. 5-7, with N. Megiddo.

"A Generalized Hazard Rate," Economics Letters (1980), pp. 245-49, with N. L. Schwartz.

"Technical Change Inclinations of a Resource Monopolist," in G. Horwich and J. Quirk (eds.), Essays in Contemporary Fields of Economics, Purdue University Press (1981), with N. L. Schwartz.

"Role of Common Property Resources in Optimal Planning Models with Exhaustible Resources," in V. K. Smith and T. Krutilla (eds.), Explorations in Natural Resource Economics, R.F.F. (1982), with N. L. Schwartz.

"Conjectural Variations," The Canadian Journal of Economics (1983), pp. 191-211, with N. L. Schwartz.

"The Private Value of a Patent: A Game Theoretic Analysis," Journal of Economics (1984), pp. 93-118, with Y. Tauman.

"Conjectural Equilibrium and Strategy Spaces in Differential Games," in G. Feichtenger, Optimal Control Theory and Economic Analysis 2 (1985), pp. 569-580, with C. Fershtman.

"Dynamics of Fishing: The Relationship to Conjectural Variations," Journal of Environmental Economics and Management (1985), pp. 308-21, with D. Levhari and L. Mirman.

"Fees Versus Royalties and the Private Value of a Patent," Quarterly Journal of Economics (1986), pp. 471-91, with Y. Tauman.

"Characterization of Constant Policies in Optimal Control," Journal of Optimization Theory and Applications (1986), pp. 315-24, with E. Muller.

"Dynamic Duopolistic Competition with Sticky Prices" Econometrica (1987), pp. 1151-1164, with C. Fershtman.

"Market Structure and Innovation," in J. Eatwell, M. Milgate and P. Newman (eds.), New Palgrave, Macmillan, 1987.

"Limit Pricing," in J. Eatwell, M. Milgate and P. Newman (eds.), New Palgrave, Macmillan, 1987.

"Calculus of Variations," in J. Eatwell, M. Milgate and P. Newman (eds.), New Palgrave, Macmillan, 1987.

"Optimal License Fees for a New Product" Mathematical Social Sciences (1988), pp. 77-106, with Y. Tauman and I. Zang.

"Stochastic Differential Equations: Applications in Economics and Management Sciences" in Kotz and Johnson (eds.), Encyclopedia of Statistical Sciences, Vol. 8, New York: Wiley and Sons, 1988.

"Turnpike Properties in a Dynamic Duopoly with Sticky Prices," with C. Fershtman, International Economic Review (1990), pp. 49-60.

"The Limits of Monopolization Through Acquisition," with I. Zang, Quarterly Journal of Economics (1990), pp. 465-499.

"On the Value of Information in a Strategic Conflict," with Y. Tauman and S. Zamir, Games and Economic Behavior (1990), pp. 129-153.

"Subcontracting, Coordination, Flexibility and Production Smoothing in Aggregate Planning," with Lode Li, Management Science (1990), pp. 1352-1363.

"Market Structure and Innovation Revisited," Japan and the World Economy (1989), pp. 331-339.

"Bertrand Competition with Subcontracting," with L. Li and D. Samet, Rand Journal of Economics (1989), pp. 553-567.

"Patent Licensing," in Aumann, R. J. and S. Hart (eds.), Handbook of Game Theory with Economic Applications (1992), pp. 332-354.

"Optimal Service Speeds in a Competitive Environment," with E. Kalai and M. Rubinovitch, Management Science (1992), pp. 1154-1163

"Competitively Cost Advantageous Mergers and Monopolization," with Israel Zang, Games and Economic Behavior (1991), pp. 323-338.

"Optimal Licensing of Cost-Reducing Innovation," with S. Oren and Y. Tauman Journal of Mathematical Economics (1992), pp. 483-508.

"Cross-Licensing of Complementary Technologies," with C. Fershtman, International Journal of Industial Economics (1992), pp. 329-348.

"Research Joint Ventures and R&D Cartels," with Eitan Muller and Israel Zang, American Economic Review (1992), pp. 1293-1306.

"Monopolization by Sequential Acquisition," Journal of Law, Economics and Organization (1993), pp. 205-229, with Israel Zang

"Competing Research Joint Ventures," Journal of Economics and Management Strategy (1993), pp. 23-39, with Israel Zang

"Entrepreneurship" Business Week Executive Briefing Service, 1994

"Virtual Patent Extension by Cannibalization," Southern Economic Journal (1999), pp. 117-131, with Israel Zang.

"Meet Me Halfway: Research Joint Ventures and Absorptive Capacity," International Journal of Industrial Organization (2000), pp. 995-1012, with Israel Zang.

"A Cake for Cournot," Economics Letters, (2001), pp 349-355.

"Highway Robbery: Complementary Monopoly and the Hold-Up Problem," International Journal of Industrial Organization , (2001), pp. 1603-1621, with Yossi Feinberg.

"Patent Licensing: The Inside Story," Manchester School (2002), pp.7-15, with Yair Tauman.

"Coase and Hotelling: A Meeting of the Minds," Journal of Political Economy, (June 2004) pp. 718-23, with Johannes Horner

"Accentuate the Positive Eliminate the Negative"
http://www.encore.nl/publications.php?single=true&id=36

"Coopting 'Decisive' Technical Advances" (forthcoming 2006 in R&D book edited by Luca Lambertini and Roberto Cellni) with Israel Zang

Working Papers

"Game Theory and Brand Management in Pharmaceuticals" (working paper) 2005, with Jim Conley and Israel Zang

"Venture Capital Syndication" 2005, with Heidrun Hoppe

"The Advantages of Spinning Off into a Holdup" 2005, with Yossi Feinberg

<u>Testimony</u>

Last 4 years starting with the most recent:

Morelock Enterprises, Inc. v. Weyerhaeuser Co. (deposition) - for Plaintiff

Aaron Hill v. U.S. Smokeless Tobacco Inc. (deposition) - for Plaintiff

James J. LaChance & Chad Crossan vs. U.S. Tobacco, Inc. (deposition) - for Plaintiff

Savient Pharmaceuticals, Inc., Organan (Ireland) Ltd., and Organon USA, Inc. v. Duramed
Pharmaceuticals, Inc., and Barr Laboratories, Inc. (deposition) - for Defendant

In re: Massachusetts Smokeless Tobacco Litigation (deposition) - for Plaintiff

Jason Feuerabend v. UST, Inc., Smokeless Tobacco Brands, Inc., et al. (deposition) - for Plaintiff

CSR v. Cigna (deposition) - for Plaintiff

Coordination Proceeding Special Title (Rule 1550(b)) Smokeless Tobacco Cases I-IV, 3 C.C.P. Nos. 4250,
4258, 4259 & 4262 (CA) (deposition) - for Plaintiff

Bradburn Parent Teacher Store v. 3M (deposition, hearing) - for Plaintiff

Maureen Baker v. Jewel Food Stores (trial) - for Plaintiff

# EXHIBIT B
# REDACTED

## CERTIFICATE OF SERVICE

I certify that this 17th day of April, 2006, copies of the foregoing Declaration of Morton I. Kamien Regarding Class Certification (REDACTED) were caused to be served on the following by efiling:

Richard L. Horwitz
Potter Anderson & Corroon LLP
Hercules Plaza 6th Floor
1313 N. Market Street
Wilmington, DE 19801

Peter E. Moll
Howrey LLP
1299 Pennsylvania Ave. N.W.
Washington, D.C. 20004

Joelle E. Polesky (I.D. No. 3694)

10013360.WPD