**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AMERICAN SEED COMPANY, INC., Individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MONSANTO COMPANY, et al.,<br><br>Defendants. | ) | C.A. No. 05-535-SLR<br><br>**JURY TRIAL DEMANDED**<br><br>**PUBLIC VERSION** |
| DARRELL SOUHRADA<br><br>Plaintiff, On Behalf Itself and Iowa Citizens Similarly Situated,<br><br>v.<br><br>MONSANTO COMPANY,<br><br>Defendant. | ) | C.A. No. 05-535-SLR |
| KENT DUXBURY<br><br>Plaintiff, On Behalf Itself and Minnesota Citizens Similarly Situated,<br><br>v.<br><br>MONSANTO COMPANY,<br><br>Defendant. | ) | C.A. No. 05-535-SLR |

**DEFENDANT MONSANTO COMPANY'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

OF COUNSEL:

Peter E. Moll
John J. Rosenthal
Timothy Finley
HOWREY LLP
1299 Pennsylvania Ave., NW
Washington, DC 20004
(202) 783-0800

Dated: June 30, 2006
Public Version Dated: July 10, 2006

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
Wilmington, DE 19899
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Monsanto Company, American Seed, Inc., Corn States Hybrid Service, Inc., Holden Foundation Seeds, Inc., Dekalb Seeds, Calgene, L.L.C., Channel Bio Co., Nc+ Hybrids and Semins, Inc*

**TABLE OF CONTENTS**

NATURE AND STAGE OF PROCEEDINGS ..... 1

SUMMARY OF ARGUMENT ..... 1

1. Lack of Standing ..... 1

2. Individual Issues Predominate ..... 2

3. Lack of Typicality and Inadequacy under Rule 23(a) ..... 5

STATEMENT OF FACTS ..... 6

A. Monsanto's Corn Seed Businesses ..... 6

1. Holden's/Corn States ..... 7

2. DEKALB and Asgrow Branded Seed Sales ..... 10

3. The ASI Companies and Direct Hybrid Seed Sales ..... 11

B. The Corn Seed Market ..... 11

1. Competition in the Corn Seed Market ..... 11

2. Critical Importance of Germplasm ..... 11

3. Significant Variations in Regional and Local Demand ..... 12

4. Growers Look to Yield and Total Costs ..... 13

ARGUMENT ..... 13

I. Plaintiffs American Seed and Mr. Duxbury Lack Standing ..... 14

II. Plaintiffs Have the Burden of Establishing the Prerequisites for Class Certification ..... 15

III. Individual Issues Overwhelm Common Issues on Antitrust Impact ..... 17

A. *Blades* Precludes Re-Litigating the Issue of Class-Wide Impact ..... 17

B. Corn Seed Pricing Does Not Follow Transgenic Trait Pricing ....................19

C. Varying Prices in the Corn Seed Market Prevent Establishing Impact with Common Proof ....................20

IV. Plaintiffs' Cannot Meet Their Burden by Proferring an Expert Who Simply Assumes Common Impact ....................23

A. Plaintiffs' Expert Assumes Common Antitrust Injury Without Any Analysis of the Corn Seed Market ....................23

1. Actual Market Data and Other Evidence Contradict Prof. Kamien's Assumptions ....................26

2. Prof. Kamien's Assumptions Ignore Any Differences Among Seed Varieties ....................27

3. Prof. Kamien and Plaintiffs Ignore Significant Differences Among Class Members ....................28

4. Prof. Kamien Ignores That, at Many Times, No Other Trait Providers Existed for Monsanto to Exclude ....................29

B. Plaintiffs Assume That Their Damages Formula Will Show Classwide Impact ....................30

1. No Single But-For Market Exists for the Hybrid Seeds at Issue ....................32

2. Both of Prof. Lesser's Benchmarks Are Inappropriate and Relate Only to Seed Containing the ECB Trait ....................34

3. Pioneer's Sales Are Not an Appropriate Benchmark ....................35

4. Spain Is Not an Appropriate Benchmark ....................35

V. Monsanto Does Not Have Sufficient Market Share to Wield Market Power ....................36

VI. Plaintiffs Cannot Establish With Common Proof That the Challenged Agreements Caused Class-Wide Injury ....................37

VII. American Seed Fails to Satisfy the Typicality Requirement Under FRCP 23(a)(3) ....................39

VIII. American Seed Fails to Satisfy the Adequacy Requirement of FRCP 23(a)(4) ..... 39

CONCLUSION ..... 40

## TABLE OF AUTHORITIES

### CASES

*In re Agricultural Chemicals Antitrust Litigation*, No 94-40216, 1995 WL 787538 (N.D. Fla. Oct. 23, 1995) ........ *passim*

*Al Barnett & Son, Inc. v. Outboard Marine Corp.*, 64 F.R.D. 43 (D.Del.1974) ........ 39, 40

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ........ 15

*Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990) ........ 2, 16

*Barr Laboratories v. Abbot Laboratories*, 978 F.2d 98 (3d Cir. 1992) ........ 38

*In re Beer Distribution Antitrust Litigation*, 188 F.R.D. 549 (N.D. Cal. 1998) ........ 37, 38

*Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir 2005) ........ *passim*

*Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 328-29 (1971) ........ 18

*Burlington Northern Railroad Co. v. Hyundai Merchant Marine Co., Ltd.*, 63 F.3d 1227, 1231-32 (3d Cir. 1995) ........ 18

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) ........ 4, 27

*Callahan v. A.E.V., Inc.*, 182 F.3d 237 (3d Cir. 1999) ........ 16, 37

*Chestnut Fleet Rentals, Inc. v. Hertz Corp.*, 72 F.R.D. 541 (E.D. Pa. 1976) ........ 16, 17, 39,40

*Coopers & Lybrand v. Livesay*, 437 U.S. 463 (1978) ........ 16

*Cordis Corp. v. Boston Scientific Corp.*, No. 03-027, 2005 WL 1331172 (D. Del. June 3, 2005) ........ 18

*In re Dalkon Shield Punitive Damages Litigation*, 613 F. Supp. 1112 (E.D. Va. 1985) ........ 18

*DiCostanzo v. Hertz Corp.*, 63 F.R.D. 150 (D. Mass 1974) ........ 40

*East Texas Motor Freight System, Inc. v. Rodriguez*,
431 U.S. 395 (1977) .......... 39

*Fineman v. Armstrong World Industries*,
980 F.2d 171 (3d Cir. 1992) .......... 36

*General Telegraph Co. of the Southwest v. Falcon*,
457 U.S. 147 (1982) .......... 14

*Johns v. Rozet*,
141 F.R.D. 211 (D.D.C. 1992) .......... 18

*Johnston v. HBO Film Management*,
265 F.3d 178 (3d Cir. 2001) .......... 26

*Kauffman v. Dreyfus Fund, Inc.*,
434 F.2d 727 (3d. Cir. 1970) .......... 15

*McKelvey v. Manley*,
No. 95-C12-005, 1997 WL 719161 (Del. Super. Sept. 23, 1997) .......... 15

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
259 F.3d 154 (3d Cir. 2001) .......... 2, 17, 22, 30

*O'Shea v. Littleton*,
414 U.S. 488 (1974) .......... 1, 14

*Premier Electrical Construction Co. v. National Electrical Contractors Assoc.*,
814 F.2d 358 (7th Cir. 1987) .......... 19

*Sample v. Monsanto*,
218 F.R.D. 644 (E.D. Mo. 2003) .......... *passim*

*San Antonio Telegraph Co. v. America Telegraph & Telegraph Co.*,
68 F.R.D. 435 (W.D. Tex. 1975) .......... 17

*Sosna v. Iowa*,
419 U.S. 393 (1975) .......... 14

*Szabo v. Bridgeport Machines, Inc.*,
249 F.3d 672 (7th Cir. 2001) .......... 26

*Tampa Electric Co. v. Nashville Coal Co.*,
365 U.S. 320 (1961) .......... 38

*Ungar v. Dunkin' Donuts of America, Inc.*,
531 F.2d 1211 (3d Cir.), *cert. denied*, 429 U.S. 823 (1976) .......... 17, 37, 38

*Weisfeld v. Sun Chemical Corp*, 210 F.R.D. 136 (D. N.J. 2002), *aff'd*, 84 Fed. Appx. 257 (3d Cir. 2004) ..... 30, 31

*Weisfeld v. Sun Chemical Corp.*, 84 Fed. Appx. 257 (3d Cir. 2004) ..... 4, 16, 23, 25

**STATUTES**

FRCP 23 ..... *passim*

## NATURE AND STAGE OF PROCEEDINGS

Plaintiffs seek certification under FRCP 23(b)(3)[1] of twelve classes. Plaintiff American Seed seeks to represent four classes[2] of direct purchasers of transgenic seed from Monsanto in 48 states.[3] Plaintiffs Kent Duxbury (Minnesota)[4] and Darrell Souhrada and David Johnson (Iowa)[5] seek to represent four classes of indirect purchasers in each of the two remaining states.

## SUMMARY OF ARGUMENT

For the reasons set forth below, plaintiffs have not and cannot meet their burden of establishing that any class should be certified and their motion should be denied.

**1. Lack of Standing.**

As a threshold matter, proposed class representatives must have standing to bring the underlying claims upon which they seek class certification. *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974). American Seed lacks standing to represent any direct purchaser class because [redacted]

---

[1] In their complaint, plaintiffs allege that, in the alternative, they are entitled to certification under FRCP 23(b)(2). [redacted]

[2] Plaintiffs complaint alleges four separate product markets: 1) glyphosate-tolerant seed; 2) ECB-resistant seed; 3) CRW-resistant seed; and 4) seed with stacked traits. Each named plaintiff seeks to represent a class of purchasers in each alleged market. Monsanto does not agree that these are distinct product markets [redacted] Moreover, plaintiffs' alleged market of seeds with stacked traits cannot be reconciled with its other three alleged markets of seeds with individual traits. Indeed, today Monsanto offers seeds with triple stacks (all three traits).

Plaintiffs also allege that the geographic market is national, which Monsanto also contests. This allegation of a national market is difficult to reconcile with the filing of separate cases for Minnesota and Iowa. Moreover, as plaintiffs themselves have admitted in their depositions, demand for and prices of hybrid seeds varies significantly across the country because of differing agronomic conditions, levels of weed and insect infestation, the presence and relative strength of regional seed companies, etc.

[3] (D.I. 1 – National Purchasers' Complaint, ¶¶ 52, 58, 64, 70). Plaintiffs offer no explanation as to why their purported national classes are limited to 48 states.

[4] (D.I. 45 – Minnesota Purchasers' Complaint, ¶¶ 43, 49, 55, 61).

[5] (D.I. 61 – Iowa Purchasers' Amended Complaint, ¶¶ 44, 50, 56, 62).

[redacted].[6] Mr. Duxbury lacks standing to represent three of the four proposed Minnesota indirect purchaser classes because [redacted].[7] American Seed's motion for certification of four classes of direct purchasers and Mr. Duxbury's motion (as to three of his four proposed classes) should be denied on this basis alone and their underlying claims should be dismissed.

**2. Individual Issues Predominate.**

Putting aside lack of standing, class certification is inappropriate because plaintiffs cannot establish antitrust injury or impact[8] by common proof, a requirement that plaintiffs concede they must satisfy. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 187-89 (3d Cir. 2001). To the contrary, individual issues predominate.

***Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005) is directly on point.** In a decision plaintiffs completely ignore, the Eighth Circuit affirmed the district court's denial of class certification, finding that during the alleged class period "prices for [transgenic] seeds varied widely" to the point that some growers paid no premium for the transgenic trait. *Blades*, 400 F.3d at 572. This variation occurs because demand for corn seed is "highly individualized, requiring particularized evidence to determine the competitive price." *Id.* As the Eighth Circuit found, regional price disparity in the corn seed market made it impossible for all transgenic seed purchasers to establish class-wide injury with common proof. *Id.* The doctrine of issue preclusion prohibits plaintiffs from re-litigating the Eighth Circuit's final determination.

---

[6] Although a Monsanto entity acted [redacted]

[7] In apparent recognition of these and other difficulties with the purported class representatives who initially filed these actions, plaintiffs have belatedly filed two motions, the first just prior to the close of class discovery and the second well after, to add additional named plaintiffs. Monsanto has opposed both motions.

[8] To recover under the antitrust laws, a private plaintiff must establish three separate and distinct elements: 1) a violation, 2) antitrust injury or impact, and 3) damages. *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 341-42 (1990).

**Plaintiffs face additional obstacles to class certification not present in *Blades*.** Unlike *Blades*, plaintiffs do not allege price-fixing claims – an antitrust claim that has qualified for class treatment in appropriate circumstances. Plaintiffs' allegations [redacted]. However, Syngenta's allegations, even if true, would not support class certification. [redacted]. To the contrary, Syngenta alleges that it was excluded from the market by Monsanto's discounts across its product line. By alleging that such activity led to monopoly pricing of hybrid seeds, plaintiffs' claims are an oxymoron: Monsanto has caused artificially high seed prices by offering low prices on its genetic traits contained in those seeds.

Plaintiffs cannot establish by common proof the effects of Monsanto's alleged monopolization across the various Monsanto companies and distribution channels (from Holden's/Corn States to DEKALB/Asgrow and the ASI companies). Nor do they articulate a common method for showing how these effects traveled vertically down each distribution chain from trait suppliers (such as Monsanto and Syngenta) to seed companies (such as plaintiff American Seed) to dealers/retailers and ultimately to growers (such as plaintiffs Mr. Duxbury, Mr. Souhrada and Mr. Johnson). [redacted]. This fact alone disproves plaintiffs' theory of common impact, which presumes that a reduction in trait price automatically results in lower seed prices for each and every putative class member.

**Plaintiffs cannot meet their burden by proferring an expert who simply assumes impact.** Plaintiffs rely exclusively upon one of their experts, Prof. Morton Kamien, to carry their



burden of showing that class-wide impact can be established with common proof.[9] [redacted][10] However, proof of common impact cannot be established by a mere tautology. *See Weisfeld v. Sun Chemical Corp.*, 84 Fed. Appx. 257, 261 (3d Cir. 2004) (An expert witness may not simply rely on "naked conclusions that common proof [will] demonstrate injury to class members.") [redacted]. This, standing alone, is grounds for rejecting his "opinion," as a proferred expert opinion is invalid when it is "not supported by sufficient facts to validate it in the eyes of the law." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993).

**Dr. Myslinski's Report shows that individual issues predominate.** As demonstrated by the extensive economic analysis performed by Dr. Myslinski, [redacted].

A hybrid seed with a trait in high demand in one area will sell poorly in another area with different agronomic conditions and levels of infestation. That [redacted], and across seed companies, distributors, retailers, farmer-dealers, and growers, all of whom fit plaintiffs' vague

---

9 [redacted]

10 References to the Appendix are cited as App. B __.

class definitions. Moreover, plaintiffs 

Thus, individual questions of impact will overwhelm common ones.

The same data refutes Prof. Kamien's assumption that



3. **Lack of Typicality and Inadequacy under Rule 23(a)**

The seed companies, dealers/retailers and growers making up the putative classes have conflicting economic interests both with respect to the litigation generally and with respect to damage elements. These diverse groups are not similarly situated with respect to their competitive roles in the seed business, their commercial relationships with Monsanto, their business relationships to each other, the products that they purchase from Monsanto, or the terms on which they purchase those products. Moreover, because

Accordingly, plaintiffs' motion for class certification should be denied in its entirety and the claims that American Seed and Mr. Duxbury lack standing to bring should be dismissed.

## STATEMENT OF FACTS

Plaintiffs present an oversimplified account of the corn seed market. In this statement Monsanto includes relevant facts and details omitted from plaintiffs' brief.

### A. Monsanto's Corn Seed Businesses

Beginning in the early 1980s, Monsanto, without any guarantee of success or grower acceptance, expended many years and billions of dollars developing its traits and transgenic seeds.[11] In the past decade, Monsanto successfully commercialized three transgenic corn traits: its European Corn Borer-resistant trait ("ECB"), introduced as "YieldGard" in 1997; its glyphosate-tolerant trait, introduced as "Roundup Ready" in 1998, with a second generation in 2001; and its corn rootworm-resistant trait (CRW), introduced as "YieldGard Rootworm" in 2003. (Declaration of Kenneth Rinkenberger ("Rinkenberger Decl.") ¶¶ 4-8). In addition, in 2004, Monsanto introduced "stacked" traits that combine two or all three traits in one seed. *Id.* These traits are bred into hybrid seeds that are planted by growers. The results have significantly expanded the alternatives growers have for controlling weeds and insects. According to a recent USDA study, "farmers have adopted some GE [genetically-enhanced] varieties [including transgenic corn] widely and at a rapid rate and benefited from such adoption." (App. B 38 -- USDA Report).

There are four basic methods by which Monsanto sells the transgenic corn seeds at issue here.

---

[11] While the term "trait" technically refers to any characteristic, in the seed industry "traits" are the common term for characteristics imparted to a through the insertion of a gene into the plant's genome. Only a small percentage of these traits are transgenic. Glyphosate tolerance and insect resistance are the traits of relevance here.

### 1. Holden's/Corn States

Holden's/Corn States licenses germplasm with traits to seed companies. Germplasm refers to the genetic material contained within a seed that gives a plant its characteristics.



**Holden's/Corn States' trait licensing business.**

. While these seed companies might appear to be the most obvious persons to seek relief in tag-alongs based on Syngenta's allegations, they are not included within any of plaintiffs' class definitions because they are licensees and not purchasers. Although certain of these companies may be putative class members because they purchased foundation seed, [13]

[12] While traits are separately licensed, they are contained in germplasm that is also licensed.

[13] As described below, some seed companies contract with third parties to produce their branded hybrid seed. In those instances, it is the third-party seed producer, not the branded seed company, that purchases from Monsanto.

Since 1996, Monsanto has signed license agreements with its seed partners.



- 

The above are only examples of the factors affecting the net royalty payment.

**Holden's/Corn States' foundation seed business.**



. Those seed companies that purchase hybrids from Monsanto's seed partners do not fall within plaintiffs' class definitions because they are not direct purchasers but licensees.



**Holden's/Corn States' private label hybrid seed business.** Holden's/Corn States also produces small quantities of unbranded hybrid seed which [redacted]

### 2. DEKALB and Asgrow Branded Seed Sales

DEKALB and Asgrow – Monsanto's national seed brands – are the second main channel for Monsanto's traits. [redacted].

### 3. The ASI Companies and Direct Hybrid Seed Sales

[redacted]

[14] DEKALB and Asgrow sometimes sell seed to [redacted]

### B. The Corn Seed Market

#### 1. Competition in the Corn Seed Market



#### 2. Critical Importance of Germplasm



. Growers choose from thousands of different hybrid seed varieties – both transgenic and conventional – to find the hybrid that is best suited to their particular, local growing conditions.

Germplasm also differs by quality. Some germplasm simply performs better than others and thus commands a premium in the corn seed market. For example, Michael Rishel, the owner of plaintiff American Seed, testified that . Similarly, Holden's/Corn States produces

15

### 3. Significant Variations in Regional and Local Demand



Demand for Monsanto's, or any company's, transgenic seeds varies greatly by region and within regions. . For example, .

Regional producers' strength varies across the United States. For example, .

In addition to varying levels of competition, growers' needs vary by region. . Growers' needs may even vary within their own farm.

Growers' needs also vary by the corn's end use. For example, . Thus, in those areas along the Mississippi, adoption of Roundup Ready® was minimal.

#### 4. Growers Look to Yield and Total Costs

Due to these different concerns, growers select the hybrid seed they will plant on the basis of many factors other than simply its price. Growers look to the total cost of producing a certain crop yield, which includes a number of other costs in addition to the seed.

## ARGUMENT

Plaintiffs' motion should be denied. As a threshold matter, American Seed lacks standing to bring any direct purchaser claims and Mr. Duxbury lacks standing to represent three of the four purported Minnesota classes he seeks to represent. Moreover, as described below, under FRCP 23(b)(3), individual issues regarding impact will overwhelm common questions. Finally, the dealers, seed companies and growers included in the putative classes have antagonistic economic interests, and their claims lack typicality.

### I. PLAINTIFFS AMERICAN SEED AND MR. DUXBURY LACK STANDING

Before the requirements of FRCP 23 are even addressed, as a threshold matter the plaintiffs must have standing to bring their claims. *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 156 (1982); *O'Shea*, 414 U.S. at 494. "A litigant must be a member of the class which he or she seeks to represent." *Sosna v. Iowa*, 419 U.S. 393, 403 (1975).

Plaintiff American Seed cannot represent any of the four purported national direct purchaser classes because it does not belong to any of those putative classes. American Seed defines the classes as persons "directly purchasing seed corn from Monsanto Company (including

its named and controlled seed companies)" that contained a Monsanto trait. (D.I. 1 – Am. Seed Cmplt. ¶¶ 52, 58, 64, 70). However, during the class period – July 26, 2001, to present – American Seed



This fact is established by

American Seed may attempt to argue that it purchased directly from a Monsanto company because Monsanto's affiliate, Corn States Hybrid Service, LLC, appears on these invoices. However,



A broker does not purchase product and then re-sell it. A broker does not take title to the product. Instead, a broker acts as an intermediary or negotiator. *McKelvey v. Manley*, No. 95-C12-005, 1997 WL 719161, at *3 (Del. Super. Ct. Sept. 23, 1997) (brokers do not take title but rather are "contracting agents on behalf of a principal"); Black's Law Dictionary 205 (8th ed. 2004). Corn States Hybrid Service, LLC is a broker.

. The fact that American Seed used

Thus, American Seed's motion should be denied and its claims dismissed because it lacks standing to bring them. *Falcon*, 457 U.S. at 156; *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 734 (3d Cir. 1970).

Similarly, even plaintiffs concede that [redacted]. At his deposition, Mr. Duxbury testified that [redacted]. Thus, Mr. Duxbury does not have standing to represent three (purchasers of glyphosate-tolerant, ECB-resistant and CRW-resistant seed) of the four classes alleged in the Minnesota action.

## II. PLAINTIFFS HAVE THE BURDEN OF ESTABLISHING THE PREREQUISITES FOR CLASS CERTIFICATION

It is plaintiffs' burden to demonstrate that the proposed classes should be certified. *In re School Asbestos Litigation,* 789 F.2d 996 (3d Cir. 1986). To meet that burden, they must first show that each class satisfies all four requirements of FRCP 23(a): 1) numerosity, 2) typicality, 3) commonality, and 4) adequacy. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997). Plaintiffs must also satisfy one of the three requirements in FRCP 23(b). *Id.* In their motion, plaintiffs argue that [redacted].

In determining whether plaintiffs have met their burden, the Court should rigorously examine the plaintiffs' allegations. *Falcon*, 457 U.S. at 161. Contrary to the claims of plaintiffs and their experts, that analysis may require the Court to "probe behind the pleadings." *Id.* at 160. A complex matter will necessarily require more probing than normal. *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n.12 (1978).

Plaintiffs imply that, because [redacted]. Although courts have recognized that some antitrust actions, such as horizontal price-fixing of a commodity product, may lend

themselves to class treatment, both the United States Supreme Court and Third Circuit reject any presumption of antitrust injury simply because the plaintiff alleges an antitrust violation. *See Weisfield*, 84 Fed. Appx. at 260-61 (citing *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 341). To recover under the antitrust laws, a private plaintiff must establish three separate and distinct elements: 1) a violation, 2) antitrust injury or impact, and 3) damages. *See Atlantic Richfield.*, 495 U.S. at 341-42; *Callahan v. A.E.V., Inc.*, 182 F.3d 237, 250 (3d Cir. 1999). Antitrust cases are suitable for class treatment only when the first element - antitrust violation – predominates and the remaining two – injury and damages – "could be determined, for example, by proof of purchases of a product or by the application of a standard recovery formula." *Chestnut Fleet Rentals, Inc. v. Hertz Corp.*, 72 F.R.D. 541, 548 (E.D. Pa. 1976). That is plainly not the case here.

This case is not a price fixing case. Nor is it even a straightforward monopolization case. Here plaintiffs allege [redacted]. The plaintiffs here must establish that the effects of Monsanto's alleged monopoly (even if it could be proven) flowed across[16] and down[17] the different channels and levels of the distribution system for corn seed. Further, transgenic seed comes in hundreds of different varieties, with varying demand and prices throughout the country. Courts routinely recognize that antitrust allegations like plaintiffs', involving competitive

---

[16] Plaintiffs' liability allegations focus on [redacted].

[17] Plaintiffs' theory of [redacted].

foreclosure,[18] non-commodity products,[19] and determining the anticompetitive effect of numerous different agreements,[20] involve individual questions that preclude class treatment.

## III. INDIVIDUAL ISSUES OVERWHELM COMMON ISSUES ON ANTITRUST IMPACT

### A. *Blades* Precludes Re-Litigating the Issue of Class-Wide Impact

Even in a price-fixing case, where class certification is more common compared to other antitrust claims, the Eighth Circuit has already found that hybrid corn seed prices vary too greatly across varieties and regions of the country to be susceptible to common proof of antitrust injury or impact. *Blades v. Monsanto*, 400 F.3d at 573. In *Blades*, the plaintiffs moved to certify a nationwide class of growers who, from 1996 to 2005, purchased or licensed YieldGard (transgenic, insect resistant) corn seed at allegedly fixed prices. *Id.* at 566. The Eighth Circuit affirmed the district court's decision denying class certification, in a valid and final judgment, on the ground that the nature of the corn seed market made it impossible to prove impact on a class-wide basis.[21] The appeals court found that plaintiffs could not establish either a but-for price for transgenic seed, or a common purchase price to compare to the but-for price:

- "the market for seeds is highly individualized, requiring particularized evidence to determine the competitive price;" *Id.* at 572, and;

---

[18] *Chestnut Fleet Rentals*, 72 F.R.D. at 548-49; *San Antonio Tel. Co. v. Am. Tel. & Tel. Co.*, 68 F.R.D. 435 (W.D. Tex. 1975).

[19] *Newton*, 259 F.3d at 187-89; *Blades*, 400 F.3d at 572; *In re Agricultural Chemicals*, 1995 WL 787538, at *5.

[20] *Ungar v. Dunkin' Donuts of America, Inc.*, 531 F.2d 1211 (3d Cir.), *cert. denied*, 429 U.S. 823 (1976).

[21] Although the theories of liability are different ([redacted]), both *Blades* and the present case involve overcharge claims by purchasers of transgenic corn seed over largely overlapping time periods. Thus, the Eighth Circuit's conclusion that the actual and but-for prices could not be established with common proof applies with equal force here.

- "prices for GM seed varied widely, and some farmers paid negligible premiums or no premiums at all for [transgenic] seeds, as compared with corresponding non-GM seeds." *Id.*

The Eighth Circuit affirmed the district court's finding that individual issues regarding impact would predominate. *Id.* at 571-73.

On the basis of *Blades*, this Court should apply issue preclusion and, since individual issues predominate as to antitrust injury, deny class certification. Issue preclusion applies to any issue that was 1) disputed in a previous litigation, 2) actually litigated in the previous litigation, 3) decided by a valid and final decision, and 4) essential to the prior decision. *Cordis Corp. v. Boston Scientific Corp.*, No. 03-027, 2005 WL 1331172, at *5 (D. Del. June 3, 2005) (Robinson, CJ). Issue preclusion does not require that the same parties were parties to the prior action. *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 328-29 (1971); *Burlington Northern Railroad Co. v. Hyundai Merchant Marine Co., Ltd.*, 63 F.3d 1227, 1231-32 (3d Cir. 1995).

Other courts have applied issue preclusion to motions for class certification. *In re Dalkon Shield Punitive Damages Litigation*, 613 F. Supp. 1112 (E.D. Va. 1985); *Johns v. Rozet*, 141 F.R.D. 211 (D.D.C. 1992). In *In re Dalkon Shield*, the Eastern District of Virginia refused to reopen the Ninth Circuit's decision denying class certification. 613 F. Supp. at 1116. The court stated that it should give the Ninth Circuit's opinion "its plain meaning: that the Court of Appeals found that a nationwide . . . class action restricted to punitive damages only fails to meet the requirements of Rule 23(a)." *Id.* at 1116. Applying issue preclusion, the court denied certification. *Id.* at 1120-21.

Even if not strictly applying issue preclusion, this Court should afford the Eighth Circuit's *Blades* decision great weight. In *Premier Electrical Construction*,[22] the Seventh Circuit addressed an opt-out plaintiff that wanted to re-litigate an issue that the class members had won. FRCP 23 precluded invoking issue preclusion in that instance – a situation not present here. But

[22] 814 F.2d 358 (7th Cir. 1987).

the court also refused to ignore the prior ruling, noting "[p]reclusion is not an all-or-nothing matter; there are degrees." *Id.* at 367. The court found that "only the gravest reasons" should prevent it from following the Fourth Circuit's findings. *Id.* at 367-68.

Without some preclusive effect for *Blades*, each and every member of the putative class could file a new action and seek certification *ad infinitum* hoping that one such member ultimately succeeds: "One plaintiff could sue and lose; another could sue and lose; another and another until one finally prevailed; then everyone else would ride on that single success." *Id.* at 363. Thus, the Court should apply issue preclusion, or give great weight to the Eighth Circuit's decision, to deny class certification and foreclose repetitive litigation.

### B. Corn Seed Pricing Does Not Follow Transgenic Trait Pricing

As tag-alongs to Syngenta's antitrust case, the basis for plaintiffs' claims are [redacted]. Prof. Kamien's assumption as to common impact presumes this to be true. However, it is demonstrably untrue. Even when Monsanto [redacted], that [redacted].

Dr. Myslinski's analysis [redacted].

Changes in [redacted]. David Witherspoon, the President of

Garst – a Syngenta subsidiary – testified that



.

### C. Varying Prices in the Corn Seed Market Prevent Establishing Impact with Common Proof

Even if this Court does not apply issue preclusion, the Eighth Circuit in *Blades* reached the right result and the record here compels the same conclusion – individual questions will predominate over any common questions on impact. Without looking at a single price, plaintiffs' expert, Prof. Kamien, concludes that . But as Dr. Myslinski's extensive economic analysis demonstrates, .

Disparate pricing across geographic regions in the corn seed market contradict any notion that common impact exists. Transgenic corn seeds are "not offered for sale at a uniform price."

*Blades*, 400 F.3d at 570 (quoting *Sample v. Monsanto,* 218 F.R.D. 644 (E.D. Mo. 2003)). Instead, list prices for the same transgenic seed variety fluctuate significantly from region to region. *Id.* 571. From those variable list prices, seed companies, retailers, and distributors offer growers numerous discounts that are "anything but formulaic – Syngenta alone had over 150 seed discount programs, and regional sales representatives were authorized to negotiate *ad hoc* discounts in the field." *Blades*, 400 F.3d at 571.



Plaintiffs' own deposition testimony confirms that . Mr. Rishel testified that . American Seed . On a single purchase Mr. Souhrada received:

.

Dr. Myslinski has analyzed



Dr. Myslinski demonstrates

. These fluctuations occur within a single variety. Price fluctuations among different varieties – plaintiffs do not distinguish among different varieties containing the same trait – will be even greater. Plaintiffs have failed to offer any common method that accounts for these large price variations. Thus, these variations necessitate individual inquiry to determine whether a given purchaser suffered injury – *i.e.* paid more than the supposed "but-for" price. *See Newton*, 265 F.3d at 187.



Given these price fluctuations in prices paid, there is no single actual or but-for price that can determine impact across the class. Prof. Kamien offers no method (and there is none) to control for those factors and his report is therefore fatally flawed.

## IV. PLAINTIFFS' CANNOT MEET THEIR BURDEN BY PROFERRING AN EXPERT WHO SIMPLY ASSUMES COMMON IMPACT

Plaintiffs have the burden of demonstrating that class-wide impact can be established with common proof. They rely solely on Prof. Kamien to attempt to meet that burden.

### A. Plaintiffs' Expert Assumes Common Antitrust Injury Without Any Analysis of the Corn Seed Market

An expert witness may not simply rely on "'naked conclusions' that common proof [will] demonstrate injury to class members." *See Weisfeld*, 84 Fed. Appx. at 261. Yet, Prof. Kamien's "methodology," arrived at without any economic analysis, amounts to nothing more than an assumption:



Similarly, Prof. Kamien assumes that

At his deposition, Prof. Kamien confirmed that

23



Plaintiffs' economic tautology cannot support class certification. If it could, a court would be required to certify every proposed class in an antitrust case:

> [Plaintiffs'] theory is flawed because it merely *assumes* class-wide impact instead of demonstrating that class-wide impact could actually be shown through the use of common proof. . . . If [the court] were to accept this theory, there would never be a case where a court *did not* certify an antitrust class action because: 1) plaintiffs' allegations of a conspiracy must be accepted as true; and 2) class-wide impact should always be *presumed* (even if the actual market demonstrates otherwise) because the conspiracy must have affected the class because, well, it is a conspiracy. Of course, this is not the standard to prove antitrust violations.

---

[24] The data was certainly available. Monsanto produced literally thousands of pages of pricing and other data as did Syngenta. Such data is also readily available from public and industry sources, such as Doane Research. The fact is that plaintiffs' counsel did not provide this data to Prof. Kamien, and he did not ask for it. (App. B 10-15, 27-29 – Kamien 58:14 - 63:22; 127:20 – 129:13).

*Sample v Monsanto Co*, 218 F.R.D. 644, 651 n.3 (E.D. Mo. 2003).

Similarly, the Third Circuit in *Weisfeld* confirmed that a plaintiff cannot presume impact based on the allegations in the complaint. *Weisfeld*, 84 Fed. Appx. at 261. There the Third Circuit affirmed the district court's finding that the plaintiffs' expert relied on "naked conclusions" that each class member suffered impact. *Id.* Plaintiffs' expert "provide[d] no independent analysis or evidence to support his conclusions of common impact." *Id.* at 162. The court distinguished other cases in which the court found common impact on the ground that, in those cases, the plaintiffs' expert had analyzed the reality in the marketplace to test the expert's theory. *Id.* at 261-62.

A similar attempt to assume impact was rejected in *In re Agricultural Chemicals*.[25] In that case, the plaintiffs' expert, like Prof. Kamien, "took as a given" the complaint's allegations and, without adequate support, concluded that class-wide impact must exist because "the price charged every customer of the defendants would have been higher." *Id.* at *5. The court rejected plaintiffs' "proof," noting that the expert simply assumed impact and ignored market reality. *Id.* at *5-6.

In *In re Agricultural Chemicals*, plaintiffs' rejected expert did even more than Prof. Kamien. There the court criticized the plaintiffs' expert for "using selected, specific transactions," and because conclusions were "contradicted by the very data he presents in the affidavit." *In re Agricultural Chemicals*, 1995 WL 787538, at 6. Even then, the court characterized the expert's conclusion of common impact as an assumption. *Id.* at *5. Unlike the expert in *Agricultural Chemicals*, Prof. Kamien, however, has not [REDACTED] . His mere assumption cannot support common impact.

Plaintiffs (in their brief) and Prof. Kamien (in his deposition) try to [REDACTED]

---

[25] 1995 WL 787538, at *5.

[REDACTED]. The Third Circuit specifically rejected that contention in *Johnson v. HBO Film Management*, finding "not only [is] it appropriate, but also necessary, for the district court to examine the factual record underlying plaintiffs' allegations." 265 F.3d 178, 189 (3d Cir. 2001). As the Seventh Circuit stated, "[t]he proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be found in Rule 23 and has nothing to recommend it." *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675 (7th Cir. 2001).

### 1. Actual Market Data and Other Evidence Contradict Prof. Kamien's Assumptions

The real world data Prof. Kamien chose to ignore demonstrates that his assumption of common impact is wrong. As stated above, in ruling on plaintiffs' certification motion, a court may examine the factual record underlying the allegations in the complaint. *See HBO Film Mgmt*, 265 F.3d at 189. After undertaking that examination, "an expert opinion must be deemed invalid when it is 'not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable.'" *In re Agricultural Chemicals*, 1995 WL 787538, at *5 (quoting *Brooke Group Ltd.*, 509 U.S. at 242.

The court in *Sample* rejected an attempt by the plaintiffs in that case to replace reality with economic presumptions:

> Simply put, plaintiffs *presume* class-wide impact without any consideration of whether the markets or the alleged conspiracy at issue here actually operated in such a manner so as to justify that presumption. [Plaintiffs' expert] *assumes* the answer to this critical issue and plaintiffs, in turn, have asked the Court to rely on this *conclusion* as support for class certification. [The court] cannot "presume" or "assume" --- much less "conclude" --- class-wide impact here because the evidence submitted during the class certification hearing demonstrates that such a presumption would be improper.

*Sample*, 218 F.R.D. at 650. As explained below, as in *Sample*, the market reality contradicts the plaintiffs' expert's theory. As in *Sample*, that theory should be rejected.

**2. Prof. Kamien's Assumptions Ignore Any Differences Among Seed Varieties**

Prof. Kamien fails to address variable demand and pricing between and within the hundreds of corn seed varieties containing Monsanto traits. His benchmark formula assumes [redacted].

A simple example from Dr. Myslinski's Report demonstrates this flaw in Kamien's methodology. [redacted].

Prof. Kamien does not acknowledge these differences or offer any method to control for them. In fact, during his deposition, he [redacted]. Prof. Kamien admitted that [redacted]. He even admitted that [redacted]. Again, no class-wide impact.

### 3. Prof. Kamien and Plaintiffs Ignore Significant Differences Among Class Members.

Prof. Kamien ignores important differences between different groups in the purported classes. For example,

Prof. Kamien does not even address, much less account for, the fundamental differences between the uses and prices of foundation and hybrid corn seed. Indeed, according to plaintiffs' own expert Prof. Lesser,



. Thus, proof of impact in the hybrid seed market is irrelevant to impact in the foundation seed market.

Even if plaintiffs include only hybrid seed purchasers in their classes, those classes would include seed companies, retailers, distributors, and growers. Yet, Prof. Kamien simply

---

26

ignores this reality and proposes a one-size-fits-all method to determine impact across each of these diverse groups.

**4. Prof. Kamien Ignores That, at Many Times, No Other Trait Providers Existed for Monsanto to Exclude**



Prof. Kamien assumed that .[27] He admitted, however, that .

In reality, at many points during the class period, no other producer offered a viable genetically modified alternative to Monsanto's trait. For example, Monsanto offered its CRW trait in 2003 when no other rootworm trait was on the market. No other company developed a competing trait that it could bring to market until Dow and Pioneer introduced Herculex RW for the 2006 growing season. Monsanto did not



Prof. Kamien

[27]

### B. Plaintiffs Assume That Their Damages Formula Will Show Classwide Impact

Not only does Prof. Kamien's benchmark "formula"



Damages evidence is irrelevant to the question of impact unless that evidence demonstrates that *every* class member suffered injury. *Weisfeld v. Sun Chem. Corp.*, 210 F.R.D. 136, 143 (D.N.J. 2002), *aff'd*, 84 Fed. Appx. 257 (3d Cir. 2004). The Third Circuit emphasized the distinction: "[p]roof of injury (whether or not an injury occurred at all) must be distinguished from calculation of damages (which determines the actual value of the injury)." *Newton*, 259 F.3d at 188. Prof. Kamien's professed



Prof. Lesser –

Prof. Kamien does not assert that



Prof. Kamien's unsupported assumption is similar to that rejected in *Weisfeld*.[28] In that case, the plaintiffs' claimed that using multiple regression analysis and a benchmark method would reveal common impact. *Id.* But, like Prof. Kamien, the plaintiffs' expert failed to offer any support for his conclusion, nor did he assert that he could show impact for all class members. *Id.* at 144. The court refused to certify the class because it was "not convinced that Plaintiff's expert has even claimed, much less shown, that he will be able to prove impact on a classwide basis." *Id.* The Court should similarly reject Prof. Kamien's conclusion as to common impact.

### 1. No Single But-For Market Exists for the Hybrid Seeds at Issue

Prof. Kamien's benchmarking theory assumes [REDACTED] However, in *Sample*[29] – the district court decision affirmed in *Blades* – the court found that the corn seed market varied considerably across the country:

> the genetically modified seeds are not homogenous products. The market for seeds is *highly individualized* depending on geographic location, growing conditions, consumer preference and other factors.

---

[28] 210 F.R.D. at 143-44.

[29] 218 F.R.D. 644.

*Sample*, 218 F.R.D. at 650-51. Those individual factors cause the "supply-and-demand conditions for seed sales [to] vary to such a great extent that the 'but-for' prices could be determined only through individualized inquiries." *Id.* at 651. Thus, "common proof simply cannot be used to establish a 'but-for' marketplace" for corn seed. *Id.* The Eighth Circuit affirmed, finding that "[t]he evidence showed the presence of individualized market conditions, which would require individualized, not common, hypothetical markets – thus individualized, not common, evidence." *Blades*, 400 F.3d at 574.

Indeed, varying demand conditions necessarily occur in agriculture by virtue of the nature of the industry. The court in *In re Agricultural Chemicals* found that different geographic locations necessarily affect demand and price:

> Depending on the climate and other growing conditions that prevail during a given growing season, and even within a given region, the demand for the various types of [agricultural] chemicals necessarily will differ.

1995 WL 787538, at *7 (emphasis added). As in *Blades*, the court refused to certify the class of agricultural chemical purchasers because determining the but-for price would "require individual – or at least fragmented – analysis since market prices for agricultural chemicals vary by location, crop, and a host of other factors, some of which may be unique to the customer." *Id.* at 4.

The courts' analyses and conclusions in *Blades*, *Sample*, and *In re Agricultural Chemicals*, are supported by the plaintiffs' own deposition testimony. Each plaintiff testified that [redacted]

---

[30] Additionally, Mr. Johnson said that [redacted]



As Dr. Myslinski's Report demonstrates,

. Thus, areas that export significant amounts of corn will exhibit low demand for glyphosate-tolerant seed. The demand for ECB-resistant seed and rootworm-resistant seed also fluctuates by region because of different levels of infestation. Those differences necessarily create much different competitive conditions and a different "but for" market. *Blades*, 400 F.3d at 574; *Sample*, 218 F.R.D. at 650-51.

Even Monsanto's



. However, less than a year ago, the Eighth Circuit decided that no such "but-for" market exists. *Blades*, 400 F.3d 562. The same conclusion is warranted here.

### 2. Both of Prof. Lesser's Benchmarks Are Inappropriate and Relate Only to Seed Containing the ECB Trait

Even if a but-for market did exist for the corn seed market, [redacted]. Any attempt to use a given trait as a "benchmark" for other traits is contrary to plaintiffs' own complaint, which alleges that [redacted]. Prof. Lesser does not explain why, if those traits constitute different markets, YieldGard is an appropriate benchmark for those traits.

Available market data demonstrates, in fact, that YieldGard seed is not an appropriate benchmark. As demonstrated in Dr. Myslinski's Report, [redacted]. Thus, the demand for hybrids with each of Monsanto's traits differs significantly and would require different benchmarks even assuming the appropriateness of the use of benchmarks in this case.

### 3. Pioneer's Sales Are Not an Appropriate Benchmark

[redacted]





Further, Pioneer licenses Monsanto's traits, it does not own rights to them. If another seed producer's gross margin could serve as an adequate benchmark, which it should not, it would have to be sales of a trait that it owned, not licensed. Otherwise, any patent holder that sold its product at a higher margin than did its licensees would by definition be reaping monopoly profits – a proposition with no legal support whatsoever.

### 4. Spain Is Not an Appropriate Benchmark



. Each of these factors will affect the market conditions for YieldGard seed, rendering Prof. Lesser's benchmark inappropriate. The deficiencies of

## V. MONSANTO DOES NOT HAVE SUFFICIENT MARKET SHARE TO WIELD MARKET POWER

Prof. Kamien assumes,





[redacted]. Thus, even assuming plaintiffs' alleged product markets (that are contrary to market realities and do not take into account available alternative systems for controlling weeds and insects), Monsanto's market share is well below the level sufficient to presume monopoly power. *See Fineman v. Armstrong World Industries*, 980 F.2d 171, 201-02 (3d Cir. 1992) (finding a 55% market share insufficient to establish monopoly power).

The court in *In re Agricultural Chemicals* faced a similar situation. There, the court criticized plaintiffs' expert who – [redacted] – assumed the complaint's price-fixing allegations to be true. The court dismissed the expert's conclusion because "[b]asic economic theory would predict that a company without market power, whose products compete with numerous, readily available substitutes, and whose customers are price sensitive, lacks the ability to impose above-competitive prices on its customers." *In re Agricultural Chemicals*, 1995 WL 787538, at *8.

As noted above, [redacted]. Plaintiff Rishel testified that [redacted]. Like American Seed, Monsanto cannot maintain monopoly prices with another competitor outselling it in the market.

## VI. PLAINTIFFS CANNOT ESTABLISH WITH COMMON PROOF THAT THE CHALLENGED AGREEMENTS CAUSED CLASS-WIDE INJURY.

Plaintiffs also fail to meet their burden to establish with common proof that Monsanto's alleged anticompetitive conduct caused class-wide injury. *See Callahan*, 182 F.3d at 250 (class

members must demonstrate causal nexus between injury and alleged conduct). Plaintiffs allege that [redacted]. Rather, plaintiffs allege that [redacted]. Thus, for class members to prove that Monsanto's varied discount and rebate programs injured them, the Court must examine Monsanto's relationship with each of its licensees. *Dunkin' Donuts*, 531 F.2d 1211; *In re Beer Distrib. Antitrust Litig.*, 188 F.R.D. 549, 555 (N.D. Cal. 1998).

[redacted]. In examining alleged exclusive dealing arrangements under Section 2 of the Sherman Act, the Court must look to:

- the relative strength of the parties;
- the proportionate volume of commerce involved in relation to the total volume of commerce in the market area; and
- the probable immediate and future effects on effective competition.

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 329 (1961). The Court must then "evaluate the restrictiveness and the economic usefulness of the challenged practice in relation to the business factors extant in the market." *Barr Laboratories v. Abbott Laboratories*, 978 F.2d 98, 111 (3d Cir. 1992) (quoting *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1251-52 (3d Cir. 1975)). That analysis would require the Court to examine Monsanto's relationship with [redacted] at various points in time, and individualized inquiries would overwhelm any common issues. *See In re Beer Distrib. Antitrust Litig.*, 188 F.R.D. at 555.

Plaintiffs may not demonstrate common impact by simply pointing to [redacted]. *See Dunkin' Donuts*, 531 F.2d 1211. In *Dunkin' Donuts*, franchisees brought a putative class action against Dunkin' Donuts alleging that licensing its trademark only in combination with other agreements – real estate, lease, equipment – amounted to illegal tying. The court observed, however, that "[w]hat is sufficient to coerce one

buyer's choice may not be enough to coerce another buyer's choice." *Dunkin' Donuts*, 531 F.2d at 1219. Thus, the court stated that each class member must prove that Dunkin' Donuts' leasing practice caused that class member's injury.

The same situation is present here. For example,



Those individual inquiries would overwhelm any common questions. *See Dunkin' Donuts*, 531 F.2d at 1218-19.

## VII. AMERICAN SEED FAILS TO SATISFY THE TYPICALITY REQUIREMENT UNDER FRCP 23(A)(3)

Even assuming that American Seed had standing to represent the proposed classes (which it did not), it fails to meet the typicality requirement. To fulfill the typicality requirement in FRCP 23(a)(3), the class representative must bring claims and suffer injury typical of the proposed class members. Fed. R. Civ. P. 23(a); *East Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977). The plaintiffs' proposed classes contain .

American Seed is neither a retailer nor a grower, and American Seed does not claim . Mr. Rishel testified that



. Mr. Rishel also claims that

.

But the claims of the purported classes do not allege

. American Seed therefore alleges

and fails to satisfy Rule 23's typicality requirement.

## VIII. AMERICAN SEED FAILS TO SATISFY THE ADEQUACY REQUIREMENT OF FRCP 23(A)(4)

In addition to different claims, American Seed holds interests adverse to other putative class members and therefore cannot "fairly and adequately protect the interests of the class." FRCP 23(a)(4); *see also Al Barnett & Son, Inc. v. Outboard Marine Corp.*, 64 F.R.D. 43, 50 (D.Del.1974) (denying certification because lead plaintiffs competed with other class members); *Chestnut Fleet Rentals*, 72 F.R.D. at 545-46 (same).

.

A terminated dealer who competes directly against the other putative class members for their business cannot adequately represent that class. *DiCostanzo v. Hertz Corp.*, 63 F.R.D. 150 (D. Mass 1974). In *DiCostanzo*, the plaintiff brought an action against several automobile manufacturers and leasing companies. The proposed class representative for Chrysler dealerships was a former Chrysler dealer who currently owned a Cadillac-Oldsmobile dealership. The court noted that, although the plaintiff may have suffered a similar compensable injury, the proposed class representative now directly competed with other class members. Due to his adverse interest, the proposed class representative could not adequately represent the class. *Al Barnett & Son*, 64 F.R.D. at 50; *Chestnut Fleet Rentals*, 72 F.R.D. at 545-46.

**CONCLUSION**

For the reasons set forth above, the motion filed by American Seed, Mr. Souhrada, Mr. Johnson, and Mr. Duxbury to certify twelve classes should be denied in its entirety and the claims American Seed and Mr. Duxbury lack standing to bring should be dismissed.

POTTER ANDERSON & CORROON LLP

By: /s/ David E. Moore
Richard L. Horwitz (#2246)
David E. Moore (#3983)
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE 19899
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Monsanto Company, American Seed, Inc., Corn States Hybrid Service, Inc., Holden Foundation Seeds, Inc., Dekalb Seeds, Calgene, L.L.C.. Channel Bio Co., Nc+ Hybrids and Semins, Inc.*

OF COUNSEL:

Peter E. Moll
John J. Rosenthal
Timothy Finley
William DeVinny
HOWREY LLP
1299 Pennsylvania Ave., NW
Washington, DC 20004
(202) 783-0800

Dated: June 30, 2006
Public Version Dated: July 10, 2006

740216

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

I, David E. Moore, hereby certify that on July 10, 2006, the attached document was hand delivered to the following persons and was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following and the document is available for viewing and downloading from CM/ECF:

Joelle E. Polesky
Smith, Katzenstein & Furlow LLP
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899

John W. Shaw
Young Conaway Stargatt & Taylor, L.L.P.
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

I hereby certify that on July 10, 2006, I have sent by Electronically Mailed the foregoing document to the following non-registered participants:

Steven F. Benz
Michael S. Zuckman
Kellogg, Huber, Hansen, Todd, Evans & Figel P.L.L.C
1615 M Street, NW
Suite 400
Washington, DC 20036
sbenz@khhte.com

R. Stephen Berry
J. Daniel Leftwich
Gregory Baruch
Berry & Leftwich
1717 Pennsylvania Ave., NW
Washington, DC 20006
sberry@berry-leftwich.com
dleftwich@berry-leftwich.com
gbaruch@berry-leftwich.com

Charles A. Bird
Jeremy R. Stevens
Bird, Jacobsen & Stevens
300 Third Ave. S.E.
Rochester, MN 55904
charles@birdjacobsen.com
jeremy@birdjacobsen.com

Richard F. Schwed
Thomas A. McGrath III
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022-6069
rschwed@shearman.com

*/s/ David E. Moore*
Richard L. Horwitz (#2246)
David E. Moore (#3983)
Potter Anderson & Corroon LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

696607