## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMERICAN SEED COMPANY, INC., Individually and on behalf of all others similarly situated, | ) ) ) ) C.A. No. 05-535-SLR |
| Plaintiffs, | ) ) ) |
| v. | ) ) **JURY TRIAL DEMANDED** |
| MONSANTO COMPANY, et al., | ) ) **PUBLIC VERSION** ) ) |
| Defendants. | ) |
| DARRELL SOUHRADA | ) ) |
| Plaintiff, On Behalf Itself and Iowa Citizens Similarly Situated, | ) ) ) ) ) |
| v. | ) C.A. No. 05-535-SLR ) |
| MONSANTO COMPANY, | ) ) |
| Defendant. | ) |
| KENT DUXBURY | ) ) |
| Plaintiff, On Behalf Itself and Minnesota Citizens Similarly Situated, | ) ) ) ) ) |
| v. | ) C.A. No. 05-535-SLR ) |
| MONSANTO COMPANY, | ) ) |
| Defendant. | ) |

## ECONOMIC EXPERT REPORT OF WILLIAM C. MYSLINSKI, PH.D. IN SUPPORT OF DEFENDANT MONSANTO COMPANY'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

OF COUNSEL:

Peter E. Moll
John J. Rosenthal
Timothy Finley
HOWREY LLP
1299 Pennsylvania Ave., NW
Washington, DC 20004
(202) 783-0800

Dated: June 30, 2006
Public Version Dated: July 10, 2006

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
Wilmington, DE 19899
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Monsanto Company,*
*American Seed, Inc., Corn States Hybrid Service,*
*Inc., Holden Foundation Seeds, Inc., Dekalb Seeds,*
*Calgene, L.L.C., Channel Bio Co., Nc+ Hybrids*
*and Semins, Inc*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AMERICAN SEED CO. INC. | ) | |
| | ) | |
| Plaintiff, On Behalf Of Itself and Others Similarly Situated, | ) ) ) ) | |
| | ) | C.A. NO. 05-535 |
| v. | ) ) | |
| MONSANTO COMPANY, et al. | ) ) ) | |
| Defendants | ) ) | |

| | | |
|---|---|---|
| DARRELL SOUHRADA, and DAVE JOHNSON | ) ) ) | |
| | ) | |
| Plaintiff, On Behalf of Themselves and Iowa Citizens Similarly Situated | ) ) ) | |
| | ) | C.A. NO. 05-535 |
| v. | ) ) | |
| MONSANTO COMPANY | ) ) | |
| Defendant | ) ) ) | |

| | | |
|---|---|---|
| KENT DUXBURY | ) | |
| | ) | |
| Plaintiff, On Behalf of Itself and Minnesota Citizens Similarly Situated | ) ) ) | |
| | ) | C.A. NO. 05-535 |
| v. | ) ) | |
| MONSANTO COMPANY | ) ) | |
| Defendant | ) ) | |

**ECONOMIC EXPERT REPORT**

**OF**

**WILLIAM C. MYSLINSKI, PH.D.**

## Table of Contents

I.      BIOGRAPHY AND ASSIGNMENT ................................................................................ 1
II.     EXECUTIVE SUMMARY ............................................................................................ 3
   A.   Overall Conclusion ............................................................................................... 3
   B.   ████████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████████ ......... 5
III.    PLAINTIFFS' ALLEGATIONS .................................................................................... 6
IV.     GENERAL BACKGROUND ........................................................................................ 9
   A.   Underlying Assumptions ....................................................................................... 9
   B.   Industry Background ............................................................................................. 9
      1.  Genetically Modified or Transgenic Corn Seed ............................................. 9
      2.  Monsanto's Corn Seed Businesses ................................................................ 10
V.      ANALYSIS ............................................................................................................ 13
   A.   Introduction ........................................................................................................ 13
   B.   ████████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████████

....................................................... 54

VI.    CONCLUSION .................................................................................................... 55

## EXPERT REPORT OF DR. WILLIAM C. MYSLINSKI

### I.    BIOGRAPHY AND ASSIGNMENT

1.    I am an economist and a principal of Economists Incorporated, a private research and consulting firm based in Washington, D.C. I received a B.A. in economics from Boston College in 1968 and a Ph.D. in economics from the University of Minnesota in 1974.

2.    I have extensive research, teaching, and consulting experience in antitrust, industrial organization, and regulation economics. Prior to my present employment, I served in a number of positions with the Antitrust Division of the United States Department of Justice (1974-1981), including the posts of Assistant Director and Acting Director of Economics in which I supervised the work of the Division's 40 to 45 professional economists. At the Department of Justice, I had supervisory responsibility for the economic analyses of market structures and competitive conditions relied upon by the Assistant Attorney General in charge of the Antitrust Division to determine whether to challenge a particular merger or business practice under the federal antitrust laws. I have taught economics at the University of Minnesota, St. Olaf College and Colgate University.

3.    Over the past 31 years in government service and in private practice, I have had substantial experience analyzing competition and allegations of anticompetitive behavior in a variety of industries. I have submitted expert reports on class certification issues in a number of matters including *Blades* v. *Monsanto*,[1] another case involving genetically modified corn seeds. I have also testified about class issues in cases involving beer distribution, milk, school milk, audiotapes, vitamins, motor sport souvenirs, baby food, credit cards, exercise equipment, rubber chemicals and ladies' accessories. My curriculum vitae and a list of my recent testimony are Exhibit 1.

4.    A list of materials that I reviewed and relied upon is Exhibit 2. Economists Incorporated is being compensated for time and expenses related to this matter. My time is billed at $525 per hour.

5.    I have been retained by counsel for Monsanto to analyze the economic issues relating to class certification. With respect to the various claims and putative classes,

---

[1] The district court's decision denying class certification was affirmed by the Eight Circuit. This case is also sometimes referred to as the *Sample* case or the *McIntosh* case.

I have been asked to address whether individual or common economic issues predominate. In particular, I have been asked to analyze whether plaintiffs have demonstrated a methodology by which they could use common proof to show that the alleged antitrust violations caused class-wide impact.

# Executive Summary

## II.  EXECUTIVE SUMMARY

### A.    Overall Conclusion

6.     Plaintiffs allege that Monsanto engaged in activities that restricted competitive entry to the licensing of transgenic corn seed traits and thereby monopolized four transgenic corn seed markets in which Monsanto injured class members by elevating the price for Monsanto's transgenic seed. To show class-wide impact with respect to each putative class, plaintiffs must show that in the absence of the alleged blocked entry of other trait suppliers Monsanto would have lowered the prices of its own transgenic corn seed for all putative class members regardless of the variety of seed the class member purchased or the local market where he bought it. In this report, I have analyzed the issue of whether plaintiffs have or could set forth a methodology for showing class-wide impact through common proof.



### B.



### C.

8.     Plaintiffs allege that Monsanto's trait licensing terms resulted in Monsanto's monopolization of four putative transgenic seed markets, which in turn caused injury to members of the putative classes.

3



D.

E.

**F.**

**11.**

**G.**

**H.**

**14.**





## III. Plaintiffs' Allegations

15.    Plaintiffs allege that Monsanto has monopolized four relevant product markets. These alleged corn seed markets are corn seed tolerant of glyphosate herbicide, corn seed resistant to the European corn borer, corn seed resistant to root worm and corn seed that combines two or more of these traits.[2]

16.    Plaintiffs allege that Monsanto engaged in two categories of conduct that violates the antitrust laws, "exclusive dealing agreements" and "bundling agreements." These allegations have to do with the terms under which Monsanto licensed transgenic corn seed traits to competing seed companies. Plaintiffs allege that those conditions have the purpose and effect of excluding competition for these traits, and as a consequence, excluding competition for the sale of transgenic hybrid seed made downstream.[3]

17.    In the American Seed Co. case, there are four putative classes, one for each of the alleged transgenic corn seed markets. The putative class members are "persons...directly purchasing seed corn from Monsanto Company (including its named controlled seed companies)...between July 26, 2001 and the present excluding citizens of the States of Iowa and Minnesota....The Class includes primarily farmers, and retailers of this seed to these farmers."[4] It is alleged that members of the respective classes were injured because they "paid above-competitive prices directly to Monsanto (including its named controlled seed companies)."[5] Plaintiffs are calling these the National Direct Buyer ("National") classes.

18.    

---

[2] Complaint in American Seed Co. Inc. v. Monsanto Company, et al. ("Complaint") at ¶¶2-3.

[3] Complaint at ¶¶3, 4, 97-100 and Plaintiffs' Class Brief pp. 5-9.

[4] Complaint at ¶¶52, 58, 64, 70.

[5] Complaint at ¶¶96-99.



19.



22. ████████████████████ Syngenta entered the marketplace in 2005 with its Agrisure GT (glyphosate-tolerant), Agrisure CB (ECB-resistant) and Agrisure GT/CB traits both though its own branded seed and through licensing agreements. ████████████████████████████████████ ████████████████ Similarly, Dow and Pioneer jointly developed and entered with an ECB-resistant trait, Herculex I, in 2003. In 2006, they are offering HXX (CRW-resistant), HXX RR, (a CRW/RR stack), HX RR (Herculex I plus RR), HX RW (Herculex I plus CRW) and HXRW/RR.[15] On April 10, 2006, DuPont (Pioneer) and Syngenta announced the formation of a 50/50 joint venture to out-license soy and corn seed genetics and traits to other seed companies, including Optimum GAT herbicide-tolerant trait developed by DuPont.[16]

## IV. GENERAL BACKGROUND

### A. Underlying Assumptions

23. For the purposes of analyzing class certification issues, I have assumed, ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████. And I have assumed, ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████.

### B. Industry Background

24. This section presents some significant background information regarding transgenic corn seed and Monsanto's corn seed business. Additional background information is contained in ████████████████████████.

### 1. Genetically Modified or Transgenic Corn Seed

25. Corn has undergone years of scientific selective breeding to produce seed types that (1) are suited to particular climate and soil conditions; (2) have superior yields; and (3) produce crops that are resistant to weeds and insects. Beginning in the mid to late 1990s, transgenic seed varieties offering enhanced weed and insect control were added to

---

[15] Biotech Traits Commercialized – 2005, The Context Network, pp. crn1, crn3-4, crn24; Pioneer, Syngenta and Mycogen web sites.

[16] http://pioneer.mediaroom.com/index.php?s=press_releases&item=149), accessed June 20, 2006.

the mix of options available to farmers. Farmers choose particular seed varieties and de-
cide between conventional and transgenic versions of these varieties based on the grow-
ing season, climate, soil conditions, and expected weed and insect conditions.[17] Farmers
must trade off the value of superior characteristics (including yield, and savings on herbi-
cides and insecticides and the labor to apply them) against the higher cost of seed offer-
ing those characteristics. Transgenic seeds were not immediately available for all crop
types, climates, and soil conditions. It takes time for the technology to be adapted to the
many different varieties of seeds.[18]

26.



### 2.    Monsanto's Corn Seed Businesses

27.

1)

---

[17] Information relating to the science and economics of seed choice is available from public and commer-
cial sources. For an example of a public source, see Kraig L. Roozeboom and Dale L. Fjell, "Select Hybrids
Carefully" in "Corn Production Handbook," Agricultural Experiment Station and Cooperative Extension
Service, Kansas State University. A commercial example is Fielder's Choice, a seed company, which
maintains   a   website   that   suggests   corn   varieties   based   on   the   farm's   zip   code.
(http://www.harvestseed.com/products.asp, viewed May 11, 2006).

[18] It is often the case that conventional corn seeds are offered over a wider range of seed varieties and
characteristics than seeds with a particular transgenic technology. For instance, only 95 of the 250 corn
hybrids that Pioneer offered in North America for planting in 2003 contained transgenic traits.
www.pioneer.com/biotech/value_of_products/product_value.htm, viewed May 11, 2006.

[19] 

[20]

[21]



2) The sale of hybrid seed by Corn States to seed companies such as plaintiff American Seed. Corn States has access to corn growing facilities in areas (*e.g.*, South America) that can produce a crop of seed during the U.S. winter.[24]

---



[22] ████████████████████.

[23] █████████████

[24] Corn and Soybean Licensing Business Overview, Ken Rinkenberger, August 2004, p. 13. http://www.monsanto.com/monsanto/content/investor/financial/presentations/2004/monmouth5.pdf, viewed June 21, 2006.



28.



# Analysis

## V.   ANALYSIS

### A.   Introduction

29.



### B.

31.

_____

33



32.

33.

[37]

[35]

[36]



34.    When we turn from prices paid by dealers to prices paid by growers, similar results are obtained.



35.

<hr>

<sup>37</sup>

<sup>38</sup>

[39] Doane Marketing Research conducts annual surveys of thousands of corn farmers to gather information on seed types purchased and prices paid. Doane data are used extensively in the seed industry.

[40] Source: Doane data.



**C.**  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

36.    Plaintiffs allege that injury to members of the putative classes resulted from Monsanto having monopolized the alleged transgenic seed markets. In fact, Monsanto competes with many other firms in these alleged seed markets, and its share is too low for monopolization of seed markets to be plausible. This makes it implausible that there is a method to show that putative class members suffered the antitrust injury alleged (*i e ,* that they were charged monopoly prices for transgenic corn seed).

37.    Plaintiffs have alleged four classes and four relevant markets that are national in scope. Without conceding that these are appropriate antitrust markets and classes, I will adopt these allegations for purposes of analyzing whether Monsanto has monopolized any of the alleged relevant markets. Literally hundreds of seed companies produced and sold transgenic hybrid corn seed in competition with Monsanto in each of these alleged markets, as well as in conventional hybrid corn seed. For most of these other seed companies, the transgenic traits used in producing their transgenic corn seed were licensed from Monsanto.

38.



39.    

40.    Plaintiffs' complaint misstates Monsanto's share of transgenic seed sales. For instance, the complaint states, "Monsanto is the only supplier of glyphosate-tolerant corn seeds in the United States."[42] However, as Figure C.1 shows, Monsanto sold no more than about 40 percent of the glyphosate-tolerant corn seed in any year in the class period. Plaintiffs make a similar error with respect to each of the other alleged seed markets.

**D.**    

41.    Plaintiffs have alleged four different classes in both the National case and the two State cases.

---

[41] Source: Calculated from Doane data.

[42] Complaint, ¶27

17



42.

43.

### 1.    Differences Across Groups

44.    The Rinkenberger declaration describes ██████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████.

45.    ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██.

### 2.    ██████████████████████

46.    ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████.

47.    ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

---

45 ██████████████████████████████████████████████████████████████
████████████████████████████.

46 ██████████████████████████████████████████████████████████████.



48. 



49.



50.

E.

51.







**Figure E.1. Competitive Trait Introductions[58]**
**2001 – 2007 (projected)**

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | |
|---|---|---|---|---|---|---|---|
| **CRW** | | | | | | | |
| Monsanto | | | x | x | x | x | |
| Herculex (Pioneer/Dow) | | | | | | x | |
| Agrisure (Syngenta) | | | | | | | |
| **GT** | | | | | | | |
| Monsanto | x | x | x | x | x | x | |
| Agrisure | | | | | x | x | |
| **ECB** | | | | | | | |
| Monsanto | x | x | x | x | x | x | |
| Herculex | | | x | x | x | x | |
| Agrisure | | | | | x | x | |
| **STACKED** | | | | | | | |
| **ECB/GT** | | | | | | | |
| Monsanto | x | x | x | x | x | x | |
| Agrisure | | | | | x | x | |
| Herculex | | | | | | x | |
| **ECB/CRW** | | | | | | | |
| Monsanto | | | | | x | x | |
| Herculex | | | | | | x | |
| Agrisure | | | | | | | |
| **CRW/GT** | | | | | | | |
| Monsanto | | | | x | x | x | |
| Herculex | | | | | | x | |
| Agrisure | | | | | | | |
| **ECB/CRW/GT** | | | | | | | |
| Monsanto | | | | | x | x | |
| Herculex | | | | | | x | |
| Agrisure | | | | | | | |

57.    With respect to the putative ECB-resistant seed classes, only for purchases of YGCB seed from Monsanto in 2003 or later could injury be alleged to have resulted from unlawful barriers to trait competition allegedly erected by Monsanto. There were ▇▇▇▇▇▇▇▇▇ dealers who purchased Asgrow/DEKALB YGCB corn seed in 2002; of these, 286 (16.4 percent) did not purchase in 2003, 2004 or 2005.

58. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

---

[58] "Biotech Traits Commercialized–2005," The Context Network, pp. crn1, crn3-4, crn24; Pioneer, Syngenta and Mycogen web sites; http://www.seedquest.com/News/releases/2006/march/15071.htm (accessed June 27, 2006); http://pioneer.mediaroom.com/index.php?s=press_releases&item=41 (accessed June 27, 2006); http://pioneer.mediaroom.com/index.php?s=press_releases&item=105 (accessed June 27, 2006).



59.

3.





**F.**

**62.**



63.

### 1.    Differences Across Geographic Areas

64.



### a.    Different Areas Buy Different Varieties

65.







66.

67.





**b.**

69.



70.



c.    **Demand for Hybrid Seeds with Traits Differs Across Areas**

71.

---



**d.** ██████████████████████████████████

72. ████████████████████████████████████████████████████████████

73.    The "Other" seed companies include some regional seed companies. Their sales also vary from area to area. For instance, Beck's Superior Hybrids, Southern States, Triumph Seed and Wyffels Hybrids are each ████████████████████████





74. ████████████████████████████████████████████████████████████████

---

74 ████████████████████████████████████████████████████████

75 Source: Doane data. Seed companies are counted separately for purposes of ranking regardless of common ownership.



**2.**

75.

76.

In 2003, growers in the Doane

survey



77.

[79]

78.



---

[78] Source: Doane data. Varieties identified as "unknown" were excluded  Any variety name appearing for multiple companies was only counted once.

[79]



[Figure 9]

81.    The



82.



---

[81] Source: Doane data. Varieties identified as "unknown" were excluded. Any variety name appearing for multiple companies was only counted once.



G.

83.

84.

85.

82





■.[89] For this reason, a simple economic model of perfect competition in which all companies simply adopt the market price does not apply. ■

■.[90]

89.    Whether or not Monsanto would decrease the price of a variety depends

.[91]

90.

.[92]

H.

91.

---

[89] ■.

[90] The elasticity of demand for a product refers to its sensitivity to price. Formally, the elasticity of demand for a good is the percentage change in the quantity sold that would result from a one-percent change in the price of the good. Intermediate microeconomics texts commonly explain how elasticity of demand and incremental cost are used to determine the firm's optimal price. See, for example, Jack Hirschleifer, *Price Theory and Applications* (Englewood Cliffs, New Jersey: Prentice-Hall, Inc., 1984), p. 245.

[91] It has been widely observed that manufacturers of branded pharmaceuticals frequently continue to raise their prices after manufacturers of generic substitutes enter. An early paper noting this phenomenon is Henry G. Grabowski and John M. Vernon, "Brand Loyalty, Entry, and Price Competition in Pharmaceuticals After the 1984 Drug Act," *Journal of Law & Economics,* October 1992, pp. 331-350.





**1.**

92.

93.

94.

93



95.

96.          Under the accepted definition of monopoly, therefore, Monsanto is not monopolizing any of the alleged seed markets. As a replacement for monopolization, Prof. Lesser alleges that Monsanto's conduct in licensing of traits has reduced the alternatives available within each trait. However, there is no general presumption in economic

---

94
95

theory that a decrease in the number of alternative products will increase the price of the remaining products.[96] The price effects of additional alternative products would have to be analyzed on an individual basis variety by variety and region by region. (See my analysis in Section F above.) One cannot simply rely on the allegations in the Complaint, as Prof. Kamien claims to do, to reach such a conclusion.

97.



### 2.    Plaintiffs' Spain and Pioneer Benchmarks

98.



---

[96] For an economic model in which price rises as variety increases, see Bruce L. Benson, "Increasing Product Variety and Rising Prices," *Review of Industrial Organization,* Vol. 5, No. 1 (1990), pp. 31-51.





102.

To allege this is to ignore real-world economics. In the simplistic competitive model of the plaintiffs' experts, this would mean that in the highly competitive restaurant business that gross margins on entrees, appetizers, cocktails, soft drinks, wine and desserts would all be the same. In reality, even though the restaurant business is highly competitive, gross margins on wine are usually 100 percent or more while the margins on entrees are tiny by comparison.[103]





**a.** ███████████

105. ████████████████████████████████

████████████████████████████████████ Thus, at the time Monsanto entered that market in 2003, little progress had been made in terms of wide-spread exposure of Spanish growers to transgenic corn seed. The Spanish benchmark period covers years during which Spanish farmers were just learning to accept transgenic seed as a planting alternative and had limited experience with only one transgenic corn seed variety (ECB-resistant seed).

106. 



107.    Even though the comparability of the product portfolios Monsanto was selling in Spain and the U.S. would be important to the value of his benchmark, Prof. Lesser gives us no assurance that DEKALB was even selling similar ECB-resistant hybrids in Spain as in the United States. In fact, DEKALB was not selling the same hybrid corn seed and selling a much smaller number of ECB-resistant hybrids than in the United States. In 2003, DEKALB had only one ECB-resistant hybrid registered for sale in Spain,



106 ████████████████
107 ████████████
108 ████████████████████████████████████████
109 ████████████████████████████████████████

DKC6575. For the 2004 crop year, it registered a second ECB-resistant hybrid, DKC6550. A third, DK513 was registered for the 2005 crop year.[110]



108.

109.

---

[110] Esteban Alcalde and Jane Bachmann, "Post-Market monitoring Plans of Bt-176 in Spain: 1998-2005," Syngenta, CH-4002, Basel, Switzerland, presented at 9th ICABR International Conference, Ravello, Italy, July, 2005.



[111]

[112]

[113]

110.



111.

112.    In Spain, a very high proportion of sales are made through farm coops at relatively low prices.[117]

113.



---

114

115

116



[117] Graham Brookes, "The Farm Level Impact of Using Bt Maize in Spain," 16 September 2002.



**b.**

114.

**I.**

115.

54



116.

## VI.  CONCLUSION

117.    Based on my review of plaintiffs' claims and the reports and deposition testimony of their experts, I conclude that ███████████████████████ ████████████████████████████. The principal supports for my conclusion are as fol-lows:



─────────────────────

119 ████████████████████████████████████████████████



_____

William C. Myslinski

June 30, 2006

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

## <u>CERTIFICATE OF SERVICE</u>

I, David E. Moore, hereby certify that on July 10, 2006, the attached document was hand

delivered to the following persons and was electronically filed with the Clerk of the Court using

CM/ECF which will send notification of such filing(s) to the following and the document is

available for viewing and downloading from CM/ECF:

Joelle E. Polesky
Smith, Katzenstein & Furlow LLP
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899

John W. Shaw
Young Conaway Stargatt & Taylor, L.L.P.
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

I hereby certify that on July 10, 2006, I have sent by Electronically Mailed the foregoing

document to the following non-registered participants:

Steven F. Benz
Michael S. Zuckman
Kellogg, Huber, Hansen, Todd,
          Evans & Figel P.L.L.C
1615 M Street, NW
Suite 400
Washington, DC 20036
sbenz@khhte.com

R. Stephen Berry
J. Daniel Leftwich
Gregory Baruch
Berry & Leftwich
1717 Pennsylvania Ave., NW
Washington, DC 20006
sberry@berry-leftwich.com
dleftwich@berry-leftwich.com
gbaruch@berry-leftwich.com

Charles A. Bird
Jeremy R. Stevens
Bird, Jacobsen & Stevens
300 Third Ave. S.E.
Rochester, MN 55904
charles@birdjacobsen.com
jeremy@birdjacobsen.com

Richard F. Schwed
Thomas A. McGrath III
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022-6069
rschwed@shearman.com

*/s/ David E. Moore*
Richard L. Horwitz (#2246)
David E. Moore (#3983)
Potter Anderson & Corroon LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

696607

2