**PUBLIC VERSION**

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

AMERICAN SEED CO. INC.,

Plaintiff, On Behalf of Itself and Others Similarly Situated,

v.

MONSANTO COMPANY,

Monsanto Controlled Subsidiaries:

AMERICAN SEEDS INC.,
CORN STATES HYBRID, SERVICE INC.
ASGROW SEED CO., INC.,
HOLDEN FOUNDATION SEEDS, INC.,
DEKALB SEEDS,
CALGENE, L.L.C.,
CHANNEL BIO CO.,
NC+ HYBRIDS,
SEMINIS INC.,

Defendants.

C.A. No. 05-535-SLR

---

DARRELL SOUHRADA, and
DAVE JOHNSON,

Plaintiffs, On Behalf of Themselves and Iowa Citizens Similarly Situated,

v.

MONSANTO COMPANY,

Defendant.

C.A. No. 05-535-SLR

---

| | | |
|---|---|---|
| KENT DUXBURY | ) | |
| | ) | |
| Plaintiff, On Behalf of Himself and Minnesota Citizens Similarly Situated, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-535-SLR |
| | ) | |
| MONSANTO COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**SECOND DECLARATION OF MORTON I. KAMIEN REGARDING CLASS CERTIFICATION**

**Filed on Behalf of Plaintiff American Seed Co., Inc., Intervenor Plaintiffs Darrell Souhrada, Dave Johnson, and Kent Duxbury, and Proposed Intervenor Plaintiffs Jerry Ellefson and Benjamin Rein**

SMITH, KATZENSTEIN & FURLOW LLP

Joelle E. Polesky (ID No. 3694)
Robert K. Beste, III (ID No. 3931)
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899 (Courier 19801)
Telephone: 302-652-8400
Facsimile: 302-652-8405
E-mail: jpolesky@skfdelaware.com

Attorneys for Plaintiffs

Dated: August 14, 2006

MORTON I. KAMIEN declares as follows:

1. I have reviewed Dr. William C. Myslinski's Economic Expert Report in Support of Monsanto's Memorandum in Opposition to Plaintiff's Motion for Class Certification. This Declaration sets forth my opinions regarding the assertions made in Dr. Myslinski's Report.



The individual grower knows that the size of her annual crop is so small relative to all growers' total annual crop that her crop has virtually no impact on the market price of corn. Thus the grower is not concerned that if she plants another acre of corn the market price of corn will decline, or that if she plants an acre less the market price of corn will increase. Moreover, if she did try to raise the price of her corn above the market price, buyers would simply buy corn from one of her many competing growers at the market price. On the other hand, if this grower were the only corn grower, she would know that she faced a downward-sloping demand curve for corn. If she grew more corn, she would have to sell it at a lower price; if she grew less, she would be able to sell it at a higher price. In other words, the monopolist corn grower would have discretion over the market price of corn through the amount she chose to grow because buyers would have nowhere else to buy corn. She would not be a price taker, but rather a price setter, which is the hallmark of monopoly power. And of course she would choose the price on the downward-sloping demand curve that maximized her profit taking into account her corn growing costs. See Jeffrey M. Perloff, *Microeconomics* 343-44 (2nd ed.).

the price elasticity of demand is a measure of how sensitive consumers are to a business's changes in its product's price, which depends on the availability of substitute products sold by its rivals. For example if a gasoline station faces a competing gasoline station across the street then the price elasticity for its gasoline will be very high because if it raises its price even slightly and its competitor across the street does not raise its price, then it will lose a large number of sales to its competitor. On the other hand, if there is no

competing gasoline station within fifty miles, then its price elasticity of demand will be lower because it can increase the price of its gasoline substantially without losing many sales.

     5.  Obviously, a firm finds it more profitable to face a low price elasticity of demand for its product than high price elasticity, because it can charge a higher price for its product without sacrificing sales. And since the price elasticity of a firm's product increases with the number of its competitors, the firm has a strong incentive to limit their number in order to realize monopoly profits.

     6.  Similarly, Monsanto has a strong incentive to limit competitive entry, in order to keep the price elasticity of demand for its trait varieties low and realize monopoly profits. Plaintiffs allege that Monsanto has acted on that incentive and successfully excluded competitors through anticompetitive practices.





**Market Definition**

11. It is my understanding and experience that relevant market definition is a factual matter that is typically decided following merits discovery, which has not even begun in this case. In any event, my review of documents and testimony in this case confirms that it is reasonable for Plaintiffs to allege that the geographic markets in this case are nationwide.

12. The Department of Justice and Federal Trade Commission Merger Acquisition Guidelines set forth a widely accepted analysis of how to determine the geographic market. The Guidelines set forth the standard that one looks to where the purchaser would look for supply. U.S. Department of Justice and the Federal Trade Commission, *Horizontal Merger Guidelines* § 1.21 (rev. Apr. 8, 1997), *available at* http://www.usdoj.gov/atr/public/guidelines/horiz_book/hmg1.html. In an otherwise competitive market, if any supplier raised prices substantially in one region, suppliers from outside that region could enter and compete.

13. The fact that there may be greater demand for particular types of transgenic corn seed in some regions than in others does not mean that the market is not national or that "but for" pricing cannot be determined on a nationwide basis using common formulas. Phillies baseball jerseys sell better in Philadelphia than in Chicago, while Cubs and White Sox jerseys sell better in Chicago than in Philadelphia. It still seems unlikely that these nearly identical shirts are distinct products sold in separate regional markets. They are made by the same companies on the same machines and those manufacturers can affordably adjust their production of the different teams' jerseys to reflect the current popularity of the teams, and ship to where the demand exists.





**Herculex Benchmark**

21. A benchmark is supposed to measure what prices would have been in an unrestrained, competitive market.

**Monsanto's Market Share in the Relevant Markets**



In that case, even if a given purchaser was able to obtain the lowest price in the current, restrained market, it could also have obtained the lowest price in an unrestrained market – which would be lower than in the restrained market. This is why it is essential that the analysis be not simply a comparison of prices (which appears to be Dr. Myslinski's approach) but a comparison of gross margins. Comparing gross margins allows us to determine whether the *entire* range of gross margins currently earned by Monsanto has been inflated by exclusion of competitors. Thus, gross margin

analysis can determine both injury and damages even if there are significant variations and even if those variations would persist even in a more competitive market.

31. As noted above, the price for all customers will be lower in an unrestrained market than in a restrained market, although the amount of the overcharge will be greater for some customers than for others. My proposed benchmarks would take account of these differences.

**Pass-Through**



**Effect of Competitive Entry**



39. In support of this unlikely assertion, Dr. Myslinski cites a paper by Grabowski and Vernon (Myslinski Report at 45 n.91) stating that the prices of brand-name pharmaceuticals have sometimes increased after the expiration of their patents and the introduction of lower-priced generic competitors. Dr. Myslinski fails to note that there are particular factors at work in the markets for prescription drugs that lead to this result. First, pharmaceutical companies know that they will inevitably lose substantial market share to generics even if the price difference is slight. This is in part because thirteen states require, and many others allow, pharmacists to switch a prescription from the more-expensive brand-name to its less-expensive generic equivalent unless the doctor explicitly instructs them not to, and because Pharmacy Benefits Managers that administer employee drug programs for large corporations and hospitals commonly switch to the cheaper generic version. The maker of the brand-name drug thus cannot protect against substantial loss of sales merely by reducing the price gap between its branded drug and the generic alternative. Second, there is a group of patients who stay with a brand-name drug because they either experience or fear adverse side effects from use of the generic (which may be compounded differently). If those patients have insurance they will often bear only a fraction of the difference between the brand-name price and the generic price.

40. In this unusual situation – in which even a small price difference between the brand and the generic will lead to a substantial reduction in market share while a minority of customers have insurance or a doctor's instruction that enables them to opt for the brand name without paying anything close to the full price difference – it can be profitable for a pharmaceutical company to raise the price of its brand-name product after its patent expires. But even in this situation, this is only the case if the pharmaceutical company introduces its own generic version *before* the patent expires and gains a large enough share of the generic market to offset its loss of its brand-name products market share. *See* M. Kamien and I. Zang, *Virtual Patent Extension by Cannibalization*, Southern Economic Journal (July 1999) 117-31.



**Timing of Competitive Entry**



[redacted]

**Foundation Seed**

[redacted]

[redacted]



I hereby certify that the above is true and correct to the best of my knowledge and belief.

Dated: August 11 2006

Morton I. Kamien

Morton I. Kamien

**ALL EXHIBIT PAGES (1-386) HAVE BEEN REDACTED**