# ATTACHMENT A

## Definitions and Instructions

1.      "Documents" means any and all written, printed or computer-recorded words, data or information, including without limitation, any writing or recording of any type of description, whether written, printed or recorded (mechanically or electronically), or reproduced by hand, and whether or not produced or created by Plaintiffs, Defendants, Pioneer (as defined below), or any third party, including, without limitation all letters; electronic mail; correspondence; telegrams; memoranda; notes; records; reports; financial statements; statistical and financial records; minutes; memoranda; notice or notes of meetings; telephone or personal conversations or conferences or other communications; envelopes; interoffice, intra-office or intra-company communications; microfilm; microfiche; tape recordings; videotapes; photographs; bulletins; studies; plans; analyses; notices; computer records, runs, programs or software and any codes necessary to comprehend such records, runs, programs or software; books; pamphlets; illustrations; lists; forecasts; brochures; periodicals; charts; graphs; indices; bills; statements; files; agreements; contracts; sub-contracts; completed forms; schedules; work sheets; data compilations; policies; amendments to policies or contracts; training manuals; operator's manuals; user's manuals; calendars; diaries; test results; reports and notebooks; opinions or reports of consultants; and any other written, printed, typed, recorded, or graphic matter, of any nature, however produced or reproduced, including copies and drafts of such documents, and any and all handwritten notes or notations thereon in whatever form.  The term "documents" also includes all data or documentation that is stored in a computer or other storage device and can be printed on paper or tape, such as drafts of

documents that are stored in a computer or word processor and information that has been input into a computer or other storage device, as well as disks or other materials in which the data or documentation is found.

2.      This Subpoena seeks all responsive documents in the custody, control, or possession of Pioneer.

3.      "Relate to" or "relating to" means in any way directly or indirectly, in whole or in part, regarding, constituting, concerning, about, pertaining to, referring to, reflecting, considering, mentioning, endorsing, evidencing, summarizing, memorializing, describing, discussing, analyzing, evaluating, or representing.

4.      "Pioneer" means Pioneer Hi-Bred International, Inc., and its affiliates and subsidiaries which sell or produce transgenic or conventional corn seed; and any or all of their officers, directors, partners, associates, employees, staff members, agents, representatives, attorneys, subsidiaries, affiliates, divisions, branch offices, successors, and predecessors.

5.      "Monsanto" means all named Defendants, and all unnamed companies affiliated with Monsanto Company or its subsidiaries; and any or all of their officers, directors, partners, associates, employees, staff members, agents, representatives, attorneys, subsidiaries, affiliates, divisions, branch offices, successors, and predecessors.

6.      "Person" includes individuals, corporations, partnerships, groups, and organizations and associations of whatever nature.

7.      "Communications" includes, without limitation, every manner or means of statement, utterance, notation, disclaimer, transfer or exchange of information of any nature whatsoever, by whoever or to whomever, whether oral or written or whether face-

to-face, by telephone, mail, personal delivery or otherwise, including but not limited to, letters, correspondence, conversations, memoranda, dialogue, discussions, meetings, interviews, consultations, agreements and other understandings.

8.      "Contract" or "agreement" includes any prospective or actual contract, agreement, and understanding, as well as all modifications, amendments, supplements, and schedules to such documents.

9.      "Gross profit margin" means gross profit divided by sales, expressed as a percentage, and as understood according to generally accepted accounting principles.

10.     "Net profit margin" means net profit divided by sales, expressed as a percentage, and as understood according to generally accepted accounting principles.

11.     "Unit costs" means gross costs divided by sales, as understood according to generally accepted accounting principles.

12.     "Transgenic corn seed" includes varieties of corn seed manufactured or made with biotechnological traits such that the corn seeds (a) are tolerant of glyphosate herbicide; (b) are resistant to the European Corn Borer or other similar pests; (c) are resistant to root worm or other similar pests; or (d) combine or "stack" two or more of these traits.

13.     "Conventional corn seed" includes varieties of corn seed other than transgenic corn seed.

14.     "Monsanto traits" refers to those biotechnological traits developed or owned by Monsanto such that corn seed containing such traits (a) are tolerant of glyphosate herbicide; (b) are resistant to the European Corn Borer or similar pests; (c) are resistant to root worm or similar pests; or (d) combine or "stack" two or more of these traits.

15.     Except where expressly stated to the contrary, all requests seek documents generated or in use at any time since January 1, 1996.

16.     Requests refer to documents relating to sales or data from the United States unless otherwise specified.

17.     All documents that respond, in whole or in part, to any portion of the requests below shall be disclosed in their entirety, including all attachments and enclosures.

18.     Except as specified in the Subpoena, documents shall be produced either as originals in the order and in the manner that they are kept in the usual course of business, or shall be exact photocopies of the originals, organized and labeled to correspond with the Subpoena.  The documents shall be produced in their original file folder, binder or other cover or container where possible.  Whenever a document or group of documents is removed from a file folder, binder, file drawer, file box, notebook, or other cover or container, a copy of the label or other means of identification of such cover or other container shall be attached to the document.

19.     Any document called for herein that Pioneer claims to be privileged against discovery on any ground shall be identified by describing:

        a.   the general type of document (e.g., letter agreement, memorandum, report, miscellaneous note, etc.);

        b.   date;

        c.   author;

        d.   organization, if any, with which the author was then employed;

        e.   addressee(s) or recipient(s);

f.  organization, if any, with which addressee, or recipient, or distributees were then employed;

g.  general summary of the subject matter;

h.  grounds for refusal to produce such document; and

i.  present location of such document and each copy thereof known to Pioneer, including the identification and location, of the file in which the document is kept, or the file from which such document was removed.

20.  Notwithstanding any claim that a document is protected from disclosure, any document so withheld must be produced with the portion claimed to be protected redacted.

21.  The singular should be interpreted to include the plural number, and vice versa, to ensure the broadest disclosure of information.  The past tense includes the present tense and vice versa where the clear meaning is not distorted by change of tense.

22.  "And" and "or" should be interpreted as "and/or," both conjunctively and disjunctively, to ensure the broadest disclosure of information.

23.  Pioneer is advised that this Subpoena is a continuing one and requires prompt supplemental production by Pioneer, in accordance with the Federal Rules of Civil Procedure, as and whenever Pioneer acquires, makes or discovers additional responsive documents, between the time of initial production and the conclusion of the trial of this action.

<u>Documents Requested</u>

1.  All documents Pioneer has produced to any party in *Syngenta Seeds Inc. v. Monsanto Company*, Civ. No. 04-908-SLR/04-305-SLR, D-Del.

2.     For each variety of transgenic or conventional corn seed sold by Pioneer in the United States, documents sufficient to show for the period 1995-2001:

    a.   The quantity of Pioneer's sales, by year and variety;

    b.   The dollar amount of Pioneer's sales, by year and variety;

    c.   Pioneer's unit costs, by year and variety;

    d.   Pioneer's gross profit margins, by year and variety; and

    e.   Pioneer's net profit margins, by year and variety.

3.     Documents sufficient to show, by variety and state, the prices charged by Pioneer to direct purchasers as well as any suggested retail prices published by Pioneer for conventional and transgenic corn seed for the period 1996 to the present.

4.     For each variety of transgenic or conventional corn seed sold by Pioneer in Spain, documents sufficient to show for the period 2000 to the present:

    a.   The quantity of Pioneer's sales, by year and variety;

    b.   The dollar amount of Pioneer's sales, by year and variety;

    c.   Pioneer's unit costs, by year and variety;

    d.   Pioneer's gross profit margins, by year and variety; and

    e.   Pioneer's net profit margins, by year and variety.

5.   All documents relating to the marketing or sale of the Herculex I trait or corn seed containing the Herculex I trait, for the period of 2000 to the present, including but not limited to:

    a.   All marketing studies prepared in conjunction with the introduction of the Herculex I trait;

    b.   All studies relating to sales and licensing of the Herculex I trait, including all studies that reference the sale of seed containing Monsanto traits; and

    c.   All documents that reference licensing agreements relating to the Herculex I trait or Monsanto traits.

6.     Documents sufficient to show, for the sale and licensing of the Herculex I trait to other seed companies, for the period 2002 to the present:

    a.   The quantity of Pioneer's sales and/or licensing agreements, by year;

    b.   The dollar amount of Pioneer's sales and/or licensing revenue, by year;

    c.   Pioneer's unit costs, by year;

    d.   Pioneer's gross profit margins, by year; and

    e.   Pioneer's net profit margins, by year.

7.     For each variety of transgenic corn seed sold by Pioneer containing the Herculex I trait, documents sufficient to show for the period 2002 to the present:

    a.   The quantity of Pioneer's sales, by year and variety;

    b.   The dollar amount of Pioneer's sales, by year and variety;

    c.   Pioneer's unit costs, by year and variety;

    d.   Pioneer's gross profit margins, by year and variety; and

    e.   Pioneer's net profit margins, by year and variety.

8.   All documents, including all communications, relating to any contract or agreement entered into between Pioneer and Monsanto during the period 1990-2001

pursuant to which Pioneer obtained or possessed a license to sell transgenic corn seed containing Monsanto traits.

9.     For the period 1995 to the present, all documents relating to any studies, data or estimates (whether created by Pioneer or by a third-party) relating to:

    a.  The cost differences associated with corn producers' growing of transgenic corn as opposed to conventional corn, including but not limited to the cost of purchased products, the cost of equipment, the cost of maintaining equipment, and labor costs;

    b.  Pioneer's market share of any transgenic corn seed market in the United States;

    c.  Pioneer's market share of any conventional corn seed market in the United States;

    d.  Pioneer's market share of any transgenic corn seed market in Spain;

    e.  Pioneer's market share of any conventional corn seed market in Spain;

    f.  Monsanto's market share of any transgenic corn seed market in the United States;

    g.  Monsanto's market share of any conventional corn seed market in the United States; and

    h.  Monsanto's market share of any transgenic corn seed market in Spain;

    i.  Monsanto's market share of any conventional corn seed market in Spain;

    j.  Any other market share analysis of the transgenic corn seed and/or conventional corn seed markets in the United States.

10016774.DOC