IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN SEED COMPANY, INC.,<br>Individually and on behalf of<br>all others similarly situated, | ) <br>)<br>)<br>) | |
| Plaintiffs, | )<br>) | |
| v. | ) | Civ. No. 05-535-SLR |
| MONSANTO COMPANY, et al., | )<br>)<br>) | |
| Defendants. | ) | |

---

| | | |
|---|---|---|
| DARRELL SOUHRADA, | )<br>) | |
| Plaintiff, individually<br>and on behalf of Iowa<br>citizens similarly<br>situated, | )<br>)<br>)<br>)<br>) | |
| v. | )<br>) | Civ. No. 05-535-SLR |
| MONSANTO COMPANY, | )<br>)<br>) | |
| Defendant. | ) | |

---

| | | |
|---|---|---|
| KENT DUXBURY, | )<br>) | |
| Plaintiff, individually<br>and on behalf of<br>Minnesota citizens<br>similarly situated, | )<br>)<br>)<br>)<br>) | |
| v. | )<br>) | Civ. No. 05-535-SLR |
| MONSANTO COMPANY, | )<br>)<br>) | |
| Defendant. | ) | |

---

Joelle E. Polesky, Esquire and Robert K. Beste, III, Esquire of
Smith, Katzenstein & Furlow LLP, Wilmington, Delaware.  Counsel
for Plaintiffs.  Of Counsel:  Steven F. Benz, Esquire, Ronald S.
Lord, Esquire, Michael J. Fischer, Esquire, and Michael S.

Zuckman, Esquire of Kellogg, Huber, Hansen, Todd, Evans & Figel
P.L.L.C., Washington, D.C.  R. Stephen Berry, Esquire, J. Daniel
Leftwich, Esquire, and Gregory Baruch, Esquire of Berry &
Leftwich, Washington, D.C.  Charles Bird, Esquire, Van Jacobsen,
Esquire, and Jeremy R. Stevens, Esquire of Bird, Jacobsen &
Stevens, Rochester, Minnesota.

Richard L. Horwitz, Esquire and David E. Moore, Esquire of Potter
Anderson & Corroon LLP, Wilmington, Delaware.  Counsel for
Defendants.  Of Counsel:  Peter E. Moll, Esquire, John J.
Rosenthal, Esquire and Timothy Finley, Esquire of Howrey LLP,
Washington, D.C.

---

**MEMORANDUM OPINION**

Dated:  November 13, 2006
Wilmington, Delaware

ROBINSON, Chief Judge

## I.    INTRODUCTION

Plaintiff American Seed Company ("American Seed") filed a complaint against defendants Monsanto Company and several of its controlled subsidiaries[1] on July 26, 2005 alleging that defendants have unlawfully maintained monopolies in four product markets, corresponding to four types of genetically modified ("GM") corn seed.  (D.I. 1)  A complaint in intervention on behalf of Minnesota citizens was filed on November 15, 2005 naming Kent Duxbury as plaintiff.  (D.I. 45)  On the same date, a complaint in intervention was filed on behalf of Iowa citizens naming Darrell Souhrada as plaintiff.  (D.I. 46)  The parties filed a stipulation to amend the latter complaint on January 17, 2005, and a first amended complaint adding Dave Johnson as a plaintiff representing the Iowa classes.  (D.I. 61 & ex. A)

On September 20, 2006 American Seed filed a first amended complaint adding Jerry Ellefson as a plaintiff.  (D.I. 153)  On the same date, an amended complaint in intervention was filed adding Benjamin Rein as a plaintiff representing the Minnesota classes.  (D.I. 154)

Discovery proceeded on issues related to class certification, which discovery period closed on March 15, 2006.

---

[1]Additional named defendants were American Seeds Inc., Corn States Hybrid Service Inc., Asgrow Seed Company, Inc., Holden Foundation Seeds, Inc., Dekalb Seeds, Calgene, L.L.C., Channel Bio Company, NC+ Hybrids, and Seminis Inc.  (D.I. 1)

(D.I. 56 at 3)   Merits discovery commenced on July 1, 2006, and
the document discovery period closed on September 1, 2006.   (Id.)
Currently before the court is plaintiffs' motion for class
certification.   (D.I. 96)   The court heard oral argument on this
issue on October 3, 2006.   (D.I. 168)

## II.  BACKGROUND

Plaintiffs allege that defendants, through the use of
financial incentives and bundled rebate programs, have driven
competing biotechnology corn seed out of the market, enabling
defendants to charge monopoly prices to farmers and retailers.
(D.I. 100 at 3-4)   Plaintiffs seek to certify three categories of
classes pursuant to Federal Rule of Civil Procedure 23(b)(3):   a
group of national direct purchasers of GM corn seed ("National
Direct Purchaser Class"), whose claims will be brought under
federal antitrust law; and groups of purchasers of GM corn seed
in Iowa and in Minnesota (the "Iowa Class" and "Minnesota
Class"), whose claims will be brought under the laws of each
respective state.   (D.I. 96; D.I. 100 at 3-4)   Within each class,
plaintiffs have identified several subclasses corresponding to
certain GM corn seed purchased, to wit, GM corn seed that:   (1)
is tolerant of glyphosate herbicide;[2] (2) is resistant to

---

[2]"Roundup Ready™"-branded seeds contain this trait, whose
name reflects the seeds' resilience to Roundup™ glyphosate
herbicide.

2

European Corn Borer pest;[3] (3) is resistant to rootworm pest; and
(4) contains two or more of the glyphosate-tolerant, European
Corn Borer ("ECB")-resistant, or rootworm-resistant traits.[4]
(D.I. 96)

In support of their motion, plaintiffs rely on the expert
opinion of Dr. William Lesser, who has provided two benchmarks
that he believes would be reasonable in estimating damages to
class members in this case, and for which data is likely to be
available.[5]  (D.I. 100 at 13; D.I. 103 at 7-13)  Another expert

_____

[3]"Yieldgard™"-branded seeds contain this trait.

[4]For example, one of plaintiffs' proffered National Direct
Purchaser Classes is described as:

A class of persons directly purchasing corn seed from
Monsanto Company (including its controlled subsidiaries)
which is tolerant of glyphosate herbicide between July 26,
2001 and the present, excluding citizens of the States of
Iowa and Minnesota, persons affiliated with Monsanto, and
governmental entities.

(D.I. 96 at 2)  In comparison, one of plaintiffs' proffered Iowa
classes is described as:

A class of persons who are citizens of Iowa and who have
purchased, from Monsanto Company (including its named
controlled seed companies) or its independent distributors,
corn seed which is tolerant of glyphosate herbicide between
July 29, 2001 and the present, excluding persons affiliated
with Monsanto and governmental agencies.

(Id. at 3)

[5]Dr. Lesser's benchmarks are:  (1) Monsanto's sales in Spain
of its YieldGard™ ECB-resistant seed from 2003 to 2005; and (2)
Monsanto's sales of its Pioneer/YieldGard™ ECB-resistant seed in
the United States before its alleged monopolization of the GM
corn seed market.  (D.I. 100 at 13; D.I. 103 at 7-11)

3

retained by plaintiffs, Dr. Morton Kamien, has provided common damages formulas to be applied to Dr. Lesser's benchmarks, and has opined that common impact of defendants' alleged monopoly can be demonstrated with respect to each of plaintiffs' proffered classes.   (D.I. 100 at 14-15; D.I. 104 at 8-15)

## III.  LEGAL STANDARD

A district court has discretion to grant or deny class certification.  See Eisenberg v. Gagnon, 766 F.2d 770, 785 (3d Cir. 1985).  The court does not inquire into the merits of a lawsuit while determining whether it may be maintained as a class action.  See Eisen v. Carlisle and Jacquelin, 417 U.S. 156, 177 (1974).  However, the court must conduct a limited preliminary inquiry, looking beyond the pleadings, to determine whether common evidence could suffice to make out a prima facie case for the class.  See General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 160 (1982) ("the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action") (citation omitted); Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 167 (3d Cir. 2001) ("[C]ourts may delve beyond the pleadings to determine whether the requirements for class certification are satisfied.").

## IV.  DISCUSSION

For a class to be certified, it is plaintiffs' burden to

4

"establish that all four requisites of Rule 23(a) and at least one part of Rule 23(b) are met." Baby Neil v. Casey, 43 F.3d 48, 55 (3d Cir. 1994). Rule 23(a) requires: (1) numerosity (the class is so large that "joinder of all members is impracticable"); (2) commonality ("questions of law or fact common to the class"); (3) typicality (the named parties' claims or defenses are typical of the class); and (4) adequacy of representation (class representatives "will fairly and adequately protect the interests of the class"). Amchem Products, Inc. v. Windsor, 521 U.S. 591, 613 (1997) (quoting Fed. R. Civ. P. 23(a)). Under Rule 23(b)(3), the category at issue in this case, two requirements must be met for a class to be certified: (1) common questions must predominate over any questions affecting only individual members; and (2) class resolution must be superior to other available methods for the fair and efficient adjudication of the controversy. Id. at 615. The parties' arguments in this case focus on whether "common questions" exist so as to satisfy the overlapping requirements of Rules 23(a)(2) and 23(b)(3). Before addressing this issue, the court pauses to address additional issues regarding plaintiffs' proffered classes.

## A. Standing and Typicality

Defendants argue that plaintiff American Seed lacks standing to represent any direct purchaser classes because it did not

purchase GM corn seed directly from defendants during the class period, rather, American Seed purchased GM seed from independent third-party seed companies. (D.I. 118 at 14)   Defendants also argue that, assuming American Seed has standing, it fails to meet the typicality requirement of Rule 23(a)(3).  (Id. at 39)   To satisfy the typicality requirement, plaintiffs must show that the class representatives are "part of the class and 'possess the same injury' as the class members."  East Texas Motor Freight System, Inc. v. Rodriguez, 431 U.S. 395, 403 (1977) (citations omitted).  Defendants argue that this standard can not be met because American Seed is neither a retailer nor a grower and was not overcharged as a result of the alleged conspiracy; American Seed's purported injury was lost sales, as growers could not afford the higher costs that were passed through to them in American Seed's pricing.  (Id.)  Plaintiff responds that a direct purchaser that passes on an unlawful increase in price is entitled to the same damages as other direct purchasers under Hanover Shoe, Inc. v. United Shoe Machinery Corp.[6]  (D.I. 133 at

---

[6]The corollary to this rule, iterated in Illinois Brick Co. v. Illinois, is that downstream (or indirect) purchasers do not have standing to sue for costs "passed-on" to them.  See McCarthy v. Recordex Service, Inc., 80 F.3d 842, 849 (3d Cir. 1996) ("Permitting the use of pass-on theories . . . essentially would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that would have absorbed part of the overcharge--from direct purchasers to middlemen to ultimate consumers.") (citing Illinois Brick Co. v. Illinois, 431 U.S. 710, 737 (1977)) (collecting Third Circuit precedent).  Plaintiffs have characterized the Iowa and Minnesota

6

18 (citing 392 U.S. 481, 489 (1968))

The parties presented argument to the court regarding whether sales invoices produced during class discovery demonstrate that American Seed purchased GM corn seed from defendants directly or from an independent seed company. At this stage of the proceedings, the court declines to render a judgment regarding the merits of the disputed facts. See Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of America, 453 F.3d 179, 183 n.5 (3d Cir. 2006). It is apparent, however, that plaintiffs face a problem either with standing or typicality in the present case. If American Seed is not a direct purchaser, as defendants allege, American Seed is not a proper representative for the National Direct Purchaser Class and, in fact, is not a proper class member under plaintiffs' definitions.[7] If American Seed is

---

classes as encompassing "indirect purchasers" of transgenic seed. (D.I. 133 at 6-7) However, plaintiffs have cited authority which demonstrates that state law in Iowa and Minnesota allows for indirect purchasers to recover damages. Gordon v. Microsoft Corp., No. Civ. A. 00-5994, 2001 WL 366432, *7 & *13 (D. Minn. Mar. 30, 2001) (certifying indirect purchaser class under "Illinois Brick repealer statute" Minn. Stat. § 325D.57); Comes v. Microsoft Corp., 646 N.W.2d 440, 445 & 449 (Iowa 2002) (holding that Iowa Competition Law codified at Iowa Code §§ 553.4 and 553.5 creates a cause of action for indirect purchasers, and stating that the policy considerations of Illinois Brick "have little, if any, applicability to antitrust suits in state court."). Plaintiffs' argument regarding the standing of American Seed does not run afoul of the request for the certification of the indirect purchaser classes in this case.

[7]Even should the court accept plaintiffs' first amended complaint adding Jerry Ellefson as a representative of the National Direct Purchaser Classes, the standing issue may persist

7

a direct purchaser, it may not have suffered the same injury (inflated pricing) as retailers and growers if it passed on overcharges to customers.[8]

Insofar as the court finds that plaintiffs' classes are not certifiable under Rule 23(a)(2) and Rule 23(b)(3) even if each proffered class had standing and fulfilled the typicality requirements, the court need not resolve these issues.

**B.  Commonality**

**1.  The Bogosian Short-Cut**

As proof of common injury, plaintiffs' expert, Dr. Kamien, opines that it is economically reasonable to conclude that, if defendants' conduct is proven to have restrained competition, this had the effect of raising or maintaining prices for all purchasers in the GM corn seed market above what they would have been.  (D.I. 104 at 8)  Plaintiffs rely on the Third Circuit's decision in LaPage's Inc. v. 3M for the proposition that Dr. Kamien may appropriately assume that monopolistic conduct results in common injury.  (D.I. 133 at 2 (citing 324 F.3d 141, 164 (3d Cir. 2003) (en banc) ("Once a monopolist achieves its goal by excluding potential competitors, it can then increase the price

_____

if American Seed is not a proper class member.  (D.I. 154)

[8]Plaintiffs and Dr. Kamien allege that seed dealers pass through all overcharges to the Iowa and Minnesota class members, which constitutes common proof of injury with respect to those classes.  (D.I. 133 at 6-7; D.I. 104 at 14)

8

of its product to the point at which it will maximize its profit.
This price is invariably higher than the price determined in a
competitive market."))  In essence, plaintiffs rely on a theory
described by the Third Circuit as the "Bogosian short-cut:"

> [If] a nationwide conspiracy is proven, the result of which
> was to increase prices to a class of plaintiffs beyond the
> prices which would obtain in a competitive regime, an
> individual plaintiff could prove fact of damage simply by
> providing that the free market prices would be lower than
> the prices paid and that he made some purchases at the
> higher price.  If the price structure in the industry is
> such that nationwide the conspiratorially affected prices at
> the wholesale level fluctuated within a range which, though
> different in different regions, was higher in all regions
> than the range which would have existed in all regions under
> competitive conditions, it would be clear that all members
> of the class suffered some damage, notwithstanding that
> there would be variations among all dealers as to the extent
> of their damage.

In re Linerboard Antitrust Litigation, 305 F.3d 145, 151 (3d Cir.
2002 (citing Bogosian v. Gulf Oil Corp., 561 F.2d 434, 455 (3d
Cir. 1977)).  The Bogosian presumption of impact does not support
class certification where there is no additional evidence of
class-wide impact.  In re Linerboard, 305 F.3d at 153 ("there is
more to this case than exclusive reliance on the presumed impact
theory") (holding that the district court did not err in
certifying the proffered class).

## 2. Courts' Application of the Bogosian Short-Cut

Plaintiffs claim that the present case parallels Bradburn
Parent/Teacher Stores, Inc. v. 3M, No. Civ. A. 02-7676, 2004 WL
1842987, *15 (E.D.Pa. Aug. 18, 2004), in which the district court

9

granted class certification.  (D.I. 133 at 12-13)  Not

coincidentally, Dr. Kamien was plaintiffs' expert in Bradburn.

Dr. Kamien relied upon the Bogosian presumption of impact in that

case, and proposed two benchmarking theories of damages.[9]  2004

WL 1842987 at *12-13.  Dr. Kamien also asserted in Bradburn, as

he does in this case, that gross margins for the products at

issue would allow him to determine defendant's response to

competition in the marketplace, irrespective of variations in the

price charged to consumers.[10]  Id. at *16.  The Bradburn court

agreed that plaintiffs had presented, through Dr. Kamien, a

theory of damages which would prove or disprove the existence of

impact for all members of the class by the use of common

benchmarking formulas and generalized proof.  Id. at *14.  The

court stated in this regard:

> Dr. Kamien has sufficiently augmented his conclusion that

---

[9]One benchmark in Bradburn was the market for the product at
issue, transparent tape, before defendant's alleged
anticompetitive activity commenced.  2004 WL 1842987 at *13.  The
other benchmark was the market for "wrap and mail" tape, another
tape market, in 1993 when defendant reduced its prices due to
increased competition.  Id.  The Bradburn court stated that
"[t]he two benchmarks proposed by Dr. Kamien are standard methods
for proving damages in an antitrust case."  Id. at *15 (citing
Nichols v. Smithkline Beecham Corp., No. Civ. A. 00-6222, 2003
U.S. DIST. Lexis 2049, at *24 (E.D.Pa. Jan. 29, 2003)) (internal
quotations omitted)).

[10]Dr. Kamien argued in Bradburn that gross margin data was
critical to determining whether defendant raised its prices
because of increased competition or, alternatively, due to other
factors such as changes in the cost of production.  2004 WL
1842987 at *16.

10

> classwide impact can be established through the use of
> common proof with supporting documentation and economic
> theory.   The court further finds that this supporting
> documentation demonstrates that Dr. Kamien has conducted **at
> least a preliminary study of the market for transparent tape
> and the feasability of applying his economic theory to this
> market**.

Id. at *17 (emphasis added).   The Bradburn court described Dr.

Kamien's preliminary study as follows:

> For example, in support of his assertion that the market for
> "wrap and mail" tape represents a valid competitive
> benchmark for this case . . . Dr. Kamien **utilized
> Defendant's own internal strategic business plan**[.] . . .
> Dr. Kamien's analysis of the market for transparent tape
> prior to 3M's anti-competitive product similarly cites to
> both **deposition testimony** of 3M employees and LaPage's **trial
> testimony** to support Dr. Kamien's assertion that the
> discounts offered by 3M during this period can be used as a
> proxy for determining the prices that 3M would have charged
> for its tape in the absence of its anti-competitive product.

Id. (emphases added).[11]   In addition to this supporting

documentation for Dr. Kamien's theory, the district court in

Bradburn had the benefit of a 9-week trial and a Third Circuit

decision regarding the transparent tape market to aid its

decision.   Id. at *1, *13, *14 n.13.

        In In re Linerboard, the Third Circuit affirmed the

_____

[11]The Bradburn court rejected defendant's attack on Dr.
Kamien's methodology for failing to take into account the
complexities of the transparent tape market, noting that:   (1)
the facts demonstrated that of 2000 asserted brands, 100 brands
of tape constituted 80% of defendant's sales; (2) Dr. Kamien
opined that the pricing behavior of the remaining 20% would
follow the majority; and (3) testimony in the case demonstrated
that defendant maintained databases which tracked prices charged
to each customer for each product, including data on rebates and
promotional allowances.   2004 WL 1842987 at *17.

certification of appellee's class where the district court relied
both on the Bogosian short-cut and the opinions of plaintiff's
experts, which "were supported by charts, studies, and articles
from leading trade publications." 305 F.3d at 153. The Court
deemed the conclusion of plaintiff's expert, Dr. Beyer,
"significant because it was supported by charts and studies,"
which included "an extensive empirical investigation into the
behavior of linerboard and corrugated box prices over time which
proved a basis for his opinion of common impact." Id. In
addition, Dr. Beyer "had studied the structure of the industry,
including Appellants' market power, geographical overlap, the
fungible nature of the products, the inelastic demand and lack of
a substitute," in concluding that higher corrugated cardboard
(product) prices were strongly influenced by linerboard prices,
thus demonstrating class-wide impact. Id. Similarly, the Third
Circuit found the conclusion of plaintiff's expert Dr. Cantor
"extremely significant" as her "conclusion [of common impact] was
supported by relevant data," namely industry and pricing data.
Id. at 154. The Court specifically explained that there was
"more to th[e] case than exclusive reliance on the presumed
impact theory:"

> [W]e conclude that the district court did not err in
> determining that plaintiffs showed that they could establish
> injury on a class-wide basis. Plaintiffs produced
> affidavits of expert witnesses, Dr. Beyer and Dr. Cantor,
> who effectively utilized supporting data, including charts
> and exhibits, to authenticate their professional opinions

12

that all class members would incur such damages.  We decide
that this was not a case where plaintiffs relied solely on
presumed impact and damages.

Id. at 153, 155.  As the Bradburn court has stated, "Linerboard .
. . teaches that at least **some** analysis of the relevant market
and other facts unique to the particular case is required before
an expert can opine that all class members have suffered
antitrust injury."  2004 WL 1842987 at *15 (emphasis added).

### 3.  Whether Common Injury May Be Presumed in This Case

#### i.  Proof of injury

Plaintiffs primarily rely on the Bogosian presumption as
proof of common injury.  In addition, plaintiffs assert that Dr.
Kamien's damages formulas can be used both to measure damages and
as further proof of common injury.  (D.I. 100 at 15)  The law is
clear, however, that proof of injury (the existence of
defendants' alleged monopoly margin) is distinguishable from the
calculation of damages (computation of the alleged inflation of
defendants' gross margins).  See Newton, 259 F.3d at 188.
Plaintiffs have not provided any factual backdrop regarding, for
example, defendants' business practices or the GM corn seed
market, which would make clear to the court how Dr. Kamien's
formulas can also constitute proof of the fact of damage.

#### ii.  Market complexity

As in Bradburn, the court has the benefit of a prior
decision addressing the relevant market (for genetically modified

13

seed). In <u>Sample v. Monsanto Company</u>, the district court held
that the evidence demonstrated that a presumption of common
impact would be improper for several reasons. 218 F.R.D. 644
(E.D. Mo. 2003). First, according to the <u>Sample</u> court,
"genetically modified seeds are not homogenous products. The
market for seeds is highly individualized depending on geographic
location, growing conditions, consumer preference and other
factors." <u>Id.</u> at 650-51. Second, the plaintiffs in <u>Sample</u>
alleged that only the "premium" portion of the seeds containing
Monsanto's patented genes were the result of the price-fixing
scheme, and the germplasm component of the seed could not be
segregated from the rest of the seed for pricing purposes. <u>Id.</u>
at 651. The <u>Sample</u> court also stated that the actual prices paid
could not be determined by common proof, as GM seeds were not
offered at a uniform price, and defendants' nationwide price
lists did not reflect the actual prices paid by farmers. <u>Id.</u>
The court stated:

> Plaintiffs cannot determine the "but-for" marketplace
> necessary to establish antitrust impact without a reliable
> methodology to determine the premiums paid by farmers. In
> fact, the evidence presented at the class certification
> hearing showed that supply-and-demand conditions for seed
> sales vary to such a great extent that the "but-for" prices
> could be determined only through individualized inquiries
> for each potential class member. These factors include
> growing seasons and conditions, regional varieties and
> farmer preferences. Common proof simply cannot be used to
> establish a "but-for" marketplace in this situation,
> particularly where the evidence showed that the actual
> prices paid by many farmers was well below Monsanto's
> technology fee.

14

\* \* \*

The variety of [genetically modified] seeds purchased,
geographic location, growing conditions, and the terms of
purchase are all relevant to a determination of impact and
cannot be shown with common proof on a class-wide basis.

Id. at 651.  The Eighth Circuit affirmed the district court's

denial of class certification based upon its holdings that the

market for genetically modified seeds is highly individualized,

prices for genetically modified seeds varied considerably, and

plaintiffs' expert did not show that the fact of injury could be

proven for the class as a whole with common evidence.[12]  Blades

v. Monsanto Co., 400 F.3d 562, 572 (8th Cir. 2005).

The Sample and Blades decisions provide factual insight into

the complexity of the market for GM corn seed which has not been

countered by plaintiffs.  Unlike the record made in Bradburn, Dr.

Kamien has not supported his theory of presumed impact with any

supporting documentation in this case.  In addition to the

Bogosian presumption, Dr. Kamien's only other substantiation of

his common impact theory is the common damages formulas to be

applied to Dr. Lesser's benchmarks.  Plaintiffs have not provided

any actual data for the court's review as to the "factual setting

of the case," against which to evaluate these formulas.  Dr.

_____

[12]The classes in Sample were persons who purchased GM seeds
"at any time from January 1, 1996 to the present."  218 F.R.D. at
646-47.  Plaintiffs' motion to certify the classes in Sample was
brought on January 17, 2003.

Kamien cites absolutely **no** factual authority in his declaration
in support of his theory of common injury and damages.[13]  (D.I.
104 at 8-15);  See Weisfeld v. Sun Chemical Corp., 84 Fed. Appx.
257, 264 (3d Cir. 2004) (non-precedential) (noting there was no
indication that plaintiff's expert conducted the required
"preliminary analysis" or had support for his opinion when the
expert's declaration contained "no actual analysis in the
declaration itself and no discussion of the evidence upon which
[the expert's] analysis was based," and "no studies or findings
attached to the declaration") (denying class certification).
There is no indication that Dr. Kamien conducted "at least a
preliminary study of the market" as in Bradburn.  2004 WL 1842987
at *15.  Dr. Kamien's submissions are not "supported by charts,
studies, and articles from leading trade publications" as in In
re Linerboard.  305 F.3d at 153.

Dr. Kamien did not independently analyze the documents
produced during class discovery.  (D.I. 166 at 38:24-39:2)  Dr.
Kamien did not study the pricing and/or pricing variability for

_____        _____

[13]Dr. Kamien cites the deposition testimony of Anthony
Leisure, Monsanto's designee on pricing, for the proposition that
the requisite cost and margins data should be available, as well
as data relating to licenses given to Iowa and Minnesota growers.
(D.I. 104 at 12, 15)  It is not clear to the court why plaintiffs
did not seek or, alternatively, could not obtain such data during
class discovery.  Nevertheless, data availability is a separate
inquiry.

any of the varieties of GM corn seeds.[14]   (Id. at 91:24-92:12)
Dr. Kamien also did not interview any farmers, class members, or
employees of seed distributors, seed companies, or retailers in
connection with his report or declaration.  (Id. at 139:10-140:7)
It is not genuinely disputed that Dr. Kamien has taken the
allegations in the complaint at face value, and formed his
conclusion of class-wide impact without conducting any
independent analysis, and without knowing whether the data will
ultimately support his theory.  (Id. at 23:20-24:2, 39:15-23,
86:20-23 & 89:2-24)

Plaintiffs apparently have chosen to rely exclusively on
their legal theory that a presumption of impact is sufficient in
this case.  A legal presumption not grounded in fact, however, is
not sufficient.  The relevant market was thoroughly studied and
previously deemed complex by the courts in Sample and Blades.
Plaintiffs' lack of underlying factual support for Dr. Kamien's
proposed common damages formulas – even assuming they are
indistinguishable from proof of common injury – is especially
troublesome considering that precedent.

_____

[14]If in fact defendants' gross margins for the seeds at
issue would allow Dr. Kamien to determine defendants' response to
competition in the marketplace, irrespective of movements in the
price charged to the end user, Dr. Kamien's omission may not be
fatal.  Under the same logic, the same may be true with respect
to Dr. Kamien's failure to consult retailers, seed companies, or
growers.  (D.I. 166 at 139:10-140:7)  Notwithstanding, as
discussed in Blades, the genetically modified seed market is
sufficiently more complicated than Dr. Kamien's analysis allows.

17

### iii.  Apportionment of the value of traits within the seed as a whole

In Sample, the court stated that "plaintiffs allege[d] that only the 'premium' portion of the seed product [was] the result of the price-fixing scheme, but the germplasm component of the seed cannot be segregated from the rest of the seed." 218 F.R.D. at 651.  Defendants in this case similarly assert that an alleged lack of competition in traits does not automatically translate into artificially high seed prices.  (D.I. 118 at 12, 19-20) Plaintiffs did not counter defendants' argument in their reply brief.  (D.I. 133)

Plaintiffs' expert in Sample, Dr. Lietzinger, conceded that "insertion of a GM trait might affect other agronomic characteristics of the seed which might otherwise affect the price." Id. at 651.  Though Dr. Lietzinger's opinion is not evidence in this case, plaintiffs have not provided any evidence to the court which would counter the persuasiveness of this observation that it is not possible to isolate the trait component of genetically modified seed in terms of price.  Nor have plaintiffs provided any evidence regarding the relationship between traits (or germplasm) and seed cost or gross margins.[15]

### iv.  Different varieties of direct purchasers exist in this case

_____

[15]Dr. Kamien testified that he has not analyzed price differences between varieties of GM corn seed containing different types of germplasm.  (D.I. 166 at 194:2 - 195:1)

18

It appears that plaintiffs' class definitions are broad enough in this case to encompass not only purchasers of hybrid corn seed, but any "corn seed" with the specified genetic traits, including foundation seed.[16] (D.I. 96)  Defendants point to record evidence which indicates that the foundation seed market is separate from the hybrid seed market, as foundation seed is priced differently and travels through different distribution channels.  (D.I. 118 at 28-29 (citing D.I. 119 at B-440 and D.I. 120 at ¶¶13-19))  Plaintiffs do not address defendants' arguments in their reply brief.  (D.I. 133)

At the very least, the record indicates that foundation seed is a different product than hybrid seed, even if the respective markets overlap.  Plaintiffs have not explained how common proof can be used to establish antitrust injury to direct purchasers of both foundation seed and hybrid seed as encompassed by their class definitions.[17]  Further, the claims and/or defenses of

---

[16]In addition to the plain language of plaintiffs' definitions, plaintiffs' statement that, "although Monsanto disputes that purchasers of its foundation seed – i.e., seed used to produce hybrid seed varieties - should be included in the classes that are certified by th[e] Court, it has not disputed that full transaction data are available for foundation seed," indicates that plaintiffs seek inclusion of foundation seed purchasers.  (D.I. 133 at 6)

[17]This case does not represent the first instance in which a distinction between foundation seed and hybrid seed has been recognized.  In a separate litigation currently pending before the court, plaintiffs have withdrawn counts relating to Monsanto's alleged monopolization of the market for GM foundation seed.  Syngenta Seeds Inc. v. Monsanto Co., No. Civ. A. 04-908

19

either group of purchasers are not necessarily typical of a class
including purchasers of both foundation seed and hybrid seed.[18]
Additionally, plaintiffs' National Direct Purchaser Classes
encompass several types of direct purchasers, such as retailers,
distributers, seed companies, and growers.  Plaintiffs have not
explained how differences between these types of purchasers (for
example, retailers versus growers) are insubstantial with respect
to the commonality and typicality requirements of Rule 23.

### v.   Indirect purchasers (Iowa and Minnesota classes)

Plaintiffs and Dr. Kamien allege that common injury to
indirect purchasers (Iowa and Minnesota class members) can be
demonstrated using common proof once the overcharges to dealers
are shown, because seed dealers pass through the overcharges to
these class members.  (D.I. 133 at 6-7; D.I. 104 at 14)   Even
assuming overcharges were in fact passed through in toto in all
cases, negating any need for individualized inquiry, the premise
of plaintiffs' theory with respect to the Iowa and Minnesota
classes rests upon the presumption of impact on the direct
purchasers.  Plaintiffs' arguments regarding the Iowa and

_____

(order granting leave to file third amended complaint docketed at
Monsanto Co. v. Syngenta Seeds Inc., No. Civ. A. 04-305, D.I. 522
(Nov. 8, 2006)).  Claims relating to hybrid seed remain in the
litigation.  Id.

[18]In the event that certain seed companies purchased both
types of seed during the class period, it is even less clear how
common proof could apply to those customers.

20

Minnesota classes thus falter for the same reasons discussed in
the context of the National Direct Purchaser Classes.

## V. CONCLUSION

Plaintiffs at bar have not provided the court with a hook on
which to soundly hang a decision that common questions
predominate in this case. Dr. Kamien has not sufficiently
grounded his theory of injury in the factual setting of the case
to justify class certification. See In re Agricultural Chemicals
Antitrust Litigation, No. Civ. A. 94-40216, 1995 WL 787538, *4
(N.D. Fla. Oct. 23, 1995) (denying class certification where
expert "did no empirical study of whether impact could be proven
on a class-wide basis. Nor did he do anything to inform himself
about the agricultural chemical industry."); compare In re
Linerboard, 305 F.3d at 153 ("there is more to this case than
exclusive reliance on the presumed impact theory"); Bradburn,
2004 WL 1842987 at *15; In re Mercedez-Benz Antitrust Litig., 213
F.R.D. 180, 189-90 (D.N.J. 2003) (plaintiff's expert tracked both
prices and dealer gross profits for a sample of seven automobile
dealers and determined that both figures remained within a small
range, demonstrating the viability of expert's benchmarks on a
class-wide scale) (granting class certification).

Plaintiffs had a full and fair opportunity to pursue fact

21

discovery related to class certification.[19]  Plaintiffs instead
elected to rely solely on Dr. Kamien's presumed impact theory.
Based on the analysis above, plaintiffs' motion for class
certification (D.I. 96) is denied.  An appropriate order shall
issue.

---

[19]During the discovery conferences held with the court,
plaintiffs never suggested that they had tried to conduct market-
based discovery and were thwarted in their efforts to do so by
defendants.