# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMERICAN SEED COMPANY, INC.,<br>Individually and on behalf of all others<br>similarly situated, )<br><br>Plaintiffs, )<br><br>v. )<br><br>MONSANTO COMPANY, et al., )<br><br>Defendants. ) | C.A. No. 05-535-SLR<br><br><br>**JURY TRIAL DEMANDED** |

| | |
|---|---|
| DARRELL SOUHRADA )<br><br>Plaintiff, On Behalf Itself )<br>and Iowa Citizens Similarly )<br>Situated, )<br><br>v. )<br><br>MONSANTO COMPANY, )<br><br>Defendant. ) | C.A. No. 05-535-SLR |

| | |
|---|---|
| KENT DUXBURY )<br><br>Plaintiff, On Behalf Itself )<br>and Minnesota Citizens )<br>Similarly Situated, )<br><br>v. )<br><br>MONSANTO COMPANY, )<br><br>Defendant. ) | C.A. No. 05-535-SLR |

## NOTICE OF SUBPOENA AD TESTIFICANDUM & DUCES TECUM

PLEASE TAKE NOTICE that, pursuant to Rules 30 and 45 of the Federal

Rules of Civil Procedure and the attached subpoena and accompanying Schedule A,

which has been or will be served via hand delivery on GreenLeaf Genetics LLC, c/o The

Corporation Trust Company, and via hand delivery and electronic mail on Plaintiffs' counsel, defendant will take the deposition upon oral examination of GreenLeaf Genetics LLC on November 1, 2006, commencing at 9:00 a.m. at Potter Anderson & Corroon LLP, Hercules Plaza, 6th Floor, 1313 N. Market Street, Wilmington, Delaware 19801. The deposition will be recorded by videotape and by stenographic means. You are invited to attend and cross-examine.

PLEASE TAKE FURTHER NOTICE that, pursuant to Rules 34 and 45 of the Federal Rules of Civil Procedure and the attached subpoena and accompanying Schedule B, which has been or will be served via hand delivery on GreenLeaf Genetics LLC, c/o The Corporation Trust Company and via hand delivery and electronic mail on Plaintiffs' counsel, GreenLeaf Genetics LLC, also has been commanded to produce documents for copying or inspection on October 4, 2006 by 5:00 p.m., at the offices of Potter Anderson & Corroon LLP, Hercules Plaza, 6th Floor, 1313 N. Market Street, Wilmington, Delaware 19801.

OF COUNSEL:

Peter E. Moll
John J. Rosenthal
John H. Bogart
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, DC 20004
Tel: (202) 783-0800

Kenneth A. Letzler
Jonathan I. Gleklen
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, D.C. 20004
Tel: (202) 942-5000

Dated: September 21, 2006
751444 / 29369

POTTER ANDERSON & CORROON LLP

By:  /s/ David E. Moore
     Richard L. Horwitz (#2246)
     David E. Moore (#3983)
     Hercules Plaza, 6th Floor
     P. O. Box 951
     Wilmington, DE 19899
     Tel: (302) 984-6000
     rhorwitz@potteranderson.com
     dmoore@potteranderson.com

*Attorneys for Monsanto Company, American Seed, Inc., Corn States Hybrid Service, Inc., Asgrow Seed Co., Inc., Holden Foundation Seeds, Inc., Dekalb Seeds, Calgene, L.L.C., Channel Bio Co., Nc+ Hybrids and Semins, Inc.*

2

# EXHIBIT A

A088 (Delaware Rev. 7/00) Subpoena in a Civil Case

## Issued by the

# UNITED STATES DISTRICT COURT

## DISTRICT OF DELAWARE

American Seed Co. Inc., et al.

        Plaintiffs,

        v.

Monsanto Company, et al.

        Defendants.

## SUBPOENA IN A CIVIL CASE

Case Number:[1] 05-535-SLR

TO:  GreenLeaf Genetics LLC
     c/o The Corporation Trust Company
     1209 Orange Street
     Wilmington, DE 19801

☐   YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☑   YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case. **See Schedule A hereto.**

| PLACE OF DEPOSITION Potter Anderson & Corroon LLP, Hercules Plaza, 6th Floor 1313 N. Market Street, Wilmington, DE 19801 | DATE AND TIME November 1, 2006 at 9 a.m. |
|---|---|

☑   YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified blow (list documents or objects):

**See Schedule B hereto.**

| PLACE  Potter Anderson & Corroon LLP, Hercules Plaza, 6th Floor 1313 N. Market Street, Wilmington, DE 19801 | DATE AND TIME October 4, 2006 at 5:00 p.m. |
|---|---|

☐   YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

     Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) _/s/ S/_  #5953 (Atty. for defendant) | DATE 7/21/06 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
David Moore, Esquire (302) 984-6000
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor, 1313 N. Market Street, Wilmington, DE 19801

(See Rule 45, Federal Rules of Civil Procedure, parts C & D on next page)

---

[1] If action is pending in district other than district of issuance, state district under case number

A088 (Delaware Rev. 7/00) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE GreenLeaf Genetics |
|---|---|---|
| SERVED | 9/21/06 | c/o The Corporation Trust Company 1209 Orange St. Wilmington, De. 19801 |

SERVED ON (PRINT NAME)                    MANNER OF SERVICE

*Scott LaScala*                            *BY HAND*

SERVED BY (PRINT NAME)                     TITLE

*Christopher Hazewski*                     *Special Process Server*

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on   9/21/06
                 DATE

SIGNATURE OF SERVER
230 N Market Street
Wilmington DE 19801
ADDRESS OF SERVER

---

## Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1)   A party or an attorney responsible for the issuance and service of a Subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A)   A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)   Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)   fails to allow reasonable time for compliance,
(ii)  requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv)  subjects a person to undue burden.

(B) If a subpoena

(i)   requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii)  Requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a party from or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions

(d) DUTIES IN RESPONDING TO SUBPOENA

(1)   A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2)   When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## SCHEDULE A

### IN THE UNITED STATES DISTRICT COURT FOR
### THE DISTRICT OF DELAWARE

AMERICAN SEED CO. INC.  )
  )
  Plaintiff, On Behalf Of Itself )
  and Others Similarly )
  )  C.A. NO. 05-0535
  v.  )
  )
MONSANTO COMPANY, et al. )
  )
  Defendant. )

_____

DARREL SOUHRADA, and  )
DAVE JOHNSON,  )
  )
  Plaintiffs, On Behalf Of Themselves )
  and Iowa Citizens Similarly )
  Similarly Situated )
  )
  v.  )  C.A. NO. 05-0535
  )
MONSANTO COMPANY, et al. )
  )
  Defendant. )

_____

KENT DUXBURY  )
  )
  Plaintiff, On Behalf Of Itself )
  and Minnesota Citizens )
  Similarly Situated )
  )
  v.  )  C.A. NO. 05-0535
  )
MONSANTO COMPANY, et al. )
  )
  Defendant. )

_____

## NOTICE OF RULE 30(B)(6) DEPOSITION OF GREENLEAF GENETICS LLC

PLEASE TAKE NOTICE THAT, pursuant to Rules 30(b)(6) and 45 of the

Federal Rules of Civil Procedure, counsel for defendants Monsanto Company, *et al.*, will

take the deposition of the corporate designee(s) of GreenLeaf Genetics LLC ("GreenLeaf Genetics"), about the matters set forth in Attachment A on November 1, 2006, at 9:00 am, at the offices of Potter Anderson & Corroon LLP, Hercules Plaza, 6th Floor, Wilmington, Delaware, 19801, or an alternate location and time to be negotiated by the parties.

The deposition will be taken upon oral examination before a court reporter or other person authorized by law to administer oaths, and may be recorded by video and stenographic means. The deposition will be taken for purposes of discovery, for use as evidence in this matter, and for such purposes as permitted by the Federal Rules of Civil Procedure. The deposition will continue from day to day until completed or adjourned by agreement of counsel.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Peter E. Moll
John J. Rosenthal
John H. Bogart
HOWREY LLP
1299 Pennsylvania Ave, N.W.
Washington, DC 20004-2402
Tel:    (202) 783-0800

Kenneth A. Letzler
Jonathan I. Gleklen
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, D.C. 20004
Tel: (202) 942-5000

Dated:  September 20, 2006
751410

By:   /s/ David E. Moore
        Richard L. Horwitz (#2246)
        David E. Moore (#3983)
        Hercules Plaza, 6th Floor
        1313 N. Market Street
        P. O. Box 951
        Wilmington, DE  19899
        Tel:  (302) 984-6000
        rhorwitz@potteranderson.com
        dmoore@potteranderson.com

*Attorneys for Monsanto Company, American Seed, Inc., Corn States Hybrid Service, Inc., Asgrow Seed Co., Inc., Holden Foundation Seeds, Inc., Dekalb Seeds, Calgene, L.L.C., Channel Bio Co., Nc+ Hybrids and Semins, Inc.*

2

# ATTACHMENT A

**A.    Definitions and Instructions**

1.    "You," "your," and "GreenLeaf Genetics LLC" mean GreenLeaf Genetics LLC, and its affiliates and subsidiaries which sell, license or produce genetic, transgenic or conventional corn seed; and any or all of their present or former officers, directors, managers and any employees, agents, attorneys, representatives, or other persons acting or purporting to act on their behalf.

2.    "Traits" or "biotechnology traits" means artificially introduced genetic material into corn seed, plants, cells, or genetic material, including hybrid seed or foundation seed.

3.    "Hybrid seed" means seed created by crossing genetically dissimilar parent plants, such as seed created by the crossing of genetically dissimilar inbred parent plants.

4.    "Foundation corn seed" means any inbred seed or other parent seed stock used in the production of commercial hybrid seed corn.

5.    "Concerning" means relating to, referring to, describing, evidencing or constituting.

6.    "Person" or "persons" refers to all individuals and entities, including all natural persons, corporations, partnerships, ventures or other business associations, societies, associations-in-fact, all federal, foreign, state, local or other governmental entities, and all legal entities including all members, officers employees, agents, representatives, attorneys, successors, predecessors, assigns, divisions, affiliates and subsidiaries.

**B.    Matters on which Examination is Requested**

1.    Financial and other projections concerning GreenLeaf Genetics LLC.

2.    Performance of GreenLeaf Genetics LLC products in corn seed sales, including comparative measures of GreenLeaf Genetics LLC's performance for the period beginning January 2004.

3.    Performance or relative quality of GreenLeaf Genetics LLC germplasm base, breeding programs, and foundation seed for the period beginning January 2004.

## SCHEDULE B

**A.    Definitions and Instructions**

1.    "You," "your," and "GreenLeaf Genetics LLC" mean GreenLeaf Genetics LLC and its affiliates and subsidiaries which sell, license or produce genetic, transgenic or conventional corn seed; and any or all of their present or former officers, directors, managers and any employees, agents, attorneys, representatives, or other persons acting or purporting to act on their behalf.

2.    "Document" has the same meaning as in Fed. R. Civ. P. 34 and includes documents in the possession, custody or control of GreenLeaf Genetics LLC, including, without limitation, electronic or computerized data compilations. A draft or non-identical copy is a separate document within the meaning of this term.

3.    "Traits" or "biotechnology traits" means artificially introduced genetic material into corn seed, plants, cells, or genetic material, including hybrid seed or foundation seed.

4.    "ECB-resistant traits" means any transgenic corn event, trait or technology that makes the corn plant resistant to the European Corn Borer pest.

5.    "Glyphosate tolerant traits" means any transgenic corn event, trait or technology that makes the corn plant tolerant to glyphosate.

6.    "CRW-resistant traits" means any transgenic corn event, trait or technology that makes the corn plant resistant to Corn Rootworm insect.

7.    "Transgenic corn traits" means any ECB-resistant, glyphosate-tolerant, or CRW-resistant traits, or combination or "stacks" of such traits.

8.    "Hybrid seed" means seed created by crossing genetically dissimilar parent plants, such as seed created by the crossing of genetically dissimilar inbred parent plants.

9.     "Foundation corn seed" means any inbred seed or other parent seed stock used in the production of commercial hybrid seed corn.

10.     "Conventional corn" means corn not containing any transgenic traits or technology.

11.     "Incentive" means any agreement or program entered between GreenLeaf Genetics LLC, its affiliates and subsidiaries, and any other person, company or licensee relating to a relevant product that offers any payment, subsidy, incentive, discount, rebate, allowance, waiver, or other financial inducement.

12.     "Concerning" means relating to, referring to, describing, evidencing or constituting.

13.     All requests seek documents generated or in use at any time since January 1, 1996.

14.     All documents that respond, in whole or in part, to any portion of the requests below shall be disclosed in their entirety, including all attachments and enclosures. Documents attached to each other must not be separated.

15.     File folders with tabs or labels identifying documents called for by this Request must be produced intact with such Documents.

16.     Selection of documents from the files and other sources and the numbering of such Documents shall be performed in such a manner as to ensure that the source of each Document may be determined, if necessary.

17.     If any document requested was at one time in existence and in your possession, control or custody, but has been lost, discarded, destroyed or otherwise removed from your possession, custody or control, provide with respect to each document a description of the document and the date it was lost, discarded, destroyed, or removed.

18.    Should you seek to withhold any Document based on some limitation of discovery (including privilege), you must supply a list of the Documents for which limitation of discovery is claimed, indicating:

i.    The identity of each document's author(s), writer(s), sender(s), or initiator(s);

ii.    The identity of each document's recipient(s), addresses(s), or party(ies) for whom it was intended;

iii.    The date of creation or transmittal indicated on each Document, or an estimate of that date, indicated as such, if no date appears on the Document;

iv.    The general subject matter as described on each Document, or, if no such description appears, then some other description sufficient to identify the Document; and

v.    The claimed grounds for limitation of discovery (e.g. "attorney-client privilege" or "work product privilege")

19.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request all responses that might otherwise be construed to be outside its scope.

20.    The use of the singular form or any word includes the plural and vice versa.

21.    Should you deem the contents of any Document to be confidential, you shall so designate such Documents. Pursuant to the local rules and orders applicable in this case, such Documents must be produced or provided. The use of such Documents shall be restricted as provided under the Stipulated Amended Protective Order.

22.    GreenLeaf Genetics LLC is advised that this Subpoena is a continuing one and requires prompt supplemental production by GreenLeaf Genetics, in accordance with the Federal Rules of Civil Procedure, as and whenever GreenLeaf Genetics acquires,

makes or discovers additional responsive documents, between the time of initial production and the conclusion of the trial of this action.

**B.     Documents Requested**

You are requested to produce and permit inspection and copying of any and all of the following documents and things under your control at the time and place noted on the attached subpoena:

1.     Documents sufficient to disclose the persons licensing traits from Greenleaf Genetics LLC and, for each such person, the traits licensed.

2.     Current list of traits GreenLeaf Genetics LLC offers for license.

3.     Licenses, contracts or agreements for each trait offered by GreenLeaf Genetics LLC.

4.     Current list of foundation seed lines offered by GreenLeaf Genetics LLC.

5.     List of any hybrid lines offered by GreenLeaf Genetics LLC for licensing, research, testing or any other purpose.

6.     Documents sufficient to disclose the persons licensing or testing each hybrid line.

7.     Documents sufficient to disclose all incentive programs offered by or in connection with GreenLeaf Genetics LLC.

8.     Documents sufficient to disclose royalty, price, license, or other like fees or charges.

9.     Financial plans, projections, and other analyses of the performance of GreenLeaf Genetics LLC.

10.     Documents sufficient to disclose all license, royalty, or other like fee paid by GreenLeaf Genetics LLC.

4

take the deposition of the corporate designee(s) of GreenLeaf Genetics LLC ("GreenLeaf Genetics"), about the matters set forth in Attachment A on November 1, 2006, at 9:00 am, at the offices of Potter Anderson & Corroon LLP, Hercules Plaza, 6th Floor, Wilmington, Delaware, 19801, or an alternate location and time to be negotiated by the parties.

The deposition will be taken upon oral examination before a court reporter or other person authorized by law to administer oaths, and may be recorded by video and stenographic means. The deposition will be taken for purposes of discovery, for use as evidence in this matter, and for such purposes as permitted by the Federal Rules of Civil Procedure. The deposition will continue from day to day until completed or adjourned by agreement of counsel.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Peter E. Moll
John J. Rosenthal
John H. Bogart
HOWREY LLP
1299 Pennsylvania Ave, N.W.
Washington, DC 20004-2402
Tel:    (202) 783-0800

Kenneth A. Letzler
Jonathan I. Gleklen
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, D.C. 20004
Tel: (202) 942-5000

By:   /s/ David E. Moore
         Richard L. Horwitz (#2246)
         David E. Moore (#3983)
         Hercules Plaza, 6th Floor
         1313 N. Market Street
         P. O. Box 951
         Wilmington, DE  19899
         Tel:  (302) 984-6000
         rhorwitz@potteranderson.com
         dmoore@potteranderson.com

*Attorneys for Monsanto Company, American Seed, Inc., Corn States Hybrid Service, Inc., Asgrow Seed Co., Inc., Holden Foundation Seeds, Inc., Dekalb Seeds, Calgene, L.L.C., Channel Bio Co., Nc+ Hybrids and Semins, Inc.*

Dated:  September 21, 2006
751410

2

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on September 21, 2006, the attached document was hand delivered to the following persons and was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following and the document is available for viewing and downloading from CM/ECF:

Joelle E. Polesky
Smith, Katzenstein & Furlow LLP
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899

John W. Shaw
Young Conaway Stargatt & Taylor, L.L.P.
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

I hereby certify that on September 21, 2006, I have sent by Electronically Mailed the foregoing document to the following non-registered participants:

Steven F. Benz
Michael S. Zuckman
Kellogg, Huber, Hansen, Todd,
     Evans & Figel P.L.L.C
1615 M Street, NW
Suite 400
Washington, DC 20036
sbenz@khhte.com

R. Stephen Berry
J. Daniel Leftwich
Gregory Baruch
Berry & Leftwich
1717 Pennsylvania Ave., NW
Washington, DC 20006
sberry@berry-leftwich.com
dleftwich@berry-leftwich.com
gbaruch@berry-leftwich.com

Charles A. Bird
Jeremy R. Stevens
Bird, Jacobsen & Stevens
300 Third Ave. S.E.
Rochester, MN 55904
charles@birdjacobsen.com
jeremy@birdjacobsen.com

Richard F. Schwed
Thomas A. McGrath III
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022-6069
rschwed@shearman.com

/s/ David E. Moore
Richard L. Horwitz (#2246)
David E. Moore (#3983)
Potter Anderson & Corroon LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

696607

2

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN SEED COMPANY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| DARRELL SOUHRADA and KENT DUXBURY, | ) | |
| | ) | |
| Intervenor Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. No. 05-535-SLR |
| | ) | |
| MONSANTO COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

O R D E R

At Wilmington this 6th day of December, 2005, the parties having satisfied their obligations under Fed. R. Civ. P. 26(f), and the court having conducted a pretrial scheduling conference pursuant to Fed. R. Civ. P. 16 and D. Del. LR 16.2(a) and (b).

IT IS ORDERED that:

1. **Pre-Discovery Disclosures**. The parties will exchange by November 30, 2005 the information required by Fed. R. Civ. P. 26(a)(1) and D. Del. LR 16.2.

2. **Discovery**.

(a) In part, discovery will be needed on the following subjects:

i.   Prerequisites governing class certification;

ii.   What are the relevant product and geographic

markets;

iii.  Whether defendant has any market power in any

relevant market;

iv.   Whether defendant has engaged in any

exclusionary or anti-competitive acts;

v.    Any business justifications of defendant for

such conduct;

vi.   Any monopoly price injury to members of the

alleged classes;

vii.  Any actual, class-wide damages suffered by

members of the alleged classes;

viii. Any defenses offered by defendant; and

ix.   Issues relating to the organization of the

parties, document retention, etc.

(b) This order shall govern the scheduling of the two

Intervening State cases which were added to this case by the oral

order entered by this court on November 9, 2005.  At the close of

fact discovery, the court shall address remaining scheduling

issues relating to Intervening State plaintiffs including the

setting of any trial dates.

(c) All fact discovery shall be commenced in time to be

completed on or before **December 15, 2006.**

i.    Maximum of 30 interrogatories by all parties

2

on one side to the other side.

ii.  Maximum of 30 requests for admission by all

parties on one side to the other side.

iii. Maximum of 150 hours for fact depositions by

all plaintiffs and maximum of 150 hours for

fact depositions by defendant.  Each fact

deposition other than those noticed under

Fed. R. Civ. P. 30(b)(6) shall be limited to

a maximum of 7 hours unless extended by the

agreement of the parties.

(d) Class discovery:

i.  The parties in all cases shall serve any

document production requests or

interrogatories going to class issues by

**November 28, 2005** and responses (including

the production of any documents sought) shall

be completed on or before **January 15, 2006.**

ii.  The parties may take fact depositions

relating to class issues between **January 15,**

**2006** and **March 15, 2006.**

(e) Merits discovery shall commence on **July 1, 2006.**

(f) Document discovery shall be completed on or before

**September 1, 2006.**

(g) Expert discovery shall be commenced in time to be

3

completed by **March 30, 2007.**

  i. Expert reports on issues for which any party

    has the burden of proof are due by **January**

    **31, 2007.** Rebuttal expert reports are due by

    **March 14, 2007.**

  ii. All <u>Daubert</u> motions shall be filed on or

    before **April 16, 2007.** Briefing on any

    <u>Daubert</u> motions shall proceed under the

    schedule set forth in paragraph 5 of this

    order.

  iii. Supplementations under Rule 26(e) are due on

    **March 1, 2007.** Nothing in this paragraph,

    however, shall be deemed to relieve a party

    of its obligation to supplement or amend in

    accordance with Rule 26(e).

(h) **Discovery Disputes.**

  i. The court shall conduct in-person discovery

    status conferences on **February 15, 2006** from

    **4:30 to 5:30 p.m., September 14, 2006** from

    **4:30 to 5:30 p.m.,** and **November 15, 2006** from

    **4:30 to 5:30 p.m.,** the time to be allocated

    equally among the parties.

  ii. The court shall make itself available,

    however, to resolve through a telephone

conference, disputes that arise during the
course of a deposition and disputes related
to entry of a protective order.

   iii. Absent express approval of the court
following a discovery conference, no motions
pursuant to Fed. R. Civ. P. 37 shall be
filed.

(i) Fact Witnesses to be Called at Trial:

   i.  Within one (1) month following the close of
expert discovery, each party shall serve on
the other parties a list of each fact witness
(including any expert witness who is also
expected to give facts testimony) who has
previously been disclosed during discovery
and that it intends to call at trial.

   ii.  Within one (1) month of receipt of such fact
witness list, each party shall serve a list
of each rebuttal fact witness that it intends
to call at trial.

   iii. The parties shall have the right to depose
any such fact witnesses who have not
previously been deposed in this case.  Such
deposition shall be held within one (1) month
after service of the list of rebuttal fact

witnesses and shall be limited to twenty (20) hours per side in the aggregate unless extended by agreement of the parties or upon order of the court upon good cause shown.

(j) Coordinated case: Defendant shall make available to plaintiffs the following materials from Syngenta Seeds Inc. v. Monsanto Company, Civ. No. 04-908-SLR (Syngenta Action) within five (5) business days from the execution by plaintiffs of the Protective Order entered in the Syngenta Action or, if not yet produced or received, from their production or receipt:

    i.    All discovery requests served by each side.

    ii.   All documents produced by each side (or from a third party subject to consent b such third party) in the same form and format (e.g. CD) used to produce the documents to the other side (or from the third party), and under the same production terms and conditions employed in that case among the parties and third parties.

    iii. All deposition transcripts in the same paper and CD formats as received by defendants in the Syngenta Action.

6

iv.  The coordination of discovery in these cases should not disadvantage those court reporting services who record the various depositions.  Therefore, the American Seed plaintiffs should not bypass the court reporting fees altogether.  In this regard, however, it is the court's understanding that many court reporting services charge an initial fee to those parties actually participating in the deposition, and a lower fee to those who request copies of the deposition transcripts at a later time.  The American Seed plaintiffs should pay the latter, lower fee, for those depositions noticed in the Syngenta Action.  If the Syngenta parties select court reporting services that make no distinction between producing the original transcript and making copies, the American Seed plaintiffs will be able to obtain, in a timely manner, transcripts from the Syngenta parties at the cost of

7

reproducing the computer disk or paper

transcript.

3. **Joinder of other Parties, Amendment of Pleadings, and Class Certification.**

(a) All motions to join other parties or amend the pleadings shall be filed on or before **August 15, 2006.**

(b) Plaintiffs shall file their motions for class certification on or before **April 14, 2006.**

(c) Defendant shall then have sixty (60) days to conduct any expert discovery and file a response.

(d) Plaintiffs shall have thirty (30) days after the response to conduct any expert discovery and file a reply.

(e) Any class expert(s) shall be made available by a party for deposition within seven (7) business days of the filing of the motion or the response (whichever is applicable).

4. **Settlement Conference.** Pursuant to 28 U.S.C. § 636, this matter is referred to Magistrate Judge Thynge for the purposes of exploring ADR.

5. **Summary Judgment Motions.** All summary judgment motions shall be served and filed with an opening brief on or before **April 16, 2007.** Briefing shall be pursuant to D. Del. LR 7.1.2. No summary judgment motion may be filed more than **ten (10)** days from the above date without leave of the court.

6. **Applications by Motion.** Any application to the court

8

shall be by written motion filed with the clerk.  Unless otherwise requested by the court, counsel shall not deliver copies of papers or correspondence to chambers.  **Any non-dispositive motion shall contain the statement required by D. Del. LR 7.1.1.**

7.  **Motions in Limine.**  All motions in limine shall be filed on or before **August 24, 2007.**  All responses to said motions shall be filed on or before **August 31, 2007.**

8.  **Pretrial Conference.**  A pretrial conference will be held on **September 10, 2007** at **4:30 p.m.** in courtroom 6B, sixth floor of the J. Caleb Boggs Federal Building, 844 King Street, Wilmington, Delaware.  The Federal Rules of Civil Procedure and D. Del. LR 16.4 shall govern the pretrial conference.

9.  **Trial.**  This matter is scheduled for a three (3) week jury trial commencing on **October 15, 2007** in courtroom 6B, sixth floor of the J. Caleb Boggs Federal Building, 844 King Street, Wilmington, Delaware.  For purposes of completing pretrial preparations, the parties should plan on being allocated a total number of hours in which to present their respective cases.

_____
United States District Judge

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MONSANTO COMPANY and<br>MONSANTO TECHNOLOGY LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. No. 04-305-SLR |
| | ) | |
| SYNGENTA SEEDS, INC. and<br>SYNGENTA BIOTECHNOLOGY, INC., | ) | |
| | ) | |
| Defendants. | ) | (Consolidated) |

| | | |
|---|---|---|
| SYNGENTA SEEDS, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. No. 04-908-SLR |
| | ) | |
| MONSANTO COMPANY and<br>MONSANTO TECHNOLOGY LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**REVISED RULE 16 SCHEDULING ORDER**

This ___ day of January, 2006, the parties having satisfied their obligations under Fed. R. Civ. P. 26(f), and the Court having conducted a pretrial scheduling conference pursuant to Fed. R. Civ. P. 16 and D. Del. LR 16.2(a) and (b), IT IS ORDERED that:

1.    <u>Scope</u>.  This Rule 16 Scheduling Order shall apply only to the claims and defenses brought by the parties in Civil Action 04-908-SLR (the "antitrust case").  Nothing in this Order shall change the Scheduling Order, entered as D.I. 21, governing the parties' claims and defenses in *Monsanto Company, et al. v. Syngenta Seeds, Inc., et al.,* Civil Action 04-305-SLR.

2.    <u>Pre-Discovery Disclosures</u>.  The parties exchanged the information required by Fed. R. Civ. P. 26(a) (1) and D. Del. LR 16.2 on May 18, 2005.

3.    Discovery.

a.    Discovery will be needed from the parties and third parties on the following subjects:

i.    Monsanto Company and Monsanto Technology LLC's (together "Monsanto") alleged monopolization of the alleged market for licensing glyphosate tolerant corn traits.

ii.    Monsanto's alleged monopolization of the alleged market for licensing ECB resistant corn traits.

iii.    Monsanto's alleged attempted monopolization of the alleged market for foundation corn seed.

iv.    Any damages and other appropriate relief resulting from ¶¶3(a)(i)-(iii).

v.    Monsanto's defenses relating to ¶¶3(a)(i)-(iii).

vi.    Monsanto's counterclaims.

b.    All fact discovery shall be commenced in time to be completed by June 23, 2006.

i.    Document production shall be completed on or before January 13, 2006.

ii.    Maximum of 50 interrogatories by each side to the other side.

iii.    Maximum of 50 requests for admission by each side to the other side.

iv.    In the absence of agreement among the parties or by order of the Court, no deposition (other than those noticed under Fed. R. Civ. P. 30(b)(6)) shall be scheduled prior to the completion of document production.

2

v.    Maximum of 225 hours for fact depositions by plaintiff and maximum of 225 hours for fact depositions by defendants. Each fact deposition other than those noticed under Fed. R. Civ. P. 30(b)(6) shall be limited to a maximum of 7 hours unless extended by agreement of the parties; provided that each party may take up to 3 depositions not exceeding 10 hours each.

c.    Expert discovery shall be commenced in time to be completed by September 21, 2006.

i.    Expert reports on issues for which the parties have the burden of proof due July 26, 2006. Rebuttal expert reports due August 21, 2006.

ii.    Expert depositions to be limited to a maximum of 14 hours per expert unless extended by agreement of the parties.

iii.    All Daubert motions shall be filed on or before October 13, 2006. Answering briefs shall be filed on or before November 3, 2006. Reply briefs shall be filed on or before November 17, 2006.

iv.    Supplementations under Rule 26(e) are due on April 8, 2006. Nothing in this paragraph, however, shall be deemed to relieve a party of its obligation to supplement or amend in accordance with Rule 26(e).

d.    Discovery Disputes.

i.    The Court shall conduct in-person discovery status conferences on January 12, 2005, from 4:30 to 5:30 p.m., and on February 13, 2006, from 4:30 to 5:30 p.m., the time to be allocated equally between the parties.

3

     ii.    The Court shall remain available to resolve by telephone conference disputes that arise during the course of a deposition and disputes over the terms of a protective order.

     iii.    Absent express approval of the Court following a discovery conference, no motions pursuant to Fed. R. Civ. P. 37 shall be filed.

     e.    <u>Fact Witnesses to be Called at Trial</u>.  Within twenty (20) days  following the close of expert discovery, each party shall serve on the other parties a list of each fact witness (including any expert witness who is also expected to give fact testimony) who has previously been disclosed during discovery and that it intends to call at trial.  Within twenty (20) days of receipt of such fact witness list, each party shall serve a list of each rebuttal fact witness that it intends to call at trial.  The parties shall have the right to depose any such fact witnesses who have not previously been deposed in this case.  Such deposition shall be held within twenty (20) days after service of the list of rebuttal fact witnesses and shall be limited to twenty (20) hours per side in the aggregate unless extended by agreement of the parties or upon order of the Court upon good cause shown.

4.    <u>Joinder of other Parties and Amendment of Pleadings</u>.  The deadline for filing motions to join other parties or to amend the pleadings was August 13, 2005.  That deadline having passed as of the date of this Order, no such motions will be accepted without prior leave of the Court.

5.    <u>Settlement Conference</u>.  Pursuant to 28 U.S.C. § 636, this matter is referred to Magistrate Judge Thynge for the purposes of exploring ADR.

6.    <u>Summary Judgment Motions</u>.

     a.    A party wishing to file a summary judgment motion shall serve and file a letter on or before May 30, 2006 identifying the issue(s) for which summary judgment is sought

and specifying the relevant fact(s) not in dispute. Answering letters shall be served and filed on or before June 13, 2006. These letters shall not exceed 5 pages in length.

    b.      The Court shall conduct a hearing on June 27, 2006 at 4:30 p.m. to determine if it will allow summary judgment motions to be filed on the issue or issues raised by the parties. If the Court grants permission to file for summary judgment, a briefing scheduled shall be set by the Court.

    c.      If the Court allows summary judgment motions, the Court may reconsider the schedule, including the trial date.

7.    <u>Applications by Motion</u>. Any application to the Court shall be by written motion filed with the clerk. The Court will not consider applications and requests submitted by letter or in a form other than a motion, absent express approval by the Court.

    a.      Any non-dispositive motion should contain the statement required by D. Del. LR 7.1.1.

    b.      No telephone calls shall be made to chambers.

    c.      Any party with an emergency matter requiring the assistance of the Court shall e-mail chambers at: slr_civil@ded.uscourts.gov. The e-mail shall provide a short statement describing the emergency in the form provided by the Court. NO ATTACHMENTS shall be submitted in connection with said e-mails.

8.    <u>Pretrial Conference</u>. A pretrial conference will be held on December 14, 2006 at 3:00 p.m. in courtroom 6B, sixth floor Federal Building, 844 King Street, Wilmington, Delaware. The Federal Rules of Civil Procedure and D. Del. LR 16.4 shall govern the pretrial conference.

9.    <u>Trial</u>. This matter is scheduled for a three week jury trial commencing on January 8, 2007, in courtroom 6B, sixth floor Federal Building, 844 King Street, Wilmington, Delaware.

For purposes of completing pretrial preparations, the parties should plan on being allocated a total number of hours in which to present their respective cases.

_____
United States District Judge

# EXHIBIT 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| MONSANTO COMPANY, *et al.*, | ( |
|  | ( |
| Plaintiffs, | ( |
|  | ( |
| v. | ( C.A. No.: 04-305-SLR (Consol.) |
|  | ( |
| SYNGENTA SEEDS, INC., *et al.*, | ( |
|  | ( |
| Defendants. | ( |

### Notice of Subpoena

TO:     Richard L. Horwitz, Esquire
        Potter Anderson & Corroon LLP
        Hercules Plaza
        1313 North Market Street
        Wilmington, DE 19899-0951

        Peter E. Moll, Esquire
        Howrey Simon Arnold & White, LLP
        1299 Pennsylvania Ave., N.W.
        Washington, D.C. 20004

        Susan Knoll, Esquire
        Howrey Simon Arnold & White, LLP
        750 Bering Drive
        Houston, TX 77057

        Kenneth A. Letzler, Esquire
        Arnold & Porter LLP
        555 12th Street, N.W.
        Washington, D.C. 20004

PLEASE TAKE NOTICE that Syngenta Seeds, Inc. has served the attached

subpoena.

DB01:1884561.1

059155.1010

1

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

_____

John W. Shaw (No. 3362)
Rolin P. Bissell (No. 4478)
Seth J. Reidenberg(No. 3657)
Adam W. Poff (No. 3990)
Karen E. Keller (No. 4489)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6600

*Attorneys for Syngenta Seeds, Inc.*

Of Counsel:

SHEARMAN & STERLING LLP
Richard F. Schwed
Thomas A. McGrath III
599 Lexington Avenue
New York, NY 10022-6069
Telephone: (212) 848-4000
Facsimile:   (212) 848-7174

Dated: April 12, 2006

059155.1010

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2006, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

>Richard L. Horwitz, Esquire
>Potter Anderson & Corroon LLP
>Hercules Plaza
>1313 North Market Street
>Wilmington, DE 19899-0951

I further certify that on April 12, 2006, copies of the foregoing document were served by hand delivery on the above listed counsel and on the following non-registered participants in the manner indicated below:

**BY FEDERAL EXPRESS**

John J. Rosenthal, Esquire
Peter E. Moll, Esquire
Howrey Simon Arnold & White, LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C.  20004

Kenneth A. Letzler, Esquire
Arnold & Porter LLP
555 12th Street, N.W.
Washington, D.C.  20004

Susan Knoll, Esquire
Howrey Simon Arnold & White, LLP
1111 Louisiana, 25th Floor
Houston, TX 77002-5242

YOUNG CONAWAY STARGATT & TAYLOR, LLP

John W. Shaw (No. 3362)
Rolin P. Bissell (No. 4478)
Seth J. Reidenberg(No. 3657)
Karen E. Keller (No. 4489)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6600
jshaw@ycst.com
*Attorneys for Syngenta Seeds, Inc., Syngenta Corporation,*
*Syngenta Biotechnology, Inc., Advanta USA, Inc., Garst Seed*
*Company, and Golden Harvest Seeds, Inc.*

# EXHIBIT A

AO88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF ILLINOIS

| Syngenta Seeds, Inc. | **SUBPOENA IN A CIVIL CASE** |
|---|---|
| **v.** | |
| Monsanto Company and Monsanto Technology LLC | Case Number: 04-908-SLR (District of Delaware) |

TO:

Savitz Research Solutions
444 N. Michigan Avenue, Suite 410, Chicago, IL 60611

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

For a description of the documents requested, please see Schedule A attached to this subpoena.

| PLACE | DATE AND TIME |
|---|---|
| Shearman & Sterling LLP, 180 N. Stetson Avenue, Suite 5780, Chicago, IL 60602 | May 3, 2006; 9:00 a.m. |

G  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR | DATE 4/13/06 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Stephen Fishbein, Esq.
Shearman & Sterling, LLP, 599 Lexington Avenue, New York, NY 10022-6069 (212) 848-4000

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

1

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                    DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

## Rule 45, Federal Rules of Civil Procedure, Parts C & D

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(2)(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection is made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, of commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## SCHEDULE A

## I. DEFINITIONS

In addition to the definitions set forth in Rule 26 of the Federal Rules of Civil Procedure, the following definitions apply to each of the following requests:

1.    The term "Monsanto" shall mean Monsanto Company and Monsanto Technology LLC and any of its present or former subsidiaries, divisions, agents, employees, directors, officers, trustees, and attorneys, or any other person or entity acting in concert with Monsanto Company, directly or indirectly, including but not limited to American Seeds, Inc., Asgrow Seed Company, Inc., Channel Bio Corp., CORE Group, Corn States Hybrid Service LLC, DeKalb Genetics Corporation, Fontanelle Hybrids, NC+ Hybrids, Inc., Holden's Foundation Seeds, Inc., Stewart Seeds, Stone Seeds, and Trelay Seeds.

2.    The term "foundation corn seed" shall mean an inbred, parent or non-hybrid corn seed.

3.    The term "hybrid corn seed" shall mean the product created by crossing two foundation seeds, and shall include any seed used by growers to produce a corn crop.

4.    The term "Relevant Product" shall mean:

    a.    herbicide-tolerant corn traits (including GA21, NK603, Liberty Link, and CLEARFIELD);

    b.    ECB-resistant corn traits (including Bt11, Mon810 and Herculex);

    c.    CRW-resistant corn traits (including Mon863);

    d.    foundation corn seed; and

    e.    hybrid corn seed.

5.    The term "document" and "documents" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule Civil Procedure 34(a),

1

including, without limitation, electronic or computerized data compilations (including electronic mail). A draft or non-identical copy is a separate document within the meaning of this term.

## II. DOCUMENT REQUEST

For the period January 1, 1996 to the present:

All documents concerning any studies, surveys, analyses, or market research performed on behalf of Monsanto and relating or referring to a Relevant Product.

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2006, I caused the foregoing subpoena to be served via U.S. mail on:

Savitz Research Solutions
444 N. Michigan Avenue
Suite 410
Chicago, IL 60611

New York, New York

_____
Stephen Fishbein

3

# EXHIBIT 5

# IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF DELAWARE

AMERICAN SEED CO. INC., and )
JERRY ELLEFSON, )
     )
    Plaintiffs, On Behalf of Themselves )
    and Others Similarly )
    Situated, )
     )      C.A. No. 05-535-SLR
    v. )
     )
MONSANTO COMPANY, )
     )
Monsanto Controlled Subsidiaries: )
     )
AMERICAN SEEDS INC., )
CORN STATES HYBRID, )
    SERVICE INC. )
ASGROW SEED CO., INC., )
HOLDEN FOUNDATION SEEDS, INC., )
DEKALB SEEDS, )
CALGENE, L.L.C., )
CHANNEL BIO CO., )
NC+ HYBRIDS, )
SEMINIS INC., )
     )
    Defendants. )
     )

---

DARRELL SOUHRADA, and )
DAVE JOHNSON, )
     )      C.A. No. 05-535-SLR
    Plaintiffs, On Behalf of Themselves )
    and Iowa Citizens Similarly )
    Situated, )
     )
    v. )
     )
MONSANTO COMPANY, )
     )
    Defendant. )
     )

---

10012365.WPD

KENT DUXBURY           )
                                )
      Plaintiff, On Behalf of Himself  )
      and Minnesota Citizens      )
      Similarly Situated,          )
                               )     C.A. No. 05-535-SLR
               v.           )
                               )
MONSANTO COMPANY,     )
                               )
      Defendant.              )
                               )

## FIRST AMENDED COMPLAINT

On behalf of themselves and other similarly-situated direct purchasers of biotechnological corn seed from the Monsanto Company (including its named controlled seed companies), American Seed Co. Inc., and Jerry Ellefson allege as follows:

### SUMMARY OF CLAIMS

1.     With the use of biotechnology, it is possible to introduce new genetic characteristics, or traits, into seeds in order to add desirable characteristics to corn crops. For example, biotechnological seed traits permit farmers to grow corn tolerant to a leading herbicide, glyphosate. This "glyphosate-tolerant" trait allows growers to spray glyphosate herbicide over the entire crop, and kill all weeds, without risking any damage to the corn. Other biotechnological seed traits permit farmers to plant corn that is resistant to certain pervasive insects that are harmful to the crops, such as root worm and the European Corn Borer.

2.    Monsanto Company sells separate varieties of corn seed that (1) are tolerant of glyphosate herbicide; (2) are resistant to the European Corn Borer; (3) are resistant to root worm; and (4) combine or "stack" two or more of these traits.  These seed varieties are sold in four relevant product markets in the United States.

3.    Monsanto Company – including the named seed companies it controls and operates as subsidiaries or divisions (collectively "Monsanto") – has unlawfully maintained its monopolies in these four relevant product markets using exclusive dealing agreements to deny Monsanto's actual and potential competitors (a) access to foundation seed companies and others needed for the creation or manufacture of competitive corn seed with the competitors' biotechnological traits; and (b) the distribution these Monsanto competitors require to market their biotechnological corn seed. These agreements impose massive financial penalties on seed companies unless a very high percentage of seeds they sell contain Monsanto traits, effectively impeding potential competitors from entering the relevant product markets.

4.    Monsanto also has unlawfully maintained and enhanced its monopoly power through "bundling" agreements.  As a result of these agreements, any seed company that sells a meaningful amount of seeds containing a single trait provided by any company other than Monsanto faces significant penalties from Monsanto across all traits licensed by Monsanto. For example, some seed companies grow and sell glyphosate-resistant corn seeds, root- worm-resistant corn seeds, or European borer-resistant corn seeds with traits provided by Monsanto. If such a seed company does not sell a minimum percentage of seeds containing Monsanto traits for *each and every* one of those product lines, it will lose discounts or seed service fees for *all* Monsanto traits. Thus, Monsanto has used its monopoly power in several markets to create a high barrier to entry for any corn seed

10012365.WPD                              -3-

competitor seeking to enter any one of those trait markets. Monsanto controls 100% of the market for the glyphosate-tolerant corn trait, at least 84% of the market for the European Corn Borer-resistant trait, and 100% of the market for the root-worm-resistant corn trait.

5.    This claim is prosecuted by four Classes of direct purchasers of corn seed sold by Monsanto (including its named controlled seed companies) that is tolerant of the glyphosate herbicide, resistant to the European Corn Borer, resistant to root worm, or combines or "stacks" two or more of these traits in the seed.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction under 28 U.S.C. § 1337 (commerce and antitrust regulation) and 28 U.S.C. § 1331 (federal question), as this action arises under Section 2 of the Sherman Act (15 U.S.C. § 2) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

7.    Venue is proper because Monsanto resides within this judicial district as provided in 28 U.S.C. § 1391(b) and (c) and as provided in Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22).

## PARTIES

8.    Plaintiff American Seed Co. Inc. is a family-owned and operated corporation, which has operated for fourteen (14) years in Spring Grove, Pennsylvania. Until the end of 2004 it was an actual or potential purchaser of corn seed with biotechnological corn traits directly from Monsanto, including its named controlled seed companies. The latter included Defendants Corn States Hybrid Service, Inc. and Holden Foundation Seeds, Inc.

9.     Plaintiff Jerry Ellefson is a farmer who lives in Flandreau, South Dakota. Until the end of 2004, he was an actual or potential purchaser of corn seed with biotechnological traits directly from Monsanto.

10.     Defendant Monsanto Company is a Delaware corporation with its principal place of business in St. Louis, Missouri.

11.     Defendant American Seeds Inc. is a Monsanto-controlled subsidiary which sells Monsanto corn seed with biotechnological traits directly to members of the four Classes defined herein by itself or through its subsidiaries.

12.     Corn States Hybrid Service, Inc. is a Monsanto-controlled subsidiary which sells Monsanto corn seed with biotechnological traits directly to members of the four Classes defined herein.

13.     Asgrow Seed Co., Inc. is a Monsanto-controlled subsidiary which sells Monsanto corn seed with biotechnological traits directly to members of the four Classes defined herein.

14.     Holden Foundation Seeds, Inc. is a Monsanto-controlled subsidiary which sells Monsanto corn seed with biotechnological traits directly to members of the four Classes defined herein.

15.     DeKalb Seeds is a Monsanto-controlled subsidiary which sells Monsanto corn seed with biotechnological traits directly to members of the four Classes defined herein.

16.     Calgene, L.L.C. is a Monsanto-controlled subsidiary which sells Monsanto corn seed with biotechnological traits directly to members of the four Classes defined herein.

17.     NC+ Hybrids is a Monsanto controlled subsidiary which sells Monsanto corn seed with biotechnological traits directly to members of the four Classes defined herein.

18.    Channel Bio Co. is a Monsanto-controlled subsidiary which sells Monsanto corn seed with biotechnological traits directly to members of the four Classes defined herein.

19.    Seminis Inc. is a Monsanto-controlled subsidiary which sells, or will sell before trial, Monsanto corn seed with biotechnological traits directly to members of the four Classes defined herein.

## RELEVANT MARKETS

20.    Corn is the leading cash crop in the United States, with an annual value of over $24 billion. To control weeds, growers apply herbicides. "Selective herbicides" are tolerated by the crop but kill or suppress one or more undesirable weeds that infest the crop. "Non-selective herbicides" are active on all vegetation and do not distinguish between the commercial crop (such as corn) and other vegetation (such as weeds).

21.    Biotechnology has made it possible to introduce new genetic characteristics into plant seeds. The genetic make-up (or "genome") of a seed can be altered by transferring a transgenic "event" into the seed genome. An event contains, among other things, a specific gene that expresses a desirable characteristic in the seed. The insertion of a desirable transgenic event into a seed alters the seed's genome, conferring a desirable characteristic, or "trait," on the crops grown from the seed.

22.    Since 1996, there have been a number of commercially available corn traits for corn seeds. One of the most common of these traits is for glyphosate tolerance offered by Monsanto. Glyphosate-tolerant corn is impervious to the effect of glyphosate, the leading non-selective herbicide used by growers. As a result of this biotechnology, growers that plant glyphosate-tolerant corn may apply glyphosate over an entire field, killing the weeds while allowing the corn crop to survive.

23.     Biotechnology is also used to make corn resistant to the European Corn Borer and the root worm.

24.     Crop protection traits, including herbicide tolerance and insect resistance, are useful to growers because they reduce production costs and increase yield. U.S. farmers are increasingly planting genetically modified varieties of seed. It is estimated that 46% of the corn planted in the U.S. in 2004 was transgenic corn (up from 40% in 2003).

**Relevant Market for Corn Seed Tolerant
of Glyphosate**

25.     The sale of corn seed tolerant of the glyphosate is a relevant product market.

26.     The pricing and derived demand for the package of non-glyphosate-tolerant corn and selective herbicides does not provide adequate price discipline for glyphosate-tolerant corn seed. Monsanto has charged monopoly prices for corn seed tolerant of glyphosate.

27.     The United States is the relevant geographic market. Before genetically modified corn seed can be commercialized in the United States, it must receive regulatory approval from U.S. governmental agencies. The U.S. Department of Agriculture regulates the use of biotechnology traits in crops planted in the United States. The U.S. Environmental Protection Agency regulates the use of both plant incorporated protectants and chemical herbicides in the United States. Other factors, such as the U.S. distribution system and other demand characteristics, support a U.S. geographic market.

28.     Monsanto is the only supplier of glyphosate-tolerant corn seeds in the United States and Monsanto possesses monopoly power in the relevant product market, that is, the power to control prices or exclude competition.

10012365.WPD                            -7-

29.     Substantial barriers to entry and expansion exist in the creation of glyphosate-tolerant corn seeds. The considerable time and expense to develop a competing corn seed with a particular trait and obtain the necessary regulatory approvals are strong barriers to entry. Importantly, Monsanto's exclusive dealing and bundling of incentives provides additional barriers to entry for any competitor.

30.     Monsanto's market domination and the existence of entry barriers are evidenced by its above-competitive prices for the glyphosate-tolerant corn seed.

**Relevant Market for Corn Seed Resistant
to the European Corn Borer**

31.     The sale of corn seed resistant to the European Corn Borer is a relevant product market.

32.     Borer-resistant corn traits differ from other non-transgenic insect-resistant corn traits that provide protection against other crop pests. Borer-resistant corn traits offer superior performance at lower total cost versus traditional chemical insecticides.

33.     No reasonable, non-transgenic insect-resistant corn trait substitutes are available to purchasers that seek the crop yield-to-cost value that borer-resistant corn traits provide.

34.     The pricing derived demand of using non-borer-resistant corn traits plus traditional insecticides does not provide sufficient discipline over the price of borer-resistant corn seed.

35.     The United States is the relevant geographic market. Before genetically modified corn seed can be commercialized in the United States, it must receive regulatory approval from U.S. governmental agencies. The U.S. Department of Agriculture regulates the use of biotechnology traits in crops planted in the United State. The U.S. Environmental Protection Agency regulates the use

of both plant incorporated protectants and chemical insecticides in the United States. Other factors, such as the U.S. distribution system and other demand characteristics, support a U.S. geographic market.

36.    Monsanto is the dominant supplier of borer-resistant corn traits in the United States. Monsanto possesses monopoly power in the market for the sale of borer-resistant corn seed, where its market share is at least 80%, that is, it has the power to control prices or exclude competition in the relevant market.

37.    Substantial barriers to entry and expansion exist in the licensing of borer-resistant corn seed. The considerable time and expense to develop a competing corn seed and obtain the necessary regulatory approvals are strong barriers to entry. Importantly, Monsanto's exclusive dealing and bundling of incentives provided an additional barrier to entry for any competitor.

38.    Monsanto's market domination and the existence of entry barriers are evidenced by its above-competitive prices for borer-resistant corn seed.

### Relevant Market for Corn Seed Resistant to Root Worm

39.    The sale of root-worm-resistant corn seed is a relevant product market.

40.    Root worm resistant corn seed differs from other non-transgenic, insect resistant corn seed providing protection against other crop pests. Root worm-resistant corn seed offers superior performance at lower total cost versus traditional chemical insecticides.

41.    No reasonable non-transgenic insect-resistant corn seed substitutes are available to developers of inbred or foundation corn lines and to purchasers that seek the crop yield-to-cost value that root worm resistant corn seed provides.

10012365.WPD

-9-

42.    The pricing and derived demand of using corn seed without root worm resistant traits plus traditional insecticides does not provide sufficient discipline over the price of root worm resistant seeds.

43.    The United States is a relevant geographic market. Before genetically modified corn seed can be commercialized in the United States, it must receive regulatory approval from U.S. governmental agencies. The U.S. Department of Agriculture regulates the use of biotechnology traits in crops planted in the United State. The U.S. Environmental Protection Agency regulates the use of both plant incorporated protectants and chemical insecticides in the United States. Other factors, such as the U.S. distribution system and other demand characteristics, support a U.S. geographic market.

44.    Monsanto is the only, dominant supplier of root worm resistant corn traits in the United States. It possesses monopoly power in the market, that is, it has the power to control prices or exclude competition in the relevant market.

45.    Substantial barriers to entry and expansion exist in the sale of root worm resistant corn seeds. The considerable time and expense to develop a competing corn seed and obtain the necessary regulatory approvals are strong barriers to entry. Importantly, Monsanto's exclusive dealing and bundling of incentives provided an additional barrier to entry for any competitor.

46.    Monsanto's market domination and the existence of entry barriers are evidenced by its above-competitive prices.

## Relevant Market for Corn Seed
## With Stacked Traits

47.     The sale of corn seed with two or more of the Monsanto glyphosate tolerant, borer-resistant, or root-worm-resistant traits constitutes a relevant product market, and possibly relevant product sub-markets.

48.     Such stacked corn differs substantially in use and price from other non-transgenic herbicide and insect-resistant corn seed for the reasons set out above.

49.     The United States is the relevant geographic area for the market and sub-markets. Before genetically modified corn seed can be commercialized in the United States, it must receive regulatory approval from U.S. governmental agencies. The U.S. Department of Agriculture regulates the use of biotechnology traits in crops planted in the United State. The U.S. Environmental Protection Agency regulates the use of both plant incorporated protectants and chemical insecticides in the United States. Other factors, such as the U.S. distribution system and other demand characteristics, support a U.S. geographic market.

50.     Monsanto is the dominant supplier of stacked corn traits in the United States. It has monopoly power in the market for its sale, that is, the power to control prices or exclude competition in the relevant market or sub-markets.

51.     Substantial barriers to entry and expansion exist in the sale of corn seed with stacked traits. The considerable time and expense to develop a competing stacked corn seed and obtain the necessary regulatory approvals are strong barriers to entry. Importantly, Monsanto's exclusive dealing and bundling of incentives provided an additional barrier to entry for any competitor.

52.    Monsanto's market domination and the existence of entry barriers are evidenced by its above-competitive prices.

## CLASS ACTION ALLEGATIONS

### Class of Direct Purchasers of Monsanto Seed Corn
### Tolerant of Glyphosate

53.    . Plaintiffs American Seed Co. Inc. and Jerry Ellefson are representatives of a class of persons ("Class of Direct Purchasers of Monsanto Corn Seed Tolerant of Glyphosate" or "Glyphosate-Tolerant Corn Seed Class") directly purchasing seed corn from Monsanto Company (including its named controlled seed companies) which is tolerant of glyphosate herbicide between July 26, 2001 and the present excluding citizens of the States of Iowa and Minnesota, persons affiliated with Monsanto, or governmental entities. The Class includes primarily farmers, and retailers of this seed to these farmers.

### Rule 23(a) Prerequisites

54.    Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

(a)    **Numerosity.**  The number of persons in the Class is, upon information and belief, in the thousands, and the members of the Class are therefore so numerous that joinder of all members of the Class is impracticable.  Joinder is also impracticable because of the geographic diversity of the members of the Class, the need to expedite judicial relief, and the Class Representatives' lack of knowledge of the identity and addresses of all members of the Class.

(b)    **Common Questions.** There are numerous questions of law and fact arising from the pattern of Monsanto's anti-competitive conduct which are common to the members of the Class. These include, but are not limited to, common issues as to:

- the existence of a relevant market for seed corn which is tolerant of glyphosate herbicide, and Monsanto's monopoly power in such market;

- whether Monsanto has unlawfully maintained a monopoly in this relevant market;

- whether Monsanto's maintenance of its monopoly over the relevant market harmed competition;

- whether such monopoly maintenance caused antitrust injury to members of the Class due to Monsanto's above-competitive pricing of the corn seed to members of the Class; and

- the nature and extent of the injunctive and actual damage relief available to the members of the Class.

55.    **Adequacy of Representation.** The claims of the Class Representatives are typical of the claims of the members of the Class and fairly encompass the claims of the members of the Class. The Class Representatives and the members of the Class are similarly or identically harmed by the same systematic and pervasive conduct including pervasive above competitive pricing of the corn seed by Monsanto.

56.    The Class Representatives and their counsel will fairly and adequately protect the interests of the members of the Class. There are no material conflicts between the claims of the Class Representatives and the members of the Class making class certification inappropriate.

10012365.WPD

-13-

Counsel for the Class will vigorously assert the Representatives' claims and those of the members of the Class.

### Rule 23(b)(3) Prerequisites

57.    In addition, the prosecution of the claims of the Class as a class action pursuant to Fed. R. Civ. P. 23(b)(3) is appropriate because:

(a)    The questions of law or fact common to the members of the Class predominate over any questions affecting only its individual members; and

(b)    A class action is superior to other methods for the fair and efficient resolution of the controversy.

### Rule 23(b)(2) Prerequisites

58.    In the alternative, the prosecution of the claims of the Class as a class action pursuant to Fed. R. Civ. P. 23(b)(2) is appropriate because Monsanto has acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

### Class of Direct Purchasers of Monsanto Corn Seed Resistant to the European Corn Borer

59.    Plaintiffs American Seed Co. Inc. and Jerry Ellefson are representatives of a class of persons ("Class of Direct Purchasers of Corn Seed Resistant to European Corn Borer" or "Borer-Resistant Corn Seed Class") directly purchasing corn seed resistant to European Corn Borer from the Monsanto Company (including its controlled seed companies) between July 26, 2001 and the present excluding citizens of the States of Iowa and Minnesota, persons affiliated with Monsanto,

or governmental entities. The Class includes primarily farmers and retailers of this seed to these farmers.

### Rule 23(a) Prerequisites

60.    Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

(a)    **Numerosity.** The number of persons in the Class is, upon information and belief, in the thousands, and the members of the Class are therefore so numerous that joinder of all members of the Class is impracticable.  Joinder is also impracticable because of the geographic diversity of the members of the Class, the need to expedite judicial relief, and the Class Representatives' lack of knowledge of the identity and addresses of all members of the Class.

(b)    **Common Questions.** There are numerous questions of law and fact arising from the pattern of Monsanto's anti-competitive conduct which are common to the members of the Class.  These include, but are not limited to, common issues as to:

- the existence of a relevant market for corn seed resistant to the European Corn Borer and Monsanto's monopoly power in such market;

- whether Monsanto has unlawfully maintained a monopoly in this relevant market;

- whether Monsanto's maintenance of its monopoly over the relevant market harmed competition;

- whether such monopoly maintenance caused antitrust injury to members of the Class due to Monsanto's above-competitive pricing to members of the Class; and

● the nature and extent of the injunctive and actual damage relief available to the members of the Class.

61.    **Adequacy of Representation.** The claims of the Class Representatives are typical of the claims of the members of the Class and fairly encompass the claims of the members of the Class. The Class Representatives and the members of the Class are similarly or identically harmed by the same systematic and pervasive conduct.

62.    The Class Representatives and their counsel will fairly and adequately protect the interests of the members of the Class. There are no material conflicts between the claims of the Class Representatives and the members of the Class making class certification inappropriate. Counsel for the Class will vigorously assert the Representatives' claims and those of the members of the Class.

### Rule 23(b)(3) Prerequisites

63.    In addition, the prosecution of the claims of the Class as a class action pursuant to Fed. R. Civ. P. 23(b)(3) is appropriate because:

(a)    The questions of law or fact common to the members of the Class predominate over any questions affecting only its individual members; and

(b)    A class action is superior to other methods for the fair and efficient resolution of the controversy.

### Rule 23(b)(2) Prerequisites

64.     In the alternative, the prosecution of the claims of the Class as a class action pursuant to Fed. R. Civ. P. 23(b)(2) is appropriate because Monsanto has acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

### Class of Direct Purchasers of Monsanto
### Corn Seed Resistant to Root Worm

65.     Plaintiffs American Seed Co. Inc. and Jerry Ellefson are representatives of a class of persons ("Class of Direct Purchasers of Corn Seed Resistant to Root Worm" or "Root-Worm-Resistant Corn Seed Class") directly purchasing corn seed resistant to root worm from the Monsanto Company (including its controlled seed companies) between July 26, 2001 and the present excluding citizens of the States of Iowa and Minnesota, persons affiliated with Monsanto, or governmental entities. The Class includes primarily farmers, and retailers of this seed to these farmers.

### Rule 23(a) Prerequisites

66.     Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

(a)     **Numerosity.** The number of persons in the Class is, upon information and belief, in the thousands, and the members of the Class are therefore so numerous that joinder of all members of the Class is impracticable. Joinder is also impracticable because of the geographic diversity of the members of the Class, the need to expedite judicial relief, and the Class Representatives' lack of knowledge of the identity and addresses of all members of the Class.

(b)    **Common Questions.** There are numerous questions of law and fact arising from the pattern of Monsanto's anti-competitive conduct which are common to the members of the Class. These include, but are not limited to, common issues as to:

- the existence of a relevant market for corn seed resistant to root worm and Monsanto's monopoly power in such market;

- whether Monsanto has unlawfully maintained a monopoly in this relevant market;

- whether Monsanto's maintenance of its monopoly over the relevant market harmed competition;

- whether such monopoly maintenance caused antitrust injury to members of the  Class due to Monsanto's above-competitive pricing to members of the Class; and

- the nature and extent of the injunctive and actual damage relief available to the members of the Class.

67.    **Adequacy of Representation.** The claims of the Class Representatives are typical of the claims of the members of the Class and fairly encompass the claims of the members of the Class. The Class Representatives and the members of the Class are similarly or identically harmed by the same systematic and pervasive conduct.

68.    The Class Representatives and their counsel will fairly and adequately protect the interests of the members of the Class. There are no material conflicts between the claims of the Class Representatives and the members of the Class making class certification inappropriate.

Counsel for the Class will vigorously assert the Representatives' claims and those of the members of the Class.

### Rule 23(b)(3) Prerequisites

69.    In addition, the prosecution of the claims of the Class as a class action pursuant to Fed. R. Civ. P. 23(b)(3) is appropriate because:

       (a)    The questions of law or fact common to the members of the Class predominate over any questions affecting only its individual members; and

       (b)    A class action is superior to other methods for the fair and efficient resolution of the controversy.

### Rule 23(b)(2) Prerequisites

70.    In the alternative, the prosecution of the claims of the Class as a class action pursuant to Fed. R. Civ. P. 23(b)(2) is appropriate because Monsanto has acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

### Class of Direct Purchasers of Monsanto Corn Seed With Stacked Traits

71.    Plaintiffs American Seed Co. Inc. and Jerry Ellefson are representatives of a class of persons ("Class of Direct Purchasers of Monsanto Corn Seed with Stacked Traits" or "Stacked-Trait Corn Seed Class") directly purchasing seed corn from Monsanto Company (including its controlled seed companies) between July 26, 2001 and the present excluding citizens of the States of Iowa and Minnesota, persons affiliated with Monsanto, or governmental entities. The Class includes primarily farmers, and retailers of seed to these farmers.

**Rule 23(a) Prerequisites**

72.    Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

(a)    **Numerosity.** The number of persons in the Class is, upon information and belief, in the thousands, and the members of the Class are therefore so numerous that joinder of all members of the Class is impracticable.  Joinder is also impracticable because of the geographic diversity of the members of the Class, the need to expedite judicial relief, and the Class Representatives' lack of knowledge of the identity and addresses of all members of the Class.

(b)    **Common Questions.** There are numerous questions of law and fact arising from the pattern of Monsanto's anti-competitive conduct which are common to the members of the Class.  These include, but are not limited to, common issues as to:

- the existence of a relevant market and sub-markets for seed corn with stacked traits, and Monsanto's monopoly power in such market(s);

- whether Monsanto has unlawfully maintained a monopoly in the relevant market(s);

- whether Monsanto's maintenance of its monopoly over the relevant market(s) harmed competition;

- whether such monopoly maintenance caused antitrust injury to members of the  Class due to Monsanto's above-competitive pricing of the corn seed to members of the Class; and

- the nature and extent of the injunctive and actual damage relief available to the members of the Class.

73.    **Adequacy of Representation**.  The claims of the Class Representatives are typical of the claims of the members of the Class and fairly encompass the claims of the members of the Class.  The Class Representatives and the members of the Class are similarly or identically harmed by the same systematic and pervasive conduct including pervasive above competitive pricing of the corn seed by Monsanto.

74.    The Class Representatives and their counsel will fairly and adequately protect the interests of the members of the Class.  There are no material conflicts between the claims of the Class Representatives and the members of the Class making class certification inappropriate. Counsel for the Class will vigorously assert the Representatives' claims and those of the members of the Class.

### Rule 23(b)(3) Prerequisites

75.    In addition, the prosecution of the claims of the Class as a class action pursuant to Fed. R. Civ. P. 23(b)(3) is appropriate because:

(a)    The questions of law or fact common to the members of the Class predominate over any questions affecting only its individual members; and

(b)    A class action is superior to other methods for the fair and efficient resolution of the controversy.

### Rule 23(b)(2) Prerequisites

76.    In the alternative, the prosecution of the claims of the Class as a class action pursuant to Fed. R. Civ. P. 23(b)(2) is appropriate because Monsanto has acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

## MONOPOLY MAINTENANCE

77.    In 1997, Monsanto began marketing a corn seed resistant to European Corn Borer under the YieldGard trade name.

78.    By 1998, Monsanto had introduced a Roundup Ready® (glyphosate-tolerant) corn seed using the "GA21 event" Defendant DeKalb had developed with Rhone-Poulenc.

79.    In 2003, Monsanto began marketing a corn seed resistant to root worm, called YieldGard Root worm®, and in 2004 a combination product or "stack" of the European Corn Borer trait and the root worm resistant trait, called YieldGard Plus®. Today, Monsanto also produces a stacked borer-resistant and glyphosate-tolerant seed corn.

80.    Monsanto has sold glyphosate-tolerant, borer-resistant, and root-worm resistant seeds through its named controlled subsidiaries, that is, Defendants American Seeds Inc., Corn States Hybrid Service Inc., Asgrow Seeds Co. Inc., Holden Foundation Seeds, Inc., DeKalb Seeds, Calgene L.L.C., NC+ Hybrids,  Channel Bio Co., and Seminis Inc.

### Exclusive Dealing Contracts

81.    The Monsanto GA 21 License for the glyphosate-resistant trait typically provides substantial financial incentives for the seed companies selling to the Glyphosate- Tolerant Corn Seed Class to favor Monsanto's trait. If Monsanto's Roundup Ready® corn seeds constitute, for example, 85% of the seed company's herbicide-tolerant corn seed sales, on or before progress or milestone dates, milestone payments to Monsanto are significantly reduced or waived altogether.

82.     Substantially similar Monsanto agreements, with varied target market share, control the use by seed companies selling to the Classes (i) Monsanto's NK603 glyphosate-tolerant corn trait, (ii) its European Corn Borer resistant corn trait, (iii) its root worm-resistant corn trait, and (iv) products containing combinations or "stacks" of these corn traits.

83.     Actual or potential trait competitors such as Syngenta Seeds, Inc. ("Syngenta") develop and produce a wide range of agricultural products, including biotechnology seeds and other crop protection products (such as herbicides, insecticides and fungicides). Syngenta is also a provider of seed traits in the United States.

84.     Syngenta markets a corn trait resistant to the European Corn-Borer trait, Bt11, by license to other seed companies and through its own NK® brand corn seeds. To date, Syngenta has been able to gain only a small market share only in the borer-resistant corn trait market.

85.     On February 5, 2004, Syngenta's affiliate acquired the intellectual property rights to the GA21 glyphosate-tolerant corn trait from Bayer CropScience. Syngenta now has the right to introduce and market its own GA21 product and to license others. As part of the acquisition, Syngenta's affiliate also acquired the GA21 license from Bayer CropScience under which Monsanto and its sublicensees operate to produce GA21 corn seeds through 2004.

86.     On May 12, 2004, Syngenta's affiliate announced its intention to acquire Advanta BV, including Advanta's Garst Seeds subsidiary and its U.S. corn and soybean seed businesses. At the same time, Syngenta's affiliate publicly announced its acquisition of the GA21 rights from Bayer CropScience.

87.     Syngenta announced an agreement to acquire the Golden Harvest group of seed companies on June 25, 2004. Golden Harvest is a producer of hybrid corn and soybean seeds.

10012365.WPD                               -23-

88.    The combination of the Advanta, Golden Harvest and GA21 acquisitions will permit Syngenta to expand its corn product offering and provide seed companies and growers a full range of biotechnology input traits for corn in competition with Monsanto. Syngetna will commercialize GA21 in NK®, Golden Harvest®, and Garst® brand seeds, and through licenses to other seed companies. It plans to introduce the GA 21 corn trait to the market for the 2005 growing season as a complement to its corn borer resistant trait, both in competition with Monsanto. Syngenta plans to offer a root worm-resistant trait in 2007.

89.    Syngenta also wishes to expand its distribution of borer-resistant corn trait in foundation and hybrid seeds via the NK®, Golden Harvest®, and Garst® seed brands.

90.    On May 13, 2004, Monsanto notified seed companies selling to the Classes that it sought to prevent any unauthorized sales of GA21 corn seeds. Monsanto pressured seed companies not to deal with Syngenta and implicitly threatened to sue the seed companies if they cooperated with Syngenta's entry.

### Product Bundling to Deny Competitors
### Distribution of Corn Seed with Traits

91.    As Monsanto added new corn seed traits to its portfolio, it leveraged its more established traits to promote its newer traits by bundling additional financial incentives across all of its products to cause seed companies to use only its traits to create biotechnological corn seed. At least as early as 1998, Monsanto bundled additional payments of fees and additional waivers of progress or milestone payments across its glyphosate-tolerant soybeans, glyphosate-tolerant corn and borer-resistant corn. At least by 2003, Monsanto had expanded the range of products covered by its bundled incentives to cover root worm-resistant corn as well.

92.    To carry out its bundling plan, Monsanto has entered an "Amended and Restated Licensee Incentive Agreement" (the "Incentive Agreement") with seed companies. Under the Incentive Agreement, seed companies meeting certain targets are paid an additional 5% to 10% of the fee and receive reduced or waived milestone payments that may be due under the individual trait licenses.

93.    However, to qualify for any of these payments or waivers, the seed company must ensure every year that its sales of each trait are at least 70% Monsanto brand products. If the seed company does not maintain Monsanto's target in any product, it loses the incentives across the entire line of products and must repay previous waived fees.

94.    Thus, for example, a seed company may be faced with substantial financial penalties for one Monsanto product (such as glyphosate-tolerant corn seed) if it fails to sell enough of another Monsanto product (such as borer-resistant corn seed). The seed company may also lose the Incentive Agreement and thus lose the upside opportunities on all traits.

95.    On information and belief, Monsanto's trait licenses, including its GA21 License and its Incentive Agreements are long term and generally run through 2007 and may not be voluntarily terminated. A majority of independent seed companies in the United States has signed Monsanto trait licenses and Incentive Agreements.

96.    The effect of Monsanto's bundled incentive programs is to create barriers to entry and expansion for its competitors seeking to sell corn seed with traits through bundling fees and incentives across all product lines, which, in turn, defeat or deter new entrants and foreclose a substantial portion of competition for the sale of trait corn seed.

## INJURY TO COMPETITION

### Relevant Market for Corn Seed Tolerant of Glyphosate

97.    Monsanto's unlawful conduct has caused and will cause substantial harm to competition in the market for the sale of glyphosate-tolerant corn seed in the United States. As a consequence of Monsanto's exclusionary conduct, members of the Glyphosate-Tolerant Corn Seed Class have paid above-competitive prices directly to Monsanto (including its named controlled seed companies) for corn seed with the glyphosate-tolerant trait. This pricing does not include any licensing payments to Monsanto associated with the purchase or subsequent sale of the corn seed.

### Relevant Market for Corn Seed Resistant to European Corn Borer

98.    Monsanto's unlawful conduct has caused and will cause substantial harm to competition in the market for the sale of corn seed resistant to the European Corn Borer. As a consequence of Monsanto's exclusionary conduct, members of the Borer-Resistant Corn Seed Class have paid above competitive prices directly to Monsanto (including its named controlled seed companies) for corn seed with the borer trait. This pricing excludes any licensing payments to Monsanto associated with the purchase or subsequent sale of the corn seed.

### Relevant Market for Corn Seed Resistant to Root Worm

99.    Monsanto's unlawful conduct has caused and will cause substantial harm to competition in the market for the sale of corn seed resistant to root worm. As a consequence of Monsanto's exclusionary conduct and practices directed at its competitors, members of the Root-Worm Corn Seed Class have paid above-competitive prices directly to Monsanto (including its controlled seed companies) for corn seed resistant to root worm. This pricing does not include any licensing payments to Monsanto associated with the purchase or subsequent sale of the corn seed.

## Relevant Market for Corn Seed with Stacked Traits

100.    Monsanto's unlawful conduct has caused and will cause substantial harm to competition in the market for the sale of corn seed with stacked traits. As a consequence of Monsanto's exclusionary conduct and practices directed at its competitors, members of the Stacked-Trait Corn Seed Class have paid above-competitive prices directly to Monsanto (including its named controlled seed companies). This pricing excludes any licensing payments to Monsanto associated with the purchase or subsequent sale of the corn seed.

### CLAIMS FOR RELIEF

### COUNT ONE
### Maintenance of a Monopoly in the Relevant Market
### for Corn Seed Tolerant of Glyphosate

101.    Plaintiffs incorporate herein the foregoing allegations.

102.    The sale of corn seed tolerant of glyphosate herbicide is a relevant product market.

103.    The relevant geographic market is the United States.

104.    Monsanto possesses monopoly power in the relevant market, maintaining a market share of 100%. Substantial barriers to entry and expansion exist in the relevant market.

105.    Monsanto has the power to control market prices and exclude competition in the relevant market.

106.    Monsanto has engaged in conduct and a pattern of conduct with anti-competitive effects to unlawfully maintain and enhance its monopoly in the relevant market and to keep the relevant corn seed prices high, stifle competition, and eliminate consumer choice through exclusionary behavior.

107.    There is no legitimate business justification for Defendants' conduct.

108.    The Glyphosate-Tolerant Corn Seed Class has suffered and will suffer antitrust injury in the form of above-competitive corn seed prices paid directly to Monsanto (including its named controlled seed companies) for corn seed with the glyphosate-tolerant trait. The corn seed pricing at issue does not include any licensing payments to Monsanto associated with the purchase or subsequent sale of the corn seed.

### COUNT TWO
### Maintenance of Monopoly in a Relevant Market for Corn Seed
### Resistant to the European Corn Borer

109.    Plaintiffs incorporate herein the foregoing allegations.

110.    The sale of corn seed resistant to the European Corn Borer is a relevant product market.

111.    The relevant geographic market is the United States.

112.    Monsanto possesses monopoly power in the relevant market, maintaining a market share of at least 80%. Substantial barriers to entry and expansion exist in the relevant market.

113.    Monsanto has the power to control market prices and exclude competition.

114.    Monsanto has engaged in conduct and a pattern of conduct with anti-competitive effects to unlawfully maintain and enhance its monopoly in the relevant market and to keep prices high, stifle competition and eliminate consumer choice through exclusionary behavior.

115.    There is no legitimate business justification for Defendants' conduct.

116.    The Borer-Resistant Corn Seed Class has suffered and will suffer anti-trust injury in the form of above-competitive prices paid directly to Monsanto (including its named controlled seed companies) for corn seed with the borer-resistant trait. The corn seed pricing at issue does not

include any licensing payments to Monsanto associated with the purchase or subsequent sale of the corn seed.

## COUNT THREE
### Maintenance of a Monopoly in the Relevant Market for Corn Seed Resistant to Root Worm

117.  Plaintiffs incorporate herein the foregoing allegations.

118.  The sale of corn seed resistant to root worm is a relevant product market.

119.  The relevant geographic market is the United States.

120.  Monsanto possesses monopoly power in the relevant market, maintaining a market share of 100%. Substantial barriers to entry and expansion exist in the relevant market.

121.  Monsanto has the power to control market prices and exclude competition.

122.  Monsanto has engaged in conduct and a pattern of conduct with anti-competitive effects to unlawfully maintain and enhance its monopoly in the relevant market and to keep prices high, stifle competition, and eliminate consumer choice through exclusionary behavior.

123.  There is no legitimate business justification for Defendants' conduct.

124.  The Root-Worm-Resistant Corn Seed Class has suffered and will suffer antitrust injury in the form of above-competitive prices paid directly to Monsanto (including its named controlled seed companies) for corn seed with the root worm trait. The corn seed pricing at issue does not include any licensing payments to Monsanto associated with the purchase or subsequent sale of the corn seed.

## COUNT FOUR
### Maintenance of a Monopoly in the Relevant Market
### for Stacked Corn Seed

125.    Plaintiffs incorporate herein the foregoing allegations.

126.    The sale of corn seed with stacked corn traits is a relevant product market, or consists of relevant product sub-markets according to the traits stacked.

127.    The relevant geographic market is the United States.

128.    Monsanto possesses monopoly power in the relevant market and any sub-markets, maintaining a market share(s) of 100%.  Substantial barriers to entry and expansion exist in the relevant market(s).

129.    Monsanto has the power to control market prices and exclude competition.

130.    Monsanto has engaged in conduct and a pattern of conduct with anti-competitive effects to unlawfully maintain and enhance its monopoly in the relevant market(s) and to keep prices high, stifle competition, and eliminate consumer choice through exclusionary behavior.

131.    There is no legitimate business justification for Defendants' conduct.

132.    The Stacked-Trait Corn Seed Class has suffered and will suffer antitrust injury in the form of above-competitive prices paid directly to Monsanto for corn seed with stacked traits.  The corn seed pricing at issue does not include any licensing payments to Monsanto associated with the purchase or subsequent sale of the corn seed.

### DEMAND FOR TRIAL BY JURY

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFFS PRAY THIS COURT:

A.      Find that Defendants have unlawfully monopolized the sale of biotechnological corn seed in the relevant markets in violation of Section 2 of the Sherman Act and award plaintiff Classes treble damages in amounts to be proven at trial, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a);

B.      Grant injunctive relief prohibiting Defendants and all persons, firms and corporations acting on their behalf and under their direction or control from continuing violations of Section 2 of the Sherman Act, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26;

C.      Award plaintiff Classes such other relief as is necessary or appropriate to restore and maintain competitive conditions in the markets affected by Defendants' unlawful conduct; and

D.     Award plaintiffs attorneys' fees and costs of this action.

Dated: September 20, 2006

SMITH, KATZENSTEIN & FURLOW LLP

Joelle E. Polesky (ID No. 3694)
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899 (Courier 19801)
Telephone: 302-652-8400
Facsimile: 302-652-8405
E-mail: jpolesky@skfdelaware.com
Attorneys for Plaintiffs

Of Counsel:

KELLOGG, HUBER, HANSEN,
TODD, EVANS & FIGEL P.L.L.C.
Steven F. Benz
Michael S. Zuckman
1615 M St., N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999

BERRY & LEFTWICH
R. Stephen Berry
J. Daniel Leftwich
Gregory Baruch
1717 Pennsylvania Ave. NW, Suite 450
Washington, DC 20006
Telephone: (202) 296-3020
Facsimile:   (202) 296-3038

10012365.WPD

## CERTIFICATE OF SERVICE

I certify that this 20th day of September, 2006, copies of the foregoing First

Amended Complaint in *American Seed Co., Inc. v. Monsanto Co.,* was caused to be served

on the following by efiling:

Richard L. Horwitz
Potter Anderson & Corroon LLP
Hercules Plaza 6th Floor
1313 N. Market Street
Wilmington, DE 19801

Peter E. Moll
Howrey LLP
1299 Pennsylvania Ave. N.W.
Washington, D.C. 20004

Joelle E. Polesky (I.D. No. 3694)

10012339.WPD

# EXHIBIT 6

New GreenLeaf Genetics Joint Venture

**Stargard, Andreas**

FYI

**From:** greenleaf.genetics@greenleafgenetics.com [mailto:greenleaf.genetics@greenleafgenetics.com]
**Sent:** Monday, April 10, 2006 6:48 AM
**Subject:** New GreenLeaf Genetics Joint Venture





April 10, 2006

**Dear GreenLeaf Genetics Customer:**

Syngenta and DuPont, through its subsidiary Pioneer Hi-Bred International, have announced a joint venture and licensing agreements forming a 50/50 joint venture to own GreenLeaf Genetics LLC and out-license genetics to U.S. and Canadian seed companies. GreenLeaf Genetics will also facilitate the out-license of biotechnology traits by Syngenta and Pioneer. This is a breakthrough event that means GreenLeaf Genetics will now have available a new and unique pool of corn and soybean genetics from both companies' research efforts and will be able to assist customers in obtaining licenses for any traits from either company. It will greatly enhance both the depth and quality of genetics we license to customers.

Syngenta established GreenLeaf Genetics in 2004 to license elite genetics to the seed industry. Now, through this collaboration, customers of GreenLeaf Genetics will also have targeted access to Pioneer's world-leading genetics library. In addition, GreenLeaf Genetics will coordinate for Syngenta and Pioneer their licensing of insect-resistant and herbicide tolerant traits, including the Optimum™ GAT™ trait, Pioneer's new proprietary glyphosate and ALS chemistry-tolerant trait for corn and soybeans.

This is an exciting time for GreenLeaf Genetics, our customers and the entire seed industry. Hybrid and inbred seed will be available immediately for testing in 2006.  For information about these new products and traits, please contact your GreenLeaf Genetics product manager or account representative. They can help you set up testing of these products for the upcoming 2006 growing season.

The enclosed attachments contain more specific details on the joint venture and will answer many of your questions about how this exciting news will affect your business.  Information is also available on the GreenLeaf Genetics website at http://www.greenleafgenetics.com.

As you make your testing plans for 2006, you will want to make sure you are looking at the many new options available from GreenLeaf Genetics.  Your product manager will be contacting you soon to update you on our new business and what we have to offer for 2006 and beyond.

New GreenLeaf Genetics Joint Venture

Best Regards,

Ron Wulfkuhle, CEO
GreenLeaf Genetics LLC

Enc:   Q&A Document
       Syngenta/DuPont news release
       PowerPoint Presentation

<<4-10 News Release.doc>> <<4-10 Q & A.doc>> <<4-10 GLG ppt.ppt>>

4/12/2006

# EXHIBIT 7



## IN THIS ISSUE:

News from the Top
What's New
Points from Production
Field Update from the Product
    Management Team
Focus on Sales
Useful Links



## News from the Top
### *Keeping the Ball Rolling*

We are excited to announce that Agrisure™ traits available from GreenLeaf Genetics™ will have the same royalty for 2007 as announced for 2006. Maintaining our royalty pricing at 2006 levels is in response to many of our seed company customers expressing a desire to move to Agrisure traits. Our customers now have assurance that they can price products and make margins on sales to corn growers for the next two seasons.

Our genetics pricing for 2007 is also identical to 2006. We will continue with our very straightforward simple pricing strategy. To take advantage of our strong genetics performance and Agrisure CB or Agrisure GT traits, please call your local Product Manager.

We've had many lines "picked up" in the industry. In fact, more than 160 lines altogether. GreenLeaf Genetics only offers certain lines direct to seed companies with the remaining lines released to other foundation seed companies. As of this month, we have more than 60 licensees, with several new ones arriving during the past week.

Ron Wulfkuhle
Business Unit Head
Ron.Wulfkuhle@greenleafgenetics.com or 402.639.6105

### Coming Up...

- Commodity Classic
  March 2-4, Anaheim
  Marriott, Anaheim, CA
- Summer ASTA Meeting,
  July 8-12, Hyatt Regency
  Chicago
- GreenLeaf Genetics
  Technology Days,
  July/August

Did you know . . .



President George W. Bush's State of the Union speech put attention on fuels, including ethanol, in the spotlight. Ethanol is homegrown and allows us to use 35 percent less forage oil. If you spend $50 on gasoline to fill up your tank, and if well-to-wheel basis, that $50 starts in the Middle East and goes to the oil company and into your tank. If you spend $50 on E85 blend, $42.50 (85%) of that money stays in a farm goes to the producers here in the states and ends up in your tank. All 841.50 stays in the United States.



## What's New

### Corn Rootworm Update

The Syngenta corn rootworm event MIR604™ (Agrisure™ RW) looks very promising and you will have an opportunity to see some results this season. More details about the location of the Syngenta demonstrator plots and opportunities to view the trials will be provided by your product manager. If you are planning a RW evaluation plot, your product manager will contact you about documentation required to plant a trial with an experimental use permit (EUP). Expect updates as the regulatory process approaches approval of the RW trait.

*Please note that Agrisure™ RW corn hybrids, hybrids or varieties are not available for purchase, are not being offered for sale and will not be available for sale until the Environmental Protection Agency approves registration. These materials do not constitute an offer for sale.*

### Agrisure™ GT/CB Channeling Agreements

For companies selling Agrisure glyphosate tolerant/corn borer resistant (GT/CB) hybrids in 2006, remember that special channeling agreements must be completed by each grower planting these products. Grain harvested from GT/CB seed must not end up in any channel allowing export to Japan and uses such as on-farm feeding, ethanol and commercial feedlots are examples of acceptable uses for the GT/CB grain. Please contact your product manager, account manager or myself for additional details or to answer questions about allowed grain channels for GT/CB hybrids.

### Agrisure™ GT Channeling

Currently GT hybrids require Market Choices® grain channeling. For any questions about what traits require a Market Choices channeling agreement, please refer to the National Corn Growers Association web site www.ncga.com. Look in the section entitled "Know Before You Grow" for complete details. To list your own hybrids for sale, click on the "seed retailers click here" link. This will give you information on how to update the NCGA on your particular hybrids.

### Agrisure Information

Be sure and check out the www.agrisuretraits.com website for information about Agrisure traits and AgriEdge™ programs. This site, available for companies who are registered users, contains a variety of information including how to order Agrisure and AgriEdge promotional materials. Agrisure brand standards and bag tag templates are also available. If bag tags are needed immediately, contact Greg Kegler for assistance.

Jeff Jorgenson
Marketing and Customer Service Manager
Jeff.Jorgenson@syngenta.com or 952.256.4045

# Points from Production

## Seedstock Ordering

It's time to order seed for 2006. Ordering early ensures your needs are covered for spring. Although some product supplies are limited, many products are available for shipping now. A mid-March shipping date is planned for products coming from off-season growing locations.

Be sure to sign a necessary genetic and trait licenses and return them to Mike Fielding (Greenleaf Genetics, PO Box 955, Minneapolis, MN 55440). No seed will be shipped until the required licenses are signed and executed.

## Greenleaf Genetics Website

We hope many of you have visited our Greenleaf Genetics website, www.greenleafgenetics.com. It is an excellent source of information to manage your business. The website also links directly to www.agrisource.com. To gain access to the restricted portion of the website a commercial license agreement is required. If you are having any issues with the website, having trouble with accessing the site or if to your password, please contact Greg Cagler.

For any of your seedstock and production needs Greg is here to help you!

Greg Cagler
Genetics Operations and Supply Chain Manager
Greg.Cagler@greenleafgenetics.com or

## useful links

The used in learning about business plans:
Here are some helpful links:

http://www.sba.gov/starting_business/planning/basics.html

http://www.inowebusiness.com/running_your_business/businessstartup/ArticleDashboard-11824.htc



## Field Update from the Product Management Team

The GreenLeaf product managers have been busy since the first of the year. We have been out promoting the GreenLeaf product lineup and the outstanding Agrisure corn traits. The first ever GreenLeaf Genetics Product Guide has been shipped and contains a comprehensive story of the lines available from GreenLeaf as well as important information regarding Agrisure and AgriEdge. If you have not received a product guide, or need additional copies, please let us know.



### Inbred Update

Our first year resulted in several outstanding lines for your use and we are excited about the potential of the new inbred releases for 2006 planting. Inbreds released in 2005 with strong performance include:

- NP2529 a strong male with excellent emerging ability that creates hybrids in the 104 to 108 day range;
- NP2536 an excellent performer in hybrid combinations from 80 to 95 days;
- NP2727 a Mo17/Oh43 type with strong drought tolerance. When used with NP26603T21 a very strong 104-day hybrid is produced.



### Inbreds released in 2006 with strong performance include:

- NP2623 is a new male that moves hybrids in the 88 to 96 day range to new yield levels;
- NP2928 is a new W153R type that works well in northern Iowa and southern Minnesota;
- NP2747 creates very healthy hybrids with strong agronomics and excellent yields it makes a particularly nice hybrid with TR7169 at 112 days;
- NP2608 is a new female that appears to have similar combining patterns as TR6467 at 105 to 108 days;
- NPFA6314 is a new female with very wide combining ability. It makes an outstanding 111-day hybrid with NPLJ7383.
- NP2546 appears to work well with most SSS's and contributes excellent health and agronomics in the 110 to 115 day maturity zone.

### Advantage Trials

Seeing is believing; and to help you analyze the available new lines we are offering GreenLeaf Advantage Trials in five maturities. The Very Early, Early, Medium, Medium Late, and Late trials will be available for planting at your locations. This is an excellent way for you to see how the new GreenLeaf lines perform in hybrid combinations. If you are interested in planting some sets of these trials please contact your GreenLeaf Product Manager. Please feel free to contact any of us regarding your needs for 2006 production and testing.

Rich Hall – Product Manger, Genetics & Traits – Western Region
Rich.Hall@greenleafgenetics.com or 605.638.0416

Chris Perry – Product Manager, Genetics & Traits – Northern Region
Chris.Perry@greenleafgenetics.com or 507.649.1628

Roy Johnson – Product Manager, Genetics & Traits – Eastern Region
Roy.Johnson@greenleafgenetics.com or 515.249.3949

**Have a Little Fun**
What vegetable may be reduced to ashes merely by removing a part of them? (Ask someone from GreenLeaf Genetics for the answer.)

## Focus on Sales

*If Things Were Different*

Ever find yourself saying that about your business in the past year? Do you sometimes have the feeling that your success is too dependent upon circumstances? With few alternatives if chances need to be made?

As the biotechnology revolution in agriculture continues to roll along, your business is likely faced with a myriad of decisions. Those decisions induce whether to market second generation versions of existing traits and to accept brand new traits coming to market. Some of these options are tied together and lead to difficult decisions such as



- Should we only offer stacked traits?
- Should we focus on a single supplier of traits and germplasm?
- What will happen with pending litigation in the marketplace?
- Will my ability to compete independently be compromised?
- Will marketing a trait in one crop affect that business in other crops we sell?

From conversations with several seed companies, my sense is that there is not a clear and straight path view through this minefield of decision-making. For success in this environment, a writer can developed in the next few months would be a good idea. The plan should lay out how you will achieve your business vision in the future, and the steps your business needs to take to get there, even if those first steps seem small. Consider the following items in your plan

- Getting aside a field day dates now to view the new technologies and germplasm
- Ensuring you have the germplasm you may use in the future in your 2006 trials and
- Working with your trait supplier to arrange training for your sales force.

All of us at CareerLeaf are available to help you lay out that plan, and to offer solutions to you for both today and in the future to help make things different. We look forward to making your wish an actionable goal, and to help you find the pathway that you prefer.

Mark Schmidt
Sales Manager
Mark.schmidt@greenleafgenetics.com or 763.360.1137



GreenLeaf Genetics Team
Toll free - 1-800-445-0956

Rich Hall
Product Manager, Genetics & Traits
Western Region
805.638.0416

Chris Perry
Product Manager, Genetics & Traits
Northern Region
507.649.1626

Roy Johnson
Product Manager, Genetics & Traits
Eastern Region
515.249.3949

Ron Wulfkuhle
GreenLeaf Genetics Business Unit Head
402.639.6105

Mark Schmidt
Sales Manager
763.360.1137

Jeff Jorgensen
Marketing and Customer Service Manager
952.250.4045

Greg Kepler
Operations and Supply Chain Manager
(763) 593-7872

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MONSANTO COMPANY and )
MONSANTO TECHNOLOGY LLC, )
                      )
       Plaintiffs, )
                      )
    v. )   Civ. No. 04-305-SLR
                      )
SYNGENTA SEEDS, INC. and )
SYNGENTA BIOTECHNOLOGY, INC., )
                      )
       Defendants. )

O R D E R

At Wilmington this 1st day of May, 2006, having conferred with counsel about various discovery disputes;

IT IS ORDERED that:

1.  **Electronic format.** My review of the documents submitted indicate that Excel spread sheets have been produced without objection in native format. Therefore, **on or before May 8, 2006**, Monsanto shall produce, in native format, the disputed "simulator" and exhibit 67.

2.  **Syngenta and DuPont/Pioneer joint venture. On or before May 8, 2006,** Syngenta shall produce all the business plans and presentations related to the above business venture.

3.  **Scruggs litigation.** I ordered Monsanto to produce "whatever materials the judge looked at in deciding your summary

judgment motion and whatever materials the Federal Circuit looked at in deciding its . . . appeal." To the extent that pages or documents were not made part of the court record, I decline to supplement my order further in this regard.[1]

4. **Monsanto/Dow settlement.** Although the terms of a settlement agreement generally are not subject to discovery, I believe that, in the context of antitrust litigation, the ongoing business relationship between two companies competing in a target market is relevant and discoverable. Therefore, **on or before May 8, 2006,** Monsanto shall produce any cross licenses that relate to the market at issue that were executed by Monsanto and Dow as a result of the settlement.[2]

5. **Garst documents.** Syngenta shall produce, **on or before May 8, 2006,** all documents that relate to the deal between Garst and Syngenta, as identified in Syngenta's antitrust counterclaim, whether said documents are in its possession or in the possession of Syngenta AG.

6. **"Load files".** Syngenta shall produce, **on or before May 8, 2006,** any and all such files maintained by Syngenta that

---

[1] I recall the discussion about the missing pages. I do not recall any specific discussion about the appendix to the expert's report. To the extent such appendix was made part of the court record, it must be produced to Syngenta **on or before May 8, 2006.**

[2] Under the circumstances, these licenses shall be provided to outside counsel only, until further order of the court.

2

reflect market shares by trait and/or sales data by trait.

7. **Sanctions.** Any party not complying with this order shall be fined **$10,000 per day** for each day of noncompliance.[3]

_____
                United States District Judge

_____

[3]So, too, shall a party be fined $10,000 for frivolous objections; i.e., document production shall be closed, one way or another, without further conferences with the court.

3