# EXHIBIT 9

1

1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                        - - -

4   MONSANTO COMPANY and          :      CIVIL ACTION
    MONSANTO TECHNOLOGY LLC,       :
5                                  :
               Plaintiffs          :
6                                  :
               vs.                 :
7                                  :
    SYNGENTA SEEDS, INC. and       :
8   SYNGENTA BIOTECHNOLOGY,        :
    INC., et al.,                  :
9                                  :
               Defendants          :      NO. 04-305 (SLR)
10                       - - -

11
                              Wilmington, Delaware
12                            Monday, May 1, 2006
                              2:00 o'clock, p.m.
13                       - - -

14
    BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge
15                       - - -

16
    APPEARANCES:
17

18            POTTER, ANDERSON & CORROON LLP
              BY:  W. HARDING DRANE, JR., ESQ.
19

20                      -and-

21

22

23

24                            Valerie J. Gunning
                              Official Court Reporter
25

2

```
1    APPEARANCES (Continued):

2            HOWREY LLP
             BY:  PETER E. MOLL, ESQ. and
3                 SEAN P. BEATY, ESQ.
                  (Washington, D.C.)
4
                     Counsel for Plaintiffs
5

6
         YOUNG, CONAWAY, STARGATT & TAYLOR LLP
7        BY:  JOHN W. SHAW, ESQ.

8                   -and-

9

10       SHEARMAN & STERLING
         BY:  RICHARD F. SCHWED, ESQ.
11                (Washington, D.C.)

12
                    Counsel for Defendants
13
                        -  -  -
14

15

16

17

18

19

20

21

22

23

24

25
```

3

1

2

3                         P R O C E E D I N G S

4

5              (Proceedings commenced in the courtroom,

6    beginning at 2:00 p.m.)

7

8              THE COURT:  All right.  I take it the fact you're

9    here means that you didn't work out everything, so I will

10   start with Mr. Schwed and you can fill me in on what issues

11   you believe we still need to bring closure to.

12             MR. SCHWED:  Thank you, your Honor.

13             We have not too many issues, so, hopefully, it

14   won't take too long.

15             The first issue had to do with what we referenced

16   last time as the simulator.  As you may recall, and Mr. Moll

17   didn't dispute that this was an important document, a

18   relevant document, one that did not have much, if any, use

19   unless it was produced in electronic form.  But what he said

20   was we had an agreement that everything would be produced in

21   TIFF.  We said that wasn't our recollection.  And you said --

22   well, the Court said that it was necessary to understand what

23   the back and forth was.

24             And I'm prepared to do that, your Honor, and

25   I can either hand it up or read from it.  I think the

4

1    reading is pretty clear.  In a letter from myself to

2    Mr. Rosenthal regarding Instruction No. 6, which had

3    to do with the format, producing documents, there's a

4    general statement that says Produce in TIFF.  However,

5    Instruction 6 says, When a request calls for information

6    in electronic form, both Monsanto and Syngenta have agreed to

7    produce databases, to the extent they exist, in a file usable

8    by the other side.  That's repeated in a letter in October,

9    October 17th, from myself to Mr. Rosenthal.

10               There's no doubt our Document Request No. 5,

11   which has to do with pricing, it's one of, I believe, three

12   requests where we specifically say that you have the

13   information in electronic format, please produce it in usable

14   electronic format.

15               And then since that time, both parties have

16   exchanged, I believe, dozens, going both ways, of Excel

17   spread sheets and electronic files where they specifically

18   have been requested.  It hasn't been that everything -- you

19   know, every e-mail has obviously not been in native format.

20   We would have been drowning more than we already are.  But

21   there are a number of specific instances where Monsanto, even

22   ones that weren't in their document request, they came back

23   to us and we produced over 60 files.  They said we want that

24   in electronic format, we want that in electronic format, and

25   we have gone ahead and done that.  And as late as the day

5

1    before the last conference, they wrote a letter to Ms. Castle

2    raising certain issues of our electronic production.

3              So we think in light of that, the simulator

4    and then it has come to light in another deposition,

5    there's at least one other document, which during the

6    deposition Mr. Rosenthal had thought that it was produced

7    to us in electronic format.  I came back and said we can't

8    find it.  It actually wasn't.  It's Exhibit 67, but it's a

9    similar type pricing model that ought to be in electronic

10   format.

11             The next issue --

12             THE COURT:  And are you going to hand up those

13   documents?  If the point has been conceded, that's fine, but

14   if it hasn't, then you can hand up the documents you're

15   referring to.

16             MR. SCHWED:  Your Honor, I would be happy to hand

17   up to the Court some documents (handing documents to the

18   Court).

19             THE COURT:  The other issue I have was you were

20   going to check out to see what kind of presentations, if any,

21   were made in connection with the joint venture between

22   Syngenta and DuPont.

23             MR. SCHWED:  Yes, your Honor.  Bear with me for

24   one second.

25             THE COURT:  All right.

6

1          MR. SCHWED:  I may have handed the Court one

2   letter that I did not hand to Mr. Moll.

3          THE COURT:  All right.

4          (Pause.)

5          MR. SCHWED:  Did I hand you multiple copies of

6   the February 1st letter?  I may have inadvertently handed the

7   Court my entire pile of one letter dated February 1st, I

8   believe.

9          THE COURT:  No.  I have July 28, October 17,

10  February 1 and April 19.

11         MR. SCHWED:  I have it (handing document to Mr.

12  Moll).

13         Yes, your Honor.  We can turn to that issue.

14         I also did have one other issue where we were

15  seeking documents.  Do you want to do the issue about the

16  presentations first, or --

17         THE COURT:  Well, it doesn't matter to me.  I

18  just want to make sure I get --

19         MR. SCHWED:  Okay.  The second issue where we're

20  seeking documents has to do with the Scruggs case, and which

21  you may recall was before your -- before the Court maybe a

22  month or two ago, probably two months.  Mr. Fishbein was up

23  here on that issue.

24         And the issue on that is there was a prior

25  antitrust litigation that had some overlapping issues,

1  including the very license incentive agreement that's at the
2  heart of this case.
3           And what we're -- there are two separate items
4  that we're asking for in connection with that case.  The
5  first is literally one or possibly two pages.
6           And just to remind the Court of the history, we
7  had originally asked for a list of antitrust litigations,
8  relevant antitrust litigations.  Out of that list, we picked
9  one case that we thought had relevant materials where we went
10 back and said, you know, this is what we need, and that was
11 the Scruggs case, because it was the important overlap.  We
12 did not ask for everything from that case.  We specifically
13 said, we want the summary judgment papers.  There was a
14 summary judgment motion and an appellate decision on summary
15 judgment.
16          We had to come to the Court to get that.  The
17 Court ordered that produced.
18          When we got the papers and we started looking
19 at them, there's a page missing, and that page is a
20 critical page in the presentation.  And this presentation
21 is entitled "Project Atlas:  Building a Plant Biotech
22 Powerhouse."  And there's a page, it begins -- it has, like,
23 sections.  Section 3 is, "Actions to achieve powerhouse
24 vision.  Strengthen trait exclusivity."
25          And then there's a page that begins on Page 3-3,

8

1   and what it looks like is Page 3-3 and 3-4 somehow got

2   combined in a copying machine somewhere.  That page does not

3   have a header.  It looks like it has been cut off.  So we go

4   from 3-2, and 3-3 and 3-4 seem to be combined somewhat on one

5   page and we're missing one of those pages, and 3-5.

6           The last item on that page is "Adopt a set of

7   licensing guidelines that is focused on obtaining and

8   maintaining exclusivity," exactly what this case is about.

9   And to be honest, this document and that type of provision

10  could have provided the basis for us trying to reopen the

11  decision that said 1996 is the cutoff date for document

12  production, because this is 1995.

13          That's not what we've done.  We've gone back and

14  said we just want the missing page, and the reasons we've

15  received is, that's the way it was submitted to the Court in

16  Mississippi and the only thing that we were actually ordered

17  to do is exactly what was submitted to the Court in

18  Mississippi.

19          We're asking them to go back and look in the

20  original, not in the original files that was submitted to the

21  Court, but in the original document, whatever Project Atlas

22  where document this is kept, and find that document, which,

23  I believe, is a presentation to the then president of the

24  company.

25          The second issue also relates to the Scruggs

1   documents.  In the Scruggs documents, there's -- one of the

2   materials submitted to the Court was an expert report of

3   Kenneth G. Elzinger, and that expert report has an appendix

4   that says, "For reader convenience, detailed analysis of the

5   licensing incentive agreement," and that's the agreement

6   that's at the heart of this case, is -- and then it goes on,

7   is basically -- is placed in Appendix E.

8            So there's a detailed analysis of the agreements

9   at issue in this case that's in an appendix.  Again, that

10  appendix wasn't part of what we received.  Apparently, it

11  wasn't part of it, what was actually submitted to the Court.

12  Again, it's shown to be highly relevant and shouldn't be a

13  burden to produce.  And, once again, it's consistent with

14  what we could hear, which is an incremental approach.

15  Instead of saying, give us every Scruggs document, we went

16  out, said, give us a limited set.  There was a glaring

17  omission.  We've asked for two specific items.

18            Your Honor, do you need me, now that I've handed

19  up those letters, to go through them again or are they clear

20  on their face?

21            THE COURT:  No.  I will look at them.  Thank

22  you.

23            MR. SCHWED:  Thank you, your Honor.

24            The third issue where we're seeking relief, your

25  Honor, has to do with the agreement between Monsanto and Dow,

1   which also was raised last time when -- it is actually in

2   response to the Pioneer issue, where we agreed to produce the

3   agreements with Pioneer regarding the joint venture, and what

4   we said is it should be a two-way street.  We want the

5   agreements with -- between Monsanto and Dow or Mycogen, which

6   is the subsidiary, that they've entered into recently, and

7   which we understand is some sort of business arrangement.

8   Whether it was licensing or joint venture, I don't know the

9   details.

10          Mr. Moll said he wanted to put it off because he

11  didn't know that that was coming up, but did raise the issue

12  that that arose out of a litigation and that was settled.

13  And so I do want to bring that before the Court.  And just to

14  highlight that what we're focusing on is the business

15  arrangement between Monsanto and Dow and the fact that it

16  happened to have arisen out of a litigation does not mean

17  that it's not an important business arrangement, an

18  important, what I believe to be license that may have some

19  different terms that are different from the industry, may

20  relate to anti-stacking, where they have a different rule

21  about stacking their products, and we also potentially could

22  be -- something that has some sort of exclusivity in it,

23  which is obviously highly relevant in terms of how much of

24  the market is potentially available to Syngenta.

25          So we're not looking for settlement documents

1   per se or what would ordinarily be a settlement agreement.

2   What we want is the ongoing business relationship that's

3   going to govern in the future.

4            Turning to the Pioneer documents, we produced,

5   as agreed, we produced seven different agreements with

6   Pioneer this morning, and those are all the agreements that

7   set up the joint venture and give it the ability to operate

8   in the corn arena.  In other words, the corn licenses, the

9   corn germ plasm licenses, the corn trait licenses.  That's

10  what we had agreed to give in terms of the agreements and

11  those were produced this morning.

12           There were two other categories of documents that

13  were discussed previously.  One was presentations where --

14  seeking approval, the formal presentation seeking approval of

15  the transaction.

16           I've been able to locate two things that I

17  think would fit into that category:  A memo to the board

18  and a, I guess you call it a slide pack.  You know, a

19  Power Point-type presentation to the board.

20           I think that it's not necessary to produce those

21  because of, A, we're giving the agreements that I think speak

22  for themselves and, B, just because of the context of how

23  this decision was made, which is there are multiple

24  litigations between Monsanto and Syngenta, both on the

25  soybean side and the corn side, including the one we're in

1  today, the one that's going to trial in 30 days, and this

2  decision was obviously made in that context.

3          And while there's information in there that I

4  don't think is probably privileged, it does -- the entire

5  context of those agreements is -- is -- makes it unnecessary

6  given that they actually have the agreements.  It's not

7  something that's hypothetical.  They can look at the

8  agreements and figure out what the deal is and what the

9  impact is and I'm sure their economists will do it.

10          The second issue are business plans.  We are

11  still trying to figure out if there is a final business

12  plan.  We received some documents that were just recently

13  obtained from the business that we're trying to and we will,

14  as soon as possible, be producing whatever formal business

15  plan there is for Greenleaf Genetics LLC as a joint venture

16  rather than Greenleaf Genetics as a business division of

17  Syngenta.

18          THE COURT:  All right.  Thank you.

19          MR. MOLL:  If I may, your Honor, I would be happy

20  to start off where Mr. Schwed left off.

21          I was not aware, and no one with me was aware

22  that any documents had been produced on -- which related to

23  this joint venture.  If Mr. Schwed is right, they were sent

24  to my office this morning.  I have no idea what the

25  agreements say, and, therefore, I can make no comment on

13

1   them.

2       The presentations to the board and the

3   presentations, any presentations to management which led

4   to a presentation to the board are, again, highly relevant

5   because they go to the market.  They go to Syngenta's ability

6   to enter the market.  If Syngenta is saying we have not been

7   able to get in and can't get in without this joint venture,

8   that goes right to impact, antitrust impact.

9       If they're saying we're getting, because we don't

10  have a transgenic product out there, we're getting killed in

11  our conventional seeds, that goes right to the market.

12      Counsel has these now.  There's no burden.  They

13  should be produced and we should also have whatever business

14  plans there are.

15      This business is already operating.  My

16  understanding is there is going to be a board meeting of this

17  joint venture that was set up within two weeks.  It is not

18  conceivable that a business would be set up by companies as

19  sophisticated as Syngenta on the one hand and DuPont/Pioneer

20  on the other hand and not have a business plan as to what

21  they're going to do.

22      Now, whether it's -- counsel uses, you know,

23  chooses his words very carefully.  When he says is there a

24  formal business plan, I don't know what the plan is called

25  because I'm not inside that joint venture, but there must be

1    some sort of a plan as to what they're going to do.

2          So, again, I think we should have the

3    presentations.  I think we should have the plan or plans,

4    whatever they are, and I can make no comment on these

5    agreements which we just got this morning and I have not seen

6    and I've just first heard about, your Honor.

7          THE COURT:  All right.

8          MR. MOLL:  As to the agreement, whatever the

9    settlement agreement with Monsanto and Dow, again, counsel

10   did not raise that issue.  It wasn't on the agenda last time

11   until we brought up the joint venture with Pioneer, and then

12   they raised it.

13         Your Honor, there were a number of pieces of

14   litigation between Dow and Monsanto.  Involving Bt in

15   Australia, there was a Federal Circuit appeal.  There

16   was a court case in Indianapolis.  There was an issue that

17   was being litigated on whether Monsanto had a certain gene

18   that related to Herculex.  All of this was settled.  It's

19   a settlement of intellectual property litigation.  And

20   very frequently, as we said last time, in intellectual

21   property settlements, there are licenses and cross licenses

22   that are entered into for the sole purpose of settling the

23   case.

24         There is no business arrangement.  There is

25   nothing other than a settlement with licenses and cross

1  licenses that were entered into, not in the marketplace, not

2  businessman to businessman, but for the purpose of settling

3  worldwide litigation, which was done. And that is not --

4  it's not relevant. They can't introduce them. They can't

5  use them. The settlement is of no value here for any

6  purpose. And, your Honor, for that reason, it should not be

7  produced.

8            As to the Scruggs case, we were here before

9  on the Scruggs case, and it's regrettable we're here

10 again.

11           Syngenta asked for the documents, a large

12 amount of documents on the Scruggs case. We had a hearing

13 before this Court on January 12th, 2006. We argued that the

14 expert reports and materials that went with summary judgment

15 need not be produced. Your Honor disagreed with us. And

16 this is what your Honor ruled at that transcript: "What I'm

17 ordering you to give them, subject to the protective order in

18 this case, is whatever materials the judge looked at in

19 deciding your summary judgment motion and whatever materials

20 the Federal Circuit looked at in deciding its motion or

21 deciding its appeal. You don't have to give them anything

22 else."

23           We have fully complied, fully complied.

24 Whatever was submitted to the Court was produced and I don't

25 believe counsel is arguing otherwise. And whatever went to

16

1  the Federal Circuit was produced.  If there's some other

2  piece of paper that Mr. Elzinger worked on, whatever it is,

3  it it didn't go to the Court, it didn't go to the Federal

4  Circuit, and we have complied and produced exactly what your

5  Honor asked us to produce, and I don't think anyone could say

6  we're not in compliance with the Court's order.

7          Unfortunately, this has become an exercise in,

8  okay, now we have this, let's see what else we can try to

9  get, without an end to any of this.

10          On Project Atlas, again, we were asked to produce

11  the documents from the case.  We did.  We were told in the

12  production of the documents from the case, there was a single

13  page missing from a single document.  We went back through

14  our files to see whether there was a copying error.  We went

15  to the files of the law firm that handled the case.  That's

16  exactly the way the document appears in the case files,

17  exactly the way it was filed for the Court, and we went

18  through the files of both of the law firms.

19          Now counsel wants us to go back and look

20  for a page out of a document that was produced because it

21  was in the Scruggs case that is dated in 1995, as counsel

22  admits, before the production date in this case, January 1,

23  1996, before either of the parties introduced a single

24  transgenic trait, and, indeed, before Syngenta was ever in

25  existence.

1        But every time we produce things and produce

2    what the Court has ordered us to produce, they are going

3    through it and say, now we notice we're missing this and

4    we're missing that, and there will be no end to this.  There,

5    literally, will be no end.  And I don't think counsel can

6    dispute we've produced what we were ordered to produce by the

7    Court.  And we are now here arguing because apparently

8    counsel did not like or is not now satisfied with the Court's

9    decision as far as the Elzinger report is concerned and

10   Project Atlas.

11        And now we're on the simulator and Exhibit 67,

12   and I was under the impression, if counsel was going to have

13   additional information, that information would have already

14   been submitted to the Court on what the parties agreed to.

15        THE COURT:  No.  I asked everyone to bring their

16   papers today and what they were relying on to support their

17   position.

18        MR. MOLL:  Okay.  So I misheard that.

19        Again, what counsel is relying on is his letter

20   of October 17th, 2005 to Mr. Rosenthal, and that's the one he

21   relies on.

22        "Instruction 6:  When a request calls for

23   information in electronic form, the parties have agreed to

24   produce databases to the extent they exist in a file useful

25   by the other side."

1          There's no question that everybody agreed to

2    produce databases because databases had to be produced that

3    way.  Otherwise, they were going to be unintelligible.  We

4    don't dispute that.

5          The documents that counsel is referring to are

6    not databases.  And we have an agreement, your Honor, that,

7    and, again, I'm reading from Mr. Schwed's letter of July

8    28th, 2005.  And his letter says, "With respect to the form

9    of production, the parties agreed that neither party is

10   required to produce native files and that the electronic

11   documents may be produced in TIFF format," and that's exactly

12   what we did.  And as I said last time, they have not only the

13   documents, they have all the data printouts from the

14   documents, they have every single, conceivable document that

15   we have that shows exactly how Monsanto arrived at its

16   prices, the alternatives it considered, every single last

17   piece of data it considered.

18          And, again, we ask -- all we're asking is

19   Syngenta abide by its agreement.  This document was produced

20   to them in January, months ago, pursuant to the agreement,

21   again, that counsel, Mr. Schwed, set out in his own letter.

22          Now, for him to say now these are databases is

23   just not accurate.  It's just not accurate because they're

24   not.  They're completely different and they were produced in

25   accordance with the agreement.  And if we have to keep

19

1  relitigating the agreement and keep relitigating documents

2  that the Court has decided on, there will never be an end to

3  this.

4          We are constantly getting requests now

5  for documents that were created after the production

6  dates.

7          THE COURT:  All right.  This is my problem:  Is

8  that these seem like fairly discrete, not complicated

9  disputes, and it astounds me that you are taking your

10 clients' money and my time to go through them.

11         Just by its very nature, a simulator seems

12 to be something that should be produced in something other

13 than TIFF, so whether it's a database or not, if it's not

14 usable, it's not usable, and it seems to me as though you all

15 shouldn't be fighting over it.

16         But, Mr. Moll, if you are done with your

17 presentation, if you have any additional issues, I am

18 happy to hear them and then I will make my decisions on

19 everything.

20         MR. MOLL:  That's right.

21         Your Honor, if there was a way to produce

22 documents in this case and to finally get to a resolution,

23 we would have done that a long time ago.  I'm not interested

24 in -- I really, and I apologize.  The Court shouldn't be

25 sitting here dealing with this, but regardless of what we

1  did, it was then something else.

2          And, yes, I do have --

3          THE COURT:  All right.

4          MR. MOLL:  I do have some issues.

5          THE COURT:  All right.

6          MR. MOLL:  The last time we were here, we asked

7  for the Garst documents.

8          Again, Garst is -- and they relate to the

9  acquisition of Garst.  And we want those documents because in

10 the complaint filed in this case, Paragraph 133, there's a

11 specific allegation that in April 2004, after learning of

12 Syngenta's acquisition of GA-21, Monsanto renewed its effort

13 to acquire Advanta, which was, in fact, Garst was a part of.

14         Monsanto came in, eventually made an increased

15 offer.  Syngenta bought Garst.  They say they had to pay an

16 increased price for it.

17         This is all part of their allegations of our

18 anticompetitive conduct.

19         We asked for the agreements concerning the deal

20 documents.  We don't have the deal documents.  We still don't

21 have the deal documents.

22         We asked, your Honor, for documents.  If, in

23 fact, you wound up paying more, as your allegation is, where

24 are the documents concerning the negotiation?  We don't have

25 those documents.

21

1            Where are the documents concerning how you had to

2   come up with a higher price?

3            THE COURT:  We're still talking about the Garst

4   documents?

5            MR. MOLL:  That's right.  We don't have them.

6            What we did get is the Hart-Scott-Rodino filing,

7   not by the plaintiff in this case, but by Syngenta AG of

8   Switzerland, because they're the one that bought this

9   company, Garst, that everybody is now complaining about in

10  this case.

11           We don't have the documents, and, again, it goes

12  right to the allegations in their complaint.  We should be

13  entitled to those documents.

14           The final thing that we don't have is we do

15  not have, and this has been denominated between the parties,

16  the extricated load file.  It's a document produced by

17  Syngenta.

18           We are trying to get from Syngenta information

19  that they have on market share by trait and sales data by

20  trait.

21           They say they don't have such data.  It's hard to

22  believe, but if they don't, I would like to get a statement

23  on the record that they don't maintain market share data and

24  sales data by trait, and then we would be satisfied with

25  that.

22

1    Thank you, your Honor.

2    THE COURT:  All right.  Thank you, Mr. Moll.

3    Mr. Schwed?

4    MR. MOLL:  Your Honor, may I give you, just so

5    you have a complete record, the letter of the 28th, which

6    references the agreement?  I don't know if --

7    THE COURT:  I think I have July 28th.

8    MR. MOLL:  Do you have it?

9    THE COURT:  I do.

10   MR. MOLL:  Thank you.

11   THE COURT:  I have July 28, October 17th,

12   February 1, and April 19th.

13   MR. SCHWED:  Yes, your Honor.  The July 28th was

14   the same letter being referenced in both presentations.

15   THE COURT:  All right.

16   MR. SCHWED:  Just briefly, on the Pioneer

17   acquisition, I think there's one thing that is worth

18   explaining here.  Unlike other joint ventures, where you have

19   a newly formed entity that, of course, in order for it to be

20   formed and start operating, you have to say, well, the two

21   joint ventures have to figure out the business plan, what

22   it's going to be doing.

23   The fact is it was Greenleaf Genetics on the day

24   before the agreement with Pioneer as a division of Syngenta.

25   The day after the agreement or whatever day it was signed, it

1    was Greenleaf Genetics LLC, and what it was doing the day

2    after the agreement is exactly what it was doing the day

3    before the agreement, which was licensing Syngenta Genetics

4    and Syngenta Agrasure trait.

5              So I understand that in many cases, you could

6    say how could you form a joint venture without knowing what

7    the joint venture is doing.  The fact is the joint venture is

8    just continuing operating for now.

9              What is significant about the Pioneer deal, it's

10   a forward looking deal.  And among other things, there's this

11   GAT technology, which is an alternative glyphosate tolerant

12   trait, and this joint venture will have the ability in 2009,

13   or some later date, to license that trait.

14             And that's why, while Mr. Moll may be right, that

15   in most instances you could not form a joint venture with a

16   lot of things happening that probably have not happened in

17   this case, and that's why, as far as I'm aware, as I said,

18   we're going to go back and figure out, but as far as I'm

19   assured, it's not as if the two joint ventures, Pioneer and

20   Syngenta, 50/50, entered this as a business plan.  This is

21   the business plan for the next five years for Greenleaf

22   genetics LLC.  That may explain the context of documents we

23   will and won't find.

24             THE COURT:  All right.  As far as that issue is

25   concerned, it's my understanding that you have not refused to

1    produce the business plans, you just have not found any yet.

2    The presentations, you did find two documents, and you are at

3    this point, you have not at this point produced them and at

4    this point are saying you don't think they ought to be

5    produced?

6                    MR. SCHWED:  Yes, your Honor.

7                    THE COURT:  All right.

8                    MR. SCHWED:  In terms of the Dow, the Dow issue,

9    just to clarify, the day before the last conference, a

10   witness was instructed not to answer any questions on Dow,

11   so this is not as if it is an issue that has been around

12   forever and we've just been sitting on.  It was obviously a

13   timely issue, and I just want to highlight that, although the

14   agreements may have been between two parties that litigated,

15   what Mr. Moll didn't say is that there are independent

16   standalone agreements, and that's exactly what is at issue in

17   this case:  Monsanto's license agreements with seed

18   companies.  Dow means Mycogen, which is one of the biggest

19   seed companies out there, and the terms of that license

20   agreement is essential, are essential, to understanding this

21   market and our claims.

22                    Again, this isn't like a patent dispute,

23   where you're just giving somebody the rights to the

24   patented technology.  There's an independent license of

25   Monsanto's traits to Dow, as we understand it, what I

1  think I heard.  We want to know what are the terms of

2  that business arrangement.  Because it has to come out

3  of a settlement arrangement doesn't make it immune from

4  antitrust review.

5          THE COURT:  And if I can understand your argument

6  a little better, what you just said was that regardless of

7  its origins, any business arrangements like this affect the

8  market and have some relevance to what the market is

9  vis-a-vis the standards for the antitrust case?

10         MR. SCHWED:  Yes, your Honor.

11         THE COURT:  All right.

12         MR. SCHWED:  Yes.  Particularly a license

13  agreement for traits, which I think is probably at issue

14  here.

15         THE COURT:  All right.

16         MR. SCHWED:  The third issue, just briefly, is on

17  Scruggs.  They kept saying we got what we ordered.  That's

18  what we asked for because, as I said, we were doing it in a

19  reasonable approach, and the fact that it was 1995 is --

20  before traits were on the market, this document is clear.

21  This is Monsanto's master plan for dominating the traits

22  markets with exclusivity and what we want is the missing page

23  from the master plan.  It's still in effect today, your

24  Honor.

25         And then, finally, with the issues Mr. Moll

26

1   raised, the Garst documents, just to clarify, we have

2   produced everything we have with one exception, which was

3   outlined in a letter to Howrey's law firm on Friday, when we

4   produced the documents.

5          There is one -- you know, one set of documents

6   that apparently were in Garst's possession, and as I

7   understand it, the owner of Garst, the former owner of Garst,

8   who sold Garst to Syngenta, is saying, we may have ownership

9   rights in these documents.

10         And what we have done is we've reviewed the

11  documents, we are prepared to produce them, but we don't want

12  to run afoul of any ownership rights or confidentiality

13  rights or any other privilege rights that the former owners

14  of Garst may have.

15         And what I would propose, I understand your Honor

16  has done, in other instances, is you set an order that says

17  you must produce them within two weeks or some amount of

18  time, where we will provide the former owners of Garst, and

19  I've been in contact with them, telling them that this is

20  what I thought would happen.

21         We reviewed them over the weekend.  We could

22  today provide them a copy of everything that we are ready,

23  willing and able to produce, and if your Honor sets a date

24  and says produce it by X date, whatever date that is, if

25  and unless the owners of, the former owners of Garst want --

1    are -- unless they come in to Court and seek relief.

2            The two things that their counsel represented to

3    me, and he said, look, I have not seen the documents, I'm not

4    sure what's in there, but if it's what I think it is, of

5    particular concern, and might prevent them from having to

6    come in to Court is, one, that it be on an outside-counsel

7    basis only, and, two, that to the extent there were other

8    bidders for Garst in competition with Syngenta, that just the

9    names of those bidders, who are independent bidders, other

10   than, say, Syngenta or Monsanto, that the names of those

11   bidders who were independent be redacted.

12           And just for the record, the former owner, I

13   believe it is AstraZeneca and there's another entity.

14           So what we would propose, we provide them with

15   documents with an order from your Honor that says within X

16   days, they -- we will produce them or they would have to come

17   in to the Court.

18           And as I said, that's the only Garst documents

19   that I am aware of that have been requested and not

20   produced.

21           MR. MOLL:  Your Honor, I would like to -- if I

22   could have a minute on that last point.

23           THE COURT:  Well, you'll be allowed to talk

24   before we leave.

25           MR. MOLL:  Thank you, your Honor.

29

1          THE COURT:  But not until Mr. Schwed was done.

2          MR. MOLL:  Fine.  I didn't know if he was done.

3          MR. SCHWED:  The only other issue is the

4   extricated load file.  As I said, I'm not aware of any market

5   share by trait and sales data by trait data that has not been

6   produced.

7          I'm willing to go back and recheck one

8   more time.  If there's anything, I'm not aware of any

9   deponent.

10         Last week, I was not defending them, so I don't

11  know what they said, but we had two of our key, what I will

12  call beta-type people, who were deposed.  I don't know what

13  they said.  Obviously, we're not withholding anything on that

14  and I would be happy to redouble our efforts to look for

15  them, although I don't believe -- I'm not aware of anything

16  in that area.

17         Thank you.

18         THE COURT:  All right.  And with respect to the

19  simulator in Exhibit 67, I just wanted to make sure I

20  understand that there's some dispute -- well, if I am

21  actually looking at these documents, are you basically

22  saying, Mr. Schwed, that you understand that this simulator

23  in Exhibit 67 is not databases, but there was another

24  exception to this agreement that these come under because

25  they can't readily be used or serve any purpose unless they

29

1   are produced in native format?

2           MR. SCHWED: I'm not an IT person to know exactly

3   what is a database, but I think at least some of them, the

4   documents we're asking for were Excel spread sheets. Both

5   sides have produced Excel spread sheets under the part of

6   this that says databases. I don't think, until I was

7   standing here today, I ever heard in any case such a

8   hypertechnical reading of the word database. I'm sure there

9   are a lot of IT people that have a lot of different

10  meanings.

11          I think, by all accounts, anybody involved would

12  have to say that this is the type of document that everybody

13  would have understood and the context of those letter

14  agreements obviously would be considered a database or

15  otherwise producible because it makes, as your Honor

16  correctly said, makes no sense to produce it otherwise.

17          THE COURT: All right. Thank you, Mr. Schwed.

18          MR. SCHWED: Thank you.

19          THE COURT: All right. Mr. Moll?

20          MR. MOLL: Your Honor, on the Garst, there was an

21  acquisition of Garst. It's a matter of public record. It's

22  alleged in the complaint there must be deal documents.

23          THE COURT: He said he has produced documents.

24          MR. MOLL: We don't have it. He said he has

25  produced documents, but he didn't say he produced the deal

30

1  documents.

2          Unless they can tell me a Bates number where they

3  are, we don't have the deal documents.  We don't.  And this

4  notion that Syngenta could have an acquisition -- have an

5  allegation in Paragraph 123 of their complaint that it was

6  because Monsanto made an offer that that drove the price up

7  and they had to pay more for it, but if they have documents

8  that apparently are at Garst that have the names of other

9  bidders in them, who may well have affected the price, we're

10  entitled to those names.

11          THE COURT:  Well, I have to say, Mr. Moll, you,

12  as always, are arguing beautifully, but I'm not competent

13  that we have a dispute of that kind.  From what Mr. Schwed

14  said, he produced documents except for one set that the

15  former owners might have some interest in.

16          If there is really a dispute about whether the

17  deal documents have been produced or whether they are

18  relevant, Mr. Schwed -- I mean, tell me before we get off

19  into an issue that really isn't in dispute.

20          Have the deal documents been produced?

21          MR. SCHWED:  Your Honor --

22          THE COURT:  Whatever that means?

23          MR. SCHWED:  To be perfectly frank, I don't know

24  the answer to that.  I know that we have not withheld the

25  deal documents.  This is the first that I've heard that this

1  was an issue that was going to be raised today.  The only

2  issue that I knew that was out there where there was an issue

3  was this one set of documents that we didn't produce on

4  Friday.  This is the first I've heard that there's some other

5  set of documents.

6          Again, I know that we did not withhold any deal

7  documents.

8          MR. MOLL:  Here's the problem, your Honor, and I

9  know your Honor is in no position right now to determine

10 whether or not they've produced the deal documents or not.

11 Mr. Schwed probably doesn't know.

12         This is the -- we made the request for these

13 documents the last time we were here.

14         THE COURT:  Well, it must have been the time

15 before that because I don't see it in the last transcript.

16 But the Garst documents do seem familiar to me.

17         MR. MOLL:  Right.  The problem is that I hope

18 we're not playing a shell game here because Mr. Schwed keeps

19 saying we produced the documents that we have.  If they have

20 an allegation here that we somehow interfered with the

21 acquisition of Garst and the entity that filed the

22 Hart-Scott-Rodino on the allegation on that acquisition was

23 not Syngenta Seeds, it was Syngenta AG over in Switzerland,

24 on the very acquisition they are complaining about.

25         If those documents that they're -- that relate to

32

1    the negotiations and the deal are sitting over in

2    Switzerland, then they either, your Honor, have to produce

3    those documents or they have to drop that allegation out.

4    They can't have it both ways, and I think that's exactly

5    what's going on here.

6            THE COURT:  Okay.  I agree.

7            MR. MOLL:  I'm not going to comment on Monsanto's

8    master plan.  I'm not going to answer those kinds of

9    allegations.  We gave him all the documents from those

10   cases.  They came in and asked for the documents from the

11   case.  We gave them all the documents we were ordered to

12   produce.

13           We gave them every last little thing, and to

14   satisfy ourselves that it wasn't a mistake in our files, we

15   went back and searched and went through the files of the

16   other law firms that were involved.  They have the complete

17   records of those cases, everything the District Court had,

18   everything the Federal Circuit had that we were ordered to

19   produce.

20           And, again, I don't know how much clearer I can

21   be, but counsel keeps saying that there's a separate business

22   arrangement as part of this Dow/Monsanto settlement, and

23   there is no separate business arrangement.  There is a

24   settlement of a lawsuit.

25           Yes, frequently, as I think the Court is well

1   aware, when patent cases and other kinds of intellectual

2   property cases are settled, there is cross-licensing as part

3   of the settlement.  It does not go to what's going on in the

4   marketplace.  It doesn't go to the value of what's going on

5   in the marketplace.

6           THE COURT:  It has to affect the marketplace,

7   doesn't it?  When you've got two big players in a relatively

8   narrow market that enter into an agreement for an ongoing

9   business relationship, that's got to affect the market,

10  doesn't it, whether or not it's kind of a free market --

11  whether or not they entered into the agreement purely because

12  they wanted to do business or whether they entered into the

13  agreement to resolve a dispute still has to have some effect

14  on the market, I would think.

15          MR. MOLL:  Well, your Honor, settlement

16  agreements are not discoverable.

17          THE COURT:  Well, I'm not asking for a settlement

18  agreement.  On occasions in the past, I never ordered

19  production of settlement agreements.  What I do order

20  production of on occasion are the license agreements, the

21  actual ongoing business documents that the parties are going

22  to use in the future to conduct their business relationship

23  that affects their business relationship.  There's a

24  difference between the two.

25          Now, if you are telling me there are no license

34

1    agreements and all there is is a settlement agreement, that's

2    one thing.  If you are telling me that because of the

3    settlement agreement, there are license agreements, that's

4    something else.

5            MR. MOLL:  What I'm telling you, your Honor, is

6    that as part of the settlement, there were licenses, cross

7    licenses.  Whether or not they were part of the settlement

8    document, I don't know the answer to that question.  But I do

9    know there were cross licenses on a worldwide basis through a

10   number of different products, some of which have no relevance

11   to this case and certainly on a worldwide basis have no

12   relevance to the case.

13           Now, counsel is talking about, well, there's some

14   sort of separate business arrangement with Mycogen, which is

15   Dow's seed company.

16           Again, I don't know where that came from, but I'm

17   not aware of any separate business arrangement with Mycogen.

18   Certainly, if it's relevant and it relates to the products

19   here and it comes within the relevant period of time and we

20   have a business arrangement with Mycogen that's relevant, I'm

21   not trying to not produce that.  What I'm trying to do is not

22   produce the settlement and the cross-licensing agreements

23   that go with the settlement.

24           Again, the very fact that they're cross-licensing

25   agreements that settle litigation are -- and the only thing

35

1    those licensing agreements can have, if products are being

2    licensed, cross licensed, is to, in effect, open the market

3    up.

4            THE COURT: Well, on Page 9 of the transcript

5    from the last time, I basically said, "If you all can't

6    clean up the loose ends of your document production, here

7    we are into depositions. You are going to end up coming

8    here with the documents in hand and I will make decisions

9    on that."

10           Now, no one, I assume, brought these documents

11   that are still disputed. I don't, frankly, want to see you

12   again, so you are left with my decision without seeing any

13   documents.

14           I just want to let you know that I will get a

15   decision out by the end of the day on all of these issues.

16   All right?

17           Mr. Moll, anything else on any of your other

18   issues?

19           MR. MOLL: No. But the other point I would make

20   is, it is -- there is a vast difference between all these

21   other documents that are electronic and databases and there

22   has never been an issue about databases and no one has ever

23   had a problem. No one has ever been in here yelling about

24   databases.

25           What we have now is Syngenta is trying to go

1    back on, and Mr. -- really, counsel can't sit here and say,

2    I really don't know what a database is.  You know, a data --

3    databases are specific things and there has never been an

4    issue on the production of these database documents because

5    if you don't produce them a certain way, they're jibberish

6    and you can't read them.

7              That's not the situation here.  The situation

8    with this simulator is that there were all sorts of scenarios

9    run and every single last one of them was printed out and

10   given to them and every single last bit of data that was

11   generated was given to them.  All the information that

12   Monsanto had when it made its decision was given to them in

13   exactly the form that Monsanto had it, so they could do

14   exactly what Monsanto could have done with it.

15             It is not a database, and, really, it's not

16   really reasonable to say, well, it's sort of -- you know, I

17   didn't really know what a database is and it sort of is

18   electronic, so it must be.  That's really not the way this

19   has been done.

20             THE COURT:  All right.  Thank you.

21             MR. SCHWED:  Your Honor, may I just briefly

22   say --

23             THE COURT:  No.  I've certainly heard enough.

24             MR. SCHWED:  All right.

25             THE COURT:  Okay.  By the end of the day, I will

37

1   get something out.

2           MR. SCHWED:   Thank you.

3           MR. MOLL:   Thank you.

4           (Hearing concluded at 2:53 p.m.)

5                   - - -

# EXHIBIT 10

SEP 02 2005 16:48 FR S&S LLP          2025088102 TO 12682#32186#0000 P.02

# SHEARMAN & STERLING LLP

FAX: 202-508-8100
www.shearman.com

801 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, D.C. 20004-2604
202 508-8000

ABU DHABI
BEIJING
BRUSSELS
DÜSSELDORF
FRANKFURT
HONG KONG
LONDON
MANNHEIM
MENLO PARK
MUNICH
NEW YORK
PARIS
ROME
SAN FRANCISCO
SAO PAULO
SINGAPORE
TOKYO
TORONTO
WASHINGTON, D.C.

WRITER'S DIRECT NUMBER:

(212) 848-5445

WRITER'S EMAIL ADDRESS:
rschwed@shearman.com

September 2, 2005

<u>Via Facsimile and U.S. Mail</u>

John J. Rosenthal, Esq.
Howrey Simon Arnold & White, LLP
1299 Pennsylvania Ave., N.W.
Washington, DC 20004

Dear John:

This letter responds to your August 22, 2005 letter concerning Syngenta's first request for production of documents. As set forth below, there are several open issues you have failed to address adequately and there is a significant amount of information that you agreed to provide but thus far have failed to supply. Given that these items have been outstanding for more than a month, we ask that you provide this information no later than September 7. In addition, we remind you that these discussions do not affect Monsanto's obligation under the Scheduling Order to complete its document production by October 21, 2005. In that respect, please let us know when to expect receiving documents from Monsanto.

## General Objections

**General Objection No. 4:** On July 21, 2005, you agreed to provide to us, within one week, a proposal identifying the custodians you proposed to include in your document search and the custodians and/or departments you proposed to exclude from the search. On August 31, 2005, you orally identified certain custodians you proposed to include in the search and certain custodians you proposed to exclude from the search. As we indicated to you, we could not make a meaningful assessment of your proposal without additional organization charts, which you agreed to provide. We ask that you send us all organizational charts as soon as possible, and in any event no later than September 7, so that we may consider your position sufficiently in advance of the September 19, 2005 discovery conference.

*Shearman & Sterling LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.*

SEP 02 2005 16:48 FR S&S LLP                2025088102 TO 12682#32186#0000 P.03

John J. Rosenthal, Esq.
September 2, 2005
Page 2

General Objection No. 9:  As promised, we sent you a draft protective order on August 29, 2005.  Again, the fact that such order is not yet in final form does not constitute a basis for withholding proprietary or confidential information.

General Objection No. 18:  In your August 22 letter summarizing Syngenta's responses and objections to Monsanto's document requests, you address the production of research and development documents.  We have agreed that both parties may exclude all underlying scientific and technical documents (e.g., data books and other purely scientific data) and production documents (e.g., field studies), but will produce responsive summaries, presentations and analyses of research, development, and production documents.

## Definitions and Instructions:

Definition No. 14:  For the reasons set forth in our letter of July 28, 2005, we disagree that claims concerning Monsanto's bundled Licensee Incentive Agreement are moot. Accordingly, we repeat our request for documents concerning soybeans and CRW-resistant corn traits as outlined in our July 28 letter.  We address your concerns regarding individual requests as follows:

- Request No. 8:  We have asked for competition documents, including documents concerning soybeans and CRW-resistant corn traits.  Monsanto maintains that this is far too broad, and invited us to make a proposal concerning this request.  We are willing to limit this request as it relates to soybeans and CRW-resistant corn traits to documents responsive to sub-requests (iii) and (iv).

- Request No. 21:  We discuss this request below.

- Request Nos. 22-24:  We do not agree with the limitations you have proposed. We are entitled to all relevant documents for soybean and CRW-resistant traits as set forth in the discussion of these requests in our July 28 letter.

Instruction No. 6:  As stated in our July 28 letter, Syngenta has agreed to produce databases, to the extent they exist, in a form usable to the other side.  You have failed to confirm whether Monsanto will agree to do the same.

Instruction No. 14:  You assert that Monsanto will only produce documents created on or after January 1, 1996.  Syngenta maintains its position that documents dated prior to January 1, 1996 are relevant to this litigation.  Therefore, we insist that the relevant time period for the document collection is January 1, 1995 to May 27, 2005, the date Syngenta's served its document requests.

SEP 02 2005 16:49 FR S&S LLP          2025088102 TO 12682#32186#0000 P.04

John J. Rosenthal, Esq.
September 2, 2005
Page 3

**Specific Requests:**

**Request Nos. 5, 8, 11, 15, 18, 25-27, 30:** We are confused about your response to these requests. During our lengthy meet and confer discussions, you indicated that Monsanto would produce all documents responsive to these requests so long as the parties agree to limit the custodian search. Now, you state that this is not correct, but fail to explain what, if any, additional concerns you have or to make a proposal concerning Monsanto's response to specific requests. We ask that you identify which of these requests you intend to withhold documents from even if we come to an agreement concerning the number of custodians involved, and provide a meaningful proposal concerning any such request.

**Request Nos. 1-2:** Monsanto has agreed to produce organizational charts for corn seeds and traits only. Monsanto also should produce organizational charges for soybean traits. Syngenta otherwise agrees to this limitation, but reserves the right to request additional documents responsive to this request. Also, please confirm that by imposing this limitation, you do not intend to withhold organizational charts for any division or group involved in or responsible for research and development, testing, auditing of sales, purchasing, distribution, legal, management or finance for corn or soybean seeds or traits.

**Request No. 4:** Monsanto has agreed to produce requested documents as they relate to brokers, dealers and retailers. However, you have stated that Monsanto will produce documents concerning growers <u>only if</u> this information exists in database form. This is unacceptable. This request is not overly burdensome since it is limited to "documents sufficient to identify." We insist that Monsanto produce responsive information sufficient to show, regardless of whether it is kept in a particular database.

You also stated that you have some information for some years in databases. However, you have not told us: (i) whether the requested information is kept in a database; (ii) if it is not kept in a database, exactly how such information is maintained; and (iii) whether the requested information is available on a monthly basis. You agreed to provide us with this information more than a month ago, but we still have not received this information. Please provide us this information by September 7.

**Request No. 6:** Monsanto has agreed to produce "top-level cost information" that is kept electronically. However, you have not explained what you mean when you refer to "top-level" cost information; nor have you explained what type of cost information Monsanto maintains electronically. Without a clear understanding of what "top-level" cost information consists of, and what types of databases Monsanto maintains, we cannot accept your response. During our meet and confer session on August 31 you agreed to provide us with this information. Please provide this information by September 7.

**Request No. 7:** We do not understand your position on Request No. 7. Whether Syngenta is producing GA21 in Latin America is not relevant to whether Monsanto must produce documents concerning imports and exports. Indeed, Monsanto did not request this

John J. Rosenthal, Esq.
September 2, 2005
Page 4

information and you indicated during one of our meet and confers that you did not intend to request import/export data from Syngenta. As for Monsanto's production, you agreed to produce documents regarding competition in the U.S. that also mention imports and exports. We agreed to this limitation. Please confirm that Monsanto intends to produce such documents.

    <u>Request No. 12:</u> We will review your list once it is received.

    <u>Request No. 13:</u> We agree with your proposal provided that the documents listed in your August 22 letter include all documents that analyze or reflect the impact on competition or any competitor or other bidder from any such acquisition, attempted acquisition, equity investment, divestiture, joint venture, alliance, collaboration or licensing of technology.

    <u>Request No. 16:</u> Monsanto has agreed to produce documents sufficient to show a licensing or purchase arrangement as it relates to corn seeds or traits as a result of settlement agreements subject to confidentiality rights of third parties. We agree to your proposal; however, we also insist that Monsanto produce the settlement agreements themselves. Please confirm by September 7 that Monsanto will produce these documents.

    <u>Request No. 17:</u> You did not address this request in your letter. In our July 28 letter, Syngenta agreed to exclude all transactional documents and to limit this request to documents from January 1, 2000 to the present. We are still waiting for you to tell us whether Monsanto agrees to this proposal.

    <u>Request No. 20:</u> In previous meet and confer sessions, Monsanto agreed to produce all documents responsive to this request.

    <u>Request No. 21:</u> You maintain that this request is burdensome. However, as set forth in our July 28 letter, during our meet and confers you agreed to tell us what type of information Monsanto keeps in its customer files so we could re-evaluate this objection. We have yet to receive this information. Please provide us with this information by September 7.

    <u>Request Nos. 22-24:</u> We stand by our position set forth in our July 28 letter.

    <u>Request No. 28:</u> You did not address this request in your letter. During our teleconferences, you agreed to produce exemplars of agreements, promotional materials, payments and correspondence for those custodians identified as part of any agreement limiting Monsanto's search by custodian. However, Monsanto maintained its objection to producing any internal communications that summarize calls, letters, or other communications responsive to this request. Again, Syngenta will not agree to these limitations, but nevertheless proposes to limit this request to all documents concerning communications between Monsanto and any broker, dealer, wholesaler, distributor, or like person concerning any relevant product from January 1, 2000 to the present. We need to know whether Monsanto agrees to produce responsive documents subject to Syngenta's proposal.

John J. Rosenthal, Esq.
September 2, 2005
Page 5

    **Request No. 31:** Monsanto maintains that it will produce all documents responsive to this request subject to an agreement on the number of custodians involved in the production. If the parties agree on the scope of Monsanto's custodian search, Syngenta agrees with this proposal.

    **Request No. 32:** You did not address this request in your letter. As we stated in our July 28 letter, Syngenta will limit this request to documents sufficient to show the requested information as it relates to biotechnology corn traits that are actually sold. Please confirm whether Monsanto will produce responsive documents subject to this limitation.

    **Request No. 34:** You agreed to confirm that Monsanto will provide a list of patent lawsuits concerning actual and potential competitors, provided that Syngenta provides the same list. We will let you know whether Syngenta agrees to this proposal in our next meet and confer teleconference.

    **Request No. 38:** Your letter suggests that we agreed to limit this request to documents showing Monsanto's antitrust compliance policy and training on that policy. We have never agreed to this limitation, and we will not accept it now. We want all documents relating to compliance with any policy as well as training for those policies.

*************************

    Again, we request that you provide all outstanding information and responses to the above issues no later than September 7. We await your prompt response.

Very truly yours,

Richard Schwed

cc:   Richard L. Horwitz, Esq. (via facsimile)
       Peter E. Moll, Esq. (via facsimile)
       Kenneth A. Letzler, Esq. (via facsimile)
       John W. Shaw, Esq. (via facsimile)



# SHEARMAN & STERLING LLP

**Washington, D.C.**
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2604
Telephone: (202) 508-8000

FAX NUMBERS

(202) 508-8100
(202) 508-8101
(202) 508-8102

# FAX COVER SHEET

## September 2, 2005

| Fax Recipient(s) | | | | |
|---|---|---|---|---|
| *Name* | *Firm* | *Location* | *Fax Number* | *Office Phone* |
| John J. Rosenthanl, Esq. | Howrey Simon Arnold & White, LLP | | 202/383-6610 | 202/383-7234 |

**From**

Name: Heather Lamberg Kafele
Telephone: 202/508-8097
Fax Number: 202/508-8100

Pages transmitted (including cover sheet): 6

**Comments:**

2005 SEP -2 PM 4:53

Confidentiality Note: The information transmitted in this facsimile message is sent by an attorney or his/her agent, is intended to be confidential and for the use of only the individual or entity named above. If the recipient is a client, this message may also be for the purpose of rendering legal advice and thereby privileged. If the reader of this message is not the intended recipient, you are hereby notified that any retention, dissemination, distribution or copy of this telecopy is strictly prohibited. If you have received this facsimile in error, please immediately notify us by telephone and return the original message to us at the address above via the mail service (we will reimburse postage). Thank you.

Please note the total number of pages to be transmitted. If you do not receive
the number indicated, please call the Communications Department at (202) 508-8017.

Shearman & Sterling LLP is a limited liability partnership organized in the United States under
the laws of the State of Delaware, which laws limit the personal liability of partners.

# EXHIBIT 11

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 12

syngenta



GROWING
POTENTIAL

**Financial highlights**

➢ Sales up 11 percent to $8.1 billion, + 9% CER[1]

➢ Earnings per share[2] up 31 percent to $7.67

➢ Free cash flow[3] $703 million

➢ Dividend increased 22 percent to CHF 3.30[4]

➢ 2006 cash return $800 million[5]: dividend, share repurchase via put option

## Financial summary

| | Excluding restructuring, impairment and discontinued operations[6] | | | | | As reported under IFRS[6] | | |
|---|---|---|---|---|---|---|---|---|
| | 2005 $m | 2004 $m | 2003 $m | 2005 vs 2004 Actual % | CER[1] % | 2005 $m | 2004 $m | 2003[7] $m |
| Sales | 8 104 | 7 269 | 6 525 | +11 | +9 | 8 104 | 7 269 | 6 525 |
| Net income[8] | 779 | 623[9] | 340 | +25 | | 622 | 460 | 248 |
| Earnings per share | $7.67 | $7.19 | $3.34 | +7 | | $6.13 | $4.34 | $2.43 |
| Earnings per share[2] *before one-off tax credit* | $7.67 | $5.87 | $3.34 | +31 | | | | |
| Recommended dividend per share[4] (CHF) | 3.30 | 2.70 | 1.70 | | | | | |

### Crop Protection: sales[10] by region



| | 2005 $m | 2004 $m | Actual % | CER[1] % |
|---|---|---|---|---|
| ● EAME | 2 274 | 2 251 | +1 | -2 |
| ◉ NAFTA | 2 069 | 1 869 | +11 | +9 |
| LATAM | 1 026 | 1 017 | +1 | +1 |
| ○ APAC | 938 | 893 | +5 | +4 |
| Total | 6 307 | 6 030 | +5 | +3 |

### Seeds: sales by region



| | 2005 $m | 2004 $m | Actual % | CER[1] % |
|---|---|---|---|---|
| ● EAME | 699 | 641 | +9 | +4 |
| ◉ NAFTA | 903 | 437 | +107 | +106 |
| LATAM | 107 | 86 | +24 | +24 |
| ○ APAC | 88 | 75 | +17 | +15 |
| Total | 1 797 | 1 239 | +45 | +42 |

EAME – Europe, Africa, Middle East; NAFTA – USA, Canada, Mexico; LATAM – Latin America; APAC – Asia Pacific

1  Growth at constant exchange rates, see p30
2  EPS on a fully-diluted basis, excluding restructuring, impairment and discontinued operations, and before a one-off tax credit.
   EPS growth excluding IFRS3 goodwill adjustment, 20 percent
3  Before pension fund injection of $350 million. For a definition of free cash flow, see p30
4  Subject to shareholder approval at the Annual General Meeting on April 19, 2006
5  The exact amount will depend upon the closing share price on February 21, 2006
6  The amounts including restructuring and impairment are reported in accordance with International Financial Reporting Standards (IFRS).
   The impact of restructuring, impairment and discontinued operations in 2005 is $157 million on net income (2004: $302 million)
7  2003 comparative figures have been adjusted to apply retroactively the change in accounting policy for financial asset impairment.
   See note 2 to the consolidated financial statements in the Financial Report 2005.
8  Net income to shareholders of Syngenta AG
9  Net income before one-off tax credit
10  Third party sales excluding inter-segment sales to Seeds

# EXHIBIT 13



*The miracles of science*™

**Sustainable Growth Through Science**
**2005 Annual Review**

# DuPont Corporate Highlights

(dollars in millions, except per share)

| Operating Results | 2005 | 2004 |
|---|---|---|
| Net Sales | $26,639 | $27,340 |
| Net Income | $2,053 | $1,780 |
| Depreciation and Amortization | $1,358 | $1,347 |
| Capital Expenditures | $1,406 | $1,298 |
| Research and Development Expenses | $1,336 | $1,333 |

| Financial Position, Year End | | |
|---|---|---|
| Total Assets | $33,250 | $35,632 |
| Net Debt* | $6,329 | $2,949 |
| Stockholders' Equity | $9,907 | $11,377 |

| Data Per Common Share | | |
|---|---|---|
| Net Income — Diluted | $2.07 | $1.77 |
| Dividends | $1.46 | $1.40 |
| Market Price Range | $54.90 – 37.60 | $49.39 – 39.88 |

| General | | |
|---|---|---|
| Average Shares of Common Stock Outstanding (millions) | 989 | 1,003 |

*The company defines net debt as total debt less cash and cash equivalents and marketable debt securities. A reconciliation of total debt to net debt can be found in Part II, Item 7 of the company's 2005 annual report on Form 10K.

This publication contains forward-looking statements based on management's current expectations, estimates and projections. All statements that address expectations or projections about the future, including statements about the company's strategy for growth, product development, market position, expected expenditures and financial results are forward-looking statements. Some of the forward-looking statements may be identified by words like "expects," "anticipates," "plans," "intends," "projects," "indicates," and similar expressions. These statements are not guarantees of future performance and involve a number of risks, uncertainties and assumptions. Many factors, including those discussed more fully in documents filed with the Securities and Exchange Commission by DuPont, particularly its 2005 Annual Report on Form 10-K, as well as others, could cause results to differ materially from those stated. These factors include, but are not limited to changes in the laws, regulations, policies and economic conditions, including inflation, interest and foreign currency exchange rates, of countries in which the company does business; competitive pressures; successful integration of structural changes, including restructuring plans, acquisitions, divestitures and alliances; cost of raw materials, research and development of new products, including regulatory approval and market acceptance; and seasonality of sales of agricultural products.

providing more sustainable solutions. For example, we are partnering with Environmental Defense to develop a system to manage potential risks associated with nanotechnology. We have also worked with the World Resources Institute and the Pew Center on climate change issues.

## Recognition for Our Accomplishments

As we pursue sustainable growth through science-based innovation, our accomplishments have brought us the kind of recognition that makes DuPont a benchmark company in key areas. An independent panel of experts assembled by DuPont the BusinessWeek magazine named DuPont the top green company of the past decade for our greenhouse gas emissions reductions and our leadership. We were awarded the Black Pearl Award by the International Association for Food Protection for our efforts in advancing food safety and quality. Scientific American 50, a list of the leaders shaping the future of technology, for our work in nanotechnology.

In this Review, we also have invited two distinguished outside experts to reflect on science and sustainable growth from their unique perspectives. Dr. J. Craig Venter led the team that sequenced the human genome and is today pursuing the exciting field of synthetic genomics. Dr. Florence Wambugu is CEO of Africa Harvest and is working at the leading edge of programs to achieve sustainable economic growth through science in developing countries of Africa.

We are proud of the leadership roles our people and businesses demonstrated in 2005. We believe that our contributions as a 21st century science company will continue to benefit our customers and consumers on a world stage, offer outstanding growth opportunities, and create value for our shareholders.

*Chad Holliday*

Chad Holliday
Chairman & CEO
March 1, 2006



DuPont senior researcher John P. O'Brien converts sugar and water into a polysaccharide that can be made into novel fibers using an industrial biotechnology process that resolved the 7 millionth U.S. patent.

# EXHIBIT 14

 **NEWS RELEASE** 

BUREAU OF ECONOMIC ANALYSIS
U.S. DEPARTMENT OF COMMERCE

EMBARGOED UNTIL RELEASE AT 8:30 A.M. EDT, THURSDAY, October 26, 2006

Clifford Woodruff:  (202) 606-9234                              BEA 06-47
E-mail inquiries:     gdpbystate@bea.gov

### Services and Goods Sectors Contribute to Strong Growth
### in Gross Domestic Product (GDP) by State in 2005
*Advance Estimates of GDP by State for 2005 by NAICS Sector*

Newly available data on the 2005 state distribution of GDP, released today by the U.S. Bureau of
Economic Analysis, showed that private services-providing industries accounted for more than
80 percent of real growth in the Great Lakes, Mideast, Plains, and New England regions (chart
1).[1] In 2005, real U.S. growth in the services and goods sectors remained strong. Private
services-providing industries grew 4.1 percent, and private goods-producing industries grew 2.6



Chart 1. Contribution to Percent Change in Real GDP by State, 2004-2005

---

[1] The 2005 estimates draw heavily on the 2005 revised state earnings-by-industry estimates released on September
26, 2006.
* Goods-producing industries excluding durable goods.
** Services-providing industries excluding FIRE.
FIRE  Finance, insurance, real estate, rental, and leasing.

percent. Overall, real U.S. GDP by state grew 3.6 percent in 2005, compared with the 1997–2004 average annual growth rate of 3.1 percent (chart 2).

> As of this release, the Bureau of Economic Analysis (BEA) is changing the name of its gross state product (GSP) series to gross domestic product (GDP) by state. This series, as of the December 2004 comprehensive revision, is consistent with the national measure of GDP. The new name, GDP by state, is also consistent with terminology used by statistical agencies in most other developed countries.

**Chart 2. Growth Rates in Real GDP by State, 1997-2005**



■ Average annual growth rate, 1997-2004          ▨ Percent change, 2004-2005

## States and Regions

The Southwest and Rocky Mountain regions grew the fastest in 2005 (5.2 percent). Growth in private services-providing industries slightly outpaced growth in private goods-producing industries (5.7 percent to 5.0 percent in the Southwest region, 5.7 percent to 5.3 percent in the Rocky Mountain region). Within the Southwest, Arizona posted the strongest growth (9.1 percent)—the fastest in the Nation (chart 3). The only state in the Rocky Mountain and Southwest regions with slower growth than the Nation was Oklahoma (3.3 percent).

The Great Lakes region experienced the slowest growth in 2005 (1.3 percent). Private services-providing industries (2.2 percent growth) performed much better than the private goods-producing industries (0.8 percent decline).

Chart 3. Percent Change in Real GDP by State, 2004-2005



U.S. Bureau of Economic Analysis

## NAICS Industry Sectors[2]

The two NAICS sectors with the largest contributions to growth were finance and insurance, and professional and technical services, which together contributed more than 28 percent to real U.S. growth. Finance and insurance grew 6.7 percent in 2005 and professional and technical services grew 7.0 percent. In the 8 BEA regions, the contributions to real GDP-by-state growth from these two sectors ranged from a high of 47 percent in the Great Lakes to a low of 21 percent in the Southwest. One of these two sectors was the largest contributor to growth in 19 states.

In addition to the strong growth in private services-providing industries, the manufacturing sector continued its strong U.S. growth, increasing 4.0 percent. In the Southwest and Far West regions, durable goods manufacturing contributed the most to real GDP-by-state growth of the industry sectors in Table 2. Durable goods manufacturing was the largest contributor to growth in 10 states.

---

[2] NAICS  North American Industry Classification System

3

## Revisions

The revisions to the advance GDP-by-state estimates for 2005, released in June 2006, are due to the incorporation of farm income and expense data from the U.S. Department of Agriculture (USDA) and the incorporation of revised BEA earnings-by-industry data.

The growth rate in real GDP by state for the New England region was revised down 0.7 percentage point. The growth rates of real GDP by state for the Southeast and Southwest regions were each revised up 0.3 percentage point. In New England, the two states with the largest downward revisions were New Hampshire (1.2 percentage points) and Massachusetts (0.9 percentage point). In the Southeast, the growth rates for Alabama, Mississippi, and Tennessee were revised up by more than 1.0 percentage point.

Tables 1-3 show these results in more detail; complete detail is available on BEA's web site at www.bea.gov.

> BEA's national, international, regional, and industry estimates; the *Survey of Current Business*; and BEA news releases are available without charge on BEA's Web site at www.bea.gov. By visiting the site, you can also subscribe to receive free e-mail summaries of BEA releases and announcements.

## Advance Estimates of GDP by state for 2005 by NAICS Sector

For the second year, BEA is releasing advance GDP-by-state estimates. In June 2006, BEA released advance 2005 GDP-by-state totals. This release provides revised 2005 GDP-by-state totals, plus both current-dollar and real 2005 GDP-by-state estimates by NAICS sectors.

These accelerated industry estimates for 2005 are based on an abbreviated estimation methodology using limited state source data. The accelerated 2005 estimates are based on BEA earnings by industry estimates released September 26, 2006 and on the accelerated U.S. GDP by industry estimates released April 27, 2006. In addition, farm income and expense data from the USDA are incorporated into the agriculture, forestry, fishing, and hunting industry.

More information on the methodology used to produce the advance 2005 estimates, on the regular (revised) GDP-by-state estimates for 1998–2004, and on revisions to the GDP-by-state estimates can be found in the July 2006 issue of the *Survey of Current Business*, BEA's monthly journal.

4

## Explanatory Notes

### Definitions

GDP by state is the state counterpart of the Nation's gross domestic product (GDP), the Bureau's featured and most comprehensive measure of U.S. economic activity. GDP by state is derived as the sum of the GDP originating in all the industries in the state.

Real GDP by state is an inflation-adjusted measure based on national prices for the goods and services produced within that state. The estimates of real GDP by state and of quantity indexes with a base year of 2000 are derived by applying national implicit price deflators to the current-dollar GDP-by-state estimates for the 81 NAICS industries for years 1997 forward and for the 63 SIC industries for years 1977–1997. Then, the chain-type index formula that is used in the national accounts is used to calculate the estimates of total real GDP by state and of real GDP by state at more aggregated industry levels.

### The relation of GDP by state to U.S. Gross Domestic Product (GDP)

An industry's GDP by state, or its value added, in practice, is calculated as the sum of incomes earned by labor and capital and the costs incurred in the production of goods and services. That is, it includes the wages and salaries that workers earn, the income earned by individual or joint entrepreneurs as well as by corporations, and business taxes such as sales, property, and Federal excise taxes—that count as a business expense.

GDP is calculated as the sum of what consumers, businesses, and government spend on final goods and services, plus investment and net foreign trade. In theory, incomes earned should equal what is spent, but due to different data sources, income earned, usually referred to as gross domestic income (GDI) does not always equal what is spent (GDP). The difference is referred to as the "statistical discrepancy."

Starting with the 2004 comprehensive revision, BEA's industry accounts and its GDP-by-state accounts allocate the statistical discrepancy across all private-sector industries. Therefore, GDP-by-state estimates are now conceptually more similar to GDP estimates in the national accounts than they had been in the past.

Except for small differences resulting from the GDP-by-state accounts excluding overseas Federal military and civilian activity (because it cannot be attributed to a particular state), growth rates of real GDP by state and real U.S. GDP are now virtually identical.

Table 1. Growth Rates in Real GDP by State, 1997-2005

| | Average annual growth rate 1997-2004 | | Percent change 2004-2005 | |
|---|---|---|---|---|
| | Percent | Rank | Percent | Rank |
| **United States** | 3.1 | .... | 3.6 | .... |
| **New England** | 3.1 | .... | 2.3 | .... |
| Connecticut | 2.0 | 39 | 3.2 | 24 |
| Maine | 2.3 | 33 | 1.3 | 44 |
| Massachusetts | 3.7 | 13 | 1.7 | 42 |
| New Hampshire | 4.1 | 9 | 3.2 | 25 |
| Rhode Island | 3.1 | 20 | 2.0 | 39 |
| Vermont | 4.1 | 10 | 2.7 | 31 |
| **Mideast** | 2.9 | .... | 2.9 | .... |
| Delaware | 3.0 | 23 | 5.4 | 8 |
| District of Columbia | 3.0 | .... | 3.6 | .... |
| Maryland | 3.6 | 14 | 4.2 | 18 |
| New Jersey | 2.6 | 29 | 2.1 | 36 |
| New York | 3.2 | 16 | 2.9 | 30 |
| Pennsylvania | 2.2 | 38 | 2.4 | 34 |
| **Great Lakes** | 1.8 | .... | 1.3 | .... |
| Illinois | 2.0 | 41 | 2.1 | 37 |
| Indiana | 2.6 | 28 | 1.3 | 45 |
| Michigan | 1.1 | 48 | 0.2 | 48 |
| Ohio | 1.6 | 44 | 0.9 | 47 |
| Wisconsin | 2.5 | 31 | 1.5 | 43 |
| **Plains** | 2.5 | .... | 2.3 | .... |
| Iowa | 2.2 | 36 | 1.0 | 46 |
| Kansas | 2.3 | 35 | 3.9 | 19 |
| Minnesota | 3.5 | 15 | 1.9 | 40 |
| Missouri | 1.6 | 42 | 2.3 | 35 |
| Nebraska | 2.0 | 40 | 1.9 | 41 |
| North Dakota | 2.3 | 34 | 5.3 | 10 |
| South Dakota | 4.1 | 8 | 2.9 | 29 |
| **Southeast** | 3.0 | .... | 4.6 | .... |
| Alabama | 2.5 | 30 | 4.5 | 15 |
| Arkansas | 2.6 | 27 | 2.4 | 33 |
| Florida | 4.2 | 7 | 7.7 | 3 |
| Georgia | 3.2 | 18 | 4.6 | 14 |
| Kentucky | 1.3 | 46 | 3.0 | 28 |
| Louisiana | 0.9 | 49 | -1.5 | 50 |
| Mississippi | 1.6 | 43 | 2.5 | 32 |
| North Carolina | 3.1 | 21 | 4.7 | 13 |
| South Carolina | 2.2 | 37 | 3.9 | 20 |
| Tennessee | 2.9 | 24 | 3.1 | 27 |
| Virginia | 4.0 | 11 | 5.4 | 7 |
| West Virginia | 1.2 | 47 | 2.1 | 38 |
| **Southwest** | 3.8 | .... | 5.2 | .... |
| Arizona | 5.2 | 1 | 9.1 | 1 |
| New Mexico | 3.2 | 17 | 3.7 | 22 |
| Oklahoma | 2.4 | 32 | 3.3 | 23 |
| Texas | 3.7 | 12 | 4.7 | 12 |
| **Rocky Mountain** | 3.9 | .... | 5.2 | .... |
| Colorado | 4.3 | 5 | 4.3 | 16 |
| Idaho | 5.0 | 2 | 7.4 | 4 |
| Montana | 2.7 | 26 | 5.2 | 11 |
| Utah | 3.2 | 19 | 6.8 | 5 |
| Wyoming | 3.0 | 22 | 3.8 | 21 |
| **Far West** | 4.1 | .... | 4.4 | .... |
| Alaska | 0.8 | 50 | -0.5 | 49 |
| California | 4.4 | 4 | 4.3 | 17 |
| Hawaii | 1.4 | 45 | 5.3 | 9 |
| Nevada | 4.8 | 3 | 9.0 | 2 |
| Oregon | 4.3 | 6 | 5.9 | 6 |
| Washington | 2.9 | 25 | 3.2 | 26 |

Source:  U.S. Bureau of Economic Analysis

6

Table 2. Contributions to Percent Change in Real GDP by State, 2004-2005

| State and region | Percent change in real gross state product | Agriculture, forestry, fishing, and hunting | Mining | Utilities | Construction | Durable goods manu- facturing | Non- durable goods manu- facturing | Wholesale trade | Retail trade | Transpor- tation and ware- housing | Information | Finance and insurance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **United States** | **3.6** | **-0.05** | **-0.04** | **0.01** | **0.13** | **0.40** | **0.06** | **0.07** | **0.20** | **0.11** | **0.34** | **0.54** |
| **New England** | **2.3** | **0.05** | **-0.01** | **-0.08** | **-0.04** | **0.35** | **0.05** | **-0.14** | **0.06** | **0.03** | **0.32** | **0.29** |
| Connecticut | 3.2 | 0.02 | 0.00 | -0.20 | 0.02 | 0.28 | 0.01 | 0.08 | 0.06 | 0.05 | 0.29 | 1.25 |
| Maine | 1.3 | 0.15 | 0.00 | 0.04 | -0.12 | 0.05 | 0.08 | -0.11 | -0.05 | 0.03 | 0.25 | 0.05 |
| Massachusetts | 1.7 | 0.04 | -0.01 | -0.03 | -0.08 | 0.36 | 0.09 | -0.34 | 0.05 | 0.02 | 0.36 | -0.32 |
| New Hampshire | 3.2 | 0.05 | 0.00 | -0.24 | 0.00 | 0.72 | 0.00 | 0.08 | 0.13 | 0.01 | 0.33 | 0.65 |
| Rhode Island | 2.0 | 0.01 | 0.01 | 0.03 | 0.02 | 0.17 | 0.01 | 0.13 | 0.01 | -0.01 | 0.32 | 0.30 |
| Vermont | 2.7 | 0.36 | -0.08 | 0.01 | 0.00 | 0.83 | 0.05 | -0.13 | 0.18 | 0.03 | 0.22 | 0.28 |
| **Mideast** | **2.9** | **0.03** | **0.00** | **-0.02** | **0.00** | **0.18** | **-0.01** | **-0.02** | **0.13** | **0.06** | **0.41** | **0.76** |
| Delaware | 5.4 | 0.09 | (d) | 0.02 | (d) | 0.12 | -0.28 | -0.05 | 0.12 | 0.01 | 0.22 | 4.62 |
| District of Columbia | 3.6 | 0.00 | (d) | 0.06 | (d) | -0.03 | 0.00 | 0.02 | 0.04 | -0.01 | 0.47 | -0.16 |
| Maryland | 4.2 | -0.01 | 0.01 | 0.10 | 0.14 | 0.11 | 0.04 | 0.06 | 0.04 | 0.09 | 0.35 | 0.62 |
| New Jersey | 2.1 | 0.02 | 0.00 | -0.03 | -0.04 | 0.09 | 0.05 | -0.09 | 0.06 | 0.11 | 0.24 | 0.59 |
| New York | 2.9 | 0.04 | 0.00 | -0.02 | -0.07 | 0.12 | -0.02 | -0.06 | 0.17 | 0.05 | 0.63 | 0.96 |
| Pennsylvania | 2.4 | 0.06 | -0.01 | -0.08 | 0.08 | 0.43 | -0.06 | 0.09 | 0.10 | 0.05 | 0.16 | 0.29 |
| **Great Lakes** | **1.3** | **-0.21** | **-0.02** | **0.06** | **-0.09** | **0.09** | **0.02** | **-0.02** | **0.01** | **0.15** | **0.20** | **0.28** |
| Illinois | 2.1 | -0.43 | -0.01 | 0.08 | -0.05 | 0.38 | 0.06 | -0.05 | 0.09 | 0.19 | 0.25 | 0.31 |
| Indiana | 1.3 | -0.35 | -0.03 | 0.05 | -0.06 | 0.28 | 0.04 | 0.08 | 0.16 | 0.16 | 0.12 | 0.14 |
| Michigan | 0.2 | 0.01 | -0.02 | 0.03 | -0.18 | -0.54 | -0.10 | -0.11 | -0.09 | 0.07 | 0.25 | 0.27 |
| Ohio | 0.9 | -0.03 | -0.04 | 0.12 | -0.12 | -0.03 | 0.03 | -0.02 | -0.06 | 0.19 | 0.14 | 0.33 |
| Wisconsin | 1.5 | -0.20 | -0.01 | 0.01 | -0.06 | 0.32 | 0.02 | 0.12 | 0.01 | 0.15 | 0.25 | 0.32 |
| **Plains** | **2.3** | **-0.40** | **0.02** | **-0.04** | **-0.04** | **0.46** | **0.10** | **0.09** | **0.04** | **0.15** | **0.26** | **0.49** |
| Iowa | 1.0 | -1.98 | -0.01 | -0.35 | 0.11 | 0.71 | 0.33 | 0.17 | -0.02 | 0.18 | 0.21 | 0.81 |
| Kansas | 3.9 | 0.65 | -0.02 | 0.07 | 0.05 | 0.63 | 0.07 | 0.07 | 0.04 | 0.12 | 0.17 | 0.29 |
| Minnesota | 1.9 | 0.02 | -0.02 | -0.02 | -0.23 | 0.41 | 0.04 | 0.08 | -0.06 | 0.10 | 0.27 | 0.49 |
| Missouri | 2.3 | -0.46 | 0.00 | -0.03 | 0.03 | 0.27 | 0.04 | 0.09 | 0.15 | 0.10 | 0.31 | 0.31 |
| Nebraska | 1.9 | -1.00 | -0.01 | -0.05 | -0.09 | 0.39 | 0.15 | -0.04 | 0.05 | 0.47 | 0.23 | 0.72 |
| North Dakota | 5.3 | 1.30 | 0.35 | 0.10 | 0.00 | 0.55 | 0.07 | 0.31 | 0.27 | 0.20 | 0.29 | 0.14 |
| South Dakota | 2.9 | -1.12 | -0.01 | 0.22 | 0.09 | 0.64 | 0.11 | 0.12 | 0.16 | 0.08 | 0.35 | 1.20 |
| **Southeast** | **4.6** | **-0.01** | **-0.12** | **0.00** | **0.27** | **0.37** | **0.08** | **0.13** | **0.32** | **0.11** | **0.40** | **0.54** |
| Alabama | 4.5 | 0.00 | 0.00 | -0.14 | 0.17 | 1.05 | -0.05 | 0.13 | 0.37 | 0.17 | 0.27 | 0.45 |
| Arkansas | 2.4 | -1.33 | 0.07 | 0.08 | 0.24 | 0.37 | 0.01 | 0.21 | 0.23 | 0.23 | 0.34 | 0.23 |
| Florida | 7.7 | 0.11 | 0.00 | 0.02 | 0.73 | 0.33 | 0.07 | 0.26 | 0.54 | 0.15 | 0.40 | 0.78 |
| Georgia | 4.6 | -0.03 | -0.03 | 0.03 | 0.13 | 0.28 | 0.12 | 0.20 | 0.27 | -0.01 | 0.62 | 0.43 |
| Kentucky | 3.0 | 0.28 | 0.06 | 0.05 | -0.03 | 0.36 | -0.06 | -0.05 | 0.13 | 0.12 | 0.21 | 0.31 |
| Louisiana | -1.5 | -0.05 | -1.66 | -0.07 | -0.07 | -0.04 | 0.48 | -0.04 | 0.03 | 0.02 | 0.14 | 0.22 |
| Mississippi | 2.5 | -0.23 | -0.09 | 0.08 | 0.34 | 0.43 | 0.03 | 0.04 | 0.27 | 0.10 | 0.25 | 0.24 |
| North Carolina | 4.7 | -0.02 | 0.01 | -0.04 | 0.15 | 0.46 | 0.16 | 0.08 | 0.29 | 0.06 | 0.60 | 1.02 |
| South Carolina | 3.9 | -0.09 | -0.02 | -0.03 | 0.05 | 0.48 | -0.03 | 0.34 | 0.29 | 0.09 | 0.30 | 0.38 |
| Tennessee | 3.1 | 0.06 | -0.01 | 0.00 | 0.10 | 0.36 | 0.06 | 0.05 | 0.34 | 0.23 | 0.26 | 0.02 |
| Virginia | 5.4 | 0.03 | -0.01 | 0.06 | 0.19 | 0.33 | 0.06 | 0.01 | 0.23 | 0.14 | 0.49 | 0.63 |
| West Virginia | 2.1 | 0.06 | 0.04 | -0.05 | 0.16 | 0.06 | -0.22 | 0.17 | 0.16 | 0.14 | 0.11 | 0.11 |
| **Southwest** | **5.2** | **-0.02** | **-0.01** | **0.06** | **0.30** | **0.82** | **0.19** | **0.20** | **0.38** | **0.18** | **0.27** | **0.61** |
| Arizona | 9.1 | 0.00 | 0.00 | 0.18 | 0.84 | 1.16 | 0.05 | 0.21 | 0.82 | 0.20 | 0.21 | 1.47 |
| New Mexico | 3.7 | 0.10 | -0.42 | 0.08 | 0.30 | 1.19 | 0.01 | 0.06 | 0.24 | 0.13 | 0.25 | 0.19 |
| Oklahoma | 3.3 | 0.02 | 0.91 | 0.08 | 0.12 | 0.18 | 0.06 | 0.13 | 0.26 | 0.10 | 0.25 | 0.08 |
| Texas | 4.7 | -0.03 | -0.08 | 0.03 | 0.21 | 0.80 | 0.24 | 0.21 | 0.30 | 0.19 | 0.29 | 0.52 |
| **Rocky Mountain** | **5.2** | **0.05** | **0.08** | **0.03** | **0.34** | **0.56** | **0.08** | **0.13** | **0.31** | **0.15** | **0.42** | **0.54** |
| Colorado | 4.3 | 0.04 | 0.02 | -0.01 | 0.21 | 0.34 | 0.09 | 0.03 | 0.18 | 0.07 | 0.42 | 0.51 |
| Idaho | 7.4 | -0.12 | 0.01 | 0.04 | 0.52 | 1.76 | 0.04 | 0.38 | 0.89 | 0.16 | 0.39 | 0.64 |
| Montana | 5.2 | 0.29 | 0.12 | 0.07 | 0.50 | 0.19 | 0.09 | 0.16 | 0.20 | 0.26 | 0.24 | 0.40 |
| Utah | 6.8 | 0.02 | 0.35 | 0.07 | 0.50 | 0.36 | 0.06 | 0.22 | 0.36 | 0.21 | 0.63 | 0.74 |
| Wyoming | 3.8 | 0.18 | -0.27 | 0.25 | 0.34 | 0.15 | 0.16 | 0.18 | 0.23 | 0.51 | 0.07 | 0.14 |
| **Far West** | **4.4** | **0.00** | **-0.09** | **0.01** | **0.26** | **0.66** | **0.18** | **0.14** | **0.27** | **0.07** | **0.40** | **0.61** |
| Alaska | -0.5 | 0.05 | -2.19 | 0.03 | 0.12 | 0.04 | 0.10 | 0.02 | 0.08 | -0.31 | 0.17 | 0.18 |
| California | 4.3 | 0.01 | -0.06 | 0.02 | 0.20 | 0.58 | 0.22 | 0.17 | 0.24 | 0.05 | 0.48 | 0.84 |
| Hawaii | 5.3 | 0.01 | 0.00 | 0.03 | 0.65 | 0.03 | 0.02 | 0.03 | 0.33 | 0.40 | 0.17 | 0.11 |
| Nevada | 9.0 | 0.02 | -0.06 | -0.02 | 1.11 | 0.26 | 0.07 | 0.23 | 0.56 | 0.27 | 0.44 | 1.32 |
| Oregon | 5.9 | 0.15 | 0.00 | -0.08 | 0.25 | 2.30 | 0.03 | 0.17 | 0.21 | 0.12 | 0.16 | 0.47 |
| Washington | 3.2 | -0.13 | -0.01 | 0.00 | 0.21 | 0.76 | 0.06 | -0.05 | 0.41 | 0.08 | 0.15 | 0.42 |

(d) Data are suppressed to avoid disclosure of confidential information.
Source: U.S. Bureau of Economic Analysis

7

Table 2. Contributions to Percent Change in Real GDP by State, 2004-2005 (continued)

| State and region | Real estate, rental, and leasing | Professional and technical services | Management of companies | Administrative and waste services | Educational services | Health care and social assistance | Arts, entertainment, and recreation | Accommodation and food services | Other services | Government |
|---|---|---|---|---|---|---|---|---|---|---|
| United States | 0.32 | 0.48 | 0.01 | 0.21 | 0.01 | 0.33 | 0.02 | 0.13 | 0.06 | 0.18 |
| New England | 0.30 | 0.51 | -0.04 | 0.14 | -0.03 | 0.40 | 0.02 | 0.05 | 0.04 | 0.02 |
| Connecticut | 0.53 | 0.37 | -0.09 | 0.12 | -0.01 | 0.32 | 0.03 | 0.05 | 0.04 | 0.03 |
| Maine | 0.20 | 0.21 | -0.27 | 0.12 | 0.01 | 0.41 | 0.02 | 0.08 | 0.05 | 0.09 |
| Massachusetts | 0.23 | 0.69 | 0.01 | 0.16 | -0.06 | 0.44 | 0.01 | 0.06 | 0.03 | 0.00 |
| New Hampshire | 0.44 | 0.43 | -0.04 | 0.15 | 0.02 | 0.43 | -0.01 | 0.01 | 0.03 | 0.05 |
| Rhode Island | -0.05 | 0.25 | 0.05 | 0.14 | 0.03 | 0.40 | 0.03 | 0.07 | -0.01 | -0.05 |
| Vermont | -0.27 | 0.37 | 0.00 | 0.01 | 0.04 | 0.50 | 0.03 | 0.10 | 0.09 | 0.22 |
| Mideast | 0.03 | 0.52 | 0.03 | 0.16 | 0.01 | 0.33 | 0.02 | 0.07 | 0.09 | 0.08 |
| Delaware | -0.48 | 0.21 | -0.28 | 0.18 | 0.00 | 0.31 | 0.01 | 0.05 | 0.05 | 0.22 |
| District of Columbia | -0.16 | 0.79 | 0.06 | 0.24 | -0.10 | 0.05 | 0.13 | 0.25 | 0.37 | 1.67 |
| Maryland | 0.33 | 0.81 | 0.06 | 0.19 | 0.02 | 0.35 | 0.06 | 0.15 | 0.06 | 0.54 |
| New Jersey | -0.09 | 0.48 | 0.08 | 0.14 | 0.00 | 0.33 | 0.01 | 0.10 | 0.08 | 0.00 |
| New York | 0.01 | 0.50 | -0.03 | 0.19 | 0.02 | 0.30 | 0.00 | 0.09 | 0.08 | -0.04 |
| Pennsylvania | 0.13 | 0.43 | 0.10 | 0.11 | 0.01 | 0.40 | 0.02 | 0.08 | 0.08 | -0.09 |
| Great Lakes | -0.04 | 0.33 | -0.04 | 0.15 | 0.01 | 0.31 | 0.01 | 0.06 | 0.03 | -0.04 |
| Illinois | 0.10 | 0.52 | 0.04 | 0.17 | 0.00 | 0.29 | 0.03 | 0.13 | 0.04 | -0.02 |
| Indiana | 0.04 | 0.23 | -0.06 | 0.16 | 0.02 | 0.33 | 0.00 | 0.06 | 0.04 | 0.02 |
| Michigan | -0.18 | 0.34 | -0.23 | 0.25 | 0.02 | 0.46 | 0.01 | 0.01 | 0.02 | -0.03 |
| Ohio | -0.21 | 0.25 | 0.03 | 0.10 | 0.00 | 0.29 | 0.01 | 0.03 | 0.00 | -0.09 |
| Wisconsin | 0.02 | 0.23 | -0.09 | 0.13 | 0.01 | 0.29 | 0.01 | 0.06 | 0.04 | -0.08 |
| Plains | 0.17 | 0.30 | 0.01 | 0.15 | 0.01 | 0.30 | 0.00 | 0.08 | 0.04 | 0.10 |
| Iowa | -0.04 | 0.13 | 0.16 | 0.08 | 0.00 | 0.27 | 0.02 | 0.09 | 0.03 | 0.08 |
| Kansas | 0.26 | 0.45 | 0.03 | 0.49 | 0.00 | 0.32 | -0.01 | 0.04 | 0.05 | 0.17 |
| Minnesota | 0.33 | 0.26 | -0.25 | 0.10 | 0.01 | 0.30 | -0.03 | 0.08 | 0.03 | 0.04 |
| Missouri | 0.07 | 0.36 | 0.19 | 0.13 | 0.03 | 0.30 | 0.02 | 0.12 | 0.05 | 0.11 |
| Nebraska | 0.01 | 0.33 | 0.08 | 0.10 | 0.00 | 0.31 | 0.02 | 0.06 | 0.05 | 0.08 |
| North Dakota | 0.21 | 0.38 | -0.03 | 0.18 | 0.01 | 0.43 | 0.02 | 0.10 | 0.08 | 0.32 |
| South Dakota | 0.50 | 0.26 | -0.07 | -0.06 | 0.02 | 0.32 | 0.06 | 0.04 | -0.08 | 0.10 |
| Southeast | 0.67 | 0.47 | 0.04 | 0.32 | 0.01 | 0.34 | 0.03 | 0.17 | 0.06 | 0.41 |
| Alabama | 0.34 | 0.23 | 0.09 | 0.24 | -0.01 | 0.49 | 0.02 | 0.12 | 0.11 | 0.38 |
| Arkansas | 0.38 | 0.25 | -0.09 | 0.08 | 0.00 | 0.37 | 0.02 | 0.10 | 0.10 | 0.59 |
| Florida | 1.82 | 0.56 | 0.09 | 0.72 | 0.01 | 0.37 | 0.08 | 0.13 | 0.08 | 0.26 |
| Georgia | 0.51 | 0.44 | 0.24 | 0.33 | 0.01 | 0.34 | 0.04 | 0.07 | 0.03 | 0.47 |
| Kentucky | 0.00 | 0.23 | -0.02 | 0.19 | -0.02 | -0.08 | -0.05 | 0.00 | -0.06 | 0.70 |
| Louisiana | -0.41 | -0.13 | 0.05 | 0.19 | 0.01 | 0.20 | -0.03 | 0.09 | 0.02 | 0.07 |
| Mississippi | 0.19 | 0.16 | -0.14 | 0.23 | 0.01 | 0.33 | 0.00 | 0.11 | 0.02 | 0.31 |
| North Carolina | 0.31 | 0.39 | -0.05 | 0.16 | 0.02 | 0.33 | 0.00 | 0.14 | 0.08 | 0.64 |
| South Carolina | 0.57 | 0.31 | -0.06 | 0.22 | 0.01 | 0.34 | 0.03 | 0.16 | 0.03 | 0.44 |
| Tennessee | 0.31 | 0.34 | 0.00 | 0.20 | 0.04 | 0.56 | 0.01 | 0.13 | 0.08 | -0.03 |
| Virginia | 0.53 | 1.26 | 0.01 | 0.12 | 0.01 | 0.32 | 0.02 | 0.13 | 0.08 | 0.77 |
| West Virginia | 0.26 | 0.21 | 0.03 | 0.10 | 0.00 | 0.31 | 0.05 | 0.06 | 0.06 | 0.24 |
| Southwest | 0.35 | 0.49 | 0.20 | 0.26 | 0.01 | 0.35 | 0.03 | 0.15 | 0.08 | 0.31 |
| Arizona | 1.45 | 0.54 | -0.18 | 0.65 | 0.05 | 0.59 | 0.04 | 0.26 | 0.11 | 0.45 |
| New Mexico | 0.08 | 0.33 | 0.02 | 0.16 | 0.01 | 0.37 | 0.03 | 0.13 | 0.08 | 0.35 |
| Oklahoma | -0.05 | 0.22 | -0.13 | 0.09 | 0.01 | 0.32 | 0.04 | 0.11 | 0.03 | 0.48 |
| Texas | 0.19 | 0.53 | 0.34 | 0.20 | 0.00 | 0.31 | 0.02 | 0.13 | 0.07 | 0.26 |
| Rocky Mountain | 0.72 | 0.66 | 0.06 | 0.17 | 0.03 | 0.33 | 0.05 | 0.15 | 0.07 | 0.33 |
| Colorado | 0.54 | 0.77 | 0.15 | 0.12 | 0.02 | 0.28 | 0.05 | 0.13 | 0.04 | 0.36 |
| Idaho | 1.23 | 0.51 | -0.12 | 0.29 | 0.02 | 0.39 | 0.04 | 0.14 | 0.09 | 0.07 |
| Montana | 0.83 | 0.46 | 0.01 | 0.16 | 0.05 | 0.51 | 0.10 | 0.16 | 0.14 | 0.32 |
| Utah | 0.89 | 0.64 | 0.00 | 0.26 | 0.05 | 0.42 | 0.04 | 0.16 | 0.08 | 0.38 |
| Wyoming | 0.53 | 0.28 | 0.00 | 0.03 | 0.00 | 0.24 | 0.02 | 0.25 | 0.09 | 0.42 |
| Far West | 0.46 | 0.60 | -0.15 | 0.18 | 0.01 | 0.33 | 0.02 | 0.21 | 0.06 | 0.16 |
| Alaska | 0.08 | 0.23 | -0.01 | 0.10 | 0.00 | 0.14 | 0.03 | 0.06 | 0.01 | 0.63 |
| California | 0.49 | 0.68 | -0.19 | 0.16 | 0.01 | 0.33 | 0.01 | 0.12 | 0.06 | 0.06 |
| Hawaii | 0.64 | 0.36 | -0.27 | 0.27 | 0.02 | 0.38 | 0.07 | 0.52 | 0.13 | 1.45 |
| Nevada | 1.15 | 0.50 | 0.18 | 0.36 | 0.02 | 0.39 | 0.14 | 1.59 | 0.13 | 0.32 |
| Oregon | 0.65 | 0.32 | 0.07 | 0.22 | 0.01 | 0.42 | 0.02 | 0.14 | 0.06 | 0.19 |
| Washington | -0.06 | 0.35 | -0.12 | 0.18 | 0.00 | 0.31 | 0.04 | 0.15 | 0.06 | 0.37 |

Source: U.S. Bureau of Economic Analysis

8

**Table 3. GDP by State in Current Dollars, 2005**
[Millions of dollars]

| State and region | Total | Agriculture, forestry, fishing, and hunting | Mining | Utilities | Construction | Durable goods manu-facturing | Non-durable goods manu-facturing | Wholesale trade | Retail trade | Transpor-tation and ware-housing | Information | Finance and insurance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **United States** | 12,409,555 | 119,066 | 213,574 | 238,908 | 593,535 | 868,438 | 628,103 | 733,090 | 828,634 | 362,247 | 578,345 | 1,011,548 |
| **New England** | 686,547 | 2,617 | 480 | 11,491 | 29,600 | 50,452 | 23,143 | 38,205 | 42,776 | 11,457 | 29,050 | 81,985 |
| Connecticut | 193,745 | 340 | 108 | 3,357 | 6,927 | 14,178 | 7,795 | 10,449 | 11,458 | 3,015 | 7,707 | 32,341 |
| Maine | 44,971 | 656 | 8 | 936 | 2,406 | 2,613 | 2,359 | 2,474 | 4,037 | 1,016 | 1,347 | 3,006 |
| Massachusetts | 325,917 | 906 | 193 | 4,070 | 14,102 | 23,321 | 9,503 | 18,325 | 17,906 | 5,420 | 15,341 | 34,870 |
| New Hampshire | 55,061 | 241 | 55 | 1,791 | 2,754 | 5,043 | 1,557 | 3,523 | 4,658 | 885 | 1,942 | 4,785 |
| Rhode Island | 43,787 | 99 | 26 | 784 | 2,153 | 3,087 | 1,219 | 2,259 | 2,783 | 637 | 1,756 | 5,614 |
| Vermont | 23,065 | 375 | 100 | 553 | 1,258 | 2,210 | 711 | 1,175 | 1,934 | 484 | 958 | 1,369 |
| **Mideast** | 2,262,524 | 6,755 | 5,048 | 45,583 | 88,445 | 86,100 | 107,844 | 128,928 | 131,665 | 51,695 | 128,545 | 262,411 |
| Delaware | 56,483 | 414 | (d) | 942 | (d) | 1,060 | 3,144 | 1,935 | 2,437 | 730 | 1,218 | 19,174 |
| District of Columbia | 81,830 | 1 | (d) | 763 | (d) | 96 | 118 | 762 | 1,059 | 467 | 5,320 | 3,918 |
| Maryland | 246,234 | 781 | 296 | 6,033 | 15,016 | 6,369 | 7,189 | 12,751 | 15,693 | 5,065 | 10,072 | 17,497 |
| New Jersey | 431,079 | 623 | 262 | 7,917 | 17,850 | 13,055 | 27,979 | 34,985 | 27,786 | 12,636 | 20,268 | 36,808 |
| New York | 957,873 | 2,099 | 811 | 17,026 | 30,344 | 28,751 | 32,240 | 49,524 | 52,560 | 17,238 | 74,306 | 147,154 |
| Pennsylvania | 489,025 | 2,837 | 3,653 | 12,902 | 21,981 | 36,770 | 37,174 | 28,970 | 31,951 | 15,358 | 17,361 | 37,861 |
| **Great Lakes** | 1,832,089 | 10,647 | 5,969 | 38,405 | 80,314 | 226,238 | 114,817 | 113,350 | 117,964 | 58,748 | 56,014 | 139,433 |
| Illinois | 560,032 | 2,071 | 1,662 | 12,240 | 26,010 | 42,974 | 31,853 | 38,871 | 32,833 | 20,144 | 20,858 | 53,747 |
| Indiana | 238,568 | 1,686 | 910 | 5,214 | 10,549 | 44,407 | 22,800 | 12,846 | 15,262 | 8,397 | 5,412 | 13,954 |
| Michigan | 376,243 | 2,038 | 1,013 | 7,758 | 16,231 | 54,827 | 14,359 | 22,340 | 25,335 | 9,587 | 10,847 | 22,733 |
| Ohio | 440,923 | 1,922 | 2,061 | 9,717 | 17,535 | 57,112 | 28,168 | 26,682 | 30,647 | 13,530 | 12,410 | 32,957 |
| Wisconsin | 216,322 | 2,929 | 322 | 3,475 | 9,989 | 26,916 | 17,638 | 12,611 | 13,888 | 7,110 | 6,487 | 16,033 |
| **Plains** | 795,735 | 18,358 | 5,554 | 13,530 | 35,607 | 70,361 | 47,275 | 51,193 | 52,285 | 30,945 | 33,406 | 67,621 |
| Iowa | 113,552 | 3,707 | 207 | 2,082 | 4,783 | 14,043 | 10,667 | 6,599 | 7,156 | 4,187 | 3,495 | 11,234 |
| Kansas | 105,574 | 2,816 | 2,286 | 2,204 | 4,104 | 10,193 | 5,343 | 6,587 | 7,181 | 3,962 | 6,712 | 6,451 |
| Minnesota | 234,552 | 3,422 | 896 | 3,183 | 11,104 | 20,820 | 11,216 | 16,104 | 14,398 | 7,412 | 8,693 | 23,812 |
| Missouri | 216,065 | 2,011 | 1,076 | 3,493 | 10,184 | 17,243 | 15,105 | 13,979 | 14,997 | 7,837 | 10,124 | 13,378 |
| Nebraska | 70,676 | 3,122 | 139 | 1,343 | 3,021 | 4,199 | 3,473 | 4,230 | 4,552 | 5,737 | 2,571 | 5,916 |
| North Dakota | 24,397 | 1,472 | 812 | 661 | 1,144 | 1,474 | 793 | 1,982 | 1,795 | 992 | 925 | 1,463 |
| South Dakota | 30,919 | 1,808 | 138 | 564 | 1,267 | 2,328 | 740 | 1,713 | 2,206 | 819 | 886 | 5,365 |
| **Southeast** | 2,786,298 | 28,231 | 39,217 | 52,148 | 148,940 | 179,270 | 182,910 | 168,016 | 203,132 | 89,976 | 116,136 | 185,369 |
| Alabama | 151,610 | 2,520 | 2,672 | 3,774 | 7,359 | 16,223 | 10,770 | 8,690 | 12,084 | 4,296 | 4,939 | 8,148 |
| Arkansas | 86,752 | 2,401 | 972 | 1,638 | 3,841 | 9,210 | 7,665 | 5,798 | 6,268 | 4,336 | 3,120 | 3,884 |
| Florida | 673,274 | 6,216 | 859 | 10,665 | 47,723 | 22,026 | 11,721 | 43,623 | 53,425 | 18,052 | 28,977 | 49,717 |
| Georgia | 363,839 | 3,343 | 1,147 | 7,414 | 18,680 | 18,938 | 27,138 | 28,420 | 24,328 | 13,323 | 23,585 | 22,604 |
| Kentucky | 140,501 | 2,290 | 3,410 | 2,223 | 5,998 | 16,213 | 10,827 | 8,596 | 9,788 | 6,793 | 3,755 | 7,112 |
| Louisiana | 168,204 | 1,302 | 20,489 | 4,635 | 7,096 | 6,741 | 20,834 | 8,210 | 11,403 | 5,969 | 4,147 | 6,818 |
| Mississippi | 81,290 | 2,085 | 2,042 | 2,247 | 3,536 | 7,798 | 4,446 | 4,170 | 6,772 | 2,916 | 2,073 | 3,662 |
| North Carolina | 346,640 | 3,725 | 559 | 6,208 | 16,549 | 25,202 | 42,031 | 19,387 | 23,053 | 8,514 | 12,573 | 35,286 |
| South Carolina | 140,019 | 1,162 | 218 | 3,563 | 7,997 | 13,658 | 11,253 | 8,261 | 11,360 | 3,432 | 3,881 | 7,223 |
| Tennessee | 229,215 | 1,384 | 544 | 888 | 9,635 | 24,986 | 15,119 | 15,350 | 18,887 | 11,719 | 7,687 | 13,210 |
| Virginia | 351,903 | 1,533 | 1,848 | 6,276 | 18,304 | 15,119 | 17,504 | 14,919 | 21,511 | 8,742 | 19,938 | 24,576 |
| West Virginia | 53,050 | 271 | 4,456 | 2,416 | 2,182 | 3,155 | 2,388 | 2,591 | 4,252 | 1,885 | 1,462 | 2,128 |
| **Southwest** | 1,396,331 | 13,376 | 113,912 | 38,618 | 74,080 | 93,957 | 65,999 | 86,402 | 96,624 | 47,690 | 53,596 | 88,615 |
| Arizona | 216,528 | 2,062 | 2,026 | 3,835 | 15,579 | 17,009 | 2,633 | 12,510 | 18,203 | 6,082 | 6,678 | 19,479 |
| New Mexico | 68,870 | 1,123 | 8,781 | 1,473 | 3,133 | 5,447 | 1,041 | 2,372 | 4,654 | 1,838 | 1,802 | 2,441 |
| Oklahoma | 121,490 | 2,015 | 15,764 | 3,169 | 4,735 | 7,395 | 4,426 | 6,006 | 8,633 | 3,954 | 4,306 | 5,791 |
| Texas | 989,443 | 8,176 | 87,341 | 30,141 | 50,633 | 64,108 | 57,897 | 65,515 | 65,133 | 35,216 | 40,809 | 60,905 |
| **Rocky Mountain** | 411,658 | 6,201 | 20,777 | 6,775 | 25,136 | 22,459 | 10,204 | 21,262 | 27,901 | 13,284 | 24,895 | 26,911 |
| Colorado | 216,537 | 1,823 | 8,591 | 2,525 | 13,669 | 9,217 | 4,758 | 11,489 | 13,404 | 5,650 | 18,729 | 14,123 |
| Idaho | 47,189 | 2,168 | 203 | 783 | 2,811 | 4,897 | 1,410 | 2,605 | 4,043 | 1,336 | 1,180 | 2,404 |
| Montana | 29,885 | 1,232 | 1,342 | 1,055 | 1,930 | 900 | 582 | 1,631 | 2,199 | 1,333 | 901 | 1,493 |
| Utah | 90,778 | 551 | 2,377 | 1,163 | 5,292 | 7,086 | 2,736 | 4,599 | 6,762 | 3,362 | 3,654 | 8,161 |
| Wyoming | 27,269 | 428 | 8,265 | 1,250 | 1,434 | 360 | 748 | 938 | 1,493 | 1,603 | 431 | 731 |
| **Far West** | 2,238,377 | 32,880 | 22,607 | 32,359 | 111,412 | 139,660 | 75,911 | 125,733 | 156,286 | 59,051 | 136,703 | 159,203 |
| Alaska | 39,314 | 357 | 10,672 | 401 | 1,932 | 151 | 758 | 786 | 1,805 | 3,951 | 997 | 1,211 |
| California | 1,622,116 | 23,132 | 9,685 | 24,906 | 76,487 | 95,990 | 61,559 | 92,548 | 113,903 | 37,577 | 107,120 | 120,795 |
| Hawaii | 54,019 | 339 | 45 | 899 | 3,157 | 271 | 611 | 1,913 | 3,995 | 2,060 | 1,389 | 2,459 |
| Nevada | 111,342 | 233 | 1,757 | 1,808 | 10,639 | 2,720 | 1,382 | 4,313 | 8,382 | 3,383 | 2,509 | 10,308 |
| Oregon | 144,278 | 3,707 | 187 | 1,857 | 6,233 | 22,934 | 4,240 | 9,529 | 8,189 | 4,136 | 4,476 | 8,019 |
| Washington | 267,308 | 5,112 | 262 | 2,488 | 12,963 | 17,994 | 7,361 | 16,645 | 20,012 | 7,944 | 20,212 | 16,410 |

(d)  Data are suppressed to avoid disclosure of confidential information.

Source: U.S. Bureau of Economic Analysis

Table 3. GDP by State in Current Dollars, 2005 (continued)
[Millions of dollars]

| State and region | Real estate, rental, and leasing | Professional and technical services | Management of companies | Administrative and waste services | Educational services | Health care and social assistance | Arts, entertainment, and recreation | Accommodation and food services | Other services | Government |
|---|---|---|---|---|---|---|---|---|---|---|
| **United States** | 1,562,863 | 862,365 | 230,634 | 375,531 | 113,082 | 864,355 | 117,921 | 337,957 | 294,611 | 1,474,748 |
| **New England** | 97,800 | 58,454 | 14,557 | 18,248 | 13,533 | 58,838 | 5,996 | 17,029 | 14,810 | 66,017 |
| Connecticut | 26,906 | 14,281 | 5,732 | 5,104 | 2,833 | 14,691 | 1,833 | 3,527 | 3,939 | 17,244 |
| Maine | 6,062 | 2,110 | 393 | 1,017 | 443 | 4,825 | 399 | 1,417 | 1,033 | 6,415 |
| Massachusetts | 47,576 | 35,202 | 6,727 | 9,195 | 7,864 | 28,502 | 2,726 | 8,167 | 6,994 | 29,007 |
| New Hampshire | 8,322 | 3,349 | 781 | 1,430 | 960 | 4,547 | 461 | 1,640 | 1,308 | 5,030 |
| Rhode Island | 6,266 | 2,256 | 889 | 1,066 | 954 | 4,103 | 382 | 1,242 | 973 | 5,239 |
| Vermont | 2,667 | 1,276 | 35 | 436 | 478 | 2,170 | 194 | 1,035 | 563 | 3,083 |
| **Mideast** | 312,918 | 195,615 | 49,971 | 62,959 | 32,754 | 174,223 | 20,498 | 53,932 | 55,189 | 261,445 |
| Delaware | 6,077 | 3,609 | 2,219 | 1,016 | 263 | 2,951 | 374 | 883 | 977 | 4,859 |
| District of Columbia | 6,949 | 16,336 | 757 | 2,180 | 2,081 | 3,655 | 501 | 2,495 | 5,143 | 28,153 |
| Maryland | 38,119 | 25,154 | 1,518 | 7,455 | 3,005 | 18,032 | 1,842 | 6,849 | 6,383 | 40,911 |
| New Jersey | 69,515 | 35,770 | 9,242 | 13,804 | 3,694 | 30,661 | 3,805 | 10,888 | 9,125 | 44,228 |
| New York | 136,510 | 79,946 | 26,955 | 25,479 | 14,471 | 73,547 | 10,407 | 22,144 | 20,420 | 95,941 |
| Pennsylvania | 55,748 | 34,800 | 9,281 | 13,025 | 9,240 | 45,377 | 3,570 | 10,673 | 13,142 | 47,353 |
| **Great Lakes** | 211,389 | 117,387 | 42,814 | 53,815 | 53,816 | 135,480 | 16,549 | 41,270 | 44,290 | 192,585 |
| Illinois | 70,428 | 46,303 | 13,990 | 17,330 | 5,677 | 36,492 | 5,209 | 13,106 | 13,568 | 54,666 |
| Indiana | 22,627 | 9,110 | 2,602 | 6,192 | 1,773 | 17,422 | 3,215 | 5,247 | 5,658 | 23,274 |
| Michigan | 45,435 | 29,515 | 8,647 | 13,305 | 2,235 | 28,381 | 3,385 | 8,251 | 8,817 | 41,225 |
| Ohio | 47,594 | 23,516 | 12,890 | 12,324 | 3,226 | 35,326 | 3,193 | 9,831 | 11,155 | 49,128 |
| Wisconsin | 25,305 | 8,943 | 4,684 | 4,665 | 1,700 | 17,868 | 1,546 | 4,834 | 5,092 | 24,292 |
| **Plains** | 82,212 | 40,283 | 19,827 | 19,295 | 6,913 | 60,539 | 7,228 | 18,602 | 19,142 | 95,616 |
| Iowa | 10,385 | 3,472 | 867 | 2,238 | 973 | 7,898 | 1,211 | 2,308 | 2,537 | 13,503 |
| Kansas | 9,605 | 5,785 | 1,229 | 3,062 | 561 | 7,462 | 490 | 2,501 | 2,518 | 14,523 |
| Minnesota | 28,956 | 13,677 | 8,157 | 5,493 | 1,872 | 18,802 | 1,820 | 5,156 | 5,608 | 23,951 |
| Missouri | 21,958 | 12,500 | 8,006 | 5,869 | 2,590 | 16,270 | 2,692 | 5,739 | 5,438 | 25,377 |
| Nebraska | 6,352 | 3,237 | 1,147 | 1,758 | 588 | 5,214 | 395 | 1,480 | 1,698 | 10,503 |
| North Dakota | 2,143 | 827 | 199 | 412 | 107 | 2,194 | 123 | 600 | 591 | 3,751 |
| South Dakota | 2,813 | 785 | 222 | 465 | 222 | 2,699 | 298 | 820 | 752 | 4,007 |
| **Southeast** | 326,680 | 168,164 | 43,317 | 96,789 | 19,166 | 188,232 | 26,554 | 82,134 | 67,724 | 374,190 |
| Alabama | 14,219 | 6,556 | 1,141 | 3,624 | 700 | 10,809 | 568 | 3,484 | 4,018 | 22,975 |
| Arkansas | 7,854 | 3,263 | 1,797 | 1,759 | 365 | 6,593 | 377 | 1,950 | 1,938 | 11,523 |
| Florida | 110,650 | 41,517 | 9,009 | 36,060 | 4,487 | 48,379 | 11,052 | 25,289 | 18,133 | 75,691 |
| Georgia | 41,528 | 22,878 | 7,513 | 12,682 | 2,912 | 21,204 | 2,260 | 9,573 | 7,491 | 46,879 |
| Kentucky | 12,372 | 5,535 | 1,588 | 3,282 | 793 | 11,413 | 869 | 3,735 | 3,218 | 20,688 |
| Louisiana | 13,219 | 6,839 | 2,718 | 3,913 | 1,216 | 10,542 | 2,692 | 4,861 | 3,670 | 20,890 |
| Mississippi | 7,174 | 2,697 | 828 | 1,608 | 463 | 5,721 | 842 | 3,358 | 2,255 | 14,194 |
| North Carolina | 32,429 | 16,514 | 7,477 | 9,089 | 2,611 | 21,902 | 2,341 | 8,134 | 7,116 | 44,941 |
| South Carolina | 15,094 | 6,119 | 744 | 5,411 | 740 | 8,287 | 1,040 | 4,755 | 3,503 | 22,318 |
| Tennessee | 23,131 | 11,850 | 2,589 | 9,115 | 2,199 | 19,649 | 2,131 | 7,196 | 6,289 | 24,845 |
| Virginia | 44,280 | 40,329 | 7,533 | 9,134 | 2,421 | 18,699 | 1,849 | 8,335 | 8,813 | 60,236 |
| West Virginia | 4,729 | 2,067 | 378 | 1,111 | 258 | 5,034 | 533 | 1,463 | 1,280 | 9,010 |
| **Southwest** | 138,360 | 84,950 | 21,354 | 44,389 | 7,686 | 85,509 | 8,920 | 36,363 | 30,461 | 166,070 |
| Arizona | 30,352 | 12,130 | 2,285 | 9,714 | 1,546 | 14,873 | 2,026 | 7,166 | 4,331 | 26,006 |
| New Mexico | 6,580 | 4,503 | 327 | 1,892 | 320 | 4,458 | 420 | 1,962 | 1,432 | 12,872 |
| Oklahoma | 10,749 | 5,154 | 1,580 | 3,438 | 632 | 8,188 | 640 | 2,743 | 2,831 | 19,339 |
| Texas | 90,678 | 63,164 | 17,163 | 29,343 | 5,188 | 57,990 | 5,833 | 24,492 | 21,866 | 107,854 |
| **Rocky Mountain** | 51,645 | 30,444 | 5,702 | 11,645 | 2,633 | 24,524 | 4,608 | 11,709 | 10,031 | 53,079 |
| Colorado | 30,080 | 18,759 | 3,266 | 6,736 | 1,268 | 12,525 | 2,901 | 6,436 | 4,916 | 25,673 |
| Idaho | 5,688 | 3,338 | 685 | 1,352 | 262 | 3,113 | 381 | 1,174 | 959 | 6,397 |
| Montana | 3,448 | 1,424 | 63 | 606 | 119 | 2,674 | 397 | 994 | 770 | 4,823 |
| Utah | 10,239 | 6,163 | 1,608 | 2,485 | 929 | 5,091 | 747 | 2,271 | 2,940 | 12,563 |
| Wyoming | 2,190 | 760 | 81 | 296 | 55 | 1,120 | 183 | 834 | 447 | 3,624 |
| **Far West** | 341,859 | 167,068 | 33,091 | 68,560 | 15,785 | 137,010 | 27,567 | 76,919 | 52,966 | 265,747 |
| Alaska | 3,035 | 1,361 | 122 | 672 | 117 | 2,095 | 290 | 981 | 630 | 6,990 |
| California | 259,606 | 134,141 | 23,392 | 50,624 | 12,456 | 96,911 | 20,201 | 43,880 | 39,174 | 178,431 |
| Hawaii | 8,835 | 2,464 | 637 | 1,864 | 541 | 3,650 | 656 | 4,792 | 1,420 | 12,022 |
| Nevada | 14,184 | 5,511 | 2,726 | 3,504 | 260 | 5,473 | 3,143 | 16,589 | 1,912 | 10,607 |
| Oregon | 19,005 | 6,793 | 2,760 | 3,747 | 936 | 10,571 | 904 | 3,550 | 3,090 | 19,413 |
| Washington | 37,194 | 16,797 | 3,454 | 8,150 | 1,475 | 18,310 | 2,373 | 7,127 | 6,741 | 38,284 |

Source: U.S. Bureau of Economic Analysis

10

# EXHIBIT 15

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 16

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY